1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

CRYSTAL DAWN SMITH,            )
                              )
    Plaintiff,                )
                              )CASE NO.
vs.                           )5:22-cv-174-BJB-LLK
                              )
AARON ACREE, et al,           )
                              )
    Defendant.                )

_____

DEPOSITION OF CRYSTAL DAWN SMITH
_____

     The deposition of CRYSTAL DAWN SMITH, taken by the
Defendants pursuant to Notice on Friday, the November
22, 2024, at the hour of 10:13 a.m. at the law offices
of Keuler, Kelly, Hutchins, Blankenship & Sigler, 100
South 4th Street, Suite 400, in the City of Paducah,
County of McCracken, State of Kentucky, before me, Amy
S. Fleming, RPR, CSR, and Notary Public in and for the
Commonwealth of Kentucky at Large, to be used for the
purpose of discovery and/or evidence and all other
purposes allowed under the Federal Rules of Civil
Procedure.

_____

WEST KENTUCKY REPORTING SERVICE, INC.
-Registered Professional Reporters-
-Certified Shorthand Reporters-
125 Nahm Street, Suite 105
Paducah, Kentucky  42001
(270)443-9631
info@wkrsdepo.com

2

1                    A P P E A R A N C E S

2

FOR THE PLAINTIFF:

3
           MARILYN "LINSEY" SHREWSBURY
4          MARILYN SHREWSBURY ESQUIRE, PSC
           256 Commerce Street
5          P.O. Box 1226
           Eddyville, KY 42038
6          linsey@mlslawgroup.net

7

FOR THE DEFENDANT JAILER JAMES HUGHES:

8
           Stacey A. Blankenship, Esq.
9          KEULER KELLY HUTCHINS BLANKENSHIP & SIGLER, LLP
           100 South Fourth Street, Suite 400
10         Paducah, KY 42001
           sblankenship@kkhblaw.com

11

12  FOR THE DEFENDANT SHERIFF AARON ACREE:

13         Derrick T. Wright, Esq.
           STURGILL TURNER BARKER & MOLONEY, PLLC
14         333 West Vine Street, Suite 1500
           Lexington, KY  40507
15         dwright@sturgillturner.com

16

17  THE VIDEOGRAPHER:

18         Alan Jackson
           Ad-Vantage Multimedia
19         (270)519-4322

20

21

22

23

24

25

3

1    CRYSTAL DAWN SMITH                              PAGE

2    Direct Examination by Ms. Blankenship..........    5

3    Cross-Examination by Mr. Wright ..............   153

4    Cross-Examination by Ms. Shrewsbury ...........   207

5    Redirect Examination by Ms. Blankenship........   244

6    Recross-Examination by Mr. Wright.............   248

7

8    CERTIFICATE OF REPORTER.......................   255

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          E X H I B I T S

2    NUMBER                    DESCRIPTION                      PAGE

3     1        Kentucky Criminal History                        31
               Summary Report
4
      2        Walmart Pharmacy Records                          38
5
      3        Cadiz Pharmacy Records                            38
6
      4        Trigg County Primary Care                         45
7              Progress Notes  8/5/21

8     5        KYIBRS Report                                     59

9     6        Crime Report Supplement                           59

10    7        Photograph - trunk of car                         75

11    8        Photograph - trunk of car                         75

12    9        Christian County Jail                            118
               Sick Call Request From  1/11/22
13
      10       Medical Progress Note  1/12/22                   119
14
      11       Pennyroyal Center Medical Records               123
15
      12       Commonwealth's Offer on Plea of Guilty           135
16
      13       Medical Records                                  136
17             Health Frist CHC - Princeton

18    14       Plaintiff's Answers to Interrogatories           159

19

20

21

22

23

24

25

5

1          THE VIDEOGRAPHER:  We are now on the

2     record.  Would the court reporter please administer

3     the oath?

4                         *   *   *

5          The witness, CRYSTAL DAWN SMITH, first having

6     been duly sworn, was examined and testified as follows:

7                    DIRECT EXAMINATION

8     BY MS. BLANKENSHIP:

9       Q.   Ms. Smith, my name is Stacey Blankenship.

10    We met this morning for the first time.  And I

11    represent Jailer Hughes and Trigg County in a

12    lawsuit that you have filed.  And so I'm sure you

13    know we're here to ask you questions today.

14         Have you ever given a deposition before?

15      A.   No.

16      Q.   Okay.  Can you go ahead and state your name

17    for the record?

18      A.   Crystal Dawn Smith.

19         THE REPORTER:  I'm going to need you to

20    speak up.

21         MS. BLANKENSHIP:  Yeah, you'll have to

22    speak up --

23         THE WITNESS:  Okay.

24         MS. BLANKENSHIP:  -- just a little bit.

25         THE WITNESS:  Okay.  Sorry.

6

1    BY MS. BLANKENSHIP:

2        Q.    Okay.  Do you go by any other names?

3        A.    No.  Mom.

4        Q.    Have you ever -- have you ever gone by

5    another name?

6        A.    No.  Well, my previous married name.

7        Q.    Okay.  What was that?

8        A.    I was Choate.

9        Q.    Okay.

10       A.    Crystal Dawn Choate.

11       Q.    All right.  And what was your maiden name?

12       A.    Wilson.  So those three.

13       Q.    Okay.  All right.  So I'll just go over

14   briefly the rules for a deposition that -- you --

15   you understand that you've been put under oath?

16       A.    (Nods head affirmatively.)

17       Q.    Do you understand what that means?

18       A.    Yes.

19       Q.    Okay.  And are you aware that the penalty

20   of perjury in Kentucky is one to five years in

21   prison?

22       A.    No, but I am now.

23       Q.    Okay.  Do -- one of the -- there's a few

24   rules that are kind of easy, but at the same time

25   are violated often, so I'll have to probably remind

7

1    you, but it's okay.  It happens all the time.

2         If you could try to refrain from using the

3    words "uh-huh" and "uh-uh" and use the words "yes"

4    or "no."  It just makes it easier for us to read it

5    on the transcript later.

6         Also, make sure that you verbalize all of

7    your answers.  So instead of nodding your head --

8    A.    Shaking my head like -- okay, yes, got it.

9    Q.    Because, again, we're going to be reading a

10   transcript later, and we need to make sure that

11   we've got your answer, and we want to make sure

12   it's an accurate answer.

13        If you can try to make sure that we don't

14   talk over each other, I'll try to do the same.  So

15   if I ask my question, just let me finish it.

16   Sometimes people in normal conversation tend to

17   anticipate what the question's going to be and go

18   ahead and answer, and then that means you're

19   talking over me.  And it just makes it difficult

20   for the court reporter to get both of us down, so

21   just wait.  Even though you may know where I'm

22   going with it, just wait until I get my question

23   out, and then you can answer, and I'll do the same

24   thing for you.  And if for some reason I end up

25   asking -- going to another question and you're not

1    done with your answer -- sometimes people take a

2    pause, and I assume that they're -- they're done

3    with their answer and they're not.  Make sure you

4    tell me that so I can allow you to continue your

5    answer if you -- if you do have more to say.

6         We -- I typically try to take a break about

7    once an hour.  I imagine this deposition is going

8    to go longer than an hour for sure, probably

9    multiple hours.  But if for some reason you need to

10   take a break before I think about it -- and

11   sometimes I completely forget when I get to the --

12   I'm absorbed in whatever -- just let me know.  As

13   long as there is not a question on the table, I'm

14   happy to take a break.  If there's a question on

15   the table, I'll ask you to go ahead and answer that

16   question, and then we can take the break.

17        A.    Okay.

18        Q.    All right.  If I ask a question that either

19   is a bad question, which I can do, or I speak too

20   fast, which I also can do, and you just didn't

21   catch what I asked, ask me to either rephrase or

22   restate the question, and I will do so.  If you

23   answer the question, I'm going to assume you

24   understood what I asked.  Is that fair?

25        A.    Yes.

CRYSTAL DAWN SMITH

9

1    Q.   Okay.  Have you taken any drugs, alcohol,

2    medicines, anything that would affect your ability

3    to understand my questions today?

4    A.   No.

5    Q.   Okay.  What did you review in preparation

6    for your deposition, if anything?

7    A.   Just pretty much my statement.

8    Q.   Okay.

9    A.   My answers that I've answered before.

10   Q.   In this case?

11   A.   Yes.

12   Q.   Okay.  Did you review anything besides the

13   interrog- -- the answers to interrogatories?

14   A.   No.

15   Q.   Okay.  You didn't look at any photographs,

16   medical records, anything like that?

17   A.   No, I did not.

18   Q.   Okay.  I assume you met with your attorney

19   to prepare for today, and I don't want to know

20   anything about what you and your attorney spoke

21   about.

22        Did you meet with anybody else or talk to

23   anybody else about your preparation today?

24   A.   My husband.

25   Q.   Okay.  Do you recall what you said to your

1    husband or vice versa?

2        A.    Just general talking about today.

3        Q.    Okay.

4        A.    Just trying to get me through it.

5        Q.    Okay, I understand.

6              All right.  What's your current address?

7        A.    It's 1157 Tanyard Road, Cadiz, Kentucky.

8        Q.    All right.  And you're still speaking

9    really low, and I'm sure that --

10       A.    Oh, sorry.  I don't how to yell anymore.

11   It's something I don't do.  Sorry.

12       Q.    Okay, that's all right.  You don't have to

13   yell, but probably speak up just a little bit.

14       A.    Okay.  Is this better?

15       Q.    It's better.

16       A.    Okay.

17       Q.    Yes, yes.  I'll try to -- I'll try to

18   remind you if your voice gets down again so --

19       A.    Okay.

20       Q.    And is that where your mother lives?

21       A.    Yes.

22       Q.    Okay.  So you live with your mother?

23       A.    Yes.

24       Q.    All right.  Does your husband live with

25   your mother as well?

CRYSTAL DAWN SMITH

11

1       A.    Yes.

2       Q.    Okay.  And I had you living before that at

3    143 Cunningham Avenue.  Is that correct?

4       A.    Correct.

5       Q.    Why did you move from there to in with your

6    mother?

7       A.    I went to jail.

8       Q.    Okay.

9       A.    We lost the house.

10      Q.    Okay, all right.  Who else lives there

11   besides you and your husband?

12      A.    My daughter.

13      Q.    And what's your daughter's name?

14      A.    Alaya Michelle Pasek.

15            Do you need me to spell it?

16      Q.    Yes.

17      A.    It's A-L-A-Y-A.  And then Michelle.  Her

18   last name is Pasek, P-A-S-E-K.

19      Q.    Okay.  How old is she?

20      A.    She's 18.

21      Q.    All right.  And what's your mother's name?

22      A.    Peggy Darnell.

23      Q.    Okay.  And your husband's name?

24      A.    Timothy Smith.

25      Q.    Okay.  Anyone else live with you there?

CRYSTAL DAWN SMITH

12

1      A.    No.

2      Q.    Okay.  Anyone else that you have relatives

3   of in western Kentucky with last names besides what

4   you just listed, Smith, Darnell, Pasek?

5      A.    My mom's maiden name is Puckett, so I guess

6   there's some Pucketts.

7      Q.    Okay.

8      A.    I was trying to think outside that box.

9      Q.    Right.

10     A.    Yeah, that's probably about it.

11     Q.    Do you have any siblings that live --

12     A.    Oh, and my daughters, they have different

13   last names.

14     Q.    And they're above the age of 18?

15     A.    Yeah.

16     Q.    All right.  Yeah, go ahead and give me

17   their names then.

18     A.    There is -- my oldest one is 28.  Her

19   name's Alyssa.  Her last name right now is Beach.

20   It's her marriage name, though.

21     Q.    Beach?

22     A.    Yes.  Her maiden name was Choate.

23     Q.    Okay.

24     A.    My other daughter is 24.  Her last name is

25   Cunningham.

1    Q.   Okay.

2    A.   Okay.

3    Q.   All right.  Is that all of your children --

4    A.   Yes.

5    Q.   -- above the age of 18?

6    A.   Yes.

7    Q.   Okay.  And you said you did or did not have

8    siblings?

9    A.   I have a sibling but not in Kentucky.  She

10   lives in Washington state.

11   Q.   Okay.  Any other relatives you can think

12   of?

13   A.   No.

14   Q.   All right.  What about friends?  Do you

15   have any friends that you hang out with or go to

16   dinner with or go over to their house or anything

17   like that?

18   A.   Not at the moment, no.

19   Q.   Okay.  What about in the past?

20   A.   Not that I can recall at the moment of who

21   I hung out with.

22   Q.   Okay.

23   A.   I mean, that was like prior to me being in

24   active addiction and all that stuff, so, no I

25   don't --

1      Q.    Okay.  Have you resided in any other states

2   besides Kentucky?

3      A.    Yes.

4      Q.    Where?

5      A.    I lived in Tennessee.

6      Q.    All right.  Where did you live in

7   Tennessee?

8      A.    In Clarksville.

9      Q.    Were you born and raised in Kentucky or

10  Tennessee?

11     A.    Kentucky.

12     Q.    Okay.  What is your date of birth?

13     A.    It's XXXX XX, XXXX?

14     Q.    All right.  Do you attend a church?

15     A.    I do.

16     Q.    What's your church?

17     A.    I go to Hilldale Baptist Church in

18  Clarksville.

19     Q.    Hilldale?

20     A.    Yeah.  That's where I'm still a member

21  at --

22     Q.    Okay.

23     A.    -- but we don't go every Sunday because

24  it's a trip, you know, to get there.

25     Q.    Right.  Have you gone to any other

15

1    churches?

2        A.    I have.  A church in Cadiz.  It's The

3    Missionary Church, I think is what it's called.

4        Q.    Okay.

5        A.    My daughter goes there with her

6    boyfriend so --

7        Q.    Okay.  What's her boyfriend's name?

8        A.    His name is -- sorry.  Cameron.  And I'm

9    trying -- I'm sorry.  I just lost my train of

10   thought --

11       Q.    Oh, you're fine.

12       A.    -- because I didn't know that was going to

13   be a question.

14       Q.    Yeah.

15       A.    He works for Trigg County, so that's why

16   I'm trying to --

17       Q.    He does work for Trigg County?

18       A.    Yeah.  He works for the court so -- what is

19   his last name right now?

20       Q.    Okay.  That's okay.

21       A.    Just come back to me about that one.

22   Sorry, I just totally lost my train of thought.

23       Q.    That's all right.  If it clicks with you

24   while we're later talking, just let me know.

25       A.    Yeah, okay.

CRYSTAL DAWN SMITH

16

1     Q.    What are your other daughters' spouses'

2   names?

3     A.    Well, my daughter who's 24, Alayna, she has

4   a boyfriend.  His name is Nick, and I actually

5   don't even know what his last name is at this

6   present moment.

7     Q.    Okay.

8     A.    I should know it but -- sorry.

9     Q.    That's okay.  And your oldest daughter

10  is --

11    A.    I'm actually just nervous.  I'm just, like,

12  forgetting those little things.

13    Q.    You're fine.

14    A.    Okay.  What's the other question?

15    Q.    The oldest daughter, what's her name?

16    A.    Alyssa.

17    Q.    I'm sorry.  I mean to ask:  Does she have a

18  boyfriend, or is she married?

19    A.    That's the one I was talking about, Alyssa.

20    Q.    Okay.

21    A.    Her boyfriend's name is Cameron.

22    Q.    Did you say you had someone that was 28?

23    A.    That's Alyssa.

24    Q.    Okay.  I'm sorry.

25    A.    I have Alyssa, who's 28.

CRYSTAL DAWN SMITH

17

1      Q.    Yeah.

2      A.    Alayna is 24, and Alaya is 18.

3      Q.    And Alaya, does she have a boyfriend or --

4      A.    No.

5      Q.    -- married or anything?  Okay.

6      A.    No.

7      Q.    Do you belong to any clubs or

8   organizations?

9      A.    No.

10     Q.    Have you ever?

11     A.    No, not that I -- just church stuff.

12     Q.    Okay.  What about ever been a member of a

13  union?

14     A.    No.

15     Q.    Ever been in the military?

16     A.    No.

17     Q.    What's the highest grade you've achieved?

18     A.    I dropped out when I was a junior, and I

19  got my GED.

20     Q.    Okay.  Do you have any college beyond GED?

21     A.    I went to Hopkinsville Community College

22  for maybe about six months.

23     Q.    Okay.  Any other schooling?

24     A.    No.

25     Q.    Okay.  And are you currently employed?

18

1      A.    Yes.

2      Q.    Where are you employed?

3      A.    I work at JTEKT in Hopkinsville.

4      Q.    Okay.  And what do you do there?

5      A.    I am a team leader.

6      Q.    And what does JTEKT do?

7      A.    We make car steering wheels, car steering

8   columns.

9      Q.    Okay.

10      A.    Holds the steering wheel.

11      Q.    Okay.  And so you're a team leader there?

12      A.    Uh-huh (affirmative).

13      Q.    How long have worked there?

14      A.    I started in September of 2022.

15      Q.    Okay.

16      A.    So a little over two years.

17      Q.    Okay.  And so I've got you, from your

18   interrogatories, saying that you've been working at

19   Douglas Autotech --

20      A.    That's the same.

21      Q.    It is the same?

22      A.    They changed their name, yeah.

23      Q.    Okay.

24      A.    That's correct.

25      Q.    Who's your supervisor?

19

```
 1      A.    His name is Andre Wright.

 2            THE REPORTER:  Say that again.

 3            THE WITNESS:  Andre Wright.

 4      A.    That's his -- yeah, that's my supervisor.

 5      Q.    And is September 2022 about when you --

 6            This incident happened in 2022, right?

 7      A.    What incident?

 8      Q.    The incident we're here to talk about

 9   today.

10      A.    It happened in January.

11      Q.    January of 2022 --

12      A.    Yes.

13      Q.    -- right?

14      A.    No, no, no, no.  It --

15      Q.    2021?

16      A.    -- happened January 2022, yes.  Sorry.

17      Q.    It was 2022?

18      A.    Yes.

19      Q.    You got me confused.

20      A.    Okay.  When you said September, it

21   was making me think of -- I lost my son in

22   September of 2021.

23      Q.    21?

24      A.    Yeah.

25      Q.    Okay.
```

1       A.    I didn't know which one you were talking

2   about.

3       Q.    So September 2022 is about when you got out

4   of jail, correct?

5       A.    I got out in August.  No, no, no.  I --

6       Q.    You went to rehab --

7       A.    I went to rehab --

8       Q.    -- in July.

9       A.    -- for 28 days.

10      Q.    Uh-huh.

11      A.    So I was released from jail in July.  I

12  went to the rehab.  I got out in August.  I think

13  it was August the 20th is when I left Genesis.

14      Q.    Okay.  So about three weeks later you got

15  this job --

16      A.    Yeah.

17      Q.    -- and you've had it since?

18      A.    Yeah.

19      Q.    Okay.  Where did you work before then?

20      A.    I worked at Harper House for about two to

21  three years prior to losing my son.  So --

22      Q.    Okay.

23      A.    -- I think the last time I worked there was

24  April of 2021st -- 2021.

25      Q.    2021?

21

1      A.    Uh-huh (affirmative).

2      Q.    Okay.  And why did you quit in April of

3    2021?

4      A.    Well, there was the COVID that was going

5    on, and it was just really -- we were shut down for

6    about six months or so.  And so when I went back,

7    everything was just kind of chaotic, and I just

8    stopped working --

9      Q.    Okay.

10      A.    -- so --

11      Q.    All right.  And did you look for another

12    job between April of 2021 and when your -- your son

13    died in September of 2021?

14      A.    No, I did not.

15      Q.    And what was your job title there?

16      A.    I was a server.

17      Q.    Okay.  Who was your supervisor?

18      A.    I don't remember who my supervisor was, but

19    Nelson Green was the owner.

20      Q.    Okay.

21      A.    So...

22      Q.    And before that, where did you work?

23      A.    I worked -- before that I worked at Texas

24    Roadhouse.

25      Q.    Okay.

1      A.    I worked at Liberty Park Grill for about

2    five years before Texas Roadhouse.

3      Q.    Okay.

4      A.    They're in Clarksville, by the way.

5      Q.    Okay.  Both the Texas Roadhouse and Liberty

6    Park Grill are in Clarksville?

7      A.    Yes, correct.

8      Q.    So I have you working at -- beginning to

9    work at Liberty Park Grill in 2013.  I don't have

10   any employment history for you prior to that in

11   your interrogatories.

12         Do you recall where you worked before that?

13     A.    Yeah.  I worked at Golden Rule Smoke House

14   Grill.

15     Q.    What was -- what's the name?

16     A.    It's Golden Rule Smoke House Grill.

17     Q.    Okay.

18     A.    They closed down.  And when they closed

19   down, that's when I stopped working.

20     Q.    Okay.  Anything before that that you

21   remember?

22     A.    Before that, I was in Cadiz.  I worked at

23   Flynn's.

24     Q.    Flynn's?

25     A.    It's a factory.  Yeah.

CRYSTAL DAWN SMITH

23

1      Q.    Okay.  What does Flynn's do?

2      A.    They make jeans.  They did.  I don't --

3      Q.    Okay.

4      A.    -- know what's going on with them today.

5      Q.    Okay.

6      A.    Yeah.

7      Q.    Anything before that?

8      A.    I worked at Elk Brand.

9      Q.    Okay.

10     A.    It's a factory.

11     Q.    Okay.

12     A.    In Cadiz.

13     Q.    Okay.

14     A.    And I probably had a few little jobs in

15   between, little restaurants.  I don't remember them

16   all --

17     Q.    Okay.

18     A.    -- because I probably was just there for a

19   few months or something.

20     Q.    Okay.

21     A.    But I've always had a job.

22     Q.    Okay.  Except for April 2021?

23     A.    Exactly.

24     Q.    And then until you went to work in

25   September of 2022?

24

1      A.    Exactly.  The only other time I did not

2   have a job is when I had my son.  I stayed at home

3   with him for two years.

4      Q.    Okay.

5      A.    So -- and that was when I worked at Liberty

6   Park Grill.  So I stopped working for about -- no,

7   no, no.  Golden Rule Smoke House Grill.  Sorry.

8      Q.    Okay.

9      A.    I got it confused, yeah.

10     Q.    Okay.  All right.  Have you ever been

11  terminated by an employer?

12     A.    I don't think so, no.

13     Q.    Okay.  And you weren't working when the

14  incident we're here to talk about today.  You told

15  me that in April of '21 you quit your job.  I

16  know -- I know you lost your son in September of

17  '21.

18         What was the reason why you weren't working

19  in January of 2022?  Do you know?

20     A.    You mean when --

21     Q.    When this incident happened.

22     A.    -- this happened?

23     Q.    Yes.

24     A.    I was not going to try to go back to work

25  during that time whatsoever because of my addiction

25

1    that I was having and me losing my son.

2        Q.    Okay.

3        A.    So I had no desire.

4        Q.    Okay.  So you've mentioned your addiction a

5    couple of times.  What were you addicted to?

6        A.    Heroin.

7        Q.    For how long?

8        A.    It got bad when I lost my son, so we lost

9    him in September.  So up until I went to jail, it

10   was extremely bad.

11       Q.    Okay.

12       A.    Before that, it was -- I actually started

13   using pills, but it was not -- it wasn't nothing

14   that was -- like, I was getting help for it.  When

15   I lost him, I didn't care.

16       Q.    Okay.  I saw somewhere in your records

17   where you told, I think, a counselor that you had

18   been using heroin for about four to five years when

19   you got arrested.

20       A.    No.

21       Q.    Would that be true?

22       A.    No.  That's not correct --

23       Q.    Okay.

24       A.    -- whatsoever.

25       Q.    Okay.  So you're saying that you didn't

26

1    start using heroin until --

2         A.    There was a time period in 2019 where, when

3    I did start using opiates, I did start using --

4    also we went to heroin.  And then I got clean, and

5    I was clean for over a year and a half --

6         Q.    Okay.

7         A.    -- until my stepfather passed away.

8    Actually, he got sick.  He passed away after my

9    son.  He got sick with cancer, and that's when I

10   started playing around with it, I guess you would

11   say.  I mean, I guess that's not the right thing to

12   say, but, you know, it wasn't extreme so --

13        Q.    When -- when did your stepfather get

14   diagnosed with cancer?

15        A.    Let's see.  We lost him a month after

16   Cameron, so about a year prior.  No, no, no.  It

17   was maybe spring.  Yeah, it was probably about

18   spring of that year.

19        Q.    Spring of 2022?

20        A.    2021.

21        Q.    2021?

22        A.    Correct.  Yeah, that's when it was.

23        Q.    Have you ever sued anyone before?

24        A.    No.

25        Q.    Okay.  So there's a couple of -- there's a

27

1    case in McCracken County -- and it's probably not

2    you, but I just want to ask -- against -- it's

3    called Crystal Smith versus Michael Kepner,

4    k-E-P-N-E-R?

5        A.    I don't know who that is.  And I've never

6    been to McCracken -- I guess that's here, Paducah?

7        Q.    That's here, right.

8        A.    Okay.  I think I've been here to go

9    shopping.  That's about it.

10       Q.    Okay.  You've -- you have been sued before

11   by -- for collections issues, correct?

12       A.    Money?  Like credit cards?

13       Q.    Right.

14       A.    I guess.  I'm not --

15       Q.    You don't know?  I've got -- I've got a

16   lawsuit against you by the Trigg County Primary

17   Care.  Do you know about that?

18       A.    I didn't even know anything about it.

19       Q.    Okay.  One by OB-GYN Associates, that would

20   be in 2019.

21       A.    Which county?

22       Q.    Christian County.

23       A.    I didn't know anything about it.

24       Q.    Okay.

25       A.    I was not living in Kentucky at that time

1    so --

2        Q.    So -- oh, okay.  Did you ever go to OB-GYN

3    Associates in Christian County?

4        A.    I actually don't think so.  My OB-GYN was

5    in Tennessee.

6        Q.    Okay.

7        A.    Her name was Lisa McIntosh.  I went to her

8    for over ten years.

9        Q.    Okay.  So that may not be you.

10            Did you go to Trigg County Primary Care in

11    Trigg County?

12       A.    There was a few times after I moved here,

13    yes.

14       Q.    Okay.

15       A.    I always had state insurance at the time.

16       Q.    What about a lawsuit by Bank of Cadiz in

17    2003?  Know anything about that?

18       A.    No.

19       Q.    Did you ever bank at the Bank of Cadiz?

20       A.    I did.  I think we got a car from them --

21       Q.    Okay.

22       A.    -- a loan so -- but I don't recall.

23       Q.    Okay.  First Resolution Investment, does

24    that sound familiar?

25       A.    It sounds like it has to do with a car --

1      Q.    Okay.

2      A.    -- if I remember correctly but --

3      Q.    All right.  And then you -- you've been

4   involved in a divorce before, right?

5      A.    Yes.

6      Q.    Okay.  And it looks like that was a 1999

7   case.

8      A.    Yes.

9      Q.    Would that be correct?

10      A.    That's about right.

11      Q.    I also have you in 2010 filing a petition

12   for an EPO against a Danny Beasley?

13      A.    Don't know who that is.

14      Q.    Okay.  So that may be somebody -- it says

15   Crystal Choate.

16      A.    I was a Crystal Choate, but I don't --

17      Q.    Don't know who that is?

18      A.    Huh-uh (negative).

19            There must be a lot of Crystals.

20      Q.    Okay.  Do you know a Wallace Earl Choate?

21      A.    That was my first husband.

22      Q.    Okay.  And do you -- were you aware that he

23   had filed a case -- an EPO against you in 2008?

24      A.    Yes.

25      Q.    Okay.

1     A.   I don't -- I didn't know anything about an

2   EPO, but I knew he went to court over some stuff,

3   yeah.

4     Q.   What do you remember about that?

5     A.   He just got upset because, I guess, my

6   daughter wanted to live with me more.

7     Q.   Okay.

8     A.   I don't know.  I don't remember.  It was a

9   long time ago.

10    Q.   Yeah, it's 2010 -- or 2008, sorry.

11         Have you ever had to testify in court

12   before?

13    A.   The only time I ever probably did was to

14   take over when I got custody of my 28-year-old --

15    Q.   Okay.

16    A.   -- when she was a teenager so --

17    Q.   Okay.  Do you have social media accounts?

18    A.   Yes.

19    Q.   Have you ever posted about anything we're

20   here -- this incident we're here to talk about

21   today?

22    A.   No.  I do not talk about it to very many

23   people, so no.

24    Q.   Okay.  You are a convicted felon.  Is that

25   correct?

31

1      A.    Yes.

2      Q.    Okay.

3            (Defendants' Exhibit Number 1 marked for

4      identification by the reporter.)

5  BY MS. BLANKENSHIP:

6      Q.    All right.  So we've had your criminal

7      history from Kentucky marked as Exhibit 1.  And I'm

8      not going to belabor a lot of it.  I know we're

9      here to talk about the first few things on there,

10     and we'll get to those later.

11           I do have you on -- do you see page 3

12     there?  If you want to look in the bottom

13     right-hand corner.  Looks like in 2014 you had

14     operating on a suspended, license to be possession,

15     failure of owner to require -- to maintain required

16     insurance, and reckless driving charges.

17           Do you remember that?

18     A.    I do.

19     Q.    Okay.  Looks like that you ended up getting

20     your suspended license amended down to license not

21     in possession.  And then you pled guilty to that

22     and no insurance and reckless driving?

23     A.    Correct.

24     Q.    Okay.  The next page, in 2012, it looks

25     like you got charged with criminal trespass, first,

1    and pled guilty to that and received a 30-day

2    suspended -- well, why can I not think of the word?

3        A.    Is this in Kentucky?

4        Q.    Yes.

5        A.    Okay.  Yes.

6        Q.    Sentenced to 30 days, suspended sentence.

7    Is that right?

8        A.    That's right.

9        Q.    Okay.

10        A.    That's correct.

11        Q.    All right.  And then you got 24 months'

12    probation.

13        A.    I don't really remember being on probation,

14    but I do remember this.

15        Q.    Okay.  Can you tell me a little bit about

16    that trespass charge?

17        A.    I went to go pick up my daughter from my

18    ex-husband, and they filed trespassing charges on

19    me.  They were mad for me to come pick her up.  She

20    called me, and I went to pick her up.  That's about

21    it.

22        Q.    Did you go into the house or something, and

23    is that why that they charged you?

24        A.    I did go into the house to get her stuff --

25        Q.    Okay.

33

1      A.    -- that we bought her.

2      Q.    Okay.  Page 6, I've got a no-insurance --

3   looks like it got dismissed -- and theft by

4   deception, cold checks, which you pled guilty to

5   and received a 30-day suspended sentence.

6          Do you remember that?

7      A.    I don't remember this.

8      Q.    That was in 2003?

9      A.    I don't remember if it --

10     Q.    All right.

11     A.    It was so long ago.  I don't -- I could

12  have been trying to pay a car payment.  I don't

13  know.

14     Q.    Okay.

15     A.    I don't remember.

16     Q.    You don't dispute that it's -- this is

17  true.  You just don't remember it?

18     A.    I just don't recall.

19     Q.    Okay.  And then when I asked you earlier if

20  you were a convicted felon, that's in relation to

21  the charges that you got charged with concerning

22  the incident we're here to talk about today.

23     A.    Correct.

24     Q.    Okay.  On the trespass charge from -- that

25  we talked about a minute ago, it said you were

34

1    ordered not to contact Carla Ledford-Choate.   Who

2    is that?

3        A.   It was her stepmother.   It is her

4    stepmother.

5        Q.   Okay.   Now, I also saw in your

6    interrogatories, you said that you had been charged

7    with misdemeanor assault in 2015 and in '18 as

8    well, but both were dismissed.   Is that correct?

9        A.   That's correct.

10       Q.   Okay.   And they're not on your record

11   because I think you said that they were expunged?

12       A.   All of that stuff should have been, yes.

13       Q.   Okay.   Did they get dismissed?

14       A.   Yes.

15       Q.   Okay.   Or did you plead guilty and get a

16   diversion?

17       A.   They -- they wanted them dismissed.

18       Q.   Who's "they"?

19       A.   My husband, because that's who it was

20   against.

21       Q.   Okay.   Well, the -- so your husband brought

22   assault charges against you?

23       A.   Somewhat, yeah.

24       Q.   Somewhat?

25       A.   I mean, he made a charge, yeah.   When the

35

1    cops were called, he -- yeah, he made a statement.

2        Q.    Okay.  And this is 2015 and again in 2018.

3        A.    Yeah.  It was -- his sister was in two

4    thousand -- he was in 2015.  His sister was in

5    2018.

6        Q.    Okay.  And that's Tim?

7        A.    Uh-huh (affirmative).

8        Q.    Okay.

9        A.    That's correct.

10       Q.    And what's his sister's name?

11       A.    Ida.

12       Q.    What's her last name?

13       A.    It's right now Page.  No, no, no.  It's

14   Odom.

15       Q.    What is it?

16       A.    She's changed it a few times.

17             It's Ida Odom.  It's O-D-E-M.  I think

18   that's her last name at --

19       Q.    Okay.

20       A.    -- the present moment.

21       Q.    Does she live in western Kentucky?

22       A.    She lives in Tennessee, in Clarksville.

23       Q.    Okay.  Does your husband -- I didn't have

24   any -- I didn't ask that -- any siblings or

25   relatives, parents, that live in western Kentucky?

1      A.   No.

2      Q.   Okay.  All right.  I do have to ask you

3   just a little bit.  And I'm sorry I do have to do

4   this, but it's kind of part of the case anyway or

5   at least leading up to the incident.  I'm sure

6   you've been told we're going to have to talk a

7   little bit about it.

8      A.   My son?

9      Q.   Your son, yeah.  Can you tell me what

10  happened?

11     A.   It was a gun accident.

12     Q.   Okay.

13     A.   I don't know what else we really need to

14  talk about.

15     Q.   Okay.  Well, did he -- was he touching the

16  gun when it went of, or do you know?

17     A.   I wasn't there.

18     Q.   You don't know?

19     A.   So -- but it was a gun accident.  I'm sure

20  that's what happened.

21     Q.   Okay.  And how old was he?

22     A.   Eleven.

23     Q.   All right.  And you found him, I

24  understand?

25     A.   Yes.

1      Q.    Okay.   And I'm so sorry.   I can't imagine

2    the horror that would be.   But unfortunately like I

3    said, I feel like I have to at least know about it

4    because it does play into your mental health, I

5    assume, correct?

6      A.    Of course.

7      Q.    Yeah, right.   So -- and since we're here to

8    talk a little bit about your mental health, I do at

9    least have to ask you those questions.

10          Whose gun was it?

11     A.    My husband's or mine.   We had -- there was

12   two, so one -- they were supposed to be put in the

13   safe.

14     Q.    Okay.

15     A.    I had one that was put up for me that was

16   for protection.   We just moved so -- and I think

17   the safe broke.   Sorry.   I try not to remember this

18   stuff.

19     Q.    I understand.

20     A.    And I guess it was moved.   And he went

21   downstairs.   I thought he was going downstairs to

22   watch TV because we just had the TV hooked up

23   downstairs.   Little did I know.   I guess he was

24   just being a nosey little boy so --

25     Q.    Right, yeah.

38

1      A.    That's about all I can --

2      Q.    Okay.  All right.  Let's talk a little bit

3   about your mental health history.

4           MS. SHREWSBURY:  Can we take a break?

5           MS. BLANKENSHIP:  You need a break?  Sure.

6           THE VIDEOGRAPHER:  We are now off the

7   record.

8           (A brief recess was taken.)

9           THE VIDEOGRAPHER:  We're back on the

10  record.

11          (Defendants' Exhibit Numbers 2 and 3 marked

12     for identification by the reporter.)

13  BY MS. BLANKENSHIP:

14     Q.    All right.  So we've had -- I've had your

15  prescription medication list from Walmart marked as

16  Exhibit 2.  And I see that it looks like since

17  about 2008 -- well, these records only go up to

18  2017.  You took alprazolam.  Do you know what that

19  is?

20     A.    Is it Valium?  Is that what --

21     Q.    It's Xanax?

22     A.    That's correct.

23     Q.    Okay.  Can you tell me why from 2009 until

24  at least 2017 -- that's these records -- you

25  would -- you needed Xanax?

39

1      A.    I had anxiety.

2      Q.    Okay.

3      A.    That's about it.

4      Q.    And I do see where you were diagnosed with

5   anxiety disorder?

6      A.    Yeah.

7      Q.    And so that's -- that's the reason why.

8           Is there anything that you attributed your

9   anxiety to, or is it just nothing to attribute it

10  to?  Some people just have anxiety.  Some people

11  say, Oh, it was because this incident that caused

12  me to develop that, but --

13     A.    I don't really recall.  I just know my

14  anxiety was pretty bad off and on.

15     Q.    Okay.

16     A.    So --

17     Q.    All right.  I also saw where you'd been

18  prescribed something called -- I will always

19  butcher these names -- bupropion.

20     A.    Wellbutrin.

21     Q.    And it's Wellbutrin, yes, exactly.

22     A.    That's --

23     Q.    Tell me what that's for.

24     A.    It was for depression.

25     Q.    Okay.  And tell me about that.  What -- do

1    you have any --

2        A.    I was --

3        Q.    -- triggering event for that?

4        A.    I was prescribed that for, like, a year or

5    two before I had my son, so -- and it was just -- I

6    really don't remember too much about it.  So I

7    think that they were trying to actually prescribe

8    it to me for something else too.  It could have

9    been like -- I'm not really for sure.  I think

10   Dr. McIntosh prescribed that to me.

11       Q.    Okay.

12       A.    I think.  I could be wrong but --

13       Q.    Let's see what I've got here.  I have got

14   Dr. Clardy prescribing that.  Do you know who

15   Clardy is, John Clardy?

16       A.    Yes, that's the person -- same person who

17   prescribed me my Xanax.  Yes --

18       Q.    Okay.

19       A.    -- you're right.

20       Q.    All right.  Are you saying that you only

21   took that for about a year or so?

22       A.    Yeah, it wasn't very long.

23       Q.    Okay.  Then the next exhibit is going to be

24   from -- which we've had marked as Exhibit 3, and

25   it's from Cadiz Pharmacy.  And that one shows that

41

1    in 2013 you were -- you were prescribed lorazepam,

2    and that's also an anxiety medication.

3        A.    Okay.

4        Q.    It looks like that you only had one dose of

5    that -- or one prescription for that.

6        A.    Okay.

7        Q.    Well, actually, my record -- my notes say

8    that it looks like you had it -- you took it from

9    '09 until about 2013.

10          Do you remember taking that at all?

11       A.    It's -- I mean, I know I was prescribed

12   with Valium or Xanax, one of them, for a few years.

13       Q.    Okay.

14       A.    So --

15       Q.    All right.  Did you have any major physical

16   illnesses or injuries prior to January 11, 2022?

17       A.    No, I did not.

18       Q.    Okay.  Any surgeries, anything like that?

19       A.    Just having my babies, C-sections.

20       Q.    Okay.  Any mental health besides what we've

21   talked about being diagnosed with anxiety and

22   depression?

23       A.    I never was -- I mean -- I'm sorry.

24       Q.    No, go ahead.

25       A.    I never was diagnosed with depression.

42

1      Q.    Okay.

2      A.    He was trying to help me with, I guess, a

3   coping mechanism maybe through my anxiety.  I mean,

4   I don't --

5      Q.    Okay.

6      A.    But I wasn't diagnosed it.

7      Q.    Okay.  Did you ever have any mental health

8   treatment besides prescription medications?

9   Like -- and I know that eventually after the

10  incident you did have in-house treatment for

11  substance abuse, which, also, obviously dealt with

12  your mental health as well.

13         But I'm talking about prior to the

14  incident, did you ever have any mental health

15  treatment besides your prescription medications,

16  like see a counselor, a psychologist, psychiatrist,

17  anything like that?

18     A.    No.  Not really, no.  I'm just -- one time

19  I did go to Pennyroyal, like, for one visit or

20  something, and that's all I can recall.

21     Q.    Okay.  And at some point in time, you -- I

22  believe you said that you got clean off of heroin

23  for about a year and a half?

24     A.    Correct.

25     Q.    Was that -- were you able to do that

43

1    through your -- just yourself, or did you --

2        A.    I did it all on my own.

3        Q.    Okay.  You -- so the time that you ended up

4    being into -- in in-house substance abuse treatment

5    after the incident was the first time that you ever

6    had any treatment for substance abuse?

7        A.    That is very true.

8        Q.    Okay.  What about alcohol?  Was alcohol

9    another substance that you used to -- that you felt

10   like you had an issue with?

11       A.    No, never.

12       Q.    So I have you eventually taking Lexapro.

13   Looks like maybe around 2019 that you got changed

14   over from one medication to Lexapro for anxiety as

15   well?

16       A.    No.  Actually, I was prescribed Lexapro

17   because I started going through menopause.

18       Q.    Okay.

19       A.    So --

20       Q.    Okay.  And so they gave you Lexapro for

21   your menopause symptoms?

22       A.    Exactly.  Because I was having issues with

23   just different things that happen through

24   menopause, and she was just trying to help it.

25   That has to do with anxiety and -- yeah.

44

1      Q.    Okay.  Because my research of...

2      A.    That's what Dr. McIntosh did, prescribed me

3  the Lexapro because I started going through

4  menopause --

5      Q.    Okay.  Because my research --

6      A.    -- and the symptoms I have something.

7      Q.    Sorry.  My Lexapro -- my research with

8  Lexapro indicates it's a treatment for anxiety, but

9  you're saying the anxiety was related to your

10  menopause?

11      A.    Correct.

12      Q.    Okay.

13      A.    That's what she said.

14      Q.    All right.

15      A.    I had trouble, like, with the social part

16  of it where I would go into Walmart and I

17  couldn't -- like, didn't want to go there because

18  I -- the social.  So she felt like the Lexapro

19  would help me with that.

20      Q.    Okay.  And this would be in the 2019 time

21  frame?

22      A.    That's correct.

23      Q.    Okay.  And then it looks like in

24  August 5th, 2021, you switched to a Jeanine

25  Evans?

45

1      A.    What year?

2      Q.    '21.

3      A.    That's when I -- I think I seen Evans

4    before then, but that's when I moved back to Cadiz.

5      Q.    I see.

6      A.    Because before I was living in Tennessee.

7            (Defendants' Exhibit Number 4 marked for

8    identification by the reporter.)

9  BY MS. BLANKENSHIP:

10     Q.    Okay.  So I've had a medical record dated

11   August 5th, 2021, marked as Exhibit 4.  And the

12   facility was Trigg County Primary Care, and Jeanine

13   Evans was the -- the medical professional you saw,

14   apparently.

15           So under -- do you see under Constitutional

16   there?

17     A.    I need my reading --

18     Q.    Let's start out with the top.  You see --

19     A.    Sorry.

20     Q.    -- in the middle of the page there's

21   "Reason for Appointment."  And it says, "Discuss

22   meds."  Do you see that, the very top, middle of

23   the page?

24     A.    I see about the current medication, surgery

25   history.

1    Q.   Go over to the middle of the page.

2    A.   Oh, the middle.

3         MS. SHREWSBURY:  You're looking at

4    Constitutional?

5    A.   Okay, I got it.

6    Q.   Yeah.  Let's look at Constitutional, if you

7    can.

8         It says, "Patient presents to establish

9    care.  Patient has issues with anxiety and

10   depression that she takes Lexapro 20 milligrams

11   daily."

12        Would you agree that you were being treated

13   at that time for anxiety and depression?

14   A.   No, I don't actually agree with that.  I

15   know that I just kept taking my Lexapro.  Like, she

16   just, like, probably went ahead and gave me my

17   Lexapro from when we left off in Tennessee.

18   Q.   Okay.

19   A.   I don't know why it says even -- I mean, it

20   might have been for anxiety because that's what

21   they always try to say.

22   Q.   On the depression screening, which is right

23   above, it said, "Feeling down, depressed, or

24   hopeless?"  And the answer is "Several days."

25        Do you remember that?

1       A.   I don't remember.  I mean, I know sometimes

2   when you go in, you have to do a survey.  I was

3   just -- I don't really recall it.

4       Q.   Okay.  And then underneath Assessments at

5   the very bottom of the page, she said, "Adjustment

6   disorder with mixed anxiety and depressed mood."

7       A.   So what -- what day was this?  I'm just

8   curious.

9       Q.   August 5th, 2021.

10      A.   Okay.  So this was during the time that I

11  was actually already starting to use, and I knew

12  about my stepdad.  And we'd just lost our house

13  too.  I meant to tell you that earlier.

14      Q.   Okay.  Because you -- what -- did you say

15  that your stepdad got diagnosed in April or so?

16      A.   It was in, like, spring, yes.

17      Q.   Okay.  And then you lost your house.  Why

18  did you-all lose your house?

19      A.   Probably just because of the whole --

20  actually, it was COVID.  That's exactly what was

21  going on.  It was the whole COVID that was going

22  on.

23      Q.   Okay.  All right.

24      A.   That's all I can remember.

25      Q.   Your husband -- did he lose his job during

1    COVID?

2        A.   He never actually worked for anybody.   He

3    worked for himself.

4        Q.   Okay.

5        A.   He did drywall and concrete, stuff like

6    that.

7        Q.   And did that work kind of dry up during

8    COVID?

9        A.   Somewhat.

10       Q.   Yeah.

11       A.   I mean, you know.

12       Q.   But then you had quit your job in -- around

13   April of 2021, I believe --

14       A.   Correct.

15       Q.   -- correct?

16       A.   Yes.

17       Q.   So you didn't have that money coming in,

18   and so that's -- did that contribute to --

19       A.   He still made money -- enough money for us,

20   like he always did.  So we were okay with our

21   bills.  It was nothing to do with that.

22       Q.   Okay.  So why did you --

23       A.   I think it had to do with the house owner

24   because of COVID.  I wouldn't -- I don't --

25       Q.   I see.

1    A.    That's something you'd have to talk to my

2    husband --

3    Q.    Okay.

4    A.    I really don't remember.

5    Q.    That's fine.

6    A.    I just know we were able to afford our

7    bills.  It wasn't that.

8    Q.    I see.  Okay.  All right.  And so --

9    A.    I think he had to sell the house, honestly.

10   Something -- the owner, something --

11   Q.    You-all were renting it?

12   A.    We were renting it.

13   Q.    I see.  What was the date of your son's

14   death?

15   A.    September the 9th.

16   Q.    Okay.  2021?

17   A.    Correct.

18   Q.    So this would be about a month -- this

19   appointment we're talking about would be about a

20   month before that, correct?

21   A.    That's what it looks like.

22   Q.    Okay.  And at this point in time, were

23   you -- would you classify yourself as being

24   addicted to heroin?

25   A.    I know that I was getting help for it.  I

50

1     was not that bad off.  I -- after going to rehab

2     and where I'm at today, I mean, yes, I would still

3     say that would be some kind of form of addiction.

4         Q.    Okay.  I know that -- I've got documents

5     that we'll talk about later, but that you indicated

6     that you did -- at the time when you were arrested,

7     that you did heroin on a daily basis?

8         A.    Yes.

9         Q.    Okay.

10        A.    That's correct.

11        Q.    When did you start doing that?

12        A.    When I lost my son, I did it nonstop every

13    time I woke up.

14        Q.    Okay.  So I don't have any more

15    appointments after August 5th, 2021, until the

16    incident in January of 2022 where you went and got

17    your medicine refilled or anything like that.

18            Were you self-medicating during that time

19    on heroin, or did you have -- did you keep your

20    medications up and running?

21        A.    You're going to have to repeat the question

22    on the years and stuff.  Now, what?  Sorry.  I

23    didn't --

24        Q.    So that appointment that I just showed you

25    of August 5th, 2021 --

1    A.    Correct.

2    Q.    And I'm not saying that -- maybe I'm

3    missing it.  I'm just saying that the records that

4    I have, I don't see that you went to a doctor's

5    appointment prior to January 11, 2022, after August

6    of 2021.

7    A.    Are you talking about with my heroin was I

8    self- --

9    Q.    Yeah.  Well --

10   A.    Yeah.

11   Q.    Right.  And so -- because I guess you would

12   have probably ran out of your medication prior to

13   that, January of 2022.

14   A.    I think it got to the point that I didn't

15   care what I was -- you know, like, I was still

16   taking my Lexapro, though.

17   Q.    Okay.

18   A.    I remember having the bottles.  But I can't

19   recall all this.  Like --

20   Q.    Right.

21   A.    -- I do know I still had my bottles because

22   I do know that I also did detox from Lexapro so --

23   because that was one thing I was also concerned

24   about, but I don't --

25   Q.    Okay.

52

1      A.    I don't recall.  I really just don't

2   recall.

3      Q.    Okay.  Have you ever attempted or

4   considered suicide?

5      A.    No.

6      Q.    What other illegal drugs have you done

7   besides heroin?

8      A.    I've done pot, the opiates when they

9   weren't, like, actually prescribed to me, the

10   roxies.  And I think there was a -- once or twice I

11   might have done crack cocaine.

12      Q.    Okay.  I also saw somewhere in here that

13   you told someone you had done meth before?

14      A.    I think there was one time I did meth, yes.

15      Q.    Okay.  And when you were in jail, you

16   mentioned, I think when you were taken to the

17   treatment facility, that you had actually been

18   doing drugs in jail.  Do you remember that?

19      A.    There was two occasions, yes.

20      Q.    All right.  Tell me about that.

21      A.    It just came through the flap.  And that's

22   pretty much when I say my clean date was, was in

23   April, because I stopped using while I was -- well,

24   I stopped using actually January the 11th.

25      Q.    Right.

53

1      A.   But there was two different occasions

2    where, I think, maybe something came through the

3    flap, and they asked me, and I just went ahead,

4    so --

5      Q.   And what -- do you remember what those

6    drugs were?

7      A.   I think it was meth, but I don't know.

8      Q.   Okay.  And the...

9      A.   I mean, I don't really totally recall.  I

10   just know --

11     Q.   Okay.

12     A.   -- it was told to me.

13     Q.   I don't want to go by memory.  I think

14   we'll get to it later.

15          So there was one other thing, I think, that

16   you -- you said you had while you were in jail, but

17   we'll talk about it when we get there.

18     A.   Okay.

19     Q.   All right.  Did you ever use needles?

20     A.   No, I did not.

21     Q.   How did you use your heroin?

22     A.   My nose.

23     Q.   Okay.  Prior to January 11, 2022, had you

24   ever been diagnosed with a substance abuse problem?

25     A.   No.

1      Q.    No one knew you were --

2      A.    (Shakes head negatively.)

3      Q.    No one in the medical field knew that you

4  were doing that.  Is that correct?

5      A.    Right.  That's correct.

6      Q.    Okay.  It's not that you would disagree

7  that you had a substance abuse problem.  You just

8  obviously were not telling your medical

9  professionals that you were doing it, taking it?

10     A.    Correct.  I didn't tell anybody about --

11  yeah.

12     Q.    Did your husband know?

13     A.    Did he know that I was in active addiction?

14     Q.    Right.

15     A.    Yes.

16     Q.    Okay.  All right.  Let's talk about the day

17  of January 11, 2022.  Do you remember what time you

18  got up that morning?

19     A.    I don't totally recall, but probably

20  8:00 or 9:00.  I don't remember.

21     Q.    Okay.  Did you spend the night -- where

22  were you-all living at that time?

23     A.    On Cunningham.

24     Q.    On Cunningham?  That was not the house that

25  was taken away from -- you-all lost your house?

1    Okay.  What house was that that you lost?

2        A.    On South Road.

3        Q.    What was the address?  Do you remember?

4        A.    I don't recall right now.

5        Q.    Okay.  So you-all lost that house because

6    of -- your landlord basically kicked you out

7    because he wanted to sell the house, I guess?

8        A.    Yeah, he wanted -- that's what I remember.

9        Q.    And you moved to Cunningham, you said?

10       A.    Correct.

11       Q.    All right.  And that's not where your mom

12   lives, right?

13       A.    No.

14       Q.    Okay.  And were you -- did you buy a house

15   or rent?

16       A.    Rent.

17       Q.    Okay.  And so you spent the night at that

18   house on Cunningham that evening?

19       A.    That's where I woke up at, yes.

20       Q.    Okay.  And do you remember anything about

21   what you did the night before?

22       A.    No, I do not.

23       Q.    So when you woke up on January 11th,

24   2022, you did some heroin.  Is that correct?

25       A.    Yes.

56

1    Q.    All right.  Do you remember how much?

2    A.    No, I don't.

3    Q.    Okay.  Did you drink any alcohol?

4    A.    No.

5    Q.    Did you take any prescription medication?

6    A.    No.

7    Q.    So the only thing --

8    A.    I don't remember if I took any prescription

9    medication.  If I was supposed to take it, I might

10   have taken -- I don't recall.

11   Q.    Okay.  All right.  Did you take any

12   prescription medication that would -- you would not

13   have been prescribed, if you took medicine --

14   A.    No, I did not.

15   Q.    Okay.  Did you see anyone that morning

16   before you left in your vehicle?

17   A.    I don't recall seeing anyone.

18   Q.    Okay.  Would anybody have been at your

19   house?

20   A.    Just my husband.  And my daughter was.

21   Q.    Were they home?

22   A.    Yes.

23   Q.    What day of the week was this?  Do you

24   remember?

25   A.    I don't remember.  I'm going to say like a

1    Tuesday or a Thursday, but I don't -- I might be

2    wrong.

3        Q.    I'll look it up real quick.  Looks like it

4    would have been a Tuesday.

5             Would your husband have normally been

6    working then?

7        A.    No.  He was at home.

8        Q.    He was at home?

9        A.    Yeah.

10       Q.    Okay.  Because he works in construction, is

11   his job kind of sporadic?

12       A.    Yeah.  It's whenever he has a job, he just

13   goes and does it.

14       Q.    Okay.

15       A.    He's kind of his own boss.

16       Q.    Okay.  And did he have an addiction going

17   on at that time as well?

18       A.    He did.

19       Q.    What was his?

20       A.    I know heroin for sure.  Other than that, I

21   don't know.

22       Q.    Okay.  All right.  I know we've seen

23   pictures of your car that you were driving.  So it

24   was some sort of red, small car.  What kind of car

25   was that?

58

1      A.    It was a Chrysler.

2      Q.    I'm sorry?

3      A.    Chrysler Sebring.  It was 2009.

4      Q.    Okay.  Was that your vehicle?

5      A.    Yes.

6      Q.    Okay.  And so tell me why were you -- where

7   did you -- Well, did you talk to your husband that

8   morning at all, or do you remember?

9      A.    Yes, I did.

10      Q.    You did?

11      A.    I had a little bit of an argument with him.

12      Q.    Okay.  Tell me about that.

13      A.    I was wanting some more drugs, and he was

14   saying I was overdoing it, so I got upset and I

15   left.

16      Q.    Okay.

17      A.    I was going to go to my son's grave.

18      Q.    You were going to drive to your son's

19   grave?

20      A.    Yes.

21      Q.    Okay.  Where is your son's grave?

22      A.    It's right there on Kings Chapel, the very

23   beginning after Kings Chapel on the right.

24      Q.    Okay.  All right.  In relation to Sheriff

25   Acree's house, where is it?  Is it --

1    A.    I mean, I was going to the direction to my

2    son's resting place --

3    Q.    Okay.

4    A.    -- is what I call it.

5    Q.    And you go -- you go down that street when

6    you go there?

7    A.    Yes.  If you're in Cadiz, yes, that's the

8    way you would go.

9    Q.    Okay.  So you're in your car, and you're on

10    your way to your son's grave.  Tell me what

11    happened next.

12    A.    I was crying, I was upset, and I just

13    decided to go down other roads.  That's about it.

14    And I decided to stop there.

15    Q.    Okay.  Now, did you stop at another house

16    before you went to --

17    A.    I stopped and I backed up and pulled --

18    pulled off and went to the next house, which was

19    his.

20    Q.    Okay.

21    A.    So I was in the driveway to another house,

22    correct.

23         MS. BLANKENSHIP:  So this will be 5 and 6.

24         (Defendants' Exhibit Numbers 5 and 6 marked

25    for identification by the reporter.)

1    BY MS. BLANKENSHIP:

2         Q.   I actually want to talk about Exhibit 6

3    first, which is the supplement.  It looks like

4    this.

5              So at the bottom of the supplement, the

6    very last paragraph says, "During a neighborhood

7    canvass [sic], Robie Ann Richardson of 351 Chasity

8    Drive stated she heard someone knocking on her door

9    around 10:30 a.m. and then attempted to open the

10   front door.  Ms. Richardson advised she looked out

11   the window and saw a white female walking away from

12   her door and left her residence in a small red

13   passenger car.  The same described vehicle was

14   identified belonging to Crystal Smith."

15        A.   I don't recall knocking on someone's door.

16   I do recall that I pulled up to a house, and I -- I

17   don't even recall getting out of the car.

18        Q.   Okay.

19        A.   But I did sit there for a minute.

20        Q.   Okay.

21        A.   That's all I can remember.

22        Q.   Well, at this -- you had done some heroin

23   at this point, right?

24        A.   Yes, that's very true.

25        Q.   And so is it possible that your memory may

1    not be well as --

2        A.    I mean, for that incident, maybe, because,

3    I mean, I don't -- I don't know.

4        Q.    Okay.

5        A.    It was a minute ago.  In my head, that's

6    all I can remember is just sitting in the car.

7        Q.    Okay.  In other words, it could be that

8    this is true.  You just don't know?

9        A.    That's true.  I don't know.

10       Q.    Okay.  All right.  All right.  So can you

11   tell me what you recall about after you pulled into

12   this driveway and turned around?

13            Why did you turn around, I guess, is the

14   first question I have.

15       A.    I don't know.  Something just told me to go

16   to the other house.  Like, I don't -- I never had a

17   reason.

18       Q.    Okay.

19       A.    Like, that's all I know.  I didn't know who

20   lived anywhere.  I don't know.

21       Q.    Was the -- the house that you turned around

22   in close to the other house?

23       A.    I'm thinking it was right next door, but, I

24   mean, I -- I don't -- I could be wrong.

25       Q.    Okay.  Tell me what you recall happening

1    next.

2        A.    I just went to the next house, and I

3    decided to go into the house.

4        Q.    Okay.

5        A.    And I pretty much made myself at home.  I

6    fed the dogs.  I mean, I went through the house.  I

7    put some stuff in suitcases.  You know, when I came

8    back out, I went out and took some stuff to the

9    car.  I went back in.

10              Next thing I know, somebody was home, I

11   thought, maybe for lunch.  And then when I looked

12   out, I seen that it was the sheriff.  I had no clue

13   it was his house.  I thought someone just reported

14   they'd seen a car there that shouldn't have been

15   there.

16              So I was going out to meet him, and I

17   thought I would be able to make up a story in my

18   head, to maybe just get in my car and go home, and

19   it didn't work out that way.

20       Q.    Okay.

21       A.    So --

22       Q.    All right.  So how did you get into the

23   house?

24       A.    It was unlocked.

25       Q.    And which -- which door did you go into?

1      A.    It was the garage door.  The way you would

2    go into like -- I don't really know if he was using

3    it as a garage.  I can't recall.  I feel like he

4    wasn't.  No, I don't think it was a gar- -- it was,

5    like, where a normal garage would be, so I'm

6    thinking maybe a man cave.  I'm not for sure.

7      Q.    Okay.

8      A.    Something like that.

9      Q.    All right.  Did you -- do you remember if

10    you got any mail out of his mailbox?

11      A.    I didn't get any mail of the mailbox, but

12    there was mail in the kitchen that I picked up to

13    put into one of the bags, because I wanted to

14    actually know whose house it was, and I was going

15    to look at it when I got home.

16      Q.    Okay.

17      A.    So -- because I didn't know where I was.

18      Q.    Okay.  When you pulled into the driveway,

19    was -- there was -- there is a garage there?

20      A.    There is.  I remember now.  Yes.

21      Q.    Was the door open or closed?  Do you

22    remember?

23      A.    I don't know.

24      Q.    Okay.  And so then you said that you went

25    into the side door and that it was open, right?

1      A.   It wasn't -- it was unlocked.

2      Q.   I'm sorry.  Unlocked, right.

3      A.   I did knock on that door.

4      Q.   Okay.  You knocked on the door?

5      A.   Yes.

6      Q.   And --

7      A.   Nobody came.  Dogs came.

8      Q.   Okay.

9      A.   And then I opened it.

10     Q.   Okay.  There was a credit card on the

11   ground right there next to the door.  Do you know

12   anything about that credit card?

13     A.   Yes, I do.  I picked it up in the house,

14   and I guess I put it in my pocket, and it must have

15   fell out.

16     Q.   Okay.  And then so you go into the area

17   that you described as a man cave, and what happened

18   next?

19     A.   There was the door to the kitchen, and

20   that's where -- the dogs were there.  And I walked

21   in and I fed dogs.  I went to the refrigerator and

22   got them some food and fed them, and they went and

23   they sat down on the couch.

24     Q.   Okay.

25     A.   I did -- there was some wine in there, so I

1    poured me a glass of wine.  Do you want to know

2    detail to detail?

3        Q.    Yes, yes.  Yeah.

4        A.    Okay.  So I poured me a glass of wine, and

5    then I threw the bottle away.  I washed my glass,

6    and I put it back.  And then I went to -- I didn't

7    look around.  I mean, I did maybe pick a few things

8    up from the kitchen, but I didn't look around the

9    living room or anything like that.  I went to the

10   bedrooms, and I went through the closet, and then I

11   started putting clothes into gift bags and a

12   suitcase.

13       Q.    Okay.

14       A.    And I noticed that they had a daughter

15   about the same age as my daughter.  So I was like,

16   Oh, she could wear this stuff.

17       Q.    Okay.

18       A.    It looked like the wife could have been

19   about the same size as me, so I was like, Oh, I

20   could wear that stuff.

21       Q.    Okay.  The -- the mail was in the kitchen

22   that you got, did you get that before or after you

23   went to the bedroom?

24       A.    I don't recall.

25       Q.    Okay.  Where did you get the glass to drink

1    the wine?

2        A.    The cabinet.

3        Q.    The cabinet?  And then you said you washed

4    it.  And where did you put it back?

5        A.    I don't know if I put it back in the

6    cabinet or if I put it back on -- like it was just

7    washed, like it was -- I don't recall.

8        Q.    Okay.  All right.  And so when you went

9    into the house, what was your purpose?

10       A.    I didn't have a purpose.

11       Q.    You didn't?

12       A.    I just was trying to do anything I could to

13   escape the pain that I was feeling at the time.

14       Q.    Okay.

15       A.    Because the heroin wasn't doing it.

16       Q.    I'm sorry, what?

17       A.    The heroin wasn't doing it.

18       Q.    Okay.

19       A.    The drugs was not helping me, and I knew I

20   still had to stay alive for my girls.

21       Q.    Okay.

22       A.    So -- sorry, I dropped my glasses.

23       Q.    You're fine.

24             Okay.  So then you go into the master

25   bedroom first, or do you remember?

1       A.    I don't remember.

2       Q.    Okay.  And you go into the closet, and you

3    notice that the clothes are about your size.  And

4    so you -- did you see a suitcase somewhere?

5       A.    I'm guessing I did in the closet, yes.

6       Q.    You don't remember?

7       A.    I don't -- I mean, I was trying to find

8    something to put the stuff in, so I'm guessing I

9    seen the suitcase and just started putting stuff in

10    it.

11       Q.    Okay.  And where did you find the bags to

12    put clothes in?

13       A.    I don't remember.  I guess they were just

14    laying around, maybe in the closet in the bedrooms.

15       Q.    Okay.

16       A.    I just looked around and grabbed whatever I

17    seen.

18       Q.    Okay.

19       A.    It was bags to load it, you know, put stuff

20    in.

21       Q.    Okay.  Did you -- did you get any jewelry?

22       A.    I don't recall.  I know there was a ring

23    that ended up on my hand.

24       Q.    Okay.

25       A.    But packing it, I don't think so.

1    Q.   Okay.  But -- I mean, obviously a ring just

2    doesn't land on your hand.

3    A.   Well, I put the -- yeah, I put the ring on

4    my hand.  I do remember going -- like, looking on

5    the dresser.

6    Q.   Okay.

7    A.   And maybe opening the dresser.  I don't

8    know if it was on the dresser or in the dresser.

9    Q.   Okay.

10   A.   And I tried it on.  I was like, Oh, this

11   looks just like -- I have a ring almost just like

12   it, by the way -- I did at one time -- that my

13   husband gave me.  I was like, Oh, it fits my finger

14   and I -- that was it.  I forgot about it.

15   Q.   Okay.  You also put some things in your

16   pockets?  Do you remember?

17   A.   I might have.

18   Q.   Well --

19   A.   I think there was some cash in my pocket

20   and maybe some chargers or something.  I don't --

21   Q.   Okay.  The things that they took out of

22   your pockets were not yours, right?

23   A.   As far as I know, yes.

24   Q.   Okay.

25   A.   That's correct.  I'm pretty sure.

69

1     Q.   Right.  The cash that -- where did you get

2     the cash?

3     A.   I think it was in the daughter's room.

4     Q.   Okay.

5     A.   Because I -- I always felt really -- of

6     course, I have my own feelings about all of this.

7     I mean, I feel shitty so --

8     Q.   Okay.  You -- the cash that was in your

9     pocket of your jacket, that -- you didn't show up

10    to the house with that cash, right?

11    A.   I don't believe so.

12    Q.   Okay.

13    A.   I really -- I mean, I don't recall

14    everything, but I do know I picked up cash.

15    Q.   Okay.

16    A.   And put it in my pocket.

17    Q.   Did your husband give you any cash that

18    morning?

19    A.   I don't know.  I don't remember.

20    Q.   Okay.

21    A.   I doubt it, but I don't remember if I had

22    anything on me.

23    Q.   Okay.  The -- as you know, when the

24    officers got there, you told them the story about

25    looking for somebody named Ashley.  Was that all

70

1    made up?

2        A.    Yes, it was all made up.

3        Q.    Okay.  Was there an Ashley at all that ever

4    cut your hair?

5        A.    No, there was never an Ashley.

6        Q.    Okay.  Do you remember being adamant to

7    them about the story about Ashley?

8        A.    Yes, I do.

9        Q.    Okay.  And that you told the story to them

10   numerous times?

11       A.    During that day, yes.  I was -- I mean, I

12   was told, like, once -- I told it, I guess, to the

13   sheriff, who I didn't know it was his house yet.

14   And then I told it to Chief Wiggins.

15       Q.    Okay.

16       A.    Yes.

17       Q.    When did you find out the house was Sheriff

18   Acree's?

19       A.    When I got in back of the car.  When Chief

20   Wiggins started taking me to downtown.

21       Q.    Okay.

22       A.    He's like, "Do you know whose house this

23   is?"  I said, "No."

24       Q.    Okay.

25       A.    That's when I find out.

1    Q.    All right.  So tell me what your -- you

2    took some things out to your trunk, right?

3    A.    Correct.

4    Q.    What -- do you remember -- I mean, I think

5    I've got a picture of it.  You don't -- as you sit

6    here today, you don't remember what it was?

7    A.    I don't remember.

8    Q.    Okay.

9    A.    I just filled some bags and took it out.

10    Q.    Okay.  Do you remember loading up alcohol?

11    A.    I think I did grab some of his good

12    bourbon.

13    Q.    Okay.

14    A.    I do think I remember that.

15    Q.    What about some beers, Modellos?  You don't

16    remember a bag --

17    A.    No.  I don't drink beer.

18    Q.    Okay.  Well, if there is a bag of Modellos

19    in your trunk, you -- you just don't remember

20    taking that?

21    A.    Don't remember that whatsoever.

22    Q.    Okay.  All right.  Do you remember what

23    kind of wine you drank?

24    A.    No, I don't.

25    Q.    Now, are you saying you only had one glass

1    of wine?

2        A.    Yes.

3        Q.    Are you sure about that?

4        A.    Yes, I am.  I drank the rest that was in

5    the bottle.

6        Q.    Okay.

7        A.    Because it was almost empty.

8        Q.    And what did you do with the bottle?

9        A.    I threw it away.  As far as I remember, I

10   threw it away.  I don't think I put it back in the

11   refrigerator.

12       Q.    Did you go through their medicine cabinet?

13       A.    I don't recall that, no.

14       Q.    And then you -- tell me about the pills.

15       A.    What pills?

16       Q.    There was a bottle of pills on your person.

17   Do you remember that?

18       A.    I don't remember.  I might -- there might

19   have been something laying in the kitchen, and I

20   might have picked it up, but I don't -- I don't

21   recall.

22       Q.    Okay.  You don't recall them finding a

23   bottle of pills in your pocket?

24       A.    No, I don't.

25       Q.    Okay.

73

1      A.    Like, I wouldn't even know what you're

2    talk- -- I wouldn't know if it was blood pressure

3    medicine, a narcotic.  I don't remember.

4      Q.    What about some perfumes?  Did you take

5    perfumes?

6      A.    Yes, I do remember taking perfumes.

7      Q.    Okay.  And what were you doing when you

8    heard a car door open and close?

9      A.    I was trying to go get the stuff out and

10   get my stuff -- myself out of the house.

11     Q.    You were trying to get the things out of

12   the house?

13     A.    Yes.  And me.

14     Q.    Okay.

15     A.    Like, I was trying to get to the car.

16     Q.    Okay.

17     A.    Because I went back in to grab the stuff.

18     Q.    Okay.

19     A.    And then I heard a car door.

20     Q.    All right.

21     A.    So I briefly looked out the window.

22     Q.    Okay.  And what did you see?

23     A.    The sheriff.

24     Q.    Okay.

25     A.    I don't really know if it was actually the

1    sheriff that I actually seen from the window.  I

2    just knew it was somebody who worked for the

3    sheriff's department.

4        Q.   Right.  And tell me -- tell me what

5    happened next.

6        A.   I tried to come up with something in my

7    head really fast to go out the door and tell him

8    why I was there.

9        Q.   Okay.  Well, just -- why don't you go ahead

10   with the story that you remember.

11       A.   I went out the door, and that's when I

12   started telling them that I stopped to -- that I

13   was there looking for Ashley, that I owed her some

14   money, and I needed to pay her for when she did my

15   hair the last time.

16       Q.   Okay.

17       A.   And I guess I went to the wrong house.

18       Q.   Okay.  And at this point, it was just

19   Sheriff Acree there, right?

20       A.   Yes.  To start with, yes.

21       Q.   Okay.  And tell me, how did he respond?

22   What happened there?

23       A.   He put me -- he told me to sit down.  He

24   put handcuffs around my front.  He told me to sit

25   down, and he put handcuffs around me in the front,

1    and he said to sit right there.  And then the next

2    thing I know, I seen two cops pulling up, city

3    cops.

4        Q.    Okay.  While you -- while you were there

5    before the police officers showed up, was there

6    any -- I mean, how was -- how was the --

7        A.    It was only 5 seconds.  Like, literally, he

8    sat me down there, and they were like right there

9    pulling up.

10        Q.    Okay.

11        A.    So there was no conversation or nothing.

12            (Defendants' Exhibit Numbers 7 and 8 marked

13    for identification by the reporter.)

14  BY MS. BLANKENSHIP:

15        Q.    So we've had the pictures of your trunk

16    marked as 7 and 8.  Do you see that picture of your

17    trunk as 7?

18        A.    This?  Yes.

19        Q.    Okay.  And then do you see 8 has a box of

20    beer?

21        A.    Yes.

22        Q.    That was -- and do you see that that box is

23    in your trunk --

24        A.    Yes.

25        Q.    -- in 7 as well?

1      A.    I see it, yes.

2      Q.    Okay.

3      A.    I do see that.

4      Q.    Do you -- you just don't recall --

5      A.    No.

6      Q.    -- boxing up any beer?

7      A.    I don't recall ever -- I only recall

8  walking out of the house one time before I walked

9  out to meet the sheriff.  There's no way I would

10 carry -- you know what I'm saying?  I think it

11 could have been already there, honestly, but I

12 don't -- I don't recall.  I know I put this stuff

13 that's on the right in the trunk, from the house.

14     Q.    Okay.  You just don't remember if you -- if

15 you -- that was already there, the box of alcohol,

16 or you brought it out?

17     A.    I don't ever think that I would even want

18 to carry that box to the car.  I was in a hurry.  I

19 don't remember.  I don't know why I would.  I was

20 trying to get the clothes and leave.

21     Q.    Okay.

22     A.    So...

23     Q.    And so Sheriff Acree didn't tell you that

24 that was his house anytime while you were

25 interacting with him?

 1       A.    No, he did not.

 2       Q.    Okay.  Do you recall telling the officers

 3   on numerous occasions that, "I'm telling the truth

 4   about Ashley.  I'm telling the truth about Ashley"?

 5       A.    Yeah, I did.  I was scared.  I didn't want

 6   to go to jail.

 7       Q.    Did you go through the dressers in the

 8   bedrooms?

 9       A.    I'm pretty sure I probably went through

10   some of the drawers.

11       Q.    Okay.  Did you take any purses?

12       A.    I think I might have.

13       Q.    Did Sheriff Acree search you?

14       A.    I don't think he did.

15       Q.    Okay.  So you just think he told you to get

16   on the ground -- to sit on the ground, and then he

17   handcuffed you?

18       A.    He did tell me to get on the ground.  He

19   put the handcuffs in front of me.

20       Q.    Okay.  He put the handcuffs in front, not

21   behind?

22       A.    Yeah, in front.  They changed them after

23   they arrested me.

24       Q.    The dispatch log indicates that Sheriff

25   Acree arrived at his house around 12:17 that day.

1    Is that -- do you have any idea of time on that

2    day?

3        A.    Time, I don't know.  I don't recall the

4    time.

5        Q.    All right.  He didn't use any force against

6    you when he was putting the handcuffs on you,

7    correct?

8        A.    No.  He -- no, he didn't.

9        Q.    All right.  So the -- this dispatch record

10   indicates that Sheriff Acree actually got to

11   your -- got home at 12:12 and that he placed you in

12   handcuffs.  At 12:17 is when he notified dispatch

13   that he had one in custody.

14            And then the Cadiz Police Department

15   arrived just a few seconds later, like you said.

16   But between the time that he said that he was home

17   and he put you in handcuffs, it was about five

18   minutes.

19            You don't recall anything happening during

20   that time other than him telling you to sit on the

21   ground and he handcuffed you in the front?

22       A.    I just remember I was trying to come up

23   with something in my head.

24       Q.    Yeah.

25       A.    And I was thinking at first of trying to

1    hide or should I go out the back door.  And then I

2    was like, no, just go out the front door.  And

3    that's -- I went out the front door.

4        Q.    Okay.

5        A.    So I don't know if it was 30 seconds, you

6    know, but I knew it was just a few minutes.

7        Q.    Did you tell Sheriff Acree your story about

8    Ashley?

9        A.    I think he asked me what I was there for,

10   yeah, and I said I was looking for Ashley.

11       Q.    Okay.

12       A.    And, yeah, he did.  Because he's like, "Do

13   you see Ashley?"

14            I said, "No, sir, I never found Ashley.  I

15   looked in every room."  That's what I said.

16       Q.    Okay.  Did you go out the back door at any

17   point in time?

18       A.    No, I did not.  I thought about it, but I

19   did not go out the back door.

20       Q.    And you never opened it while you were

21   there?

22       A.    I might have when I went to try -- to want

23   to go leave.  I might have grabbed the door handle,

24   but I never did open it, nor did I walk out the

25   back door.

1    Q.    Okay.  Do you know whether it was locked or
2    unlocked?
3    A.    I don't recall.
4    Q.    Okay.  So could you have unlocked it
5    possibly when you went to grab the door?
6    A.    I might -- I mean, I could have.
7    Q.    Okay.
8    A.    They did ask me later if somebody else was
9    with me, something about the back door.  And I told
10   them, no, I was by myself.
11   Q.    Have you watched the body cam videos of
12   this incident?
13   A.    No.  I didn't know there was a body cam
14   incident video.
15   Q.    Do you recall telling the Cadiz police
16   officers on numerous occasions that you did not
17   remove anything from the house?
18   A.    Repeat that one more time.
19   Q.    Do you recall telling the Cadiz police
20   officers that you did not remove anything from the
21   house on numerous occasions?
22   A.    I could have during that time, yes.
23   Q.    Okay.  And that the things in your pocket
24   you insisted were yours.  Do you recall that?
25   A.    That probably was about right.

1       Q.   Okay.  And you told them that you didn't

2   even go into the bedrooms at any point in time?

3       A.   I don't recall the -- about where I went in

4   the house, what I told them.  I don't recall that.

5   I don't remember --

6       Q.   You don't recall what?

7       A.   I don't remember, like, telling them which

8   rooms I went in or whatever.

9            Now, when I talked to Chief Wiggins, I did

10   tell him pretty much step by step everything that

11   took place.

12       Q.   That would be, though, at the Cadiz Police

13   Department, correct?

14       A.   Correct.

15       Q.   But I'm talking about -- what I'm talking

16   about is your questioning at the house.

17       A.   I don't recall, no.

18       Q.   Okay.  You don't remember what you told

19   them there?

20       A.   No, except for I was there to meet Ashley.

21       Q.   Okay.

22       A.   That was it.

23       Q.   I assume that you don't dispute if the

24   video shows you denying that you ever even went

25   into the bedroom on several occasions?  You dis- --

82

1      don't dispute that.

2          A.    I don't remember.  I would probably say

3      anything I could at that moment.  I wanted just to

4      go home.

5          Q.    Do you recall telling them that the money

6      on your person was given to you by your husband

7      that day?

8          A.    I think I did say something like that.

9          Q.    You said to them -- they asked you -- he

10     asked you that there -- this is at the Cadiz Police

11     Department.

12             He said, "There's $170 there."  They

13     counted the money out.  "Not 250, not 300."

14             Because you had told them earlier it was

15     250 or 300.

16             You said, "Well, I never counted it.  My

17     husband gave it to me.  He told me there was like

18     300 there.  I mean, I literally have to ask my

19     husband for money right now because I can't work.

20     And if there's any money missing, just give them

21     everything because -- I'm sorry.  I just said --

22     I'm so sorry."

23             You said "because I can't work."  Why

24     couldn't you work at that time?

25         A.    I lost my son, and I was in active

83

1     addiction.  And I had to ask my husband, also, for

2     money because I was in active addiction.  Like...

3         Q.   Now, at the Cadiz Police Department, you

4     told the chief that you -- you stopped taking stuff

5     from the little girl because you saw her LED

6     lights, and "my daughter has some just like it, and

7     I'm thinking like, 'What am I doing?'"

8              But as you sit here today, your plan was to

9     take all of that out to the car, correct?

10        A.   Whatever I packed, my plan was to take it

11    to the car.  And I did go through stuff when I

12    realized, you know, that she -- you know, she was

13    about the same age as my daughter.  And then I

14    probably did go through a moment where I'm like,

15    "What am I doing?"

16        Q.   Uh-huh.

17        A.   I mean -- but I don't recall even saying

18    that to him so -- but that does sound -- because my

19    daughter did have LED lights.

20        Q.   Okay.  And in your pocket you had a -- you

21    kept saying it was a charger, but it was a Kodak

22    mobile printer.  You took that from the daughter's

23    room, correct?  Little white --

24        A.   I remember putting something in my pocket.

25    I don't recall what it is.

CRYSTAL DAWN SMITH

84

1      Q.    And what about a -- there was a gold box

2    that had a lot of earbuds in them?

3      A.    Yeah.

4      Q.    You took that from her -- the daughter's

5    room, correct?

6      A.    That's correct.

7      Q.    Okay.  Do you recall the police officers

8    telling you on numerous occasions that if you had

9    anything illegal, that you needed to let them know

10   because you would be charged with promoting

11   contraband when you went to the jail if you had it

12   on you?

13     A.    I remember Chief Wiggins asking me one

14   time, and I told him what was in my purse and where

15   to find it.

16     Q.    All right.  Well, if the video indicates

17   that you told them on numerous occasions that you

18   did not have anything illegal on you, I assume you

19   won't disagree with that?

20     A.    One more time.

21     Q.    If the video shows you telling them on

22   numerous occasions that you did not have anything

23   illegal in your possession, would you disagree with

24   that?

25     A.    Yes, because I told him I did, and he found

1    it.

2        Q.    Right.  I know -- I know eventually, and

3    we're going to get to that.  But prior to that --

4        A.    I don't remember --

5        Q.    Okay.

6        A.    -- to begin with.

7        Q.    All right.  So --

8        A.    Maybe I was hoping he wasn't going to go

9    through my purse.  I can't recall.

10       Q.    Okay.  So you get to the Cadiz Police

11   Department, and he starts searching in your purse.

12   And he asked you prior to searching in your purse,

13   "Is there anything illegal in here I need to know

14   about?"

15           And you said "no."

16       A.    And honestly, I thought I didn't even have

17   it with me, because normally I don't ever take it

18   outside the house.

19       Q.    Okay.

20       A.    Nothing -- okay.  And then when he maybe

21   asked me again, I remembered it was in my purse.

22       Q.    All right.  Well, on the video, he gets out

23   a small, little bag and opens it, and there's like

24   a metal container inside.  And on the video, that's

25   when you -- when you saw that is when you said,

1    "Oh, I think I might have heroin in there."

2        A.    Okay.

3        Q.    Would that be any -- does that jog your

4    memory at all?

5        A.    Yes, that sounds about right.

6        Q.    Okay.  And you also had four plastic straws

7    in your purse as well.  Do you remember that?

8        A.    I remember him talking about it, and I

9    probably did.  If I had that in there, yes.

10       Q.    And that's what you used to snort the

11   heroin?

12       A.    Yes.

13       Q.    And they asked you if you had any other

14   property belonging to Sheriff Acree before you were

15   taken to jail, and you told them no, correct?

16       A.    Correct.

17       Q.    All right.  But later it was determined

18   that you did have a ring on that was --

19       A.    Yes.  But I did actually forget that ring

20   was on my hand.  After everything took place, I was

21   clueless that it was on my hand.

22       Q.    Well, when you got to the jail and they

23   took your jewelry off --

24       A.    I didn't have any jewelry on except for

25   that ring.

87

1          Q.   Right.  But when you got to the jail, they

2     didn't let you take that ring back with you, did

3     they?

4          A.   I was in the holding cell with it on my

5     hand.

6          Q.   You were?

7          A.   Yes.

8          Q.   Okay.  Tell me about that, then.  How did

9     -- how did it -- did someone show up and --

10         A.   No one ever did say anything about that

11    ring because I didn't even think it was on my hand

12    until Sheriff Acree showed up there.

13         Q.   Okay.  Tell me about that.

14         A.   Well, he showed up, and he was in his

15    street clothes.  And they -- I was in the holding

16    cell, and they were outside, and they were just

17    looking at me.  Of course I don't know what they're

18    talking about.  And someone came in there and asked

19    me about the ring.  And, also, he made me go

20    outside and step out of my shoes and --

21         Q.   Who did?  Who made you go outside?

22         A.   Acree and one of the people that worked

23    there.

24         Q.   Okay.

25         A.   And had me step on the nasty floor

1    barefooted because I guess they were going to take

2    pictures of my shoes because they thought I took

3    the shoes, and I already told them the shoes were

4    mine.

5        Q.   Okay.  But you had also already told them

6    on numerous occasions that everything on your

7    person was yours when it wasn't, correct?

8        A.   The ring was not.

9        Q.   Right.  Well, everything in your pockets.

10       A.   Prior?

11       Q.   Yes.

12       A.   Before I got --

13       Q.   Arrested.

14       A.   -- arrested?

15       Q.   Well, no, you were arrested, and even in

16   the back seat of the car --

17       A.   Yes, yes.

18       Q.   -- you were still insisting that everything

19   in your --

20       A.   That's right.  That's correct.  To begin

21   with, yes.

22       Q.   In your pockets --

23       A.   Yes.

24       Q.   Hang on.  Let me --

25       A.   Sorry, sorry.

89

1      Q.    -- finish my question.  That's okay.

2            Everything in your pockets were yours,

3      right?

4      A.    Correct.

5      Q.    Okay.

6      A.    That's right.

7      Q.    So you would agree that the mere fact that

8      your insisting that the shoes are yours may not --

9      A.    Yeah, I get it.

10     Q.    -- it's probably not reliable at that

11     point?

12     A.    Yeah, I got it.

13     Q.    Okay, all right.

14     A.    Makes sense.

15     Q.    Okay.  And -- okay, so you had to step out

16     of the shoes for them to take pictures of them, of

17     your shoes.  Proceed on because I assume the

18     ring --

19     A.    I guess I was aggravated because I was

20     thinking you could just take pictures with my feet.

21     My feet are not that bad to take a picture of, so I

22     was, like, just -- but anyway.  But, yeah, they

23     asked me about the ring, and then I just gave it to

24     them.

25     Q.    Okay.  What did you say about the ring?

1    A.    I probably told them it was mine because I

2    was scared I was going to get charged with

3    something else because I did forget about it, but I

4    don't recall what I said.

5    Q.    Okay.

6    A.    I just know I gave it to them, and they

7    took it.

8    Q.    All right.  So you were taken to the Cadiz

9    Police Department about 12:48 p.m., according to

10    the dispatch log.  And Jailer Hughes arrived at the

11    Cadiz Police Department at 2:39, so almost two

12    hours later.

13         Do you have any memory of that one way or

14    the other?

15    A.    No, I don't recall the time frames.

16    Q.    All right.  What do you recall about jailer

17    Hughes when he showed up at the police department?

18    A.    They put me in cuffs and -- and then took

19    me to the car.

20    Q.    Okay.

21    A.    He walked me to the car.

22    Q.    He came into the room where you were at?

23    A.    Yeah.  Well, I think I was outside of the

24    room at this point.  But he said "hi," you know,

25    whatever.  "We're going to go to the jail."  Took

1    me in the -- you know, made sure I was in my cuffs,

2    all that good stuff, shackled up, whatever, however

3    it works.  And then they took me and put me in the

4    car.

5        Q.    Okay.  Did you ever hear any discussions

6    between Jailer Hughes and any Cadiz Police

7    Department officer?

8        A.    I don't recall anything.

9        Q.    Okay.  Did you know Jailer Hughes?

10       A.    I know him, yeah.

11       Q.    And you knew him at the time?

12       A.    I know who he is, yes.

13       Q.    Well, I know you're saying "I know," like,

14   today.  But I'm asking at that --

15       A.    Yes.

16       Q.    -- time you knew --

17       A.    -- I knew who he was, yes.

18       Q.    Okay.  All right.  Was he respectful and

19   courteous to you?

20       A.    Yes.

21       Q.    Do you recall having a conversation with

22   him at all in the jail vehicle on the way to -- I

23   know you stopped at the sheriff's department.

24       A.    Yeah, I don't remember if I said anything

25   to begin with.  I was like, upset, you know, so I

92

1    don't remember.

2        Q.    Okay.  You were embarrassed about the

3    incident?

4        A.    Yeah, of course I was embarrassed.

5        Q.    So you probably weren't --

6        A.    Yes.

7        Q.    -- offering him --

8        A.    No.

9        Q.    -- much information?

10       A.    Of course I was embarrassed.

11       Q.    But you weren't offering him any

12   information or anything about it?

13       A.    I don't think so.  I don't remember.  I

14   really don't at all.

15       Q.    All right.  And during the -- after you got

16   into the car, at some point Jailer Hughes told you,

17   "We're going to make a stop at the sheriff's

18   department"?

19       A.    Yes.  I assumed we were about to pull off

20   to the road to go there, and that's when he said,

21   "We're going to make a stop."

22             And I thought it was weird --

23       Q.    Okay.

24       A.    -- that we were going to stop somewhere

25   else when I'm supposed to go to jail.

1        Q.    All right.   But you didn't say anything to

2    him about that?

3        A.    I don't recall at this moment --

4        Q.    Okay.

5        A.    -- if I -- I don't recall.   I'm trying to

6    remember, but I don't remember right now.

7        Q.    Okay.   Did you ever hear any conversations

8    between Jailer Hughes and Sheriff Acree while they

9    were in -- you were in the car?

10       A.    When I was going --

11       Q.    Did you hear any radio traffic or anything?

12       A.    I thought there could be a chance that he

13   might have said something on his little whatever,

14   but I don't -- I don't know.   Like, I don't know.

15   That could have been after the stuff occurred too.

16   I don't know.

17       Q.    Okay.

18       A.    I don't remember.

19       Q.    And he said, "We're going to make a stop"?

20   He didn't tell you where?

21       A.    Well, I could see where we were going.

22       Q.    Okay.   Do you know whether Jailer Hughes

23   knew that Sheriff Acree was the victim of your

24   crime --

25       A.    Do what?

94

1      Q.    -- at this point?

2            Sheriff Acree was the victim of your crime,

3      correct?

4      A.    Yes.

5      Q.    Okay.  Do you have any evidence to indicate

6      whether Jailer Hughes knew that at this moment?

7      A.    No, I don't.

8      Q.    Okay.

9      A.    I didn't know.

10     Q.    Do you know whether Jailer Hughes believed

11     Sheriff Acree was assisting the Cadiz Police

12     Department in the investigation of your crime?

13     A.    I don't know at that time what he knew.

14     Q.    Okay.  In fact, Sheriff Acree was at the

15     Cadiz Police Department earlier while you were

16     there, was he not?

17     A.    I never did see him at the Cadiz Police

18     Department.

19     Q.    If the video --

20     A.    Last time I seen him was at his house.

21     Q.    If the body cam video shows him there in

22     the police department at some point, you wouldn't

23     have any reason to dispute that, would you?

24     A.    No.  I just don't recall seeing him.

25     Q.    Okay.  If Jailer Hughes didn't know

1    Sheriff Acree was the victim of your crime and, in

2    fact, believed Sheriff Acree was assisting with the

3    investigation of your crimes, are you aware of any

4    policy or training that would prohibit Jailer

5    Hughes from taking you to the sheriff's department

6    at Sheriff Acree's request?

7            MS. SHREWSBURY:  I'm going to object to the

8    form of that question.  You can answer if you

9    understood.

10   BY MS. BLANKENSHIP:

11       Q.   Do you know of any policy or training?

12       A.   I really don't totally understand the

13   question.  Sorry.

14       Q.   All right.  Are you aware of any policy or

15   training of a jailer as we sit here today?

16       A.   Yeah, I don't -- I don't know what any of

17   this stuff right now means because I don't -- I

18   don't know the laws on all the protocols.

19       Q.   This is a factual question.  Are you aware

20   of the jail's policies as you sit here today?

21       A.   The jail's policies?

22       Q.   Yes.

23       A.   I'm aware of the fact when you get into a

24   vehicle and you're arrested, they're supposed to

25   take you straight to jail.  That's what I'm aware

1   of.

2       Q.   What -- where -- what policy are you

3   relying on?

4       A.   Anybody that I know that's been to jail.

5   That's all I know.

6       Q.   Okay.

7       A.   What they've told me.

8       Q.   Okay.

9       A.   What I know that's happened.

10      Q.   What policy are you aware of?  That's my

11   question.

12      A.   Of the jail policies?

13      Q.   Yes.

14      A.   I don't know.

15      Q.   Okay.  What training are you aware of that

16   would indicate that that's what they're supposed to

17   do?

18      A.   I don't know.

19      Q.   Okay.  All right.  You've never been

20   trained as a law enforcement officer, right?

21      A.   No.

22      Q.   You've never been trained as a jailer,

23   right?

24      A.   No.

25      Q.   You don't have any experience as a jailer

1    or a law enforcement officer, do you?

2        A.    No.

3        Q.    Okay.  When you were interviewed later

4    about this, you told the FBI, "They asked if he --

5    "They asked if he," meaning Jailer Hughes, "could

6    stop by there for me to talk to Sheriff Acree.  I

7    was going to say sorry and all this stuff."

8        A.    Yeah, when I realized we were going to

9    stop, I thought that was my chance that I could

10   apologize to him.  I thought that was my chance

11   that maybe he would remember me from the day that I

12   lost my son, that he understood that maybe I was

13   going through something.

14       Q.    Okay.

15       A.    And that I had a chance to talk to him.

16       Q.    Okay.  But you recall telling the FBI that

17   someone asked Jailer Hughes to stop by the

18   sheriff's department for you to talk to Sheriff

19   Acree?

20       A.    No.

21       Q.    You don't remember telling him that?

22       A.    I told the FBI -- okay, you're going to

23   have to repeat this again.

24       Q.    Do you recall telling the FBI that the --

25             You stated, "They asked if Jailer Hughes

1    could stop by there for me to talk to him."

2        A.    Who is "they"?

3        Q.    I don't know.  I'm quoting you.

4            "They asked if Jailer Hughes could stop by

5    there for me to talk to him," meaning Sheriff

6    Acree.  Do you know what you're talking about when

7    you said that?

8        A.    I don't even recall saying that.

9        Q.    Okay.  And you say, "And he" -- "he"

10   meaning Sheriff Acree -- "waited for the dude,"

11   Jailer Hughes, "to shut the door.  He pinned me up

12   against the wall, yelled at me, holding me tight,

13   and then threw me down on the ground."

14           Do you recall saying that?

15       A.    Say it one more time.

16       Q.    "And he waited for the dude to shut the

17   door.  He pinned me up against the wall, yelled at

18   me, holding me tight, and then threw me down on the

19   ground."

20       A.    I don't remember saying he threw me down on

21   the ground.

22       Q.    Okay.  Because he didn't -- at that point

23   in time, he didn't throw you down on the ground,

24   right?

25       A.    He never actually threw me on the ground.

99

1      Q.    Right.

2      A.    He pushed me.

3      Q.    Okay.  You said earlier that you were

4   hoping that Sheriff Acree would remember when your

5   son died.  Was he involved in that?

6      A.    Yeah, he was there.

7      Q.    Okay.

8      A.    He showed up.

9      Q.    Tell me about that.

10     A.    He said that he showed up to help the city

11  because they didn't have enough people to be there.

12  He was up there giving condolence to my daughter.

13  And I walked in there, and he talked -- he was

14  being with her.  You know, so I felt like that's --

15  I didn't really talk to him very much, of course,

16  with that incident.

17     Q.    You say, "I didn't really talk to him."

18  Did you talk to him at all?

19     A.    That day?

20     Q.    Yes.

21     A.    I just found out I lost my son.  I don't

22  remember who I talked to.  But I know that he was

23  there.  I know he was in the living room with my

24  daughter, sitting with her, you know, not let her

25  be alone because she just went through it, and

1    we're all -- you know, whatever.

2            And at that point later, I felt like, well,

3    he has a daughter, and I know this now.  Maybe I

4    could have a -- and he was there with my daughter.

5    Maybe he was -- I'd have a chance to tell him I'm

6    sorry.  Maybe he was having a heart where I could

7    talk to him and he understood I was going through

8    it because he was there at the house.

9        Q.    Uh-huh.

10       A.    You know, and he did meet me, and he did

11   know that we were going through something to the --

12   you know, loss of my son.

13       Q.    Okay.  Do you have any idea whether Sheriff

14   Acree recognized you?

15       A.    I'm sure he did.  I mean, not too many

16   people lose their child in Cadiz that just took

17   place.

18       Q.    Okay.  I guess my ques- -- I know you say,

19   "I'm sure he did."  But do you have any evidence to

20   indicate that he actually recognized you that day?

21       A.    Like saying my name --

22       Q.    Right.

23       A.    -- or something?  No.

24       Q.    Or saying, "Oh, yeah, I remember.  You're

25   the one, you know, whose son died" or anything like

1    that?

2        A.    No.  At that time, no.  But once they told

3    him his name -- I mean, once he talked to Chief

4    Wiggins, he knew.

5        Q.    He did know?

6        A.    If he talk- -- when he talked to Chief

7    Wiggins or whoever about the instigation, like, I'm

8    sure he knew, hey, that's Crystal who lost her son.

9        Q.    Okay.

10       A.    I'm just saying that's common sense really

11   but --

12       Q.    Okay.  But this is your belief.  I'm just

13   asking what you know, like, as far as, like,

14   evidence or a statement --

15       A.    I have no evidence, correct.

16       Q.    Okay.  Now, when -- tell me about -- when

17   you pulled into the sheriff's department parking

18   lot, tell me what hap- -- go from there.

19       A.    I walked -- he got me out of the car.

20       Q.    Jailer Hughes?

21       A.    Yes.  He was -- Acree was standing right

22   there, and that's when we went into the building.

23       Q.    What -- what door did you go into?

24       A.    The side door.

25       Q.    Okay.

102

1    A.    That's all I know.  The side door.

2    Q.    Okay.

3    A.    It was in the back of the office.  He waved

4    me to go to the left, so I started going to the

5    left.

6    Q.    And when you say "he," I just need --

7    A.    Acree.

8    Q.    Okay.

9    A.    Acree waved me to go to the left.

10   Q.    And where was Jailer Hughes at this point?

11   A.    Outside.

12   Q.    Okay.

13   A.    So he waved me to go to the left.  Acree

14   waved me to go to the left.  Jailer Hughes was

15   outside.  And I started going to the left, and I

16   heard the door shut behind me.  And he was outside

17   the door.

18   Q.    Jailer Hughes was outside the door?

19   A.    Yes, he was outside the door.

20   Q.    All right.

21   A.    And then I went into an office supply room

22   that was to the left.

23   Q.    Okay.

24   A.    I don't remember exactly what was in there,

25   but I do know there was like, you know, computer

1    papers, office stuff, whatever.

2         We went in there.  I thought still at

3    this mo- -- well, when the door shut, I actually

4    knew, okay, I'm not having a heart-to-heart with

5    him.  Something's up.

6         Q.   Okay.

7         A.   It's a different -- all of a sudden the

8    vibe just changed totally, so -- and then I went to

9    the office supply room.  I turned around, and I

10   never had a chance to talk.

11        Q.   Okay.  Tell me what happened next.

12        A.   He grabbed my coat and picked me up and

13   threw me up against the wall, threatened to kill me

14   over and over in different ways.  Threatened to

15   kill me if I was ever to go to his house,

16   threatened to kill me if he ever seen me,

17   threatened to kill me if I was ever around him or

18   his family or he seen me, over and over.

19        Q.   Okay.

20        A.   And of course I was hysterical.  He put me

21   down -- or, like, let go of me at this point, and

22   he told me to go out.  So I started to walk out of

23   the office supply room, and that's when he said,

24   "Get the hell out of here."

25        And when he did say that -- sorry if I mess

104

1    this up -- he said, "Get the hell out of here," so

2    I started walking towards the exit, and that's when

3    he pushed me.

4        Q.    Okay.

5        A.    From the back.

6        Q.    And what happened at that point?

7        A.    I fell really hard.

8        Q.    Okay.  And do you know where Jailer Hughes

9    was at this point?

10       A.    I think at that point he was still outside,

11   but I think he was trying to get in.

12       Q.    Okay.

13       A.    I don't re- -- I mean, I fell on the floor

14   on the concrete.

15       Q.    Okay.

16       A.    I slid across it.

17       Q.    Did you -- Jailer Hughes couldn't see into

18   the supply room?

19       A.    I don't think so.

20       Q.    Okay.  And do you know if Jailer Hughes

21   saw -- could see when you got pushed or anything

22   like that?

23       A.    I don't think so, no.

24       Q.    Okay.  You were still coming out of the

25   supply room when that happened?

1    A.    I was walking out of it.

2    Q.    Okay.

3    A.    But I was out of the supply room all the

4    way when I went to go slide across the floor.

5    Q.    Okay.  And do you know if Jailer Hughes saw

6    anything in relation to that part?

7    A.    I don't recall if he saw anything.

8    Q.    Okay.  All right.  What happened after

9    that?

10    A.    I was picked up.

11    Q.    Well, who --

12    A.    Acree picked me up.

13    Q.    Okay.

14    A.    Tried to pick me up.  It seemed like pretty

15    fast.  I feel he was trying to do it, maybe, before

16    James Hughes came in --

17    Q.    Okay.

18    A.    -- when he was trying to get in.  I don't

19    know.

20         He picked me up, and then that's when we

21    were walked to the car.  And I think James Hughes

22    was trying to put me in the car.  Seemed like he

23    was trying to get me out of the situation.

24    Q.    Okay.  Who walked you to the car?

25    A.    I don't recall totally, but I'm pretty sure

1    it was James Hughes, but I don't totally remember

2    who totally put me in the car.

3         Q.   Okay.  And so somebody -- somebody, one of

4    them, opened the door and put you into the back

5    seat of the car, correct?

6         A.   Correct.

7         Q.   And what happened after that?

8         A.   He was trying to get to the driver's seat

9    so he could leave.

10        Q.   Who?  Sorry.

11        A.   James Hughes was trying to go around the

12   car.  This is why I think he put me in car because

13   I remember him going around the car to get to the

14   driver's seat and to try to leave.  And then Acree

15   came to get in the back seat with me to threaten me

16   some more.  He grabbed my shoulders and got into my

17   face, yelling at me again, saying the same thing he

18   said to me in front -- in the supply office.

19        Q.   Was the back door open or closed?

20        A.   It was still open.  Like, I'm thinking it

21   was still open.

22        Q.   Okay.  So you're saying James Hughes put

23   you in the back of the car and went around and left

24   the door open?

25        A.   I'm thinking he did, but I can't recall

1    like -- I mean, he had to.  I don't think -- I

2    don't know how the door -- I don't think you can

3    just open the door from the outside like that.  I

4    don't know how it works so --

5        Q.   Okay.  It could be that Sheriff Acree was

6    able to open the door?

7        A.   Maybe.  He could have, yeah.  He could have

8    very much, that could he true.  But he did, like,

9    lean down, and he grabbed me, and he yelled at me

10   some more.

11       Q.   And what did he say?

12       A.   "If I ever see you again, I will fucking

13   kill you.  If you ever go near my house again, I

14   will fucking kill you.  If you are ever around my

15   family again, I will fucking kill you."

16            And I told him -- I said, "Go ahead.  I

17   want to be with my son anyway."

18       Q.   Okay.  Did -- do you know where Jailer

19   Hughes was during this conversation?

20       A.   He was getting in the car.

21       Q.   He was getting in the car?

22       A.   Yes.

23       Q.   Okay.  Do you know if he heard any of that?

24       A.   I mean, I'm sure he did hear it.  It was

25   loud.

1      Q.   Okay.

2      A.   He was yelling.  We were both yelling.  He

3   was yelling a lot.  Acree was yelling.

4      Q.   You said you both were yelling?

5      A.   Well, he was yelling.  I yelled, maybe,

6   back saying, "Go the fuck ahead.  Go ahead."  I

7   don't know if I said the F word.  He said it a lot.

8   "I want to be with my son anyway."

9      Q.   Okay.  Did you see anyone else besides

10   Sheriff Acree in the sheriff's department?

11     A.   No.

12          THE WITNESS:  Can we take a break?

13          MS. SHREWSBURY:  Yeah.

14          MS. BLANKENSHIP:  Yeah.

15          THE VIDEOGRAPHER:  We are now off the

16   record.

17          (A brief recess was taken.)

18          THE VIDEOGRAPHER:  We are back on the

19   record.

20   BY MS. BLANKENSHIP:

21     Q.   Okay.  So I wanted to go back just a minute

22   to when you were at the Cadiz Police Department and

23   you were leaving.

24          So Sheriff Acree was there when you -- when

25   Jailer Hughes was taking you out through the

109

1   building.  Do you remember that?

2      A.    No.

3      Q.    Do you recall him walking in front of

4   you-all and his vehicle being parked across the

5   street?

6      A.    No.

7      Q.    After Jailer Hughes put you into the back

8   seat of his car, do you recall Sheriff Acree coming

9   over to Jailer Hughes and speaking to him standing

10  outside his vehicle?

11     A.    No.

12     Q.    Okay.  You're not saying none of that

13  happened.  You're just saying you don't remember

14  it?

15     A.    I don't remember at all.

16     Q.    Okay, all right.  You don't dispute that

17  that happened.  Just that you don't remember it?

18     A.    Yeah, I just don't recall.

19     Q.    Okay.  You told the FBI in talking about

20  Jailer Hughes, "Jailer Hughes didn't see him put

21  his hands on me because the sheriff made sure he

22  shut the door behind him when he took me in to

23  throw me against the wall."

24         Do you agree with that today?

25     A.    Say it one more time.

110

1    Q.    "Jailer Hughes didn't see him put his hands

2    on me because the sheriff made sure he shut the

3    door behind him."

4    A.    I mean, it seemed like that was his plan,

5    maybe, when I heard the door slam behind me.

6    Q.    Okay.  And then you talked about that you

7    were screaming.  Were you screaming back at Sheriff

8    Acree when he was yelling at you?

9    A.    I don't recall screaming that much in the

10   building.  I was crying.  I might have had some

11   noises.  I don't recall saying anything.

12   Q.    Okay.

13   A.    Not until I was actually in the car.

14   Q.    Okay.  So as far as you know, Jailer Hughes

15   didn't hear anything standing outside of the

16   building either?

17   A.    Acree was really loud.

18   Q.    Okay.

19   A.    Just saying.

20   Q.    Okay.  Do you know whether Jailer Hughes

21   heard it or not?

22   A.    I do not.  I don't know.

23   Q.    So after -- and I think you got to the

24   point of talking about Sheriff Acree leaning into

25   the back seat of the car.

1          And then I assume, did he shut the door

2    after he did that?

3       A.   Yes.

4       Q.   Okay.  And then now you-all go to the jail,

5    correct?

6       A.   Yes.

7       Q.   Can you tell me about the -- what happened

8    between leaving the sheriff's department and

9    getting to the jail?

10       A.   I am hysterically upset.  I realized that

11    Hughes is upset too.  I could see that he was just,

12    you know, bothered by the situation.

13       Q.   Tell me how.

14       A.   Just by the way he was acting.  His

15    motions, his -- you know, just -- he seemed just --

16    you can tell if someone's, like, bothered by

17    something.  I can't really -- I don't --

18       Q.   You can't articulate the facts that made

19    you think that?

20       A.   He just seemed very frustrated, you know,

21    with the -- aggravated.  Not -- I don't even -- you

22    know, just upset.  He wasn't -- I don't think he

23    knew what to say to me or knew what to do.  That's

24    just -- that's what I was picking up.

25       Q.   Okay.

1      A.   I asked him if he was allowed to do that.

2    He didn't say anything back.  Then I realized I

3    needed to calm down because I felt like he was

4    extremely upset, and I didn't know if he might have

5    a heart attack or something, I was just -- had to,

6    like, get myself together.

7      Q.   Is that all you recall about the -- the

8    ride between the sheriff's department and the jail?

9      A.   I mean, he seemed like he was very sorry

10   for what took -- maybe what took place.

11     Q.   Okay.  Did -- was there any conversation to

12   that effect?

13     A.   There could have been somewhat small talk

14   about it.  I don't totally remember everything.  So

15   I don't really remember him saying too much to me

16   that I can recall in my head until we were there.

17     Q.   All right.  And then once you got to the

18   jail, tell me about that.

19     A.   When he walked me into the jail, I at that

20   point gave him -- he asked if there was anybody I

21   could call.

22          I said, "Will you call my mom."

23          And I gave her [sic] my number.  And he did

24   then tell me that -- I'm pretty sure he told me he

25   was sorry for what took place or said

1   something along --

2           No, no.  He actually said, "Are you okay?"

3       Q.   Okay.

4       A.   He said, "Are you okay?"

5           And I knew then he recognized, okay, this

6   is not right, you know.

7       Q.   Okay.

8       A.   What just took place.

9       Q.   But your only recollection of him saying

10  anything was he asked you, "Are you okay?"

11      A.   I remember for sure he asked if I was okay.

12      Q.   All right.  And what did you say?

13      A.   I don't recall.

14      Q.   Okay.

15      A.   I was like, "Can you call my" -- I wasn't

16  okay, you know?  So I don't recall what I said.

17      Q.   Okay.

18      A.   But I do know he asked, "Who can I call?

19  Is there anybody I can call?"

20          I said, "My mom."  And I gave him the

21  number.

22      Q.   Okay.

23      A.   And he called my mom.

24      Q.   Okay.  Do you recall being -- I'm going

25  to -- for lack of a better word -- hysterical at

1    the house when you were being interviewed in the

2    back seat of the car by the Cadiz Police

3    Department?  Crying and --

4        A.    I was crying, yes.

5        Q.    And kind of hysterical a few times?

6        A.    I wasn't that bad then as I was after I was

7    with Acree --

8        Q.    Okay.

9        A.    -- at the sheriff's department.  I wasn't

10   that -- I was crying.  I was upset because I knew I

11   did something I shouldn't have done and I'm about

12   to go to jail.

13       Q.    Okay.  Do you recall crying and being upset

14   at the Cadiz Police Department?

15       A.    I was crying, yeah.

16       Q.    Okay.  I mean, I assume -- you say you

17   haven't watched the body cam videos.

18       A.    No.  Yeah.

19       Q.    You agree that they speak for themselves?

20       A.    The body cams?

21       Q.    Yes.

22       A.    I mean, you see it happen.  Yeah, I guess.

23       Q.    Okay.  Do you recall whether you were upset

24   when Jailer Hughes picked you up at the police

25   department?

1       A.    I don't recall.

2       Q.    Okay.  Or when he was taking you out to the

3   vehicle to be transported to jail?  Do you

4   recall --

5       A.    During that time, I think I might have

6   calmed down just a little bit, but at the same

7   time, yeah, I was still emotionally upset.  I was

8   about to go to jail.

9       Q.    Okay.

10      A.    I do not believe I was hysterical at that

11  point at all until later.

12      Q.    All right.  So did you have any injuries or

13  anything as a result of this incident that you

14  described?

15      A.    Yes.

16      Q.    Can you tell me about that?

17      A.    I woke up the next morning or a few hours

18  went by -- I don't remember, but the next morning

19  for sure -- I had, like, a road rash all on my arm

20  right here.  From, like, here to here where I slid

21  across the concrete.

22      Q.    Okay.

23      A.    It was bleeding too.  It was -- this is

24  what probably took the longest, almost, actually to

25  heal where you could see it.

116

1          And then I had bruises on my wrist.  I had

2     bruises on my ankles.  I had bruises on my knees.

3     And then I had a huge bruise on my right hip.

4     Like, it was so big, when I went into crawl into

5     the bunks, that's when everybody started

6     questioning me saying, "What happened to you?"

7          They're like, "Oh, you were telling the

8     truth.  You were assaulted."

9        Q.    Okay.

10       A.    And they started asking questions.

11       Q.    As we sit here today, do you have any

12    visible injuries?

13       A.    As far as I know, no.

14       Q.    Okay.  So the -- the place on your arm is

15    completely healed?

16       A.    It's been over two years, so yeah.

17       Q.    You don't have a scar or anything from it?

18       A.    I don't think so.

19       Q.    Okay.

20       A.    I mean, I lay in the tanning bed so -- I

21    mean, I was worried, actually, when I started

22    laying in the tanning bed. I thought it was going

23    to -- so I don't --

24       Q.    Can you just show your arm to us?

25       A.    Yeah, I don't have anything visible as of

1    right now.  But it was like a bruise and a mark

2    there for a long time.

3        Q.   Okay.

4        A.   But I don't --

5        Q.   Did you take any pictures?

6        A.   No.  I was in jail when it was really bad

7    when I -- it was still actually there when I went

8    to rehab.

9        Q.   All right.  Did you take any pictures?

10       A.   I didn't really think about it in rehab.

11       Q.   Because you said it was still there at

12   rehab --

13       A.   There was still --

14       Q.   -- the one on your arm?

15       A.   Yes.

16       Q.   But you never had anybody take pictures?

17       A.   Huh-uh (negative).

18            I thought honestly everybody forgot about

19   the situation, so -- and I had trouble trusting

20   people.

21       Q.   Did you have visitors come visit you when

22   you were in rehab?

23       A.   You weren't allowed to have visitors, but I

24   seen people at the meetings.

25       Q.   Okay.  So...

118

1          (Defendants' Exhibit Number 9 marked for

2     identification by the reporter.)

3  BY MS. BLANKENSHIP:

4     Q.    So I've had a Sick Call Request Form that

5     you completed at the jail marked as Exhibit 9, and

6     the date is the day that you were taken into the

7     jail, correct?

8     A.    That's correct.

9     Q.    1/11/22?

10    A.    That's correct.

11    Q.    All right.  And do you know about what time

12    you submitted this?

13    A.    I don't recall.  Probably as soon as I

14    found out I could.

15    Q.    All right.  So you say that you need to be

16    seen at sick call, detox, heroin, ASAP, correct?

17    A.    Correct.

18    Q.    All right.  So had you already started, by

19    the time you wrote this, feeling detox?

20    A.    I don't remember.  I knew it was going to

21    happen, but I don't remember if I started feeling

22    it yet.

23    Q.    All right.  You don't -- you didn't mention

24    anything about any injuries that you --

25    A.    No, I did not.  I did not trust anybody

1    outside of that.  I didn't trust anybody, honestly.

2    I was scared to talk to anyone.

3          (Defendants' Exhibit Number 10 marked for

4    identification by the reporter.)

5   BY MS. BLANKENSHIP:

6      Q.   It looks like the next day, January 12,

7    2022, at 9:40 a.m. you saw a nurse, according to

8    this medical record that we've had marked as

9    Exhibit 10.

10          Do you remember seeing a nurse that day?

11     A.   Yes, I do remember seeing a nurse.

12     Q.   All right.  And they said -- the subjective

13   complaint was detoxing from heroin, one half to one

14   gram daily.  Last use one day ago.

15          Would that be true?

16     A.   Yeah.

17     Q.   Okay.

18     A.   Yes.

19     Q.   And then so the assessment was, "Patient

20   states she uses 1/2 to 1 gram heroin daily.

21   Patient complaining of nausea and diarrhea."

22          Do you remember that?

23     A.   Yes.

24     Q.   Okay.  You did not mention anything during

25   this medical appointment about any injuries, did

120

1    you?

2        A.    No, I did not.

3        Q.    And would you be -- have been wearing a

4    short sleeve shirt at that point?

5        A.    I don't -- no.  I was in my whole -- when

6    you leave the cell, you have to be in your

7    jumpsuit.

8        Q.    Okay.

9        A.    It's -- covers your whole body.

10       Q.    It covers your whole body?

11       A.    Yes, it does.

12       Q.    Okay.

13       A.    It might -- it cuts off maybe right here

14   (indicating).  I don't know.  You can wear

15   something under it.  I don't know if I had anything

16   on at that point under it.  Because you can wear

17   your whites under it too.

18       Q.    Okay.

19       A.    I don't recall.

20       Q.    Yeah, it cuts off around -- just above your

21   elbow, correct?

22       A.    Something like that.  But you can wear your

23   whites under it.  I don't recall if I had whites at

24   that point or borrowed any, so I don't know.

25       Q.    Okay.  And I've reviewed your entire jail

121

1    file, and I don't see that you ever went to the

2    medical department complaining about any injuries

3    relating to the incident with Sheriff Acree.

4    Would --

5        A.    I never did.

6        Q.    Did you ever seek any medical treatment

7    from anyone relating to any of the injuries that

8    you received?

9        A.    Yes, when I got home.

10        Q.    All right.  Tell me about that.

11        A.    I went to my doctor and complained to her

12    that my hip was extremely hurting because I had --

13    it hurt for a long time on my hip, like.

14            And my -- Dr. Perry, then she recommended

15    me to go to a therapist.  She did give me -- she

16    was going to give me something for it, but I didn't

17    want anything because, of course, I'm, you know, in

18    recovery.  I didn't want anything whatsoever.  So I

19    don't recall if she actually gave me anything or

20    not, but I didn't want to take it.

21            We did do X-rays.  They -- I don't remember

22    what they -- I know there was no broken bones or

23    nothing.  I don't know what else they found.  But

24    then she recover- -- she recommended me to go to a

25    therapist, so I did go to a therapist for a little

1    bit.

2        Q.    Okay.  And we're going to go through those

3    records here in a few minutes.  But do you recall

4    them telling you the X-ray on your hip just showed

5    degenerative changes?

6        A.    I think she said something, yes, about

7    that.  I had a phone call about it, so I can't

8    remember exactly, you know.

9        Q.    Did she explain to you what degenerative

10   changes are?

11       A.    She might have.  I don't really --

12       Q.    Did she tell you that there was nothing

13   really -- no findings to indicate --

14       A.    She did.

15       Q.    All right.

16       A.    She did say that.

17       Q.    And so you were indicted by the Trigg

18   County grand jury for burglary, second degree;

19   possession of a controlled substance, first degree;

20   possession of drug paraphernalia; and receiving

21   stolen property less than a thousand dollars.

22            Is that correct?

23       A.    Yes.

24       Q.    During this time frame, you were able to

25   get accepted into the facility that treated you for

123

1    your addiction.  Is that correct?

2        A.    Yes.

3        Q.    All right.  And so you -- the judge allowed

4    you to get out to do that, correct?

5        A.    After three attempts, yes.  We had to file,

6    like, three motions.

7        Q.    And you went to -- is it Pennyroyal

8    Regional?

9        A.    Genesis.

10       Q.    Genesis -- the Genesis program at

11   Pennyroyal.  Is that right?

12       A.    Yes.

13       Q.    Okay.

14            MS. BLANKENSHIP:  I'm going to make it all

15   one exhibit rather than have separate ones, so it

16   might take me a second to get these together.

17   Sorry.  I meant for them to be all together, but

18   whoever did this for me decided I needed it

19   separate.

20            (Defendants' Exhibit Number 11 marked for

21   identification by the reporter.)

22   BY MS. BLANKENSHIP:

23       Q.    So I've had your medical records that we

24   received from the Pennyroyal Center, the Genesis

25   program, marked as Exhibit 11.  I just want to go

124

1    through some of that really quickly.

2           So July 21st, 2022, I think, was your

3    date that you got admitted.  And this is the same

4    date of your -- of the first page there.  Is that

5    correct?

6       A.   Sounds right, yes.

7       Q.   Okay.  So on the third paragraph down, they

8    are talking about what you're telling them, and you

9    state, (As read) "Crystal reported that she is

10   seeking treatment today because 'For my kids, my

11   husband, my mom, and my son who's in Heaven.'  In

12   the last year she reported to have used the

13   following substances:  Spice, heroin,

14   methamphetamine, and crack.  Prior to her

15   incarceration crystal repeated -- reported that her

16   primary drug of addiction is heroin, which she

17   would use daily, snorting 1 gram each day, her last

18   date of use being her date of incarceration,

19   1/11/22, and age of first use is 41.  Crystal

20   reported that while she was incarcerated, she used

21   methamphetamine 'multiple times in the month of

22   April, because I found out that I was not being

23   released, so I was like, Who cares anymore?'  She

24   also stated that she smoked spice multiple times

25   within the last few weeks despite her

1    incarceration."

2           And then -- well, let's just go down.

3           "I asked her how she was able to maintain

4    sobriety during the rest of her incarceration, she

5    stated that she knew if she used substances

6    consistently and ended up getting caught that she

7    would not have been released to treatment.  During

8    the mandatory drug screen admissions process,

9    Crystal tested positive for THC."

10          Were you aware that you tested positive for

11   THC upon being -- upon your admission into the

12   Pennyroyal Center?

13       A.    That is not true.

14       Q.    That's not true?

15       A.    That is not true.

16       Q.    Okay.

17       A.    There is no way.

18       Q.    Okay.  Is it true that you used meth

19   multiple times in the month of April and --

20       A.    I used it twice the whole time I was there.

21       Q.    And that you smoked spice multiple times?

22       A.    I used spice maybe once.  I didn't know if

23   it was spice or marijuana.

24       Q.    Okay.  So is it possible that you did smoke

25   marijuana, which would explain why you were THC

126

1    positive?

2        A.    No.

3        Q.    Why is that?

4        A.    Because I didn't use anything since April.

5    There's no way.   April, May, June, July.

6        Q.    Well, on this it says, "She stated that she

7    smoked spice multiple times within the last few

8    weeks."

9        A.    I stated that to them because they sat

10   there and looked at me and said, "The only way you

11   can actually get your stuff covered by insurance is

12   if you have something that you've done recently."

13       Q.    Okay.

14       A.    That's one reason why I stated it.

15       Q.    Okay.   Under Past Psychiatric History, do

16   you see background comments there?

17            "Crystal denied a history of psychiatric

18   hospitalizations.   She reported a mental health

19   diagnosis depression, anxiety, and borderline PTSD.

20   She denied any prior mental health medication

21   because she quit seeing her therapist and she never

22   picked up her medications."

23            Is that true?

24       A.    Okay, wait a minute.   Let's -- let me read

25   this again.

1      Q.    Sure.

2      A.    Okay.  This -- it could -- yeah, I mean, it

3    could be true.

4      Q.    I mean, you did -- we talked about

5    medication.

6      A.    Yeah, yeah.  Like, that's what I'm trying

7    -- I'm trying to relate it to that, yeah.  Because

8    I was looking at November 2021.  I was trying to

9    figure out the dates and all this stuff.

10          Yeah, because I might have -- yeah, I mean,

11   it could be true.  Sorry.  I'm just trying to put

12   together the dates and times.

13     Q.    Okay.  Well, we just talked about that you

14   had taken medication for anxiety --

15     A.    Correct.

16     Q.    -- since, like, 2009, I think, at least.

17          So do you not perceive that medication is a

18   mental health medication?

19     A.    Which?  What, the --

20     Q.    The medicine you took for your anxiety.

21     A.    Yes.

22     Q.    Okay.

23     A.    Yes.

24     Q.    So it said, "She denied any prior mental

25   health medication."

128

1          That would not be true, would it?

2      A.    It's just that I don't remember this.  I

3  don't remember denying -- or I just don't remember

4  this.

5      Q.    Okay.

6      A.    This is what I don't recall.  I don't --

7  I'm having still trouble with the whole THC thing.

8  It's still in my head.  Because I know I did not do

9  anything after April, so I'm just like still

10  stumped by that.  So I apologize.

11     Q.    That's okay.

12          You also state she -- and it says, "because

13  she quit seeing her therapist."  Who was your

14  therapist at this point?

15     A.    I don't even remember having a therapist

16  until I went to rehab, so that's why I'm like --

17  I'm kind of baffled with what I'm reading.  I

18  didn't go to therapy.

19     Q.    Okay.

20     A.    I don't know.  I don't know.

21     Q.    All right.

22     A.    I don't know if I said something that

23  wasn't accurate.  I don't know if they did a

24  typo.  I don't know what's going on really right

25  here so --

129

1      Q.   Okay.  Can you flip over to the next page

2   under Family Social History.

3      A.   Yes.

4      Q.   And the last page -- paragraph in that

5   section there, it says, "Crystal describes her

6   using environment as 'before I lost my son I always

7   try to hide it from them, but then after he died I

8   just didn't care anymore who knew.'  She reports

9   that her husband was a dealer.  But since she has

10   been in jail he has stopped dealing."

11          Is all of that true?

12      A.   That's about accurate.

13      Q.   It is true?

14      A.   I mean, it's about accurate, yes.  Because

15   I was telling you I did sometimes, you know -- when

16   I found out my stepfather was sick, and then after

17   I lost him, I didn't care anymore.

18      Q.   Okay.  On the next page under Mental

19   Status, it says, "Judgment impaired."  Do you see

20   that?

21      A.   Yes.

22      Q.   And then two things down it says, "Memory

23   impaired."  Do you agree with both of those?

24      A.   "Impaired" means that that's what exactly?

25   What does that --

1      Q.    It means it's not clear, I would assume.

2      A.    This would be during the time that I went

3    to Genesis?

4      Q.    Yes.

5      A.    No, I don't believe that's true during that

6    time, no.  During the time of prior, yes.  So if

7    it's talking about my prior time before I went to

8    jail during that time, yes.

9      Q.    Okay.  And why would your judgment and

10   memory be impaired before you went to jail?

11     A.    Because I was in active addiction.

12     Q.    Okay.  So the rest of these are your -- you

13   had went to see a therapist while you were there

14   during that time frame, correct?

15     A.    Correct.

16     Q.    All right.  I don't see anywhere in any of

17   those notes where you ever mentioned the incident

18   with Acree.  Do you agree with that?

19     A.    No, I did talk to her about it.

20     Q.    You believe you did?

21     A.    I know I did.

22     Q.    And tell me about that.

23     A.    I mean, I just talked to her about what

24   took place.  And they said it wasn't okay.  And I

25   talked to some of the other ladies out there that

1    was there, some of the staff --

2         Q.    Okay.

3         A.    -- about this situation.  I mean, they

4    knew.  I can tell you their names if you want them.

5         Q.    Yes.  Yes, I do need to know those names.

6         A.    One of them's name is Jenny.

7         Q.    What?

8         A.    Her name's Jenny.  I don't know what her

9    last name is.  She lost her leg, so she still

10   probably works there.

11        Q.    Okay.

12        A.    And Meredith Ezell.

13        Q.    All right.  Did you tell them not to put it

14   in your notes or anything like that?

15        A.    I don't recall.

16        Q.    Okay.

17        A.    I know my therapist said there was a lot of

18   things that she would not write down.  She didn't

19   write a lot of things down that was between me and

20   her.

21        Q.    All right.

22        A.    I felt safe to talk to her about certain

23   things.

24        Q.    On the last group of stapled documents --

25   and it's going to be Bates stamped at the bottom.

132

1    Do you see where it says in little letters "Smith,"

2    and it has a number beside it at the bottom?

3       A.   Wait.   Here?

4              MS. SHREWSBURY:   0080.

5              MS. BLANKENSHIP:   So I'm going to be

6    looking at 00131, if you want to help her get to

7    that page.

8              THE WITNESS:   I don't -- are they stapled?

9              MS. BLANKENSHIP:   It's the second-to-last

10   page in that group, if that helps you you.

11             THE WITNESS:   What's the bottom number?

12   108?

13             MS. BLANKENSHIP:   000131.

14             MS. SHREWSBURY:   Hold on.

15             THE WITNESS:   131?   130?

16             MS. BLANKENSHIP:   131.

17             MS. SHREWSBURY:   It's going to start with

18   130, yeah.

19             THE WITNESS:   The last -- oh, that's the

20   last page for mine -- or no.

21             MS. BLANKENSHIP:   The second-to-last page.

22             THE WITNESS:   Yeah, you're right.

23   BY MS. BLANKENSHIP:

24      Q.   Okay.   The second paragraph there says --

25   do you see where it says -- starts with

1    "Response:"?

2       A.   Yes.

3       Q.   All right.  "Crystal presented to session

4    in person and appropriately dressed on this date.

5    She appeared anxious as she had rated her anxiety

6    '7 out of 10.'  Crystal denied any suicidal

7    ideations or suicide intent at the time of

8    Columbia Screener.  She shared that the FBI claims

9    to come speak with her but she was unaware of the

10   situation."

11          Do you remember that?

12      A.   I do remember when the FBI was wanting to

13   come talk to me.  And at first, I was so confused

14   why they wanted to talk to me.  Yes.

15      Q.   Okay.  Do you remember telling them at that

16   time that you were unaware of why?

17      A.   Yes.

18      Q.   And didn't -- you didn't think that it was

19   anything to do with the incident with you and

20   Sheriff Acree?

21      A.   Within 20 minutes I knew what it was.

22      Q.   Why 20 minutes?

23      A.   I was stumped.  It was the FBI.  I didn't

24   understand what was going on so --

25      Q.   So when you --

134

1    A.    I honestly thought no one even cared that I

2    was assaulted, so I did not know.  I was clueless.

3    Q.    When you went to speak to this person on

4    August 10th, 2022, are you saying that this --

5    this was the -- within the 20 minutes before you

6    understood and knew what the FBI was wanting?

7    A.    I don't recall everything, who I talked to

8    within that time.

9    Q.    When did the bruising resolve?

10    A.    It took a few months for -- it took about a

11    month or two maybe for, you know, the little ones

12    to resolve.  It took a long time for the one on my

13    hip.

14    Q.    How long?

15    A.    I would say it was gone before I left.

16    Q.    Okay.  So you left in July of 2022?

17    A.    Yeah, I would say it was gone.

18    Q.    By then?

19    A.    By May or June, yeah.

20    Q.    Okay.  And --

21    A.    The one on my arm, it was still a mark.  It

22    was still there when I showed up, but you could

23    barely -- like, it was more, like, faded.  It was

24    kind of like --

25    Q.    Okay.

1      A.   You could just see there was something that

2   was there, and it was just starting to fade away at

3   that point.  I mean, it was a road rash.  They take

4   probably longer to heal anyway.

5           I would like to say something else about

6   the FBI thing.  You have to realize that I was

7   assaulted by a cop.  Like, so when the FBI came to

8   me, it scared me.  That's where I was at at that

9   time, panicking.  So I probably did not remember or

10  think anything about the incident being the issue

11  or what they came to talk to me about.

12          (Defendants' Exhibit Number 12 marked for

13  identification by the reporter.)

14  BY MS. BLANKENSHIP:

15     Q.   I've had your Commonwealth's Offer on a

16  Plea of Guilty marked as Exhibit 12.  And the first

17  page lists the charges that you were charged with,

18  and then the -- at the top.  And then Number 2

19  lists any amendments.  And so the amendment was

20  from second-degree burglary, which is a Class E

21  felony, to third-degree burglary, Class D felony.

22  It looks like the rest of the charges remained the

23  same.  And the recommendation was that you receive

24  25 months for Counts 1 and 2 and 12 months for

25  Counts 3 and 4, to run concurrently.

136

1          And is that your signature on the second

2     page?

3     A.    Well, if I can open it.

4          Yes.

5     Q.    All right.  So you accepted that offer?

6     A.    Yes.

7     Q.    All right.  And ultimately you were

8     sentenced and placed on probation?

9     A.    Yes.

10    Q.    And are you still on probation as we sit

11    here today?

12    A.    Yes.

13          (Defendants' Exhibit Number 13 marked for

14    identification by the reporter.)

15    BY MS. BLANKENSHIP:

16    Q.    All right.  I've had your medical records

17    that we've been able to obtain following your

18    release from Genesis marked as Exhibit 13.

19          And it looks like that you went to Health

20    First Community Health Center.  Is that correct?

21    A.    Yes.

22    Q.    And did you establish a new -- as a new

23    patient there after --

24    A.    I was a new patient there, yes.

25    Q.    Okay.  And it looks like the first time

1    that you went there was -- oh, I forgot.  They have

2    this in backwards order, so, unfortunately, we're

3    going to have to go backwards.

4          So the first date of service is -- do you

5    see at the bottom where it says pages six- -- like

6    this, page something of 21?

7    A.    Uh-huh (affirmative).

8    Q.    This is 16 of 21.  The date of service is

9    November 18, 2022.

10         This was -- based on what I can tell, this

11   is your first time that you went there.  Do you

12   recall one way or the other?

13   A.    What date is it saying?  Eight --

14   Q.    November 18, 2022.  And it says, "Reason

15   for appointment," number one, "establish care."  So

16   typically that means that's your first appointment.

17   A.    Yeah, that sounds about right.

18   Q.    And it also says slash "blood pressure."

19   Do you recall when you went there that you had to

20   complete some sort of survey that asked questions?

21   A.    Uh-huh (affirmative).  Yes.

22   Q.    Yes?  Under depression screening, which is

23   your first thing, do you see that?  And I'm just

24   going to have you read that to yourself.

25   A.    (Witness looking at document.)

138

1        That sounds about right at that moment.  I

2    didn't want to see anybody the first time I

3    visited.  I was scared they were going to try to

4    put me on something for depression so --

5        Q.   Okay.  So you agreed -- I think your score

6    for this was zero as far as a depression screening.

7        You agree that you did indicate that you

8    didn't have any issues with respect to mental

9    health at all?

10       A.   Yeah, that's what I told them.

11       Q.   Okay.  And you were afraid that they were

12   going to put on --

13       A.   I was afraid that -- every time pretty much

14   I've ever went to the doctor for depression or, you

15   know, whatever, like even -- I'm really against the

16   whole being put on pills right away.  So I was

17   actually -- just went with that because I was

18   scared they were going to try to put me on

19   something, and I didn't want to be on something.

20       Q.   Okay.  But you -- I mean, you understand

21   that you don't have to take what your doctor tells

22   you to take?

23       A.   Yeah, I understand that.

24       Q.   Okay.

25       A.   I was just trying to rule it out, I guess,

139

1    myself.

2        Q.   All right.  Looks like that they diagnosed

3    you with hypertension, and then it also indicates

4    right hip.  Complaining of right hip lateral hip --

5    sorry.  Start over.

6            "Complains of pain right lateral hip,

7    burning pain, lasts 30 minutes or so usually, worse

8    when she is still."

9            Is that the hip you were talking about?

10       A.   Yes.

11       Q.   All right.  And then on page 18 of 21, it

12   looks like that they said, "Imaging X-ray, hip" --

13   it says "left."  I don't know if that's a mistake

14   or what?

15       A.   Yeah, I never did -- there's nothing been

16   wrong really with my left hip.  It's my right hip.

17       Q.   Okay.

18       A.   So, I mean, they might have x-rayed both of

19   them, but I don't see why they would.

20       Q.   All right.  So then if we go forward, the

21   next appointment I have is January 12th, 2023.

22   Do you see that on page 13 of 21?

23       A.   Okay.  Yes.

24       Q.   Yes?

25       A.   Uh-huh (affirmative).

140

1      Q.    Okay.  Now, you filed your lawsuit,

2   according to the complaint, on December 7th,

3   2022.  So in between this first and second

4   appointment, you filed the lawsuit.

5           Would you agree with that, if that's

6   correct?

7      A.    I don't remember exactly when I did, but I

8   know it was shortly after I came home.

9      Q.    All right.  And it says, "Reason for

10  appointment, recheck mood/anxiety."

11          And then under -- you had the depression

12  screening.  They still told you you scored zero,

13  but now they have generalized anxiety disorder.

14          Do you see that?

15     A.    Yes.

16     Q.    "Level of anxiety:  Yes.  Higher than usual

17  recently.  Current new stressors:  Sobriety,

18  holidays, previous loss of child.  Restlessness:

19  On edge, yes.  Irritability:  Yes.  Fatigued:  No.

20  Sleep disturbance:  Difficulty falling asleep,

21  difficulty staying asleep.  Counseling:  Requesting

22  visit."

23          "And then depression has been down and

24  tearful at times with grief process.  Coping

25  strategies, prays."

141

1          So did -- what happened between the

2     appointment on November 18th when you denied

3     having any of these issues to January 12th of

4     2023?

5          A.    Nothing.

6          Q.    Okay.  So why did you --

7          A.    I mean, I was just more honest because my

8     husband was telling me all the time, "You need to

9     try to be honest with them.  Don't be scared to

10    talk to them."

11         Q.    Okay.

12         A.    And that little screen thing, when I first

13    started doing it, I did not like that thing at all.

14    Like, it just intimidated me.

15         Q.    The what thing?

16         A.    The screen, where you have to do it, to put

17    your depression and all of that.  It just really

18    was intimidating to begin with, because that's the

19    first time I ever used one.

20         Q.    Okay.

21         A.    So I didn't know what the outcome even was

22    going to be.  It took me a minute to actually --

23    you know, to learn to try to be real with the -- on

24    how I was feeling at that moment.

25         Q.    Okay.  If you go over to page 14 of 21 --

142

1     A.    Which page?

2     Q.    14 of 21.

3     A.    Okay.

4     Q.    Looks like under Assessments, they state,

5     "Adjustment disorder with depressed mood,

6     disappearance and death of family member,

7     generalized anxiety disorder."

8         Do you know if you told them anything about

9     the incident with Sheriff Acree?

10    A.    No, I did not talk to my doctor about that.

11    I do not -- I do not recall.  No.  Yes, we did.  We

12    did talk to him about it.  My husband is the one

13    who was in the room with me who actually said

14    something about it.  I didn't because I didn't like

15    talking about it.  Because when I talk about it, I

16    actually sometimes just shut down so -- like, I

17    can't talk too much about certain things.  Same

18    4thing with my son.

19    Q.    Do you know if that -- what you're

20    remembering as far as your husband was on

21    January 12, 2023?

22    A.    I don't recall.

23    Q.    Okay.  All right.

24    A.    I know he was with me on most of these

25    doctor visits.  He came with me.

143

1      Q.    All right.  So on the bottom of page 14 of

2    21, at the very -- the very last paragraph says,

3    "Depression Care Plan:"

4           Do you see that?  14 of 21?

5      A.    Oh, the same page?

6      Q.    Yes.

7      A.    Okay.  Yes.

8      Q.    And then if you keep going it says, "To

9    decrease PHQ9 score, to decrease medication usage,

10   to increase life enjoyment.  Self-management plan:

11   Take medication daily as prescribed, attend

12   counseling sessions, journal daily, exercise daily,

13   limit alcohol intake, small frequent meals, sleep

14   at least 7 to 9 hours per night.  Encourage

15   grooming habits.  Counseling, referral to

16   counseling.  Meet with therapist.  Meet with

17   psychiatrist, psychiatric nurse practitioner."

18   I'll stop there.

19          Do you know when you met with this

20   counselor after this, following this?

21     A.    I don't remember exactly when, but they

22   wanted me to meet her, so I went ahead and did

23   that.

24     Q.    Okay.  So if you'll move forward to -- the

25   next appointment is 9 of 21.  Do you have 9 of 21

144

1   up?

2       A.    Oh, no.  9?

3       Q.    Yeah.

4       A.    I keep going the wrong way.

5       Q.    I know.

6       A.    I'm sorry.

7       Q.    I hate the way they did this.

8       A.    I keep going -- okay.

9       Q.    All right.

10      A.    Yes.

11      Q.    That would be March 20, 2023.  This is the

12   first -- the next appointment that I see that you

13   had there -- and it said "Initial Psychiatric

14   Evaluation."

15          So you were referred to see a counselor on

16   January 12th, 2023, but you didn't go until March

17   20th, 2023.  Do you know why --

18      A.    Yes, I do.

19      Q.    -- you waited two months?

20      A.    Okay.  I was working nonstop, and I'm only

21   allowed so much PTO.  Most of my PTO went towards

22   court or going to the doctor, so I had to, like,

23   squeeze it in.

24      Q.    Okay.  And it states -- under Initial

25   Psychiatric Evaluation, if you go about three lines

145

1    down, it says, "Patient identifies stressors as

2    memories of son, police officers, seeing young

3    children, and loud noises."

4        I will tell you that I've reviewed all of

5    your medical records, and this is the first time

6    I've seen anything in any medical record indicating

7    anything about a police officer or anything like

8    that.

9        Do you have any reason to dispute that?

10   A.   Wait.  First of all, where is this at so I

11   can just -- I don't see where you're at.

12        MS. SHREWSBURY:  I gotcha.

13        THE WITNESS:  Oh, okay.

14   A.   I don't recall actually talking about it

15   too much before because I didn't like talking about

16   it.

17   Q.   Okay.

18   A.   It was one of those things that I was asked

19   to talk about what was really going on with me.

20   Q.   Okay.  On 11 of 21, the Modality states,

21   "Crystal will meet with LPCC," which is licensed

22   professional clinical counselor, "biweekly in order

23   to process through the traumatic events."

24        And then next appointment I have of you is

25   3/31/23, which is on 6 of 21, so it'd be about 11

1    days later, but it's not with the LPCC.  It's

2    actually for a recheck of your hypertension and

3    mood.  And then it's discussing at the -- if you

4    see down there "right hip, complaining of right hip

5    pain again."  You had not -- still not gotten your

6    X-ray done at this point yet, but it looks like

7    that -- well, you if you turn over to the next

8    page, 7 of 21, do you see under "Treatment," "Right

9    hip pain"?

10       A.    Yes.

11       Q.    And then that's where they noted that you

12   had mild degenerative changes in both hips, no

13   acute abnormality.  Is that what they told you?

14       A.    I don't recall everything.  I just know

15   they did say something about the generative,

16   whatever, how you say that, yeah.

17       Q.    So the next time I have you going to see an

18   actual therapist from 3/20 was -- is not until

19   4/24/23, which would be page 2 of 21.  And it says

20   Reason for appointment is BH, which is behavioral

21   health, recheck.

22           So it looks like that is about five weeks

23   or so after your first appointment, even though

24   they told you to go biweekly, that you were able to

25   go back again for your second appointment.

1          Would that be correct?

2     A.    It looks like it's correct.

3     Q.    All right.  And then on page 4 of 21, it

4     says, "Modality, Crystal will meet with LPCC

5     biweekly."  So again, they were saying that you

6     need to do biweekly.  And I don't see that you've

7     been back since then.

8     A.    Yeah, I haven't.

9     Q.    You have not?

10    A.    I actually stopped going after a period of

11    time because I was starting to run out of PTO.

12    Q.    Okay.  All right.  So you went to two

13    therapy sessions?

14    A.    No, I went to more than two.  I'm pretty

15    sure it was like four.

16    Q.    Okay.  Well, I only --

17    A.    I went there like four different times.

18    Q.    Was it all -- you're saying it's at this

19    particular place?

20    A.    I thought so, yes.

21    Q.    Okay.  Well, they sent us the records, and

22    it's certified as being complete.  And as you saw

23    there, numbered as page 1 of 21 -- and we went

24    through them each -- and I only saw two.

25          Is it possible that your memory is

CRYSTAL DAWN SMITH

148

1    incorrect, and it may have just been two.

2        A.    I thought I seen her more than twice.

3    Because I remember I just -- I thought I'd seen her

4    more than twice.  The first time I had a full-blown

5    anxiety attack before I talked to her, and I had to

6    go to the hospital.

7        Q.    You went to the hos- -- what hospital did

8    you go to?

9        A.    To Calloway.

10        Q.    Sorry, what?

11        A.    Ca- -- the one that's in Princeton, the

12    hospital there.  Is it --

13            MS. SHREWSBURY:  Caldwell.

14        A.    Caldwell.  I got it confused with Murray.

15    Sorry.  Like, they were trying to put me in the

16    hospital and everything.

17        Q.    And you're saying that was after your first

18    appointment?

19        A.    It was my very first one that I was

20    supposed to go to, so I didn't even -- I didn't

21    even see her, I don't think, that day.  Yeah, it

22    was the very first one, because I was very scared

23    to talk about all of it, everything.

24        Q.    But you had already talked to the FBI at

25    that point, had you not?

149

1    A.    That has nothing to do with me talking to

2    the therapist.  It was bringing it all back up.  So

3    I had a full-blown -- I had to go to the hospital.

4    I couldn't breathe.  My blood pressure went up and

5    everything.

6    Q.    Okay.  But when you talked to the FBI, that

7    brought it all back up, too, correct?

8    A.    I mean, it was not fun to talk to them.

9    Q.    Okay.  After this April 24th, 2023,

10   appointment, have you been to see any doctors about

11   anything relating to this incident?

12   A.    I don't recall right now.

13   Q.    I don't -- I've gotten all the records that

14   you identified, your medical records.

15   A.    I do know at a point I ran out of PTO.  I

16   do know I'm trying to move forward from all of this

17   the best that I can.

18   Q.    When -- going back just real quick.  When

19   Jailer Hughes -- did Jailer Hughes walk you over to

20   the door -- the side door, or did Sheriff Acree

21   walk you there?

22   A.    I think James Hughes got me out of the car.

23   Q.    Okay.

24   A.    I think Acree was just standing there

25   waiting.

150

1       Q.    Okay.

2       A.    That's what I --

3       Q.    And do you think Jailer Hughes walked you

4    to the door?

5       A.    To go in?

6       Q.    Yes.  Or was it Sheriff Acree?  To the

7    door -- the side door of the sheriff's department.

8       A.    I think he guided me in that direction --

9       Q.    Okay.

10      A.    -- and I just seen Acree motion me to go

11   into the building.

12      Q.    Okay.  So Acree motioned you to go into the

13   building, right?

14      A.    Yes.

15      Q.    All right.  You didn't see James Hughes

16   motion you?

17      A.    I don't recall.

18      Q.    Okay.  Do you know anything about the Jared

19   Kennedy lawsuit?

20      A.    I've heard a little bit about it, but I

21   don't --

22      Q.    Who have you heard it from?

23      A.    People around town.

24      Q.    What do you recall knowing about it?

25      A.    People on social media.  I don't -- I try

CRYSTAL DAWN SMITH

151

1    -- I really honestly try not to have anything to do

2    with any of the things that take place in Cadiz

3    anymore, to do with that.

4        Q.    What about Dylan Akers?  Do you know

5    anything about that?

6        A.    No.

7        Q.    Do you know anything Perry Stokes?

8        A.    No.

9        Q.    What about Allan Stout -- Allan Stott?

10       A.    I mean, I've heard a lot of stories, but I

11   cannot put a name with a story.

12       Q.    Do you know anything about Allan Stott,

13   S-T-O-T-T?

14       A.    No.

15       Q.    James Hughes took you out of the Cadiz

16   Police Department, right, not a Cadiz police

17   officer?

18       A.    When I was going to the car --

19       Q.    Yes.

20       A.    -- to go to jail?  Yes.

21       Q.    Okay.  Do you know if Jailer Hughes had an

22   order to transport you to the Caldwell County

23   Jail -- or, I'm sorry, the Christian County Jail?

24       A.    No, I wouldn't know that.

25       Q.    Do you know anything about what the Trigg

1   County Fiscal Court has done in the past with

2   respect to any incident relating -- similar to this

3   or relating to this or whether -- do you know

4   anything about that?

5       A.   What do you mean?

6       Q.   Do you know anything about the Trigg -- how

7   the Trigg County Fiscal Court has operated at all,

8   I guess I should ask first.

9       A.   No.

10      Q.   Okay.  Are you aware of any other incident

11  in which a suspect was transported by the jailer to

12  someplace other than the jail?

13      A.   No.

14          MS. BLANKENSHIP:  That's all of my list of

15  questions.  I don't know if we -- do I need to talk

16  to you, or are we good?

17          Do I need to talk to you, or are we good?

18          MR. WRIGHT:  I'm okay.

19          MS. BLANKENSHIP:  Okay.  That's all I have

20  for now.

21          MR. WRIGHT:  Take a short beak?

22          MS. SHREWSBURY:  I'd be happy to do that.

23          THE VIDEOGRAPHER:  We are now off the

24  record.

25          (A brief recess was taken.)

153

1          THE VIDEOGRAPHER:  We are back on the

2     record.

3                    CROSS-EXAMINATION

4   BY MR. WRIGHT:

5      Q.   Ms. Smith, my name is Derrick Wright.  Let

6     me start off by apologizing.  I thought I was 10

7     minutes late.  I was an hour and 10 minutes late.

8     My office is in the Eastern time zone, and we must

9     have missed calendaring that.  I'm very sorry.  But

10    Ms. Blankenship has done a lot of this, so I

11    hopefully won't take much longer.

12          I represent Sheriff Acree, and I'm just

13    going to hit some points that I need to follow up

14    for my client.  I may bounce around, but all the

15    same rules apply.  You're under oath.  Just please

16    verbalize your answers.

17     A.   Okay.

18     Q.   And if you don't understand anything, just

19    let me know, and I'll be happy to reask it.

20    Otherwise, I'll assume you understood.  Okay?

21     A.   Okay.

22     Q.   All right.  So picking up on a few things,

23    you indicated you were not looking for employment

24    in January of 2022 when this incident happened

25    because of your addiction and grieving.  Is that

CRYSTAL DAWN SMITH

154

1   right?

2       A.   Correct.

3       Q.   Is it fair to say you weren't -- didn't

4   have any job prospects in the offing or any plans

5   to get any placement anytime soon because of that?

6       A.   I wasn't really thinking about work during

7   that time.  My husband was able to take care of us.

8       Q.   So you had no plans at that point?

9       A.   Didn't think about it.  Yes.

10      Q.   And then I believe after you were released,

11  you did find employment fairly quickly after your

12  release.  Is that right?

13      A.   Yes, correct.

14      Q.   And you still work there right now?

15      A.   Yes.

16      Q.   What are you making per hour there?

17      A.   Right now?

18      Q.   Yeah.

19      A.   What am I making?  I think it's 20.55.

20      Q.   Okay.  Is that comparable or better than

21  what your -- your other jobs there?

22      A.   I was a server most of my years, so I could

23  make a hundred dollars a night, or I could make

24  $500 a night.

25      Q.   It was kind of fluctuating?

1        A.    Yeah.

2        Q.    Okay.  And it had been how long before --

3    how long had you been not working?

4        A.    When the incident happened?

5        Q.    Yes.  I believe you stopped sometime prior

6    to that, right?

7        A.    April.

8        Q.    April?

9        A.    Yeah.  It was around April.

10       Q.    Was your last job before that in serving

11   or was it --

12       A.    Serving.

13       Q.    -- a factory job?

14       A.    No.  I didn't start working in a factory

15   until after I got home from rehab.

16       Q.    Okay.  What are your hours there?

17       A.    It's -- I have to be there at 4:30, and I'm

18   there until 4:00, so I get about 11 to 12 hours

19   each day.

20       Q.    Is that -- what days per week?

21       A.    Friday -- I mean, Monday through Thursday

22   for sure.  If we have overtime, it's Friday and

23   Saturday.

24       Q.    Okay.

25       A.    Just depends on how well we're doing.

156

1      Q.    You've indicated that there's no scarring

2      left over from any of your claimed injuries, right?

3      A.    I don't -- I don't see any.

4      Q.    Okay.  You indicated that there was some

5      bleeding from the -- the rash.  Is that right?

6      A.    Like the road burn, rash, yes.

7      Q.    Yeah.  Was that immediate?

8      A.    I don't re- -- yeah, it probably was

9      immediately.  Like, it even had, like, scabs over

10     it.  So, I mean -- like, the scab -- when you,

11     like, fall down on the concrete, yeah.

12     Q.    Right.  And I think you indicated it went

13     from somewhere above your elbow to close to your

14     wrist?

15     A.    Yeah.  It was like right there,

16     (indicating).

17     Q.    So is that about 4 inches.  Six?

18     A.    I don't know.

19     Q.    Okay.

20     A.    I never measured it.

21     Q.    Was that bleeding when you went to the

22     jail?

23     A.    I don't know if it was -- it wasn't like a

24     whole lot of blood.  It wasn't like spilling out or

25     nothing.  It was just, you know, road rash, like a

157

1    little bit of blood coming out of the arm.

2         Q.    Did it ever get bandaged?

3         A.    No, but I did see it on my sheets at the

4    bed -- at the jail.

5         Q.    Did you ever ask for cream or ointment?

6         A.    No, I never did ask for anything.

7         Q.    No one ever noticed it when you were

8    booked?

9         A.    I -- no.  I was in a holding cell by

10   myself.  Nobody else -- maybe two other inmates

11   might have been in there.  And then they took me

12   back within a few hours.  I don't remember exactly

13   the time.  They gave me my stuff, and they put me

14   in the cell, and I never came out ever.

15        Q.    But you did make a sick call request of --

16        A.    Besides that call.  And I think I went to

17   church maybe four or five times while I was there.

18        Q.    But you never put anything on there about

19   bleeding from any scar or rash?

20        A.    No.  I never told anybody anything to do

21   with that incident outside that cell.

22        Q.    And I believe we saw some records of after

23   your release, you had -- you had your hip looked

24   at?

25        A.    Yes.

158

1       Q.   I believe you said it was extremely

2    hurting?

3       A.   Yes.

4       Q.   Was that consistent?

5       A.   It would come and go.

6       Q.   So --

7       A.   There's times that it would really hurt.  I

8    don't -- and then there was times I just -- it

9    wasn't as bad.

10      Q.   And did it come and go while you were still

11   in custody?

12      A.   I -- being in Christian County Jail?

13      Q.   Yes.

14      A.   It hurt off and on.  I don't -- I also

15   detoxed at first too, so there was that.  There's a

16   lot of things that I didn't even notice until I was

17   done detoxing.

18      Q.   You'd agree there was no -- we've not seen

19   any records of any requests for any pain relievers

20   or anything to do --

21      A.   I never did ask --

22           THE REPORTER:  Let him get that whole

23   questions out.

24           Can you repeat that, please?

25           MR. WRIGHT:  Sure.

1   BY MR. WRIGHT:

2       Q.   You'd agree we've not seen any requests for

3   any pain relief or any treatment for any hurting in

4   the -- to your hip?

5       A.   That's true.

6       Q.   I have to share this with your counsel

7   after we mark it.  I didn't print off a bunch to

8   circulate around.

9           (Defendants' Exhibit Number 14 marked for

10  identification by the reporter.)

11          MR. WRIGHT:  We can remove the

12  authorizations.  I think that may have been printed

13  off accidentally.

14          MS. SHREWSBURY:  Yes.

15          MR. WRIGHT:  If you just want to cut it off

16  at her verification, that's fine.

17  BY MR. WRIGHT:

18      Q.   Do you recall answering written requests

19  for information in this case, Ms. Smith?

20      A.   What do you mean?

21      Q.   Well, what we have in front of you, there's

22  questions and answers.  This is your responses to

23  defendant Acree's interrogatories and request for

24  production.  Do you recall answering those?

25      A.   Answering his questions?  Yes.

160

1      Q.   Yes.  Okay.

2           I'm going to ask you to go to Number 6 on

3      page 3.  And it asks you to identify all persons

4      that you believe have knowledge or information

5      related to your allegations in your complaint.

6           Do you see that?

7      A.   Yes.

8      Q.   And we have listed Mr. Hughes, Mr. Acree,

9      and then some additional people.

10     A.   Correct.

11     Q.   Is this all the -- as we sit here today, is

12     this all the people you believe have information

13     about your claims?

14     A.   There could be a lot more now, but that's

15     just because of word of mouth, but this is the

16     people that I talked to when I was incarcerated.

17     Q.   All right.  So these are the people who

18     have firsthand information?

19     A.   Yes, exactly.

20     Q.   Is that fair?

21     A.   Yes, that's fair.

22     Q.   Who are -- beginning with Andrea Baron,

23     who's that?

24     A.   Andre -- Andrea, sorry.  She was -- I was

25     in the cell with her.  All of these ladies were

161

1    in the cell with me, and they asked me about my

2    bruises.

3        Q.    All right.  So Baron, Howard, Dunlap,

4    Filbock, and McRoy?

5        A.    Yes.

6        Q.    They were all cellmates?

7        A.    Yes.  They are the ones who seen it and

8    asked me about what happened.

9        Q.    Did you -- I believe this was signed off

10   by -- looks like you verified this in April of

11   2023.  So that would have been a couple of years

12   after the incident -- or I'm sorry.  One -- a

13   little over one year after the incident.

14           Did you need anything to remember who these

15   people were?

16       A.    What do you mean "need"?

17       Q.    Did you have to, like, review cell lists or

18   any --

19       A.    No, no, no.

20       Q.    You recall these people?

21       A.    Very well.

22       Q.    So you remembered them just straight from

23   your memory when you were filling this out?

24       A.    Yes, I remembered exa- -- they slept right

25   beside me for days, months.

162

1    Q.    Have you been into -- have you had any

2    contact with these individuals since your release?

3    A.    Yes, I have.

4    Q.    Who have you spoken to?

5    A.    Andrea, I've spoken to her.  Tina, I speak

6    to her, Tina, a lot.  And the -- I spoke to Lexi a

7    few occasions.  The other two I have not.

8    Q.    The interrogatory asked for names,

9    addresses, and telephone numbers.  Do you see that?

10   A.    Yes.  I don't where they live at.

11   Q.    Well, it also includes telephone numbers,

12   right?

13   A.    I think I might have given phone numbers.

14   I don't recall.  I thought maybe I'd given -- yeah,

15   I'm pretty sure I gave some of them the phone

16   numbers.  The people that I contacted, I gave

17   numbers.

18   Q.    Can you and your attorney agree to provide

19   that contact information after this?

20   A.    Yeah.

21   Q.    And which ones did you say you have the

22   numbers for?

23   A.    I knew -- I have Andrea's number and Tina,

24   and I had Lexi on Facebook.

25   Q.    Do you know where any of these individuals

163

1    live?

2        A.    I know Tina lives in Hopkinsville, and so

3    does Andrea.  Okay, I don't know exactly if Tina

4    still lives in Hopkinsville.  I know she works at

5    Genesis right now so -- Tina.

6        Q.    She works where?

7        A.    I think she works at Genesis.

8        Q.    Tanna [sic] does?

9        A.    Yeah.  Or for them.

10       Q.    Do you know where Andrea works?

11       A.    No.  She was working in a factory, but I

12   don't -- I don't know, no.

13       Q.    What about Crystal Howard?  Have you had

14   any contact --

15       A.    I have not talked to her since she left the

16   cell.

17       Q.    Do you know where she's at?

18       A.    No.

19       Q.    Have no contact for her?

20       A.    She had lived in a different county.

21   That's all I know.

22       Q.    Carmen Filbock?

23       A.    I haven't --

24            THE REPORTER:  What was that name again?

25            MR. WRIGHT:  Filbock.

164

1  BY MR. WRIGHT:

2      Q.   Do you have any contact information for

3  her?

4      A.   No, I don't.

5      Q.   You haven't been in contact with her since

6  your release?

7      A.   The last time I seen her, when she left the

8  cell, but both of those last ladies left before I

9  did.

10     Q.   Okay.  And then Lexi, you still communicate

11  with her on Facebook?

12     A.   I did for a little bit.  And then she kind

13  of just stopped.  And I reached out to her.  She

14  stopped talking to me, so I'm thinking she might

15  not be doing very good because she stopped.  We

16  lost contact with each other.

17     Q.   When was the last time you reached out to

18  her?

19     A.   I would say it's probably been about a

20  year.

21     Q.   Do you know where she lives?

22     A.   No.  I think she lived in McCracken.  I

23  think she lives -- yeah.  But I could be wrong.

24  No, no.  She lived in Mayfield.  That's exactly

25  where she lived at.  I remember now.  Yeah.

165

1    Q.   And as far as people with firsthand

2    knowledge, that list is complete?

3    A.   The people who seen it while I was there,

4    yes.  Well, I mean --

5    Q.   I'm not just talking about seeing your

6    injuries.  I'm talking about who you think has

7    knowledge about just your allegations in general.

8    A.   Okay.  There is the girls at rehab that I

9    mentioned earlier, that I talked to them.  Meredith

10   Ezell.  Jenny, which I don't know what her last

11   name is.  Some of the other girls did, too, but I

12   don't -- I don't know their names so -- we talked

13   about the situation.

14   Q.   So you talked to -- are those counselors,

15   or were they people who were doing the program with

16   you?

17   A.   Some of the staff and the therapist.

18   Q.   And we've already covered the ones you

19   believe you mentioned it to?

20   A.   Yes.  I did mention it to them.

21   Q.   My question was, just to be clear, that the

22   people that you believe you've spoken to about this

23   incident, we've talked about that already through

24   Ms. Blankenship's examination.  Is that right?

25   A.   Yes.

166

1      Q.   No one's been left out, to your knowledge?

2      A.    I mean, there could be some people that

3   were left out, but I can't recall, you know, who's

4   talked to me or who hasn't.  Like, I know the main

5   people that I had a discussion with.  There

6   could've been other people that could've overheard

7   it.

8      Q.   No one else stands out?

9      A.    There's one girl that I talked to a lot who

10  we left together, the jail, and went into rehab.

11  And her name is Kim, Kim McCain.  There's her too,

12  yeah.  I actually talk to her a lot.  I don't even

13  know why I forgot about Kim McCain.

14     Q.   And she was a fellow inmate?

15     A.    She was in the cell with me for about two

16  or three weeks.  She left and she ended up, I

17  guess, getting arrested again, and then we went to

18  rehab together.

19     Q.   At Genesis?

20     A.    Yeah, exactly.

21     Q.   And then as best as you can remember,

22  the -- Andrea Baron, how long was she in with you?

23     A.    She was in almost the whole time.  She did

24  go to another cell.  So she was in there for almost

25  the whole time I was there.

1          Q.    How long was she in the same cell, if you

2     can remember?

3          A.    Maybe four -- maybe three or four months.

4          Q.    Was she in there when you first arrived?

5          A.    Yes.

6          Q.    Crystal Howard, was she in there when you

7     first arrived?

8          A.    She came, maybe, about a few weeks later.

9          Q.    And then how long was she in the same cell

10    with you?

11         A.    She was in there for a minute.

12               THE REPORTER:   She was what?

13         A.    In there for a little bit.  She went to

14    another county, I think, right before I left.

15         Q.    Tonya Dunlap, was she in there when you

16    first arrived?

17         A.    She was.

18         Q.    How long was she in the same cell as you?

19         A.    I would say a few months, and then she got

20    released to go to rehab.

21         Q.    Carmen Filbock, was she in there when you

22    first arrived?

23         A.    No, she was not in there when I first

24    arrived.  She was a few weeks later.

25         Q.    And then how long were you in the same cell

168

1    as her?

2        A.    I would say a month or two, and then she

3    went to actually work release.

4        Q.    Lexi McRoy?

5        A.    She showed up two days after I was there.

6        Q.    And then how long was she with you in the

7    same cell?

8        A.    She was there when I left.

9        Q.    I saw reference in the jail records that

10   have been produced in the case.  I believe you were

11   primarily, at least at the beginning, in a cell

12   called 402.  Does that sound right?

13       A.    That's where I was at the whole time I was

14   there.

15       Q.    Is that the same cell as detox?  Some

16   places, I think, have a separate detox --

17       A.    Yeah.  They don't -- I don't think they do

18   that there.

19       Q.    They don't?

20       A.    No.

21       Q.    Just treat the detox if that's the

22   reference?

23       A.    If you want to call it treating.  I mean,

24   they throw you in a cell, and you're on your own.

25       Q.    So you were just in a regular cell, and to

169

1    your memory it was Cell 402?

2         A.    Yes.

3         Q.    And you believe you were there the whole

4    time?

5         A.    I know I was there the whole time.

6         Q.    Were you transported in and out for court

7    appearances occasionally?

8         A.    Yes.

9         Q.    That would have been the only movement out

10   of the facility?

11        A.    Yes.

12        Q.    Did Jailer Hughes ever transport you again?

13        A.    I don't think so.

14        Q.    Not to your memory?

15        A.    No, he didn't.  I don't recall.  Honestly,

16   I don't recall.  I know there was times he

17   transported people, and I might have seen him, but

18   I don't recall.

19        Q.    Did -- were people allowed to visit you?

20        A.    No.

21        Q.    No face-to-face visits in --

22        A.    No.

23        Q.    -- Christian County Jail?

24        A.    No.  You did it on the screen.

25        Q.    How often did you do that?

170

1      A.    You got a free one, I think, on Sunday.

2    And then if you had so much money, you could have

3    anytime you wanted to.  The only person that ever

4    called me was my husband.

5      Q.    And it was like a -- sort of a Zoom type of

6    --

7      A.    Yes.

8      Q.    -- format?

9      A.    That's right.

10      Q.    Did you ever show your injuries to him on

11    that screen?

12      A.    No, I did not.

13      Q.    Do you know the first time you did a --

14    like a screen call?

15      A.    Probably that week.

16      Q.    The first week you were in?

17      A.    Probably.  I really can't recall for sure.

18    I mean, I know it took a minute for me to figure it

19    out, but I would say that week.  Because I'd never

20    been to jail before, I didn't know how to work

21    anything, so it took me a minute to figure out how

22    the whole process of how to -- phone calls, the

23    video calls.

24      Q.    How long would it -- did it take

25    approximately for the detox, the withdrawals, detox

1    to end where you felt like you were through that?

2         A.    It took -- I didn't eat for 7 days.  I

3    didn't sleep for 15 days.  It took about a month.

4         Q.    For all of that to kind of --

5         A.    Yes.

6         Q.    -- be in the rearview?

7         A.    Yeah.  It was about a month.  The hard part

8    was the first two weeks.

9         Q.    You -- we saw some medical records where

10   you indicated your husband was a drug dealer.  Is

11   that right?

12        A.    Yes.

13        Q.    When did he start doing that?

14        A.    Probably before I actually ever met him,

15   but, I mean, it was on and off.

16        Q.    And he did that while you-all were married?

17        A.    Yes.  I was not aware of what he did until

18   I was actually using myself.

19        Q.    And you indicated you started -- I want to

20   make sure I understand this.  It sounds like you

21   had a period where you used heroin, then you were

22   sober, then you started up again?

23        A.    That's correct.

24        Q.    The -- what was the time frame when you

25   first started using heroin?

1      A.    I was about 41, 42.  So 2018, maybe, 2019,

2    something like that.  And then I know I was clean

3    for a year and a half, so I didn't touch anything

4    for over a year and a half.

5      Q.    Would you get the heroin through your

6    husband when you first started?

7      A.    Yes.

8      Q.    Was he still selling when you were trying

9    to sober up?

10     A.    He was actually incarcerated.  That's one

11   thing that helped me to get better during that

12   time.

13     Q.    So when he was incarcerated and no longer

14   dealing, that -- that --

15     A.    That's when I knew -- yeah.

16     Q.    That kind of aligns with your sobriety,

17   that period?

18     A.    That period, somewhat, yeah.  I mean, I

19   still stayed clean for quite a bit after he came

20   home.

21     Q.    When did he come home?

22     A.    I think he came home -- let me see -- 2020.

23   I think he was -- he was released when the COVID

24   started because they released him from Clarksville.

25   He was in Montgomery.

CRYSTAL DAWN SMITH

173

1      Q.    In Tennessee?

2      A.    Like they forced him -- like, his time was

3   supposed to be up within two extra months, and they

4   released him two months prior to, yes.

5      Q.    What was he in jail for?

6      A.    I think it was a DUI maybe.  I don't really

7   remember all of this.  I don't remember everything,

8   but I think that's what he was...

9      Q.    What else has he been convicted of?

10     A.    There's a few things, which, honestly, I

11  don't know everything.  I know there's the -- the

12  DUI, and there's something to do with, like, some

13  kind of checks or something that happened with a

14  business so --

15     Q.    Has he --

16     A.    We owned our own business.

17     Q.    Has he ever been arrested on drug charges?

18     A.    I think that's part of the DUI, maybe.

19     Q.    Okay.  So once he comes back, eventually,

20  you start using it again?

21     A.    After so much time goes by, yes.

22     Q.    And was he supporting your habit?

23     A.    What do you mean by "support"?  Because he

24  really didn't want me doing it, but I did get it

25  from him, if that answers your question.

CRYSTAL DAWN SMITH

174

1    Q.   Yeah, that was what I was getting at.  He

2    provided it to you?

3    A.   Yeah, but he didn't want me to have

4    anything to do with it.

5    Q.   All right.  What did he sell?

6    A.   He sold heroin.

7    Q.   Was that it?

8    A.   As far as I know.

9    Q.   How much did he sell?  Do you know?

10   A.   I don't know.  I don't remember all those

11   numbers and stuff.

12   Q.   Do you know how much money he made?

13   A.   I don't know either.  He made enough to pay

14   our bills, and he still did side jobs so --

15   Q.   Part of the -- part of the income was the

16   drug --

17   A.   Yes.

18   Q.   -- trafficking?

19   A.   That's correct.

20   Q.   Okay.  And then I think you indicated after

21   the incident with your son, you started using it

22   more heavily, the heroin?

23   A.   After losing my son, yes.

24   Q.   And that was September of 2021, correct?

25   A.   September the 9th of 2021.

175

1    Q.    When you say "heavily," what are we talking

2    about?

3    A.    I'm talking about every time I woke up, I

4    snorted a line of heroin, and I would go back to

5    sleep.

6    Q.    So would you snort it multiple times a day?

7    A.    Yes.

8    Q.    How often would you use it per day?

9    A.    I probably did five or six lines a day.

10   Q.    Okay.  I don't have any experience with it,

11   so for five or six lines a day, how much does that

12   equal, like in a --

13   A.    I did also a gram a day.

14   Q.    Okay.

15   A.    That's a lot.

16   Q.    All right.  And so there's about five lines

17   in a gram.  Is that about right?

18   A.    It depends on how you break it up.

19   Q.    But you're estimating you did about a gram

20   a day and that --

21   A.    You can have little lines.  You can have

22   big ones.  It's all up to what you want to do.

23   It's not funny.

24   Q.    Now, you testified that you were arguing

25   with your husband about needing drugs that morning.

1     That's your memory?

2          A.    Yes.

3          Q.    Did you have them?

4          A.    I think I did have some.  I just knew I was

5     about to run out of some, so I asked him for some

6     more so -- and I didn't want to run out.

7          Q.    So was that why you left, to go find more?

8          A.    No, I did not leave for that, no.  I never

9     got it from anybody but from him at that time, so

10    no.  I wouldn't even know where to go.

11         Q.    I believe you'd indicated that -- you admit

12    that you initially denied taking any of the things

13    that you had in your car or on your person when

14    police found you at the scene.  Is that right?

15         A.    Yes.

16         Q.    And I believe you admitted that you tried

17    to claim those things were yours initially.  Is

18    that right?

19         A.    I probably did, yes.

20         Q.    You don't dispute that?

21         A.    No.

22         Q.    And you admitted that the story about the

23    Ashley was completely made up.  Is that right?

24         A.    Yes, that's correct.

25         Q.    And to be clear, that was an intentional

1    lie.  It wasn't because of confusion or

2    intoxication or anything.  You --

3        A.    Yeah, I intentionally made her up.

4        Q.    Okay.  And you were hoping to walk out of

5    there and get away, right?

6        A.    Yes, I was hoping just to go back home.

7        Q.    Isn't it true that the -- as of the time

8    you left that police department, the only thing

9    that hadn't been taken from you yet was that ring?

10       A.    Yes.

11       Q.    When you go to the sheriff's office, that

12   ring is still on your person, isn't it?

13       A.    Yes.

14       Q.    Where is it at?

15       A.    It's on my hand.

16       Q.    What were you going to do if Sheriff Acree

17   asked you about that ring?

18       A.    I never thought about that ring again until

19   they asked me about it at the jail.

20       Q.    So your testimony is you completely forgot

21   about it?

22       A.    Yes.

23       Q.    Did Acree ever try to inspect your hands?

24       A.    No.

25       Q.    Did you ever pull away to try to keep him

178

1    from seeing that?

2        A.    No.   I couldn't pull away.   He jerked me up

3    against the wall.   And I couldn't pull away anyway.

4    I was shackled up in cuffs.

5        Q.    You didn't try to jerk away from him?

6        A.    No.

7        Q.    You said you were in a -- a room to the

8    left where there were some supplies?

9        A.    Correct.

10       Q.    What furniture was in there?

11       A.    Shelves is all I remember.

12       Q.    Were there any cabinets?

13       A.    I didn't look that well.   Like, I was only

14   in there for the time he was in my face, so I

15   don't -- I don't know.

16       Q.    Okay.   When you walk into the door --

17             There's a side door.   Is that right?   Is

18   the way you entered the office?

19       A.    The side door on the building?   Yes.

20       Q.    Yeah, on the exterior.

21       A.    Yes.

22       Q.    What's that door look like?   Is it solid?

23       A.    I think it's metal, solid.

24       Q.    Did it have a window?

25       A.    No.

1     Q.   Okay.  Did you notice any windows to the

2   left or right?

3     A.   I didn't notice any windows.

4     Q.   Okay.  Once you enter through the side

5   door, how many -- approximately how many steps did

6   you have to take to get into that area to the left?

7     A.   I'd say the office room was closer than the

8   door to me right now.  Like that door, it's closer.

9   I would say maybe like --

10    Q.   These double doors here?

11    A.   -- to me to you.  Yeah.  Probably like

12  that's how many steps.

13    Q.   Across this table?

14    A.   Yes, about.

15    Q.   Would you estimate that's, what, 10 feet?

16    A.   6, 7, 8 steps.

17    Q.   8 feet?

18    A.   I don't know.

19    Q.   Oh, I was trying to do feet.

20    A.   Oh, I was doing steps.

21    Q.   I'm sorry.

22    A.   I don't know, but I would say about this

23  distance.  I'm not really good with the whole math

24  of feet and measurements.

25    Q.   I know.  I try to envision a basketball

180

1    goal, and it looks about close to one, 8 feet or

2    so.  But you think it would be six or so steps?

3        A.   Maybe a little bit more, but I guess it

4    depends.  I mean, I was --

5        Q.   Shackled?  So it --

6        A.   Yeah.  So, I mean, I was -- I don't -- I

7    don't know.

8        Q.   All right.  Was there a door when you go

9    into this room, or was it just a door frame

10   threshold?

11       A.   I can't really recall.  I think there could

12   be a door but could just be a door frame, so I

13   don't -- I don't know.  I wasn't paying attention

14   to the whole door thing.

15       Q.   Doesn't recall -- you don't seem to recall

16   whether one had to be opened?

17       A.   Yeah.  I just know it was opened, and I was

18   able to walk through it, and it was a small room.

19       Q.   Okay.  And my -- if I understand your

20   testimony, in that you turned around to him?

21       A.   Yeah, when I walked -- he was, like, behind

22   me because he guided me to go in there.  And then I

23   turned to be able to face him.  Because I knew he

24   was going to be coming right behind me.

25       Q.   And he grabbed you by your coat?

CRYSTAL DAWN SMITH

181

1      A.    My coat.

2      Q.    Did you have a winter coat on?

3      A.    Yes.  I had a green winter coat on, and I

4   still had it when I left the Christian County

5   Jail so --

6      Q.    Okay.

7      A.    I threw it away.

8      Q.    And you demonstrated.  So he grabbed you in

9   the front of the coat?

10     A.    Yes.

11     Q.    Like where the zippers would be?

12     A.    Yes, correct.

13     Q.    Up around?

14     A.    Right here (indicating).

15     Q.    Okay.  Thanks for demonstrating that.  We

16   got a video, so that helps.

17           And it's my understanding that you've made

18   a prior statement he lifted you off the ground in

19   the coat?

20     A.    Yes.

21     Q.    And my understanding is you said that the

22   exchanges that were made, you were off the ground

23   for that time period.  Is that right?

24     A.    I mean, he lifted me up, and he threatened

25   me with me up against the wall.  I just remember my

182

1    feet somewhat coming up because that's, you know --

2    I'm not saying he threw me up in the air, but he

3    lifted me, enough force, and threw me up against

4    the wall.  I felt my feet leave --

5        Q.    The ground?

6        A.    -- the floor.  Yes.

7        Q.    The ground?

8        A.    Yes.

9        Q.    And they were off the ground while he

10   was -- while you-all were having these exchanges.

11   Is that right?

12       A.    I mean, they were for a little bit, yes.

13       Q.    Okay.  Did your coat rip or anything?

14       A.    I don't know.  I don't think it ripped, but

15   I don't know.

16       Q.    You don't have any memory of your coat

17   being --

18       A.    Uh-uh (negative).

19       Q.    -- damaged when you said you got it back,

20   right?

21       A.    No.  I mean, they took it from me at the

22   jail.  They put it in the bag.  When I got it back,

23   I just threw it away.

24       Q.    You threw it away?

25       A.    I threw that coat away because it was -- I

183

1    had a -- I didn't want to remember.  I don't want

2    to remember this.  So any evidence of that day, I

3    just get rid of it.

4        Q.    You've seen Sheriff Acree, right?

5        A.    Since then?  What do you mean?  Like --

6        Q.    Well, in that moment, he was kind of --

7              Would you agree he's kind of a thin guy?

8        A.    Yes.  The only time I seen him was when I

9    lost my son.  That's the only time I've ever had

10    any encounter with him until that day when I was at

11    his house.

12        Q.    Okay.  So my understanding is that happens,

13    and I believe you've answered interrogatories where

14    you've indicated you were screaming the entire

15    time?

16        A.    Crying and screaming, yes.  I don't

17    remember having words with him in the office, but I

18    do remember crying -- or the supply office.  I do

19    remember crying, and I might have been screaming.

20        Q.    As well, if you stated that, you wouldn't

21    deny it, that --

22        A.    Do what now?  If I stated -- if I stated if

23    I was screaming then, yeah, I guess I was

24    screaming.  Is that what you're trying to say?

25        Q.    Yeah.  If you said, "I was screaming and

184

1    crying the entire time," that would be accurate to

2    the best of your memory?

3        A.   I mean, I don't think it -- I was crying

4    for sure.  I was terrified.  I probably screamed

5    out.  Some stuff probably came out of my mouth, but

6    I just don't remember actually words coming out of

7    my mouth until I was in the car.

8        Q.   Do you recall if you would have told him

9    "Just kill me now" in the sheriff's office?

10       A.   No, I never said that in there.

11       Q.   Your testimony is you just did it at the

12   car?

13       A.   I did it in the car.

14       Q.   You don't recall what you were -- what you

15   would have been screaming inside the department?

16       A.   I don't recall saying anything outside of

17   that -- in the building.  I only recall what I said

18   in the car.  I only actually spoke back to him in

19   the car.

20       Q.   So we have the instance where you're up

21   against the wall.  He lets you down at some point,

22   and tells you to get out.  Is that right?

23       A.   Correct.

24       Q.   And you indicate you felt pushed from

25   behind.  Is that right?

1      A.    I was pushed.

2      Q.    Okay.  And you've said you landed on the

3  floor and slid.  Is that right?

4      A.    Yeah, I slid across the concrete.

5      Q.    So did you hit the exterior door and fall

6  down, or were you on the floor and kind of slid

7  into it?

8      A.    I didn't hit any door.

9      Q.    Okay.

10      A.    I don't know what you mean by "the door."

11      Q.    I'm sorry.  I know that you -- you

12  described that he let you down, and you proceeded

13  to walk back toward the exterior door, right?

14      A.    Oh, yeah, towards the exit door.  Okay,

15  yes.

16      Q.    And that's when you felt pushed.  Is that

17  right?

18      A.    Yes.

19      Q.    Did you, like, get pushed into the wall or

20  the door, or did you go down?

21      A.    I went down.

22      Q.    And when you hit the floor, did you slide

23  into anything?

24      A.    I just slid on the concrete.  Now, there

25  was -- I never did hit nothing.  I just slid on the

1    concrete.

2        Q.    I see.

3        A.    Yeah.

4        Q.    Okay.  And your memory is you were brought

5    to your feet and then exited out the door.  Is that

6    right?

7        A.    Yes.

8        Q.    And as far as Sheriff Acree goes, you --

9    his next exchange with you was after you had

10   already been put in the back of the car.  Is that

11   right?

12       A.    Yes.

13       Q.    Was there any physical contact there, or

14   was that you and him just yelling at each other?

15       A.    He grabbed my shoulders.

16       Q.    Like what you just demonstrated?

17       A.    Yeah.  He grabbed, you know, like that

18   (indicating).  He grabbed my shoulders and got into

19   my face.  Like, I wanted to headbutt him, but I

20   felt like I'd probably get myself in more trouble,

21   so I'm just going to say what I said.  So that's

22   when I said, "Go ahead and fucking kill me.  I want

23   to be with my son anyway."

24       Q.    How long do you estimate the exchange

25   lasted in the sheriff's office?

1    A.    I mean, it honestly felt like it lasted ten

2    minutes, but I'm thinking it did not last that long

3    because that's a long time for something to take

4    place so -- I mean, in my head it did at that time

5    because it was pretty bad so -- but I'm -- a few

6    minutes.

7    Q.    How long was the exchange in the -- you

8    know, the back seat of the car?

9    A.    Probably not even 60 seconds, if that.

10    Q.    And I think you indicated you were

11    handcuffed and shackled at the ankles.  Is that

12    right?

13    A.    Yes.

14    Q.    Did you have a belly chain too?

15    A.    I think I could have, but I really -- I

16    know I had it so many times going in and out of

17    the -- being transported, I can't -- I can't

18    remember.  I can't -- I'm not for sure about that

19    one, but I know I was -- I know they were in the

20    front.

21    Q.    Let me see if I can walk it through.

22          So Sheriff Acree first detained you at his

23    -- at the scene, I'll call it.  Is that right?

24    A.    Yes.

25    Q.    And he handcuffed you in the front.  Is

1   that correct?

2       A.   Yes.

3       Q.   And then Cadiz Police Department took

4   custody of you and took you to the police

5   department.  Is that right?

6       A.   Right.

7       Q.   And I believe they cuffed you in the back.

8   Does that sound right?

9       A.   No.

10      Q.   Did they just leave you cuffed the way

11  Sheriff Acree did?

12      A.   If I can recall correctly, I think Chief

13  Wiggins took those and gave him back to him and put

14  his on me before I left, but I could be wrong.

15      Q.   Okay.

16      A.   I think that's what took place then.

17      Q.   So you think they switched cuffs, but you

18  recall being still cuffed in the front?

19      A.   Yes.

20      Q.   I gotcha.  Were you handcuffed at the

21  police department when you were doing the

22  interview, or did they uncuff you there?  Do you

23  recall?

24      A.   I don't remember when I was sitting there.

25      Q.   When Jailer Hughes came to pick you up and

189

1   transport you, did he handcuff you?

2       A.   I don't remember if it was him or Chief

3   Wiggins.  They both were standing right there in

4   front of me.

5       Q.   Is it fair to say that before you left the

6   Cadiz PD to go with the jailer, you were -- that's

7   when you would have had the handcuffs and the

8   ankle --

9       A.   Yeah.  It was all on me before I walked out

10  the door.

11      Q.   At the police department?

12      A.   Yes.

13      Q.   Because you didn't have those ankle ones on

14  you when you left Sheriff Acree's house?

15      A.   No, I did not.

16      Q.   That is when the jailer came?

17      A.   Yeah, just to be transported.

18      Q.   Did you ever have those taken off at any

19  time?

20      A.   Not until I got to the jail.

21      Q.   The Christian County Jail?

22      A.   Yes.

23      Q.   So they stayed on you when you went to

24  Sheriff Acree's --

25      A.   Yes, correct.

CRYSTAL DAWN SMITH

190

1      Q.    And I believe you indicated that you saw

2    Sheriff Acree at his house when he detained you,

3    right?

4      A.    Yes.

5      Q.    You didn't realize that was Sheriff Acree

6    at the time, or did you know?

7      A.    I knew that was Sheriff Acree.  I met him

8    before when I lost my son.

9      Q.    But you didn't realize it was his house?

10     A.    No, I did not know.

11     Q.    Okay.  And I believe your testimony was the

12   next time you saw him was at the sheriff's office.

13   Is that right?

14     A.    Correct, yes.

15     Q.    You were in an interview room in Cadiz

16   Police Department.  Is that right?

17     A.    Yes.

18     Q.    You didn't recall seeing him there during

19   the interview?

20     A.    No.  I don't recall seeing him at all until

21   I got to the sheriff's office.

22     Q.    Okay.  And as far as the transport, you

23   don't recall whether Jailer Hughes was on his radio

24   or cell phone or what --

25     A.    I thought maybe he might have talked to

1    somebody, but I don't -- I don't know for sure.

2        Q.   Don't remember specifically?

3        A.   Right.

4        Q.   Do you know how far -- can you estimate how

5    far you slid on the floor?

6        A.   I mean, I would say a few steps, like, you

7    know.

8        Q.   Okay.

9        A.   I don't have -- three, four steps of my

10   walking steps.  I don't -- I don't -- like I said,

11   I'm bad with the whole measurements and the math,

12   so I don't -- I know I slid enough to get a carpet

13   burn on my -- or, you know, road rash on my arm.

14       Q.   After you were in jail, you had

15   communications with your husband over the phone and

16   by the screen.  Is that right?

17       A.   That's right.

18       Q.   Is it true that you tried to tell him the

19   lie about the -- Ashley?

20       A.   I think I did try to tell him something

21   about it, but he cut me off.

22       Q.   But you were trying to misinform him as

23   well.  Is that fair?

24       A.   What do you mean "misinform"?

25       Q.   Well, the Ashley thing was made up,

192

1    correct?

2        A.    Yes.

3        Q.    So you were also lying to him about that?

4        A.    I don't really recall.  I know that I

5    was -- at that moment knew that my family was about

6    to be hurt from what I did, so I don't recall what

7    I actually said to my husband.

8        Q.    But if you -- if that's on a recorded call,

9    you don't deny, then, that you were --

10       A.    No, I don't deny it.  If it's on a recorded

11   call, then I said it.

12       Q.    Can you look at Exhibit 12?

13             Is this a copy of the offer that was made

14   to you for your guilty plea?

15       A.    Yes.

16       Q.    And it's dated the 27th of September.  Do

17   you see that on the second page?

18       A.    Yes.  I see the 27th, yeah.  Yes.

19       Q.    The 27th of September, 2023, and that's

20   at the bottom of the second page, right?

21       A.    Yes.

22       Q.    Was this -- were you aware of this offer

23   before that date?

24       A.    I don't recall.  I think we talked about a

25   few things, but I don't recall --

193

1            MS. SHREWSBURY:  I'm going to admonish you

2      to never discuss anything that you and I have

3      talked about or any of your attorneys, for that

4      matter.

5            THE WITNESS:  Okay.

6            MS. SHREWSBURY:  But do answer the question

7      to the best of your recollection.

8      A.    I really don't recall.

9  BY MR. WRIGHT:

10     Q.    Yeah, I don't want to get into your

11     conversations with counsel.  I'm just curious about

12     your awareness of when an offer had been made.

13            I didn't know if this might give you some

14     context of when you signed it how far in advance it

15     may have been.

16     A.    I don't remember that either.

17     Q.    Okay.  Who was your defense attorney in the

18     criminal side?  Was it Ms. Shrewsbury?

19     A.    Yes.

20     Q.    Did you have any other attorneys during

21     that process?

22     A.    I did prior.  I had Cody Hooks for a little

23     bit, and then I had -- Cody Hooks to begin with

24     when I was incarcerated.  And then he went to

25     private practice while I was incarcerated, so I

194

1    had -- I know her name.  I just cannot think of it

2    right now.  It was a lady.  I just can't remember

3    her name right now.

4        Q.    Okay.  And then Ms. Shrewsbury switched --

5        A.    Yes.

6        Q.    -- substituted at --

7        A.    Yes.

8        Q.    -- some point?

9              We looked at some medical records -- I

10   believe they were from August of 2023 -- where you

11   made reference to the FBI coming to do an

12   interview.  Do you recall us looking at those

13   today?

14       A.    Yes.

15       Q.    Who was at the interview?

16       A.    When I was interviewed by the FBI?

17       Q.    Yes.

18       A.    The -- his name is Shawn from the FBI, and

19   then the state police.  I don't recall his name

20   right now.  I know I have his card in my purse.  I

21   just don't know what his name is.

22       Q.    So to your memory, there was an FBI agent

23   named Shawn and a state police investigator as

24   well --

25       A.    Yes.

CRYSTAL DAWN SMITH

195

1    Q.    -- and you?

2    A.    Yes.

3    Q.    Did you have any attorney there?

4    A.    No, I did not.

5    Q.    And my --

6    A.    I was in rehab.

7    Q.    You were in rehab?

8    A.    Yes.

9    Q.    And it was in August of that -- 2023.  Does

10   that sound right?

11          MS. SHREWSBURY:  No.

12   A.    2022.

13   Q.    I'm sorry.  August of 2022.

14          So that was way before you ever pled guilty

15   to anything.  Is that right?  You took this offer.

16   A.    Yes.

17   Q.    It's dated Septem- --

18   A.    Yes, that's correct.

19   Q.    And you gave an interview to the FBI with

20   no attorney present?

21   A.    Correct.  They came in there to talk to me.

22   Q.    Did they Mirandize you?

23   A.    Read me my rights?

24   Q.    Yeah.

25   A.    I don't know.  I know they recorded

1    everything.  So I really don't -- I don't know.  I

2    was, you know --

3        Q.    Did you confess to them about stealing

4    items.

5        A.    I told them the whole story the best as I

6    could.

7        Q.    So you were being truthful to them --

8        A.    Yes.

9        Q.    -- about --

10       A.    My crime, yes.

11       Q.    Before you ever pled guilty?

12       A.    I think I might have, yes.

13       Q.    Did -- what was -- how was it made aware to

14    you that the FBI was coming to interview you?

15       A.    They showed up and rung the doorbell at the

16    Genesis.  And the ladies are like, "The FBI is here

17    to see you, Crystal."

18       Q.    So did you have no advance notice?

19       A.    No.

20       Q.    When we read that medical record, was that

21    before or after your FBI interview?

22       A.    The medical records?  Which medical

23    records?  What are we --

24       Q.    Let me find it.

25              MS. BLANKENSHIP:  It's going to be Exhibit

1    13.

2           MR. WRIGHT:  There's a few of them.

3           MS. BLANKENSHIP:  I'm sorry.  That's wrong.

4    It's 11.

5           MR. WRIGHT:  I've got it.  I think it is

6    part of Exhibit -- yeah, it's part of 11.  I'm

7    sorry.  And it's Bates number Smith 131.

8           MS. SHREWSBURY:  So 11.  Yeah.  And then

9    find -- the first page is 130.  131.

10           THE WITNESS:  130.

11           MR. WRIGHT:  131?

12           MS. SHREWSBURY:  The first page in that is

13    -- yeah.

14           THE WITNESS:  Okay, I got it.

15    BY MR. WRIGHT:

16      Q.   So at the top of 131, it says, Date created

17    8/10/2022.  August 10, 2022.  Do you see that?

18      A.   Yes.

19      Q.   And it has in that second paragraph

20    beginning with the response a couple of lines down,

21    "She shared that the FBI plans to come speak with

22    her, but she was unaware of the situation."

23      A.   Yes.  I think they had to come back to talk

24    to me.  Like, the first time they came to talk to

25    me, there was something going on.  I was busy.  I

198

1    don't know what I was -- I don't know if I was,

2    like, seeing -- talking to my therapy or whatever.

3           So I knew they already stopped by to talk

4    to me.  And then they told the staff they wanted to

5    talk to me.  And so I knew they were coming back,

6    like, within a few days.  I did -- yeah, I forgot.

7    It was like two different occasions they came

8    there.

9       Q.   So your memory is they came once, and you

10   were unavailable?

11      A.   Correct, yes.

12      Q.   But you had the understanding they would be

13   coming back --

14      A.   Yes.

15      Q.   -- soon?

16      A.   Yes.  They were -- they let the staff know

17   that they would be back to talk to me.

18      Q.   And between those two visits, it appears

19   you had a session here that is recording that

20   you're aware of this, right?

21      A.   Yes.  As soon as they showed up to tell the

22   staff that they were there -- and I don't know -- I

23   don't know if I was -- what was going on, what our

24   activity was.  And they told me about it.  I pretty

25   much had a panic attack not understanding what was

199

1    going on.  And then, like, I was trying to get

2    myself together.  So, yes, I talked to my

3    therapist.

4        Q.   And at that time, you didn't have any idea

5    what it was about?

6        A.   I was kind of clueless at first, and then

7    it kind of came to me.  Like I said before, it kind

8    of -- it took a little bit, but it came to me.

9        Q.   And you had --

10       A.   This is what it has to do with.

11       Q.   You have pending unresolved criminal

12   charges at the time, right?

13       A.   Yes.

14       Q.   And you had a criminal defense attorney

15   representing you on those charges?

16       A.   Yes, correct.

17       Q.   And I don't want to know what you said, but

18   did you ever contact your attorney to let you know

19   that the FBI is here?

20       A.   No, I did not.  I don't think I did.  I

21   don't recall me doing that.

22       Q.   Did they indicate they had talked to your

23   attorney?

24       A.   I don't have any remembering -- I don't

25   remember any of that so -- I don't even know who my

200

1    attorney totally was at that moment.  I'm trying

2    to, like, think back to who.  I don't remember.

3       Q.   Did they talk to you before they turned the

4    recording on?

5       A.   Honestly, I don't think they did.  I think

6    they told me they were about to record.

7       Q.   So you --

8       A.   They had to record everything.

9       Q.   You didn't have any discussions about what

10   may or may not have happened --

11      A.   No.

12      Q.   -- before the recorder was on?

13      A.   No.

14      Q.   Did you ever hear again from the FBI?

15      A.   They told me I could call them anytime I

16   wanted to.  That gave me their cards.  But, no, I

17   never did talk to them again.  That was it.  No,

18   wait a minute.  It wasn't me.  I think -- I thought

19   maybe they might have contacted my mom or

20   something.  But, no, I think that -- I think she

21   got something confused.  No, I don't -- I didn't --

22   I didn't talk to them again after that.

23      Q.   You testified that after Mr. Hughes

24   delivered you to the Christian County Jail, you

25   asked him to contact your mother?

1      A.    That's right.

2      Q.    Did -- did you know her number?  Was it in

3   your phone?

4      A.    She's had the same number, as far as I

5   know, for like 40 years so -- she has a landline.

6      Q.    Okay.  I get it.  A lot of people including

7   myself don't know their mother's phone number --

8      A.    Yeah, so --

9      Q.    -- anymore with cell phones.

10     A.    If anything ever happens to me, the one

11  number I know is my mom's number.

12     Q.    So you were able to tell that to him?

13     A.    Yes.

14     Q.    Did you -- what did you tell him to tell

15  her?

16     A.    Just to call her and tell her I was in

17  jail.

18     Q.    Okay.  And he indicated he would?

19     A.    Yes.

20     Q.    Did you talk to your mom about that

21  conversation?

22     A.    I -- no, she told me that he told her.

23           About the conversation of telling him?

24     Q.    No.  I was meaning after -- after you asked

25  him to do this, I was -- to your knowledge, he did

1    follow through and call your mom?

2        A.    That's right, yes.

3        Q.    Were you there when he did that?

4        A.    No.

5        Q.    So he did it after he dropped you off and

6    then left, to your understanding?

7        A.    I guess.  My mom just told me that he

8    called her.

9        Q.    Okay.  And then what did your mom say about

10    the conversation?

11        A.    His -- their conversation?

12        Q.    Yeah.  With her.  Yeah, with them.

13        A.    I don't remember.  I just know she was very

14    upset.

15        Q.    Did she indicate any knowledge of anything

16    going on at the sheriff's office?

17        A.    What do you mean?

18        Q.    After Jailer Hughes contacts your mom --

19        A.    Right.

20        Q.    -- did she indicate she has any knowledge

21    that anything had happened at the sheriff's office?

22        A.    Oh, no, she was not aware of any of that

23    whatsoever.  I did try to tell her a little bit,

24    but she shut me down because she was upset.

25        Q.    How long were you at the house before

1    Sheriff Acree arrived and you noticed he was there?

2        A.    How long was I there altogether before I

3    went outside?

4        Q.    Right.

5        A.    I don't know.  Like, I'd say maybe -- could

6    have been 5 or 10 minutes.  It could have been 15

7    minutes.  I really don't remember.

8        Q.    Have you ever stolen anything from

9    somebody's house before?

10       A.    No, I have not.

11       Q.    What gave you the idea to use their own

12   luggage to take their belongings?

13       A.    Because I didn't know how else I was going

14   to carry it outside.

15       Q.    Where did you -- where did you find the

16   luggage at?

17       A.    I believe it was in the closet.

18       Q.    Did you interact with Sheriff Acree at the

19   jail?

20       A.    He came to look at the shoes to see if the

21   shoes were, I guess, somebody's in the house, if

22   they belonged to somebody from there, his family.

23   He was talking to them outside where I could see

24   him in the holding cell.  He was in his normal

25   street clothes then, so before he was in his

CRYSTAL DAWN SMITH

204

1      uniform.  And he just mostly looked at me a whole

2      lot while I was sitting there.  But other than -- I

3      don't remember actually having a conversation with

4      him.  He was mostly talking to them.

5          Q.   So they came in there and retrieved your

6      shoes and the ring?

7          A.   No, just the ring.  The shoes were mine.

8          Q.   Well, what I meant was I think you said you

9      had to take them off.

10         A.   Yes, outside.  I stepped outside of the

11     holding cell because Acree didn't go into the

12     holding cell where I was at.  But there's a big

13     window, so you can see me sitting there.  I went

14     outside of the holding cell, and he then had me

15     take them off for him to take a picture to send it

16     to, I guess, his wife or his daughter.

17         Q.   Were jail guards also there while you were

18     doing that?

19         A.   Yes, they were there.

20         Q.   How was he interacting with the jail

21     guards?

22         A.   Like they were best friends.

23         Q.   So he was alternately, you know, kind of

24     chumming it up with them but staring hard at you?

25     Is that --

1      A.    Yeah, pretty much.

2      Q.    What is the -- is the holding cell up

3   front?  I've never been to the --

4      A.    Yeah.  It's up front.  Like, as soon as you

5   come into the jail, you have where all the people

6   that work there to the left.  It depends on how you

7   come in, I guess, but then there's the holding

8   cell, and it's a big window.

9      Q.    How many people were in the holding cell

10   with you?

11      A.    I don't remember if anybody was in there

12   when I first went in there.  There was probably

13   about two or three people that ended up in there

14   with me.

15      Q.    How long were you in the holding cell

16   before you got sent back to 402?

17      A.    Probably like two or three hours.

18      Q.    Do you know -- did you get to know the

19   jailers, some of the jailers at the jail?

20      A.    No, I did not.

21      Q.    So you don't know who booked you?

22      A.    If I can be in there for so long and

23   learning names -- I keep wanting to say Barbara but

24   maybe not.  I don't --

25      Q.    Was it a female?

206

1     A.    Yeah, it was definitely a female.

2     Q.    Was it just one person who did the booking,

3   or were there multiple jailers?

4     A.    There was multiple jailers.

5     Q.    Do you know anybody else who was there

6   during your booking?

7     A.    There was other people that was there that

8   worked there, but I can't -- I can't remember.

9     Q.    I understand.  From the intake process, did

10  they read any, like, questionnaires, whether you're

11  hurt, injured?  Did they go through questions like

12  that?  Do you recall?

13    A.    I don't remember.

14    Q.    Did they do any kind of visual inspection

15  when they changed --

16    A.    No --

17    Q.    -- dressed you out?

18    A.    -- they did not.  No.  They didn't even

19  watch me change.  She turned around.

20    Q.    Barbara did?

21    A.    I think, if it was Barbara.

22    Q.    The same female who book you in --

23          THE REPORTER:  Wait a second.

24          THE WITNESS:  Sorry.

25          THE REPORTER:  We're getting a lot of --

207

1      A.    I don't remember who booked me.  I really

2    don't.

3      Q.    Okay.  But to your memory, the female guard

4    who was there when you dressed out, she turned

5    around?  She didn't do an inspection?

6      A.    No, she did not.  I mean, I'm about to take

7    my clothes off.  She probably didn't care to see me

8    naked.  So I took my clothes off, put them in a

9    bag.  She puts them in the bag.  She puts them up.

10   And I put my jumpsuit on.  So while she's taking my

11   clothes, putting them in the bag, that's what she's

12   doing while I'm throwing my jumpsuit on.

13          MR. WRIGHT:  That's all the questions I

14   have.

15                    CROSS-EXAMINATION

16   BY MS. SHREWSBURY:

17     Q.    Crystal, I'm going to be jumping around.

18     A.    Okay.

19     Q.    Just asking you some questions to clarify a

20   few things that have been discussed today.

21          Both Sheriff Acree's attorney and Jailer

22   Hughes' attorney asked you questions about the

23   varying events that occurred in January of 2022.

24   Do you recall answering questions about that?

25     A.    Yes.

1      Q.    I want to clear up what to me didn't seem,

2   I guess, chronological.  So after the -- after you

3   were found at Sheriff Acree's house, the Cadiz

4   Police Department showed up, correct?

5      A.    Right.

6      Q.    And you were taken back to the Cadiz Police

7   Department.  Is that right?

8      A.    Yes.

9      Q.    And then when you left the Cadiz Police

10   Department, you went with Jailer Hughes back to the

11   sheriff's department.  Is that correct?

12          MS. BLANKENSHIP:  Objection to the form.  I

13   don't think she had been to the sheriff's

14   department.  You said "back to the sheriff's

15   department."

16          MS. SHREWSBURY:  That's fair.

17   BY MS. SHREWSBURY:

18      Q.    To the sheriff's department, correct?

19      A.    Yes.

20      Q.    And then after the incident that occurred

21   at the sheriff's department, you went to where?

22      A.    Christian County Jail.

23          THE REPORTER:  I'm sorry.  I can't hear

24   you.

25      A.    Christian County Jail.

209

1    Q.   Do speak up because I do want to make sure

2    the record is pretty clear.

3         So which jail were you at when Sheriff

4    Acree came in street clothes?

5    A.   Christian County Jail.

6    Q.   And which jail were you at when he wanted

7    to take pictures of your shoes to see if it was

8    property from his home?

9    A.   Christian County Jail.

10   Q.   So did you see him at the Cadiz Police

11   Department?

12   A.   No.

13   Q.   And Cadiz doesn't have a holding cell,

14   right?

15   A.   Right.

16   Q.   They don't house inmates there?

17   A.   Correct.

18   Q.   Was Sheriff Acree in uniform when he found

19   you at his home?

20   A.   Yes.

21   Q.   Was Sheriff Acree in uniform when you were

22   brought to the sheriff's department by Jailer

23   Hughes?

24   A.   Yes.

25   Q.   Do you know how far it is from the

210

1   sheriff's department to Christian County Jail?

2       A.    Like 25 minutes.

3       Q.    And do you recall how long after you got

4   to Christian County Jail that you first saw

5   Sheriff Acree?

6       A.    It didn't seem like it was very long.  I

7   don't -- you know, I don't recall the time, but it

8   didn't seem like it was very long.

9       Q.    And that's fine.  If you don't recall, you

10  don't --

11      A.    Yeah.

12      Q.    -- recall.

13            You have been asked a lot of questions here

14  today by both Acree's attorney and Jailer Hughes's

15  attorney to which you responded that you don't

16  recall.

17            Do you recall that -- that that's been a

18  response that you've given today?

19      A.    Yes.

20      Q.    That you don't remember --

21      A.    Yes, yes.

22      Q.    -- in detail?

23      A.    Certain things, yes.

24      Q.    The name of the jailer, Barbara --

25      A.    Yeah.

211

1      Q.    -- maybe --

2      A.    Yeah.

3      Q.    -- maybe not, right?

4      A.    Yeah, I actually think it was somebody else

5   now, but they were both little and short.  That's

6   why I got confused so --

7      Q.    Okay.  But fair to say that that period of

8   time in your life, you don't necessarily have the

9   best memory of details?

10     A.    Correct.

11     Q.    There was a lot of testimony today about

12   your history with drugs?

13     A.    Yes.

14     Q.    Do you recall talking about that?

15     A.    Yes.

16     Q.    Had you ever been arrested for use of drugs

17   prior to this event?

18     A.    No.

19     Q.    Had you ever been arrested for burglary or

20   robbery prior to this event?

21     A.    No.

22     Q.    We saw your criminal history, and there was

23   a cold check theft on your record.  Do you recall

24   that?

25     A.    I don't recall it.

CRYSTAL DAWN SMITH

212

1      Q.   You didn't serve any time in jail for it?

2      A.   No.  All my kids were little -- I don't --

3    I don't remember.

4           THE REPORTER:  I can't hear you.

5      A.   I said, all my children, they were little

6    at the time, so I don't recall anything.  But, no,

7    I didn't -- I don't even remember going to court

8    over it.

9      Q.   And had you ever served any time in jail

10   prior to this incident?

11     A.   Overnight visit, yes, in Tennessee.

12     Q.   And was that for one of the domestic

13   assaults?

14     A.   Yes.

15     Q.   With your now spouse and his sister?

16     A.   Yes, correct.

17     Q.   Charges, right?

18     A.   Yes.

19     Q.   I'm going to jump around, so I'm sorry if I

20   confuse you.  If you don't understand my question,

21   do ask me to rephrase it.

22     A.   Okay.

23     Q.   You were just asked a series of questions

24   about your discussion with the FBI?

25     A.   Yes.

213

1      Q.    When you met with the FBI, was the name of

2   the Kentucky State police officer Zach?

3      A.    Yes, it was Zach.

4      Q.    Zach Green.  Does that ring a bell?

5      A.    Shawn and Zach.  Okay, yes.

6      Q.    And Shawn's last name is Miller.  Is that

7   correct?

8      A.    I guess.  I know I still have their cards

9   in my purse.

10      Q.    Did you also ever talk to Jason Darnell

11   about what happened between you and Acree?

12      A.    I don't know who Jason Darnell is.

13      Q.    Do you recall talking to a prosecutor about

14   what happened to you and Acree -- between you and

15   Acree?

16      A.    I'm thinking he's a prosecutor.

17            THE REPORTER:  I can't hear you.

18      A.    Is he a -- okay.

19      Q.    Don't ask me.  I'm just asking if you

20   recall.

21      A.    What was the question?

22      Q.    Do you recall talking to an individual

23   named Jason Darnell or to a prosecutor about the

24   incident that occurred between you and Acree?

25      A.    No, I don't.

CRYSTAL DAWN SMITH

214

1      Q.   Do you recall receiving a subpoena to

2   testify in Acree's trial?

3      A.   No.

4      Q.   Do you recall being told that you would be

5   testifying in the trial of Acree?

6      A.   No.

7      Q.   Do you recall that Acree was brought up on

8   criminal charges in part for the incident that

9   occurred between the two of you?

10     A.   Yes.

11     Q.   But you don't recall ever being told that

12  you were going to have to be a witness in that

13  case?

14     A.   I guess I'm confused about the witness.

15  Okay.

16     Q.   I mean, just answer the best that you can.

17     A.   To be a witness of my case?

18     Q.   No, in Acree's criminal trial.

19     A.   His stuff.

20     Q.   Right.

21     A.   To be a witness?  No.

22     Q.   So you don't recall that you were going to

23  have to testify in that trial?

24     A.   No.

25     Q.   That's fine.

215

1      A.    No, I don't right now.  I think I'm just

2    tired.  Maybe I'm just --

3      Q.    No, no, no.  No worries.  There's no wrong

4    answer.  Just the truth and what you remember.

5      A.    Okay.

6      Q.    Did you call the FBI?

7      A.    No.

8      Q.    Did you make a complaint to the Kentucky

9    State Police?

10     A.    No.

11     Q.    Did you ever make a complaint to the Cadiz

12   police?

13     A.    No.

14     Q.    Or Christian County police?

15     A.    No.  I did not, no.

16     Q.    You never made a complaint against Acree

17   for what occurred?

18     A.    I feel like I'm confused.

19     Q.    No.  I mean, you never called any of --

20     A.    No, I --

21     Q.    -- of these agencies, right?

22     A.    -- didn't call anybody.

23           THE REPORTER:  I'm sorry.  I'm getting two

24   people, and I can't hear.

25           MS. SHREWSBURY:  Sure.

216

1          THE REPORTER:  I need one person at a time,

2     and I need the witness to speak up.

3          THE WITNESS:  Sorry, sorry.

4          MS. SHREWSBURY:  That's okay.

5     A.   No, I don't -- I did not reach out to

6     anyone except for actually you.

7     Q.   Right.  And, of course, we're not going to

8     talk about --

9     A.   Okay.

10     Q.   -- any discussions that we --

11     A.   Yes.

12     Q.   -- had.  And we're here because of a

13     complaint you filed in civil court.

14     A.   Yes.

15     Q.   But you never reached out to any criminal

16     agency about the incident that occurred?

17     A.   No.

18     Q.   They reached out to you?

19     A.   Yes.

20     Q.   KSP and the FBI?

21     A.   Yes, that's correct.

22     Q.   Now --

23     A.   They reached out to me.  They reached out

24     to me.

25     Q.   Yeah.  Now, you had been in rehab when you

217

1   talked to the FBI.  Is that correct?

2      A.   Yes.

3      Q.   You said you don't recall who your criminal

4   defense attorney was at the time, right?

5      A.   I don't recall.  I know it was a lady.  I

6   know what she looks like.  I just don't -- I don't

7   remember her name right now.  I know I had Cody

8   Hooks, and then I had her, and I just can't -- I

9   keep wanting to say Renee, but that don't sound

10  right.

11     Q.   What about Mary Lords (phonetic)?

12     A.   She was supposed to be for a minute, but I

13  never even -- I don't even think I ever talked to

14  her.

15     Q.   Okay.  When you were arrested the night

16  that the incident occurred, the night that you

17  were found -- or day that you were found at

18  Sheriff Acree's home, did you do an interview with

19  Officer Wiggins?

20     A.   After I was arrested, yeah, he interviewed

21  me at the police station.

22     Q.   And in that interview, did you admit to

23  being in Officer Acree's home without permission?

24     A.   Yes.

25     Q.   Did you admit to taking things from

218

1    Officer -- or from Acree's home without permission?

2        A.    Yes.   I mean, I was still -- to start out

3    with, you know, I was saying it wasn't mine, but in

4    the end, yes.

5        Q.    And that's on tape.  Were you aware of

6    that?

7        A.    Not really, no.

8        Q.    You've never watched it?

9        A.    No.

10       Q.    But as you testified earlier, you don't

11   disagree that anything that was recorded would

12   speak for itself?

13       A.    Right, correct.

14       Q.    So if in that recording you admit to

15   committing the crimes that you ultimately pled

16   guilty to, that wouldn't surprise you?

17       A.    Correct.

18       Q.    So by the time you talked to Mr. Miller and

19   Mr. Green, you had already admitted to your crimes?

20       A.    Yes.

21       Q.    Did you ever have an intention of not

22   admitting to your crimes?

23       A.    No, never.

24       Q.    Now, obviously, that was a very difficult

25   time for you.  You've testified about that quite a

219

1    bit today.

2        When you testified earlier with

3    Ms. Blankenship about what you were doing that

4    morning, you said that you had gotten into an

5    argument with your husband and were driving toward

6    your son's grave.  Do you recall saying that?

7    A.    Yes.

8    Q.    Why did you pick the house that you picked?

9    A.    I don't know.

10    Q.    What were you planning on doing?  You said

11    you knocked on the door.

12    A.    I don't know.  I didn't have a plan.  I

13    never had a plan.  The only thing I knew in my

14    heart, what was going on in here, is that I just

15    was trying to escape, escape from what was going on

16    by losing my son.

17    Q.    So when you went up to the home, did you

18    plan on robbing it?

19    A.    No, I did not.

20    Q.    And when you went into the home, you

21    testified that you fed the dogs?

22    A.    Yes.

23    Q.    And you drank a glass of wine?

24    A.    Yes.

25    Q.    And then you started looking through other

220

1    people's things?

2         A.    Yes.

3         Q.    To me it doesn't sound like you were in a

4    hurry.  Were you?

5         A.    Not to begin with, no.  I was not at all.

6    I kind of was pretending it was my home.

7         Q.    And you'd never done that before?

8         A.    No.

9         Q.    And you had taken heroin that day?

10        A.    Yes.

11        Q.    And you testified that you were taking

12   about a gram a day?

13        A.    Yes.

14        Q.    For the several months preceding this

15   incident?

16        A.    Correct.

17        Q.    Now, you know what active addiction is, and

18   you know what sobriety is.  Is that fair to say?

19        A.    Yes.

20        Q.    Are you -- how -- how is your thought

21   process, your thought process, in active addiction?

22        A.    It is not good.

23        Q.    Is it clear?

24        A.    No.

25        Q.    Would you consider it rational?

221

1    A.    I consider it you're all over the place.

2  Like, you're not -- you're not here, not thinking

3  clear whatsoever.

4    Q.    Did you consider consequences?

5    A.    No.  You don't think of any of that stuff.

6  It's like you're -- it's like you're invincible.

7    Q.    Now, you mentioned that you would take

8  heroin, wake up, snort a line, go back to sleep.

9  Do you recall testifying --

10    A.    Yes.

11    Q.    -- to that?

12    A.    Yes.

13    Q.    How much did you weigh in January of 2022?

14    A.    I don't totally recall.  I know I did lose

15  weight in jail.  I would say maybe 150.

16    Q.    Was Sheriff Acree taller than you?

17    A.    He might be just a tad.

18    Q.    And he didn't have any issue lifting you

19  off the ground?

20    A.    No, he did not.

21    Q.    Do you know if Sheriff Acree ultimately was

22  prosecuted for anything related to you?

23    A.    Do I know if he was?

24    Q.    Yeah.

25    A.    Yeah, the charges.  Yes.

222

1    Q.   He was charged.  Do you know if he

2   ultimately --

3    A.   Yes.

4    Q.   What -- do you know what the disposition of

5   those charges was?

6    A.   No.

7    Q.   Do you know if he pled guilty to charges?

8    A.   Yes.

9    Q.   Maybe not the same ones that he was

10  initially charged with?

11   A.   Right.  I know he pled guilty to charges

12  that had to do with the assault.

13   Q.   But he didn't plead guilty to an assault

14  charge, right?

15   A.   Yes, he didn't plead guilty to an assault,

16  but he pled guilty to what took place and certain

17  things that took place.

18   Q.   You testified that you were shackled at the

19  time that he brought you into the sheriff's

20  department.  Do you recall that?

21   A.   Yes.

22   Q.   And you testified that after the incident

23  you had bruising around your hands --

24   A.   Yes.

25   Q.   -- or wrists?

223

1    A.    And my wrists, my ankles.  Like, the hip.

2    My arm, I had the mark.  I had bruises, I think, on

3    my knees too.  Other little places.

4    Q.    What about when you -- he grabbed you in

5    the car.  You testified --

6    A.    Yes, and I had bruises there too.

7         THE REPORTER:  Wait a second.  Will you

8    start that one over?

9    Q.    Sure.  You testified earlier that when you

10   were placed back in the car, Sheriff Acree grabbed

11   you by the arms, and you indicated where in the

12   video he grabbed you?

13   A.    Yeah, on my -- right here below my

14   shoulders (indicating).

15   Q.    Do you recall if there was bruising there?

16   A.    Yes, there was.

17   Q.    There's been a lot of testimony today about

18   how you didn't tell anyone what happened.

19   A.    Correct.

20   Q.    Do you want to tell why?

21   A.    Yes.  So when I got to Christian County

22   Jail after all this took place, I didn't trust

23   anybody.  Who was I supposed to trust?  So I just

24   -- I didn't talk to, like, anybody about it.  I

25   felt like you're supposed to trust the law

224

1    enforcement.  Even though I know I did something

2    wrong, I felt like I had nobody to turn to.

3         So I just kept it to myself because I was

4    extremely scared and worried that I could tell the

5    wrong person, and I might sit there forever.  And I

6    felt like I was sitting there for a long time

7    because I knew that, you know, I did something

8    wrong to a sheriff.  But after he put his hands on

9    me, I just felt like I had no one to talk to except

10   for the people that was in there so -- I was

11   scared.  I was extremely scared.

12        And the only people, also, I talked to,

13   like, at the rehab because they made me feel safe.

14   They're like, "This is your safe place."  I felt

15   safe to talk to them.  I felt safe to talk to the

16   FBI because I felt safe at that part where I was in

17   rehab.  When I left again to the rehab and came

18   home, I still felt like I really didn't have too

19   many people to talk to until certain people came

20   forward to talk to me, about, you know, he's doing

21   this to a lot of people, so you can talk to me.

22        So there's -- and I still kept it short.

23   Like, I still kept my circle small.  I just felt

24   like I didn't trust anybody.  So I didn't tell them

25   about my bruises.  I didn't tell any -- because I

225

1    felt like it could harm me more when I was there.

2        Q.   Who stepped forward to say he was doing it

3    to a lot of people.

4            MR. WRIGHT:   What was that question again?

5    I didn't hear that?

6            MS. SHREWSBURY:   She just testified that

7    after --

8            THE WITNESS:   I came home.

9            MS. SHREWSBURY:   -- she came home, she felt

10   safe with a small group because somebody -- people

11   stepped forward and said he was doing it to a lot

12   of people.

13           THE WITNESS:   There was different people,

14   but yeah.

15       Q.   I'm asking who.

16       A.   There was a few people that came to me

17   talking to me about it.

18       Q.   Do you recall their names?

19       A.   I mean, I know one person, Sandbrink.

20   Like, he came to me, telling me that it took place

21   with other people.

22           MS. BLANKENSHIP:   Who is it?

23       A.   Sandbrink, Mike.  And I felt very safe with

24   him to talk to him about my story, so I talked to

25   him a lot about my story.

1      Q.    And what did he say to you in response?

2      A.    He wanted me to do something about it.  You

3  know, but I didn't talk -- it was a few months

4  before I even talked to him.  Because at first,

5  when I first came home, I was still very scared

6  so -- my husband is the one who wanted me to do

7  something about it.  That's the first person who

8  was wanting me to take action.

9      Q.    Did the FBI agent ever say anything to you

10  about your rights civilly?

11     A.    If they did, I don't really recall.

12     Q.    Anybody other than Sandbrink come forward

13  that you felt safe talking to?

14     A.    I'm sure there could be a few.  I just

15  can't -- like, at rehab, there was those people who

16  were always there for me.  I'm sorry.  It's been a

17  long day.  I know there's probably some people.  I

18  just can't recall right now.

19     Q.    Sure.  Would you agree that if you think of

20  any other additional information, you'd be happy to

21  supplement your discovery responses with that

22  information?

23     A.    Yes.

24     Q.    You were just looking with Acree's attorney

25  at some medical records, if you recall.  If you

1    would look at 131.

2         A.    Which one?  11?

3         Q.    Uh-huh (affirmative).  Yeah.  It would be

4    Bates labeled 131.  Let me know when you get there.

5         A.    I'm sorry.  There's so many things here.  I

6    think I'm almost there.  There we go.  Okay.

7         Q.    When you are looking at the second page,

8    though, Bates labeled 131, in the middle of the

9    second paragraph is where you report that the FBI

10   plans to come and speak to you, but you were

11   unaware of the situation.  Do you see that?

12        A.    Yes.

13        Q.    Why did you feel like that was important to

14   include in this meeting with your therapist?

15        A.    Why was it important to tell her --

16        Q.    Right.

17        A.    -- that they were going to come see me

18   again?

19              Because I was having anxiety and I was

20   freaking out, and my blood pressure went up.  And

21   everybody was concerned about me, so they sent me

22   to talk to her.

23        Q.    And what was it about that that caused you

24   to freak out?

25        A.    I don't -- at first I don't -- I just knew

1    the FBI, that sounds -- like, I've already been in

2    trouble.  Stuff's already took place with the

3    sheriff.  You know, I was scared so...

4        Q.   Is that a response to law enforcement that

5    you have today?

6        A.   Yes, very much.

7        Q.   And did you have that response to law

8    enforcement prior to the interaction you had with

9    Sheriff Acree?

10       A.   No, I never did ever.

11       Q.   You testified that Sheriff Acree threatened

12   to kill you --

13       A.   Yes.

14       Q.   -- and -- if he ever saw you again.

15       A.   Yes.

16       Q.   And if he ever saw you around his family

17   again.

18       A.   Yes.

19       Q.   Did you believe him?

20       A.   Yes, I very much believed him.  Even now,

21   like, when I go to work -- I go to work at 3:00 in

22   the morning.  I have to get up, and I have to be at

23   work at 4:00.  Really 4:30, but I'm always there

24   early because I'm in management now so --

25            But I have to drive early in the morning,

229

1    and I get scared 24 -- it's not as bad anymore, but

2    it was really bad at first, that I would get pulled

3    over, because who's driving out at 3:00 a.m. unless

4    you're doing something wrong, right?  Well, people

5    actually go to work that early too.

6          So I stayed terrified when I go to town.  I

7    stay terrified when I go to Cadiz.  My biggest

8    thing is -- it's not even about me so much as it's

9    about my girls.  I have three girls that are grown.

10   They're 28, 24, and 18, and I am always terrified

11   if they get pulled over.

12   Q.   Do you avoid certain places as a result

13   of --

14   A.   I -- I do.

15   Q.   -- this interaction?

16   A.   Also, I picked up my scripts from Cadiz

17   Pharmacy.  I no longer pick up my scripts from

18   Cadiz Pharmacy.  I try not to.  I get my husband or

19   my mom to because Acree's daughter works there.  I

20   know she's innocent, whatever, but I'm still

21   scared.  Because guess what?  He -- you know,

22   that's his family.  So I get -- I just don't want

23   to be --

24          One time I went to a carwash, and I'm

25   pretty sure it was her.  She pulled up behind me.

230

1    The reason why I know, she got out to clean her

2    tires.  I'm thinking, I think that's Acree's

3    daughter.  And the reason why I know what she looks

4    like, because I've seen them on Facebook.  So like

5    the whole -- when he got, I guess, into being a

6    sheriff, I seen her picture.

7            So she was behind me.  I'm pretty sure it

8    was her.  Plus, she looks like him.  And I didn't

9    think I could get out.  I started having a whole

10   panic attack because my car's getting washed, and

11   she's behind me, and I can't get out of the

12   carwash.

13           So, yeah, there is a whole bunch of

14   different situations that I probably can't remember

15   right now where I stay terrified.  I don't go to

16   Cadiz unless I have to, ever.

17      Q.   Has it had an impact on your relationship

18   with your husband?

19      A.   Yes.  Because of my -- I guess you can call

20   it my PTSD pretty much from that.  I -- we get into

21   little bit of arguments.  He worries about me.

22   Like, it's a whole big thing where, you know --

23   because I don't want to go to certain places or do

24   certain things or, you know, just certain little

25   things that take place with our marriage because of

231

1    it.

2          I also want to leave Cadiz as soon as I

3    can.  I do not want to stay in Cadiz anymore.  I've

4    tried to do it so much because I try to be the

5    strong person and do it for my kids and stuff to be

6    close to them, because two of them live in Cadiz.

7    But I would rather just leave Cadiz altogether

8    because it's -- it's just -- it's too much so --

9          Also, I used to be a server.  I will throw

10   this in too.  I used to be a server for a long

11   time.  I loved serving.  And one of the reasons why

12   I do have trouble serving, yes, it's because I

13   don't want to wait on little boys so -- but also,

14   even for -- like, I'm starting to more try to

15   enjoy, like, when I see a child now.  I'm at the

16   place where I kind of try to enjoy it a little bit

17   more.

18          But I would be scared to death to work as a

19   server to know that Acree could come in there at

20   any time, or law enforcement could come in there.

21   So I feel very safe working in a factory.  You have

22   to have a card to get into the factory.  You can't

23   get in there without permission.  You would have to

24   tell the people that are in the office to even get

25   in there.  So I feel very safe working in the

232

1    factory.  That's my place I go to is work.

2        Q.   If you would pull Exhibit 13 and then look

3    at page 10 and 21.  If you look on the left side of

4    this page, there's like a shaded rectangle,

5    vertical rectangle.  Do you see that?

6        A.   Yes.

7        Q.   And in the middle of that rectangle is all

8    capital letters.  It says, "A hard copy of the

9    patient's history report and psychosocial

10   assessment can be located elsewhere in the EMR."

11           Do you see that?

12       A.   Yes.

13       Q.   And then if you go down one, two, three,

14   four sentences, so four periods, the next sentence

15   starts with, "Patient."  And the "patient" P and A

16   are both capitalized.  Do you see that?

17       A.   Yes.

18       Q.   And it says, "Patient states she is very

19   active in church.  Patient reports she also has

20   criminal charges open.  Patient reports feeling

21   anxious where it comes and goes and is triggered by

22   police officers."

23           Do you see that?

24       A.   I'm sorry.  I bounced around a little bit.

25   I keep seeing stuff.  Okay.  Yes, yes.  Sorry.

CRYSTAL DAWN SMITH

233

1      Q.    That's all right.

2            Did you report that you were triggered by

3      police officers?

4      A.    Yes.

5      Q.    And then if you want to flip to page 9 of

6      21 under Initial Psychiatric Evaluation, starting

7      at sentence number two.  Starts with, "Patient

8      presents for initial assessment."

9            Do you see that?

10     A.    Yes.

11     Q.    And it says, "Patient presents for initial

12     assessment unaccompanied.  Patient reports history

13     of grief, trauma, anxiety, and depression.  Patient

14     identifies stressors as memory of son, police

15     officers," and then there's others.

16           Do you see that?

17     A.    Yes.

18     Q.    Was the incident that occurred with Acree

19     traumatic?

20     A.    Yes.

21     Q.    And has it changed your life?

22     A.    Yes.

23     Q.    Would you say that it's made your life

24     better or worse?

25     A.    Worse.  It's hard to do day-to-day stuff.

234

1    It's hard to try to be normal.

2        Q.    Now, you filed this lawsuit presently --

3    isn't that correct -- that we're here about today?

4        A.    Yes.

5        Q.    How has the litigation process been for

6    you, responding to questions and, like, today's

7    event of giving your deposition?

8        A.    It brings everything back up, what took

9    place.  That's why probably I need some really good

10   deodorant right now.  But it's just hard to

11   breathe.  It's just hard.  It brings all that

12   anxiety and all those emotions back up.  All of it

13   does.

14       Q.    Would you say it causes you to stress?

15       A.    Yes, very much.

16       Q.    Now, you mentioned with Ms. Blankenship

17   earlier that you weren't aware of the Trigg County

18   Jail policies, right?

19       A.    Correct.

20       Q.    Or procedures.  Is that fair to say?

21       A.    Yeah.

22       Q.    You've never worked in the jail.  Is that

23   fair to say?

24       A.    Yes.  No, I have not worked in the jail.

25           THE REPORTER:  I'm sorry?

1      A.    No, I have not.

2      Q.    Why do you believe that Jailer Hughes

3    should not have taken you to Acree upon his

4    request?

5           MS. BLANKENSHIP:   Object to the form.

6    BY MS. SHREWSBURY:

7      Q.    You can answer if you understood.

8      A.    Because you're supposed to go straight to

9    the jail is what I understand.  You're supposed to

10   take -- transport them right to the right place.

11     Q.    You were asked questions about whether or

12   not you knew what Trigg County Fiscal Court does or

13   how it operates by Ms. Blankenship.

14          Do you recall being asked questions to that

15   effect?

16     A.    Yes.

17     Q.    And I believe you answered that you do not

18   know how it operates?

19     A.    Correct.

20     Q.    Do you know if anybody from Trigg County

21   Fiscal Court ever came to talk to you about what

22   happened with you and Acree?

23     A.    No, I never talked to anybody.

24     Q.    Or about the transportation with Jailer

25   Hughes to Acree on that evening?

236

1      A.    Yeah, no one never talked to me.

2            THE REPORTER:  I couldn't hear you.

3      A.    Nobody never talked to me.

4      Q.    Who is it that you understood, if you know,

5   reported what happened to you to the FBI and KSP?

6            MR. WRIGHT:  Object to form.

7   BY MS. SHREWSBURY:

8      Q.    You can answer if you understood.

9      A.    Mike Sandbrink, I thought, reported it, but

10   I could be wrong.  I don't --

11     Q.    Did Mr. Sandbrink tell you that?

12           MS. BLANKENSHIP:  Object to the form.

13     A.    I don't recall right now.

14   BY MS. SHREWSBURY:

15     Q.    Did Mr. Sandbrink tell you how he learned

16   of it?

17     A.    Yes.

18           MS. BLANKENSHIP:  Object to the form.

19     Q.    And what did he say?

20     A.    From James Hughes.

21     Q.    So it's your understanding that Jailer

22   Hughes actually reported what happened that

23   evening?

24     A.    Yes, that's what I was told.

25     Q.    And it was his reporting of the incident

237

1    that led to us being here today?

2        A.    Yes.

3              MS. BLANKENSHIP:   Objection, form.

4              MR. WRIGHT:   Join.

5        Q.    And to Sheriff Acree being criminally

6    prosecuted?

7        A.    Yes.

8              MS. BLANKENSHIP:   Object to the form.

9              MR. WRIGHT:   Join.

10       Q.    Do you believe that Jailer Hughes took you

11   to Sheriff Acree because he wanted you to be

12   assaulted by Sheriff Acree?

13       A.    No, not at all.   No.

14       Q.    Do you have any reason to believe that

15   Jailer Hughes knew that Sheriff Acree was going to

16   assault you?

17       A.    No.

18       Q.    Yet if you had been taken straight to the

19   jail --

20       A.    -- it wouldn't have happened.

21             MS. BLANKENSHIP:   Object to the form.

22   BY MS. SHREWSBURY:

23       Q.    Let's talk about your hip for a second.

24   You testified that your hip was bothering you when

25   you were in the jail and when you got out of jail.

238

1    Is that correct?

2        A.    Correct.

3        Q.    Prior to the incident that occurred with

4    Acree, were you having hip issues?

5        A.    No.

6        Q.    Had you ever seen a doctor about your hip

7    prior to that incident?

8        A.    No.

9        Q.    About how long did your hip hurt?

10       A.    It still hurts.  And only on the right

11   side.

12       Q.    You testified that you threw the coat away

13   after you received it back when you were

14   discharged.

15       A.    Yes.

16       Q.    And you said something to the effect of you

17   wanted to forget that incident.

18       A.    Yeah, it was part of my trauma.  I just

19   wanted to -- anything to do with trauma, you want

20   to get rid of it.

21       Q.    You hadn't filed a lawsuit yet --

22       A.    No.

23       Q.    -- when you threw the coat away?

24       A.    That's right.

25       Q.    And since the filing of this lawsuit, you

239

1    have not thrown away anything related to that

2    incident?

3        A.    Right.    Yeah.

4        Q.    And at the time you threw the coat away,

5    you didn't know you were going to be filing a

6    lawsuit?

7        A.    Right, correct.

8        Q.    It hadn't occurred to you yet?

9        A.    I hadn't -- yeah.    Right.

10       Q.    And you've never filed a lawsuit before?

11       A.    No.    Can I state one of the reasons why I

12   filed the lawsuit to begin with?

13       Q.    Why did you file the lawsuit?

14       A.    Because there's so many stories I kept

15   hearing about people with Acree and gunshots and

16   assaulted and broken arms and all kind of stuff

17   that I felt like -- I felt like there's -- trying

18   to say without starting crying.

19            But, you know, I couldn't help my son.    You

20   know, like, what happened, happened.    I can't go

21   back on that.    But maybe I can help people in the

22   future with being in that situation.    So I thought

23   if I spoke up and have a voice, it could help other

24   people.

25       Q.    And your testimony today is that you were

240

1      injured as a result of what happened to you?

2          A.    Yes.

3          Q.    When Sheriff Acree found you at his home,

4      you testified that he didn't assault you?

5          A.    No, he did not assault me in his house.

6          Q.    He asked you to sit down?

7          A.    He asked me to sit down.

8          Q.    And you complied?

9          A.    Yes.

10         Q.    And he put cuffs on you?

11         A.    Yes.

12         Q.    And that was the last you saw or spoke to

13     him at his home?

14         A.    Yes.

15         Q.    You testified about going to therapy, that

16     it was becoming a burden based on the amount of PTO

17     you had at your job.  Do you recall saying that?

18         A.    Yes.

19         Q.    How much PTO do you get?

20         A.    You get more and more each year you're

21     there.  But the first year that I was there, I

22     think I only got like 42 hours.  So that's not very

23     much when you're trying to go to the doctor and

24     court and still might need to be out for other

25     reasons with your family so --

241

1    Q.   And court, you're referring, of course, to

2    the criminal charges that you pled guilty to?

3    A.   Yes.  And his stuff too.  Like, I had to

4    leave work for his stuff too.

5    Q.   Because you were a victim in his criminal

6    case?

7    A.   Yes.

8    Q.   Did you need help for your heroin

9    addiction?

10   A.   Did I need help for it?  Yes.

11   Q.   Do you recall Officer Wiggins asking you to

12   let him help you?

13   A.   Yes.

14   Q.   Are you remorseful for breaking into

15   Sheriff Acree's home?

16   A.   Of course.  I was trying to tell him sorry

17   at that occasion, but that didn't work out.  I

18   guess my brain was thinking, oh, I can have a

19   heart-to-heart with him because, you know, he

20   understood I lost my son and maybe I was not all

21   there.  And, like, okay, why did she really do

22   this?  Like, what was her purpose?  And I thought I

23   could tell him I was sorry.

24   Q.   Even as you sit here today, are you still

25   sorry for --

242

1      A.    Of course.

2      Q.    -- doing that?

3      A.    Yes.   I'm more sorry to his wife and his

4   daughter.

5      Q.    Is there anything else that you haven't

6   been asked about this lawsuit that you are bringing

7   forward that you would like to testify about?

8           MS. BLANKENSHIP:   Objection to form.

9           MR. WRIGHT:   Join.

10      A.    I'm sure there probably is.   Sorry.   I just

11   know this has been really extremely difficult for

12   me and my family, and my girls had to also go

13   through stuff, and it's not something I wanted to

14   do.

15           Like I said, I wanted to do it for a reason

16   to have a voice for other people.   I wanted to do

17   it because, also, I feel like he should not be in

18   office.   That's really all I really wanted to begin

19   with, him just not to be in office.   But I feel

20   like this will make a difference.

21           And my husband -- I mean, my husband, my

22   family, my girls, we all have been through, like,

23   so much.   Like, my daughter is a nurse practitioner

24   in Trigg County, and I feel like sometimes she can

25   be, like, embarrassed of the situation of what's

243

1    taken place.

2            And I just know that at the end of the day,

3    I just want to make a difference for other people.

4    And maybe for him not to somehow just not be in

5    office or something to be taken place out of it.

6    But it has been very emotional, stressful.  All of

7    it has been, so -- not really the lawsuit itself,

8    what took place, and that's why we did -- I wanted

9    to do the lawsuit.  It really was hard to do.  It

10    was difficult to do.  With Jesus and God, I've been

11    able to do this so --

12        Q.    But you are seeking damages --

13        A.    Yes.

14        Q.    -- from Sheriff Acree and Trigg County?

15        A.    Yes, correct.

16        Q.    And those damages you're seeking are for

17    physical pain and suffering?

18        A.    Yes.

19        Q.    And for emotional distress?

20        A.    That's correct.

21        Q.    Would you say that your emotional distress

22    is ongoing?

23        A.    Yeah.  Right now, still going, yes.

24            MS. SHREWSBURY:  I have no further

25    questions.

244

1        MS. BLANKENSHIP:  I have a few follow-ups.

2    Do you need me to get the microphone?

3                    REDIRECT EXAMINATION

4    BY MS. BLANKENSHIP:

5        Q.   Ms. Smith, when you were at the jail, you

6    were aware that your phone calls were being

7    recorded?

8        A.   At the beginning I really didn't think too

9    much of it.  But, yeah, it tells you on the

10   recorder.

11       Q.   Yeah.  So as soon as the phone call --

12       A.   Yeah.

13       Q.   -- starts happening, it tells you, "This is

14   a recorded call" --

15       A.   Yes.

16       Q.   -- correct?

17       A.   That's correct.

18       Q.   Do you recall on February 9th, 2022,

19   speaking to your husband and saying -- this is

20   about Sheriff Acree -- "You know, I made him feel

21   pretty little, and I understand.  But at the same

22   time, he should look at it as a good thing because

23   he saved my life.  And also, he should learn to

24   lock his doors so some crazy person doesn't come in

25   there and actually do something stupid, because I

245

1    would never do anything like that.  I was just

2    taking some belongings, you know.  Somebody could

3    have come in there and done something crazy.  So

4    maybe I saved something more than just me.  Maybe I

5    saved something like his family."

6        A.    I do remember that.

7        Q.    Okay.  So at the time, you told your

8    husband that you felt like that Sheriff Acree,

9    quote, saved your life.

10       A.    What I mean by that when I said that he

11   saved my life, because I do remember that, is that

12   me going to jail and me -- all the stuff that took

13   place with my heroin addiction and stuff, he

14   saved -- that situation, that situation that

15   occurred, which because of God, you know, it saved

16   my life to be able to be a mom to kids, to my

17   girls.  It saved my life to be able to be there for

18   them and anybody else who might go through a

19   situation that I've been through.

20       Q.    You had your coat on when you went into the

21   sheriff's department, correct?

22       A.    That's correct.

23       Q.    Long-sleeve coat, correct?

24       A.    Most coats, yeah, have long sleeves, yes.

25       Q.    Yeah.  And it was -- it had like cuffs --

246

1    or it had elastic at the bottom of the --

2        A.    It was like the bubble coat.

3        Q.    Yeah.

4        A.    Yeah.

5        Q.    Elastic at the bottom?

6        A.    Yeah, it was a bubble coat.

7        Q.    And yet somehow your arm -- all the way up

8    to your elbow got scuffed with that coat on?

9        A.    Yes.  It must have -- I don't know if it

10   came up.  I don't know if it was still -- but, yes,

11   that's correct, very much so.

12       Q.    You said you and your husband own a

13   business?

14       A.    We did own a business.  We did not at the

15   prior time.

16       Q.    What was the name?

17       A.    There was two different ones.  There was RC

18   & R.  And then there was another one that -- I

19   don't really know right now.  I'm sorry.

20       Q.    How many lines of heroin did you do that

21   morning before the -- before you --

22       A.    I don't recall how many I did.  I know I

23   did some, yes, for sure.

24       Q.    Was it more than one?  Multiple?

25       A.    I don't know.

247

1      Q.   And you still had heroin in your purse,

2   too, correct?

3      A.   I brought it with me, yes.

4      Q.   Okay.  You said something about the cuffs

5   were switched out by the police department --

6      A.   I think --

7      Q.   -- and given.  Wait, let me finish.

8      A.   Okay.

9      Q.   Cuffs were switched out by the police

10   department and given to Sheriff Acree.

11      A.   I think he might have switched them out.

12      Q.   Okay.  And where did that occur?

13      A.   In the -- when I was being put in the car

14   from his house.  I thought.  I think.  I don't

15   really know for sure.

16      Q.   Okay.  When you were being interviewed at

17   the PD's office by the chief, ultimately you, faced

18   with reality, admitted that you were there to steal

19   these things that were in your trunk, correct?

20          MS. SHREWSBURY:  Object to the form of the

21   question.  You can answer.

22      A.   In the end I was -- I admitted that I took

23   them --

24      Q.   Okay.

25      A.   -- but that's not why I was there.

248

1     Q.   Okay.  But you still maintained that you

2     were there to pay Ashley even at the end?

3     A.   I don't recall what I said at the very end

4     after I was arrested.  After I knew I was going to

5     jail, I don't really recall.

6     Q.   Do you recall that you said earlier

7     something about the last time you saw Acree was

8     when he cuffed you and had you on the ground?

9          Do you not recall him coming out to the car

10    at some point when you were sitting in the back

11    seat of the car?

12    A.   At his house?

13    Q.   Yes.

14    A.   No.  I don't recall that.

15         MS. BLANKENSHIP:  Okay.

16              RECROSS-EXAMINATION

17    BY MR. WRIGHT:

18    Q.   All right, a few follow-ups.

19         You've referenced some information you've

20    heard about Acree from others, and I believe the

21    only person you've identified that you can recall

22    who stepped forward is this Mr. Sandbrink.  Is that

23    right?

24    A.   I talked to him, yes.

25    Q.   As far as other things you've heard, you

249

1    can't say where they happened?

2        A.    I mean, I heard a lot of different stories

3    when I got home.  Like, even from my stepbrother

4    who -- his Shane Deloach, if you want to write it

5    down.  Like, supposedly there was a whole story

6    with him and his friend.  I heard stories when I

7    was in jail.  I heard more stories from just other

8    people.  It got to the point where I didn't even

9    want to hear it anymore.  You know, like, I just

10   wanted it to stop and go away.  So -- but, yeah, I

11   couldn't keep up with all the stuff.

12       Q.    So you don't know any other names today?

13       A.    I can't remember all the names.  I'm not

14   very good with names.

15       Q.    Sandbrink, when did he approach you?

16       A.    We talked to him at the Ham Festival.

17       Q.    The where?

18       A.    Ham Festival that year.

19       Q.    Is that in Cadiz?

20       A.    Yes.

21       Q.    What time of year is that?

22       A.    It's like fall, mid-October.

23       Q.    Would this have been October of 2022?

24       A.    I don't know.  We just had a conversation

25   with him that we were going to talk to him later.

250

1   We never actually had a discussion that day, just

2   the fact that I was -- we want to talk to you.  We

3   just reached out.  We would like to talk to you.

4       Q.   You're saying "we."  Who's "we"?

5       A.   Me and my husband.

6       Q.   You and your husband reached out to

7   Sandbrink?

8       A.   Well, we ran into him at the Ham Festival.

9   Like, we ran into him.  He was there.  He had his

10  own booth.  I think they were doing the whole

11  campaign thing.  The whole, you know --

12      Q.   He's campaigning for sheriff?

13      A.   He was then, yeah.

14      Q.   And was that 2022.  Do you remember?

15      A.   Yes, that was.

16      Q.   Was he a jailer at the time?

17      A.   No, he was not.

18      Q.   Did he ever work at Christian County Jail

19  to your --

20      A.   He did afterwards.

21      Q.   After when?

22      A.   He lost his job at the sheriff's

23  department.

24      Q.   Was he an employee there when you were an

25  inmate?

251

1      A.    No, he was not.

2      Q.    So when you approached him, was that

3   because he's running for office?

4      A.    That was just because we seen him at the

5   booth, and my husband just made small talk with

6   him.  That's all it was.  And then my husband

7   mentioned to him that -- I don't remember exactly

8   what the talk was.  And then we just ended up

9   talking.

10     Q.    Was that the only time you talked, or was

11  there a follow-up conversation?

12     A.    We have actually become pretty good

13  friends.  I mean --

14     Q.    You continue to talk with him?

15     A.    Yes, I do.

16     Q.    What's he doing right now?

17     A.    He works at the jail.  He's one person I

18  felt like I could trust, so of course I reached out

19  to him.

20     Q.    Did he indicate that he'd been in contact

21  with the FBI?

22     A.    He -- sooner or later it came out, but, I

23  mean, I don't remember every -- when it came out or

24  nothing like that.  I don't --

25     Q.    Did it come out from him?

252

1      A.   I actually think I heard about it from

2   somebody else.  I don't -- I don't -- I don't

3   remember.  There's a lot of stuff that's going on

4   in that town, so I can't -- I can't recall

5   everything.

6      Q.   The disposition of the charges, you pled

7   guilty to charges against you.  We've seen the

8   offer.  Right?

9      A.   Sorry.  I was zoned out, for real.  What?

10  I'm so --

11     Q.   You pled guilty to charges against you

12  related to this incident.  Is that right?

13     A.   Yes.

14     Q.   You referenced your -- have awareness of

15  charges involving Sheriff Acree.  Is that right?

16     A.   Yes.

17     Q.   Is it your understanding that they were

18  initially assault charges?

19     A.   Yes.

20     Q.   But he didn't plead guilty to any assault

21  charge.  Is that right?

22     A.   I guess he did not.

23     Q.   Did he -- do you even know whether the

24  convictions involved a crime involving physical

25  contact at all?  Do you have any knowledge?

253

1    A.   I am not for sure exactly.  I mean, I

2    know -- no, I'm not aware.

3    Q.   Don't know one way or the other?

4         Were you consulted with respect to the plea

5    arrangements being made to Sheriff Acree?

6    A.   No.

7    Q.   You didn't give your permission to -- or

8    consent or agreement to what was being proposed?

9    A.   What -- okay, maybe I'm not understanding

10   the question.  My consent how -- like, what is

11   that --

12   Q.   When Sheriff Acree entered into a plea

13   agreement with the Commonwealth, did the prosecutor

14   contact you about that?

15   A.   I don't recall.  I don't recall if they

16   talked to my attorney.  I don't recall if they

17   talked to me.  I don't -- I'm sure something was

18   talked about, but I don't -- I don't know.

19   Q.   Do you have any recollection of agreeing

20   with the outcome?

21   A.   I did agree with it.  I was -- I did agree

22   with all of that because I got -- I was tired.  I

23   was tired of doing all of this, so I just agreed

24   with it --

25   Q.   So your --

CRYSTAL DAWN SMITH

254

1      A.    -- yes, yes.

2      Q.    -- agreement was because you were tired of

3   the process?

4      A.    Yes.  I was tired of going back and forth

5   to court over it.  I had anxiety.  I was just over

6   it.  So, yes, I did finally agree to like, okay,

7   that's fine, whatever.

8           MR. WRIGHT:  That's all I have.

9           MS. SHREWSBURY:  I don't have any further

10   questions.

11           THE VIDEOGRAPHER:  This concludes this

12   video deposition.  We are now off the record.

13           (The deposition concluded at 3:23 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1    COMMONWEALTH OF KENTUCKY
     COUNTY OF McCRACKEN

2

3        I, AMY S. FLEMING, RPR, CSR, and Notary Public in
     and for said Commonwealth of Kentucky at Large, do

4    hereby certify that the above and foregoing is a true,
     correct, and complete transcript of the deposition of

5    CRYSTAL DAWN SMITH taken at the time and place and for
     the purpose set out in the caption hereof; that said

6    witness was duly sworn by me; that said deposition was
     taken down in stenotype by me and thereafter

7    transcribed; that the appearances were as set out in
     the caption hereof; and that no request was made by

8    counsel for either party that the deposition be
     submitted to the witness for signature.

9

10       I further certify that I am neither attorney for,
     nor counsel for, nor related to, nor employed by any of
     the parties to the action in which this deposition is

11   taken; and further, that I am not a relative nor
     employee of any attorney nor counsel employed by the

12   parties hereto nor financially interested in the
     action.

13

         My commission expires on June 16, 2027.

14

         Given under my hand and seal of office on

15
     this the 13th of December, 2024.

16

17                         /s/ Amy S. Fleming
                           AMY S. FLEMING, RPR, CSR

18                         Notary Public No. KYNP73114
                           State of Kentucky at Large

19

20

21

22

23

24

25