UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

CASE NO. 5:22-cv-00174-BJB

CRYSTAL DAWN SMITH                    PLAINTIFF


V.



AARON ACREE, ET AL                    DEFENDANTS




DEPONENT:  AARON ACREE

DATE:      AUGUST 19, 2024


REPORTER:  STEVEN TAYLOR








TAYLOR COURT REPORTING KENTUCKY
2901 SIX MILE LANE
LOUISVILLE, KENTUCKY 40220

Aaron Acree
August 19, 2024

AARON ACREE

AUGUST 19, 2024

```
 1
 2                        APPEARANCES
 3
 4   COUNSEL FOR PLAINTIFF:
 5
 6   Annie L. Malka, Esq.
 7   (Appeared via Zoom videoconference)
 8   MALKA LAW OFFICE
 9   1387 South Fourth Street
10   Louisville, Kentucky 40208
11   Telephone:  (502) 212-5888
12   Email:  annie@malkalawgroup.com
13
14
15   COUNSEL FOR DEFENDANTS TRIGG COUNTY JAILER AND
     TRIGG COUNTY FISCAL COURT:
16
17   Stacey A. Blankenship, Esq.
18   (Appeared via Zoom videoconference)
19   KEULER, KELLY, HUTCHINS, BLANKENSHIP & SIGLER
20   100 South Fourth Street
21   Suite 400
22   Paducah, Kentucky 42001
23   Telephone:  (270) 488-8888
24   Email:  sblankenship@kkhblaw.com
25
```

Aaron Acree
August 19, 2024

4

APPEARANCES

COUNSEL FOR DEFENDANT AARON ACREE:

Derrick T. Wright, Esq.

(Appeared via Zoom videoconference)

STURGILL, TURNER, BARKER & MALONEY, PLLC

333 West Vine Street

Suite 1500

Lexington, Kentucky 40507

Telephone:  (859) 255-8581

Email:  dwright@sturgillturner.com

Sharon Acree
August 19, 2024

5

INDEX

                                                 PAGE


Color picture of deponent              2

Appearances                            3

Index                                  5

Exhibits                               6

Stipulations                           7

Introduction                           8

Examination by Ms. Malka               10

Examination by Ms. Blankenship         158

Examination by Mr. Wright              159


Court Reporter's Certificate           161

Aaron Acree
August 19, 2024

6

1

2                          EXHIBITS

3

4                                              PAGE

5

6   Exhibit A                                  55
    (Drawing)

7

    Exhibit B                                  151
8   (Texts)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Aaron Acree
August 19, 2024

STIPULATIONS

The deposition of AARON ACREE was
taken pursuant to Notice, via Zoom, on Monday,
August 19, 2024; said deposition was taken for
the purposes of discovery, to be used in
accordance with the Federal Rules of Civil
Procedure.

Aaron Acree
August 19, 2024

8

INTRODUCTION

1
2
3
4          THE COURT REPORTER:  We will open
5     the record.  My name is Steve Taylor, the court
6     reporter.  I am reporting remotely today from
7     Louisville, Kentucky via Zoom videoconference.
8               Counsel, please state your name and
9     whom you represent.  Also, please state the
10    names of any other persons present with you
11    today for the deposition, and in what capacity
12    they are attending.
13              MS. MALKA:  This is Annie Malka for
14    Plaintiff Crystal Smith, attending remotely from
15    Louisville, Kentucky.
16              MR. WRIGHT:  Derrick Wright for
17    Defendant Acree, attending remotely from
18    Lexington, Kentucky.
19              MS. BLANKENSHIP:  Stacey
20    Blankenship, attending remotely from Paducah,
21    Kentucky.
22              THE COURT REPORTER:  And I'll ask
23    the deponent, Sheriff Acree, to please state
24    your full name for the record and identify
25    anyone present with you as well.

9

1              THE WITNESS:  Aaron Acree, Trigg

2    County Sheriff, attending remotely from

3    Lexington, Kentucky.

4              THE COURT REPORTER:  Thank you.

5              Having identified everyone present

6    for the record, I will now swear the witness

7    pursuant to KRS 423.455(6).

8

9                    *    *    *

10

11             THE COURT REPORTER:  Sheriff Acree,

12   would you please raise your right hand?

13             THE WITNESS:  (Complying.)

14             THE COURT REPORTER:  Do you

15   solemnly swear or affirm that the testimony you

16   are about to give will be the truth, the whole

17   truth, and nothing but the truth?

18             THE WITNESS:  Yes, sir.

19             THE COURT REPORTER:  Thank you.

20             Counsel, you may proceed.

21             MS. MALKA:  Thank you.

22

23                    *    *    *

24

25

```
 1
 2                    PROCEEDINGS
 3
 4           AARON ACREE, called by the
 5  Plaintiff, Crystal Dawn Smith, by and through
 6  counsel, having been first duly sworn, was
 7  examined and deposed as follows:
 8
 9                 *    *    *
10                    EXAMINATION
11  BY MS. MALKA:
12       Q.    Good morning, Sheriff Acree.  As
13  I've just stated, my name is Annie Malka.  I
14  represent the plaintiff, Crystal Smith in this
15  case.
16           Could you please provide your full
17  name for the record?
18       A.    Aaron Scott Acree.
19       Q.    And have you ever given a
20  deposition before?
21       A.    No.
22       Q.    Okay.  So we'll go over just a
23  couple of guidelines to help things flow more
24  smoothly today.
25           If you need a break at any time,
```

Aaron Acree
August 19, 2024

1    just let me know.  This certainly isn't a

2    marathon.  I don't expect to be here for long

3    today, but if you need a break for any reason,

4    just let me know.  I just ask that you finish

5    the question that we're on and then we'll break

6    at that point.

7                Okay?

8                Obviously, we've got a court

9    reporter here that's writing down everything

10   that's said.  For that reason, I just ask that

11   you try to let me finish my question completely

12   before you start to give your answer.  I'll do

13   the same thing, try to let you finish your

14   answer completely, before I jump in with my next

15   question.

16               A lot of times, you'll be able to

17   tell kind of where I'm going, but just so that

18   we have a clean record, I ask that you to -- we

19   try not to over talk each other.  I also ask

20   that you answer verbally with yeses and nos

21   instead of uh-huh or huh-uh, huh-uh.

22               Again, it's natural conversation,

23   but again, just so that it's clear and there's

24   no question of what's said, that you give

25   verbal, yes or no answers.

Aaron Acree
August 19, 2024

```
 1              If you don't understand my
 2    questions for any reason, please let me know,
 3    ask me to rephrase.  I'm certainly guilty of
 4    asking a bad question.  You will be held to your
 5    answers today, so I want to make sure that you
 6    understand completely what it is that I'm
 7    asking.
 8              Is that fair?
 9         A.    Yes, ma'am, it is.
10         Q.    Okay.  Are there any medications,
11    physical conditions, anything that would prevent
12    you from understanding my questions today and
13    giving truthful testimony?
14         A.    No.
15         Q.    All right.  I'm going to start by
16    getting some background.  Are you originally
17    from Trigg County?
18         A.    Yes.
19         Q.    And have you lived there all your
20    life, in Trigg County?
21         A.    Yes.
22         Q.    Okay.  What's your current address?
23              MR. WRIGHT:  Is it okay if we do
24    that under separate cover?  I usually don't put
25    law enforcement addresses --
```

Aaron Acree
August 19, 2024

13

```
 1              MS. MALKA:  Yeah.  We can go off

 2    the record.

 3

 4                    *     *     *

 5                 (Off the record.)

 6                    *     *     *

 7

 8              THE COURT REPORTER:  We are back on

 9    the record.

10

11                    *     *     *

12              CONTINUED EXAMINATION

13    BY MS. MALKA:

14         Q.    Sheriff, you've just given me your

15    address and date of birth off of the record.

16    For the address that you gave me, how long have

17    you been at that address?

18         A.    Roughly a year, maybe.

19         Q.    And who lives there with you?

20         A.    My family -- my immediate family.

21         Q.    Okay.  Would that be your wife and

22    daughter?

23         A.    Wife and daughter.

24         Q.    Is your daughter a minor?

25         A.    Yes.
```

Aaron Acree
August 19, 2024

```
 1        Q.     What's your wife's name?

 2        A.     Angela.

 3        Q.     Angela Acree?

 4        A.     Yes.

 5        Q.     What year did you all get married?

 6        A.     2015.

 7        Q.     Have you ever been married before?

 8        A.     No.

 9               MS. MALKA:  Okay.  If we could go

10   off the record once more.  I'm sorry.

11

12                      *    *    *

13               (Off the record.)

14                      *    *    *

15

16               THE COURT REPORTER:  We are back on

17   the record.

18

19                      *    *    *

20               CONTINUED EXAMINATION

21   BY MS. MALKA:

22        Q.     And Sheriff, we've just gone off

23   the record because I asked you for the address

24   that you lived at prior to the one you've been

25   at for the last year.  How long were you at this
```

1    former address for?

2        A.    Roughly -- maybe almost five years.

3        Q.    Okay.  And who did you live there

4    with?

5        A.    My wife and daughter.

6              MR. WRIGHT:  I believe that that

7    address is probably in the record already

8    through the document production, and he no

9    longer lives there.  We can put that one on the

10   record if you'd like.

11   BY MS. MALKA:

12       Q.    Okay.  You told me that was 235

13   Chasity Drive in Cadiz, Kentucky.

14             Is that correct?

15       A.    Correct.

16       Q.    Okay.  Where did you go to high

17   school, Sheriff Acree?

18       A.    Trigg County High School.

19       Q.    And what year did you graduate?

20       A.    2008.

21       Q.    Did you have any continuing

22   education at any time following graduation from

23   high school?

24       A.    Yes.

25       Q.    Tell me about that, please.

Aaron Acree
August 19, 2024

16

```
 1          A.      College credits at Hopkinsville
 2   Community College.
 3          Q.      And what was your area of study?
 4          A.      Criminal justice.
 5          Q.      What years were you there?
 6          A.      Maybe -- 2009, 2010, maybe.
 7          Q.      And did you obtain any sort of
 8   degree or certificate?
 9          A.      No.  College credit.
10          Q.      Okay.  Beyond Hopkinsville
11   Community College, have you obtained any
12   licenses, certifications, any other sort of
13   professional training?
14          A.      Aside of my law-enforcement
15   training?
16          Q.      Yes.
17          A.      No.
18          Q.      Okay.  Let's go into your
19   law-enforcement training.  When did you start
20   your law-enforcement training?
21          A.      2011.
22          Q.      And where did you complete that at?
23          A.      Department of Criminal Justice
24   Training in Richmond, Kentucky.
25          Q.      How long did it take you to
```

Aaron Acree
August 19, 2024

17

```
1   complete that?

2        A.      Eighteen weeks at the basic police

3   academy.

4        Q.      And is that 18-week training what's

5   required to become a police officer?

6        A.      For a basic police officer, yes.

7        Q.      Did you do any additional training

8   beyond that 18-week basic police academy?

9        A.      Yes.

10       Q.      What year was that?

11       A.      2015.

12       Q.      And where did you complete that at?

13       A.      Kentucky State Police Academy,

14   Frankfort, Kentucky.

15       Q.      And was there a different role that

16   you were trying to obtain in getting this

17   additional training at the Kentucky State Police

18   Academy?

19       A.      I don't believe I understand your

20   question, different role.

21       Q.      Well, what was the purpose of you

22   attending Kentucky State Police Academy?

23       A.      That's the requirement to become a

24   Kentucky state trooper.

25       Q.      Okay.  How long is that training?
```

1          A.      Twenty-two weeks.

2          Q.      You said 22?

3          A.      Twenty-two, maybe 23.

4          Q.      Okay.  And did you complete that

5    training in 2015?

6          A.      Yes.

7          Q.      Beyond Kentucky State Police

8    Academy, was there any additional training that

9    you've completed or undertaken?

10         A.      As far as training academies, or

11   mandatory credit hours to maintain

12   certification?

13         Q.      Let's talk about the first, the

14   training.

15         A.      No.

16         Q.      Tell me about mandatory credit

17   hours.

18         A.      Mandatory to -- to maintain your

19   KLEFPF, you have to maintain 40 -- 40 hours of

20   mandatory training for law enforcement a year.

21         Q.      And where do you complete that?

22         A.      Well, it varies between agencies.

23   Either Department of Criminal Justice, Kentucky

24   State Police, or more recent, the Kentucky

25   Sheriff's Association Conference.

Sean Acree
August 19, 2024

19

```
 1        Q.      And do you choose the topics that
 2   you learn about, or is it just whatever is
 3   offered for that year?
 4        A.      Well, that depends.  Since I've
 5   been sheriff it's been the Kentucky Sheriff's
 6   Conference, and it varies.
 7        Q.      Varies based on what the conference
 8   is putting on, what training they're putting on?
 9        A.      Correct.
10        Q.      At any of these trainings or
11   academies that you attended, have there been any
12   training or lessons on procedure for
13   transporting an accused criminal to a jail?
14        A.      Specific transportation trainings,
15   I don't recall any specific transportation
16   training.
17        Q.      Are you a member of any churches or
18   community associations, clubs, groups?
19        A.      Yes.
20        Q.      Can you list those out for me?
21        A.      My church is Virginia Street
22   Baptist Church, Hopkinsville, Kentucky.
23        Q.      Any other associations, clubs, or
24   groups that you're a member of?
25        A.      No.
```

Mason Acree
August 19, 2024

20

```
1          Q.     How long have you been a member of

2    Virginia Street Baptist Church in Hopkinsville?

3          A.     Since I was a young child.  I don't

4    know an approximate time frame.

5          Q.     Okay.  Seeing as you're from Trigg

6    County, do you -- I -- I assume you've got quite

7    a few relatives there by blood and marriage?

8          A.     I have relatives.

9          Q.     Okay.  I don't want to take the

10   time to get in that today, but for jury

11   selection purposes, if this matter proceeds to

12   trial, would you agree to provide your attorney

13   with a list of all of your relatives through

14   blood and marriage that are living in Trigg

15   County?

16         A.     Yes.

17                MR. WRIGHT:  We can do that.

18   That's fine.

19                MS. MALKA:  Okay.  Thank you.

20                MR. WRIGHT:  I also want to

21   indicate that I think the question about social

22   groups, he answered socially.  He did indicate,

23   professionally he was a member of the Sheriff's

24   Association.  I don't know if -- I don't want to

25   leave that out there, because he mentioned it
```

```
 1   earlier.
 2   BY MS. MALKA:
 3        Q.    Okay.  Let's talk about your
 4   employment history from high school forward.
 5   What was the first job that you held after high
 6   school?
 7        A.    Maintenance at Lake Barkley State
 8   Resort Park.
 9        Q.    I'm sorry.  What was that job
10   title?
11        A.    It was a seasonal position at Lake
12   Barkley State Resort Park, maintenance.
13        Q.    And how long were you in that role?
14        A.    A few years.
15        Q.    Okay.  So did you start there in
16   2008?
17        A.    Possibility.  Yes, 2008.  Sounds
18   about right.
19        Q.    Who would your supervisor have
20   been?
21        A.    Chuck Etherington.
22        Q.    How do you spell that last name?
23   Do you know?
24        A.    Yes.  E-T-H-E-R-I-N-G-T-O-N, maybe.
25        Q.    And did you say the first name was
```

Aaron Acree
August 19, 2024

22

```
 1   Joe?

 2        A.      Charles, Chuck.   Charles

 3   Etherington.

 4        Q.      Okay.   You said you think you were

 5   in there for a couple of years.   Would that have

 6   been what, 2010, 2011?   Did you have that job up

 7   until you started your police academy training?

 8        A.      It would have ended in 2010.

 9        Q.      And why did you leave that role?

10        A.      I was offered a position in law

11   enforcement.

12        Q.      During your time at Lake Park --

13   Lake Barkley State Resort Park, did you ever

14   have any sort of corrective disciplinary action,

15   write-ups, anything like that, taken against

16   you?

17        A.      No.   Not to my knowledge, no.

18        Q.      Who offered -- okay.

19        A.      I apologize.   Not that I could

20   remember.

21        Q.      That's fair.

22                Who offered you the position in law

23   enforcement?

24        A.      Hollis Alexander, former Cadiz

25   police chief.
```

Aaron Acree
August 19, 2024

23

```
 1        Q.     And did you -- I take it, did you
 2   know the former Cadiz police chief before he
 3   offered you the role?
 4        A.     I knew of him, yes.
 5        Q.     And how did he come to offer you
 6   that role?
 7        A.     I was dedicating my time through
 8   college course --
 9             MR. WRIGHT:  You -- you cut out,
10   Aaron.
11             THE WITNESS:  Can you still hear
12   me?
13             MR. WRIGHT:  We can now.
14             MS. MALKA:  I can hear.
15             THE WITNESS:  I apologize.
16             THE COURT REPORTER:  Repeat that
17   answer.
18   BY MS. MALKA:
19        Q.     Yeah.  Well, I asked how you came
20   to know him.  I -- I heard you say you were
21   dedicating time through college courses.  Were
22   you doing it at the Cadiz Police Department?
23        A.     Yes.  It was not through the
24   college program.  It was during my college
25   courses.  I was dedicating my personal time to
```

Aaron Acree
August 19, 2024

```
 1    their ride-along program, prior to employment
 2    with Cadiz Police.
 3         Q.    Okay.  And so you stated that the
 4    Cadiz police chief offered you a position in law
 5    enforcement.  I take it you accepted that
 6    position in or around 2011, and then went to the
 7    Department of Criminal Justice training?
 8         A.    2010, I accepted the position.
 9         Q.    What did you do between 2010 and
10    2011 when you started your training?
11         A.    Field training with a
12    field-training officer I rode with for a few
13    months prior to attending the Academy in
14    February of 2011.
15         Q.    Who was that field-training
16    officer?
17         A.    Duncan Wiggins.
18         Q.    Okay.  Is Duncan Wiggins still
19    employed as a Cadiz police -- well, I'm sorry,
20    as a Cadiz police officer?
21         A.    Yes.
22         Q.    And what is his current role?  Do
23    you know?
24         A.    Specifically, no, other than
25    patrol.
```

Aaron Acree
August 19, 2024

25

1          Q.      Okay.  How long did you do this

2     field training with Duncan Wiggins?

3          A.      A couple of months.  Prior to --

4     prior to my basic training at the Academy.

5          Q.      Okay.  And then once -- when you

6     were at the Academy doing your basic training,

7     that was a full-time deal, right?  You weren't

8     also working at the -- at the police department

9     and going to your training.

10              Correct?

11         A.      Correct.

12         Q.      All right.  Once you completed the

13    18 weeks of training, did you return to the

14    Cadiz Police Department?

15         A.      Yes.

16         Q.      And what was your job title at that

17    time?

18         A.      Patrolman.

19         Q.      And how long did you work in that

20    position?

21         A.      Up until I went to the Kentucky

22    State Police Academy.

23         Q.      In 2015?

24         A.      Yes.

25         Q.      Who was your supervisor during your

Aaron Acree
August 19, 2024

26

```
 1   time at the Cadiz Police Department?

 2        A.    I had various supervisors.

 3        Q.    Okay.  Give me all the ones that

 4   you remember.

 5        A.    To the best of my memory, Rick

 6   Martin, Duncan Wiggins.  Of course, Chief Hollis

 7   Alexander.

 8        Q.    During your time at the Cadiz --

 9   well, in 2015, did you leave the Cadiz Police

10   Department?

11        A.    Yes.

12        Q.    Okay.  And -- and so during your

13   time at the Cadiz Police Department, did you

14   ever have any disciplinary or corrective action

15   taken against you?

16        A.    To my memory, no.

17        Q.    Were there ever any complaints made

18   about you?

19        A.    Formally?

20        Q.    Formally or informally.

21        A.    Not to my knowledge.

22        Q.    And when you say formal complaint,

23   what do -- what does that mean to you?  What's

24   the difference between a formal complaint and an

25   informal complaint?
```

Jason Acree
August 19, 2024

27

1        A.      Typically, formal would be when

2   someone comes in and puts their complaint on

3   paper and brings it through channels.

4        Q.      And informal would be just a verbal

5   complaint, or a telephone call, or something

6   like that?

7        A.      Or if someone didn't complete a

8   formal complaint.

9        Q.      All right.  So no complaints,

10  formal or informal, to your knowledge, while you

11  were working at Cadiz Police Department.

12               Is that correct?

13       A.      If I could rephrase that to my --

14  to my ability, I -- that I can't remember to...

15       Q.      To the best of your recollection.

16               Is that correct?

17       A.      Correct.  Yeah.

18       Q.      Okay.  Your screen is doing some

19  funny stuff, but it looks like it's back.  I

20  guess we'll keep pushing it as long as we can.

21               You said that you left the Cadiz

22  Police Department in 2011, and you went to

23  Kentucky State Police Academy for 22 or 23

24  weeks.

25               MR. WRIGHT:  Looks like we had an

Aaron Acree
August 19, 2024

28

```
 1   issue.
 2              THE WITNESS:  Can you still hear
 3   me?
 4              MS. MALKA:  We can hear you, yeah.
 5              MR. WRIGHT:  You want me to take a
 6   short break, see if I can get that video working
 7   again?
 8              MS. MALKA:  Sure.
 9              MR. WRIGHT:  I'm sorry.
10              THE COURT REPORTER:  We'll go off
11   the record.
12
13                    *     *     *
14                 (Off the record.)
15                    *     *     *
16
17              THE COURT REPORTER:  We are back on
18   the record.
19
20                    *     *     *
21                 CONTINUED EXAMINATION
22   BY MS. MALKA:
23       Q.    Okay.  Sheriff Acree, when we took
24   a quick break, we were talking about your
25   transition from the Cadiz Police Department to
```

```
 1    your role at Kentucky State Police.
 2              Is that --
 3         A.    Yes, ma'am.
 4         Q.    -- your recollection?
 5              Okay.  Were you offered a position
 6    with Kentucky State Police or was that a
 7    position that you applied for?
 8         A.    It was a position I applied for.
 9         Q.    Okay.  And so after you completed
10    your training to become a Kentucky State Police
11    officer, what did your job -- formal job title
12    become at that point?
13         A.    Trooper.
14         Q.    Okay.  And I want to ask you about
15    that role, but I actually want to go back really
16    quickly.
17              When you were working as a
18    patrolman with the Cadiz Police Department, what
19    was your job duties?  Walk me through kind of a
20    typical day for you.
21         A.    Patrol, basically.  I don't -- in
22    law enforcement, there's not really a typical
23    day, but patrol would be how to classify what my
24    job duties were.
25         Q.    And was there a particular area
```

Aaron Acree
August 19, 2024

30

```
 1    that you were assigned to patrol, or was it the

 2    whole --

 3         A.    Yes, ma'am.

 4         Q.    -- town, Cadiz?

 5         A.    Yes, ma'am.  The city limits of

 6    Cadiz.

 7         Q.    And were you -- I take it you had

 8    to arrest people.

 9               Is that fair?

10         A.    If it warranted.

11         Q.    And did you ever transport people

12    to jail?

13         A.    To jail?  No, ma'am.

14         Q.    Yeah.

15               What would you -- what would the

16    process be in that role as patrolman at Cadiz

17    Police Department if you arrested somebody and

18    they needed to be taken to jail?

19         A.    We have a jail transport service,

20    and they are to remain either at the police

21    department or a holding cell underneath the

22    Justice Center.

23         Q.    And what was the name of the jail

24    transport service they used?

25         A.    That was our jail trans- -- Trigg
```

Aaron Acree
August 19, 2024

31

```
 1    County jail transport.
 2         Q.      And is there a jail in Trigg
 3    County?
 4         A.      No, ma'am.
 5         Q.      So what jail would people typically
 6    be transported to?
 7         A.      That would be the discretion of the
 8    jailer.  But typically, to answer your question,
 9    would be Christian County Jail.
10         Q.      So would it be fair to say that in
11    your position as a patrolman for the Cadiz
12    Police Department, you worked regularly with the
13    Trigg County jail transport?
14         A.      During arrest purposes.
15         Q.      And did you ever see a situation
16    during your role as patrolman for the Cadiz
17    Police Department, where an accused criminal
18    defendant was arrested and then taken back to
19    see, or interact in some way with a victim of a
20    crime?
21         A.      I can't recall a specific
22    situation.
23         Q.      So fair to say you don't recall any
24    time when a criminal defendant, an accused
25    arrested individual, was taken back to see a
```

Aaron Acree
August 19, 2024

32

```
1    victim of -- of their specific crime?

2         A.     To see?  What are you asking me?

3         Q.     To see or interact in some way with

4    the victim of their crime.

5         A.     I can't remember a specific

6    incident.

7         Q.     All right.  In your role as a

8    Kentucky state trooper, what did that job

9    consist of?

10        A.     Patrol.

11        Q.     What area?

12        A.     Well, I was assigned to Mayfield

13   Post 1 upon completing the Kentucky State Police

14   Academy.

15        Q.     Post 1?

16        A.     Yes.

17        Q.     And is that several counties,

18   several cities?  What area does Post 1 consist

19   of?

20        A.     Eleven counties between Fulton and

21   Trigg County.

22        Q.     How long did you work as a Kentucky

23   state trooper?

24        A.     Up until my appointment in 2020,

25   for the position of sheriff.
```

Aaron Acree
August 19, 2024

33

```
 1        Q.      2015 to 2020?

 2        A.      Yes, ma'am.

 3        Q.      And who was your supervisor in your

 4   role as a Kentucky state trooper?

 5        A.      I had numerous supervisors.

 6        Q.      Okay.  List all the ones that you

 7   remember.

 8        A.      Michael Williams.  He was Kentucky

 9   State Police Post 1.  Bob Winters, Kentucky

10   State Police Post 2, Madisonville.

11        Q.      Anyone else that you remember?

12        A.      I had numerous post commanders.  It

13   was a revolving door with supervision.

14        Q.      Okay.  Other than Michael Williams

15   or Bob Winters, do you recall the names of any

16   of your other supervisors from 2015 to 2020?

17        A.      I had a post captain at

18   Madisonville, Derek Smith.

19        Q.      Anyone else that you recall?

20        A.      Post Captain Commander, Post 1,

21   Janet Barnett.

22        Q.      Okay.  Any others?

23        A.      Not right off the top of my head,

24   no.

25        Q.      Did you ever receive any sort of
```

Aaron Acree
August 19, 2024

34

```
 1    discipline, write-ups, corrective action of any
 2    kind, in your role as a Kentucky state trooper?
 3         A.    No, ma'am.
 4         Q.    And what about any -- do you know
 5    if there were any complaints made on you in your
 6    role as Kentucky state trooper?
 7         A.    Formal or informal?
 8         Q.    Let's start with formal.
 9         A.    No, ma'am.
10         Q.    And what about informal?
11         A.    I can't remember any specific
12    informal complaints or formal complaints.  Not
13    -- none specifically.
14         Q.    Do you know that you received
15    informal, you just can't remember what they
16    were, or you don't recall ever getting one,
17    period?
18         A.    Not really a direct complaint, more
19    like -- more like guidance.
20         Q.    Guidance?
21         A.    More -- yes.
22         Q.    Tell me what that was about.
23         A.    Maybe how to effectively conduct a
24    traffic stop, as opposed of doing it one way and
25    doing it this way.
```

Aaron Acree
August 19, 2024

```
 1          Q.      Who gave you that guidance?
 2          A.      I believe it was Sergeant Michael
 3   Williams.
 4          Q.      And was there a situation that
 5   necessitated him giving you the guidance, or
 6   that led rather to him giving you the guidance?
 7          A.      No, ma'am.
 8          Q.      So did he ride along with you and
 9   observe you conducting a traffic stop, or how
10   did it come to be that he gave you this
11   guidance?
12          A.      It could have been through the
13   field training trooper or -- I -- I'm not sure.
14          Q.      And when you say field training
15   trooper, what does that mean?
16          A.      You have a field training trooper
17   before you're released on your own patrol after
18   completing the Academy.
19          Q.      Who was your field training
20   trooper?
21          A.      Trooper Derek Scott, Kentucky State
22   Police, Post 1.
23          Q.      Were you in Post 1 for your entire
24   career with Kentucky State Police?
25          A.      No, ma'am.
```

Aaron Acree
August 19, 2024

1      Q.      Where else did you move to?

2      A.      I was assigned to Madisonville,

3   Post -- Post 2.

4      Q.      And when you went to Post 2, did

5   you have to work with a field training trooper,

6   or you just went directly into that role?

7      A.      I went directly into patrol.  I --

8   I didn't have a field training.

9      Q.      And so the names of the supervisors

10  that you gave me just a few minutes ago, were

11  those your supervisors in both Post 1 and Post

12  2, or were those just for Post 1?

13     A.      Both Post 1 and Post 2.

14     Q.      Okay.  Do you remember any other

15  guidance that you received in your role as

16  Kentucky state trooper, from a superior?

17     A.      No, ma'am.

18     Q.      Do you recall what was the

19  difference in the way to effectively conduct a

20  traffic stop?  Like, what were you doing, and

21  what was the guidance on what you could be doing

22  better?

23     A.      It was the way I was asking for

24  documents.  I -- you want to ask for documents a

25  certain way as far as discussing with why you

1   pulled someone over.  There's -- there's no

2   right way to do it.  There is -- sometimes could

3   be a more effective way of doing it.

4           Q.      What was the criticism?  I mean,

5   you say it was the way that -- for asking for

6   documents.  What was the criticism or the --

7           A.      There was no criticism.

8           Q.      Well, what was wrong with the way

9   -- or I guess how were you asking for documents,

10  and how did he tell you to start asking for

11  documents?

12          A.      There's no right or wrong way.  It

13  was just to be more effective.  It was, hey, try

14  this way or try this way.  There was nothing

15  that I was doing wrong.

16          Q.      What were the ways that he was

17  saying to try?  I'm just trying to get you to be

18  as specific as possible, because I -- I'm not --

19  I understand that he wanted you to do it a

20  different way, but I -- I don't understand how

21  it was different.  In what way was it different

22  from what you were already doing?

23          A.      Maybe asking for docum- -- for

24  documentation as opposed of explaining to the

25  reason why I've -- I stopped them.

```
 1        Q.      Okay.  All right.  You said that
 2   you were appointed to your role as sheriff in
 3   2020.
 4                Is that correct?
 5        A.      Yes, ma'am.
 6        Q.      And were you filling a vacancy?  Is
 7   that why you were appointed, or is it normally
 8   an elected position?
 9        A.      I was filling the position from the
10   previous sheriff resigning from his position.
11        Q.      Who was that sheriff?
12        A.      Jason Barnes.
13        Q.      Do you know why he resigned?
14        A.      Specific on why he resigned, no,
15   ma'am.
16        Q.      And then, I apologize, did you say
17   there was additional training that you did to --
18   before you became the sheriff, or what -- what
19   you had already completed at the -- to be a
20   Kentucky state trooper was enough?
21        A.      I don't believe I understand your
22   question.  I'm sorry.  When you say additional
23   training --
24        Q.      That's okay.
25        A.      -- would it --
```

Aaron Acree
August 19, 2024

```
 1          Q.      Yeah.  I mean, I know that you did
 2   your training to become the police officer at
 3   the Cadiz Police Department, and then you did
 4   anoth- -- additional training to become a
 5   Kentucky state trooper.  Was there some other
 6   training that you had to do to become a sheriff?
 7          A.      No, ma'am.  No.
 8          Q.      Okay.  And when you joined the
 9   Sheriff's Department -- am I saying that
10   correctly -- in 2020, what was your official job
11   title?
12          A.      Sheriff.
13          Q.      All right.  And what were your job
14   duties as a sheriff?
15          A.      They were running the
16   administrative office, respond to criminal
17   complaints.  Priority one is to effectively
18   receive tax collection.
19          Q.      And I apologize for jumping around.
20   I meant to ask you this when we were talking
21   about your role as a Kentucky state trooper.
22          A.      Okay.
23          Q.      Did you have to arrest people in
24   your role as a Kentucky state trooper?
25          A.      If it warranted, yes, ma'am.
```

Aaron Acree
August 19, 2024

```
1        Q.      And would you transport an accused
2   criminal defendant to jail in your role as
3   Kentucky state trooper, or did you also use the
4   Trigg County jail -- Count- -- Trigg -- or let
5   me start over.  Sorry about that.
6                In your role as Kentucky state
7   trooper, did you transport people to jail?
8        A.      It depends where I was at in the
9   Commonwealth.  It varied within counties
10  depending on what county I was assigned to.
11       Q.      And if there was a jail in the
12  county that you were assigned to, would you
13  transport a criminal -- accused criminal
14  defendant to the jail yourself?
15       A.      If they had a jail?
16       Q.      Yes.
17       A.      Yes, ma'am.
18       Q.      And if they didn't, then what would
19  you do?
20       A.      I would call for a transport
21  service or it would be jailer of the county.
22       Q.      Okay.  And where would you hold
23  that criminal defendant while you were waiting
24  for a transport service?
25       A.      In the appropriate facility.
```

Aaron Acree
August 19, 2024

```
1        Q.      Would that be like a Kentucky State
2    Police post or a local jail?
3        A.      It would be --
4        Q.      I'm sorry, a local police station.
5        A.      Yeah.  In the appropriate facility
6    in the county which they were arrested.
7        Q.      Okay.  Can you recall any time
8    while you were working as a Kentucky state
9    trooper, where you or anyone else that you were
10   working with took an accused criminal defendant
11   back to see their alleged victim, or to interact
12   with their alleged victim in any way?
13       A.      I don't recall any -- any specific
14   incidents to where a victim was at the detention
15   facility.
16       Q.      Okay.  So that's a no?
17       A.      I don't -- yeah, I mean, I don't
18   recall to where -- what you're asking me.  Can
19   you be more specific when you say --
20       Q.      Yeah, I mean --
21       A.      -- if I have brought anybody back.
22       Q.      If there's a victim of a crime, do
23   you ever remember a situation where the
24   perpetrator of that crime, the accused
25   perpetrator of that crime, was brought by
```

Aaron Acree
August 19, 2024

42

1   Kentucky State Police to see the victim?

2   Brought -- taken away from the victim and then

3   brought back to the victim.

4        A.    I know in some incidences where you

5   have a domestic violence case, if you have a

6   husband and wife and either/or gets arrested, or

7   somebody forgets medication, you may have to go

8   back, whatever the case may be.  Sometimes

9   that's not uncommon.  But for a victim to be at

10  the detention facility, no.

11       Q.    And in those situations that you

12  just talked about, maybe a domestic violence

13  situation involving a husband and wife, would

14  the accused defendant be taken to interact with

15  the victim, or more often than not, the officer

16  would just go get -- retrieve whatever was

17  needed?

18            I mean, would the accused be left

19  in the car or would they be taken back to see

20  the victim?

21       A.    It just depends what the

22  circumstances are and the emotions of the

23  circumstances.

24       Q.    Can you recall any situation in

25  particular where a crim- -- accused criminal

Aaron Acree
August 19, 2024

43

1   defendant was taken in that situation to

2   interact with the victim?

3          A.     On hand, specifically, no.

4          Q.     Okay.  All right.  Sorry about

5   that.  Let's jump back to your role as sheriff.

6   In your role as sheriff, you've been there, I

7   guess, from 2020 to the present date.

8                 Correct?

9          A.     Yes, ma'am.  That's correct.

10         Q.     All right.  Do you ever have to

11  arrest people in your role of sheriff?

12         A.     If it warrants arrest.

13         Q.     Is that something -- I mean, I know

14  that you said it -- it seems like it's -- is it

15  fair to say your role of sheriff is more

16  administrative in nature rather than patrolling?

17         A.     No, ma'am.  That's not fair to say.

18         Q.     Okay.  Do you feel like it's still

19  more patrolling than administrative?

20         A.     It just -- there -- there is no set

21  -- there's no set schedule.  There's no set day.

22  Outside of anything that I do have scheduled

23  there's sometimes where I'm patrolling,

24  sometimes I'm in the office and then I go back

25  out to patrol or I answer calls for service.

```
 1   There -- there is no -- there is no set day as a
 2   role for sheriff in a county of my size.
 3        Q.    Okay.  And would you say that the
 4   frequency with which you might have to arrest
 5   somebody, is that the same as it was when you
 6   were a Kentucky state trooper and when you were
 7   working at the Cadiz Police Department?
 8        A.    Absolutely.
 9        Q.    Okay.  And during your time at --
10   in the Sheriff's Office, can you tell me all of
11   the supervisors that you've had that you can
12   recall?
13        A.    Yes.  That worked for me at the
14   Sheriff's Office while I've been sheriff?
15        Q.    Yes.  Well, who do you report to,
16   if anybody?
17             MR. WRIGHT:  Object.
18             THE WITNESS:  Who do I report to?
19   I'm sorry.
20   BY MS. MALKA:
21        Q.    Yeah.
22        A.    Sorry.  I thought -- I -- I did not
23   want to talk over someone.  I didn't know if
24   someone object or --
25             MR. WRIGHT:  I did, but go ahead
```

Aaron Acree
August 19, 2024

45

1   and answer the best you can.

2        A.    Okay.  I -- I don't have a

3   supervisor.

4   BY MS. MALKA:

5        Q.    Are there employees, or I -- I

6   guess, people that work for the Sheriff's

7   Office, that you supervise?

8        A.    Correct.

9        Q.    Okay.  How many people

10  approximately?

11       A.    Employees or supervisors?

12       Q.    Any.  Total.  How many people are

13  you overseeing?

14       A.    So you're asking me how many

15  employees I have.

16             Is that correct?

17       Q.    Yes, sir.  Yes.  That's correct.

18       A.    Less than 20.  I believe, 17.

19       Q.    Do you wear body cam as -- in your

20  role as a sheriff?

21       A.    No, ma'am.

22       Q.    What about in your role as a state

23  trooper?  Did you then?

24       A.    They weren't issued.  No, ma'am.

25       Q.    And what about in your role as the

Aaron Acree
August 19, 2024

46

```
 1   patrolman at the Cadiz Police Department?

 2        A.    Yes.

 3        Q.    Okay.  And so talk to me about the

 4   process.  What happens if you come into contact

 5   with somebody, you have reasonable belief that

 6   they've committed a crime and you place them

 7   under arrest.  And they're going to be taken to

 8   jail, or you just -- they need to go to jail.

 9   What does that process look like?  Can you walk

10   me through that?

11        A.    Well, which part of the process

12   would you like to know, the crime they committed

13   or the process where they're arrested and

14   transported?

15        Q.    Let's start at the very beginning.

16   Walk me through the whole thing.

17        A.    Usually, if someone commits a crime

18   and an -- an arrest is warranted, or if it's on

19   the officer's discretion, they're placed under

20   arrest and charged with the appropriate crimes,

21   documented, and then transported to -- to the

22   detention facility in the respective county.

23        Q.    And so would it be the Trigg County

24   transport service that transports defendants, in

25   your role as sheriff --
```

Braxton Acree
August 19, 2024

47

```
1        A.      Yes.

2        Q.      -- once they're placed under

3   arrest?

4               Okay.  And so while you're waiting

5   for the transport service to come, are you

6   usually still at the scene of the crime?  Do you

7   take them somewhere to be held?

8        A.      Yes.  You take them either to the

9   Sheriff's Office or to the holding cell at the

10  Justice Center.

11       Q.      And if you were to take them to the

12  Sheriff's Office, where in particular would they

13  be held?

14       A.      Well, they would -- they would

15  enter into the side of the building.  And

16  there's not really a holding cell in our

17  sheriff's office, but there is a -- there is a

18  -- a bench to where it has restraints on it.  Or

19  there could be a squad room where we would want

20  to interview someone.

21       Q.      Okay.  Can you walk me through the

22  layout of the Sheriff's Office?  You mentioned

23  the side door.  If you're walking through the

24  side door, can you kind of lay out for me what

25  it looks like inside, where everything is?
```

Mason Acree
August 19, 2024

```
 1          A.      We have a hallway to the left, and
 2   then a hallway to the right, once you come into
 3   the side door.  Well, the one on the left would
 4   be not -- not generalized as a hallway, but you
 5   go through another door to where it's a filing
 6   room where we keep our case files.
 7                  And then if you go to the right, it
 8   leads you into my office, supervisor's office,
 9   and the squad room.
10          Q.      Is there a door -- you said there's
11   a door to the right or there's not.  I'm sorry.
12          A.      To the right, no.  No, ma'am.
13          Q.      So you go down that hallway, it
14   takes you down to your office?
15          A.      Uh-huh.  Yes, ma'am.
16          Q.      The squad room.  And was there
17   something else that was down that right hallway?
18          A.      Yeah.  Yes.  Other supervisor
19   offices.
20          Q.      How many supervisor offices are
21   there?
22          A.      There's two additional offices next
23   to mine.
24          Q.      And where is that bench with the
25   restraints that you mentioned?
```

Sharon Acree
August 19, 2024

```
 1        A.      When you come into that door, on
 2   the right.
 3        Q.      Right when you walk in that door,
 4   on the right?
 5        A.      Yes, ma'am.  That's correct.
 6        Q.      I know that we're not in-person,
 7   and it makes it a little bit more difficult, but
 8   I'm wondering if you could sketch out on a piece
 9   of paper, it doesn't have to be anything
10   detailed, just, like, the general layout of the
11   Sheriff's Office when you walk in through that
12   side door.
13             MS. MALKA:  Is that possible,
14   Mr. Wright?
15             MR. WRIGHT:  I'm trying to think of
16   the best way to do this, because I've never had
17   to do a sketch remotely.  We may be able to just
18   take pictures of it, might be the easiest way to
19   do it, if you'd like us to do that.
20             MS. MALKA:  Okay.  That would be
21   helpful.  Whether you want to do that or if he
22   wants to sketch something out now, hold it up to
23   the camera.  Because I'm drawing as he's
24   describing, but I don't know if this is
25   accurate.  And then you could -- I don't know if
```

Aaron Acree
August 19, 2024

```
 1   you want to email it to me or take a picture of
 2   it for me and we could enter it as an exhibit.
 3            But I would like to have some sort
 4   of a -- especially when we get into what
 5   happened on the day in question, something to be
 6   able to reference.
 7            MR. WRIGHT:  Okay.  Yeah, I mean,
 8   I've done this before with witnesses.  If you
 9   want to take a break -- my only kind of
10   objection to doing it is the Sheriff's Office is
11   -- it's kind of like a large industrial looking
12   building.
13            And so he's described what
14   immediately happens.  There's, like, a bay and
15   an exercise room.  If you keep on going past to
16   the right, and there's more office space to the
17   left.
18            I don't know how good of an artist
19   he is, but we can kind of sketch out the -- the
20   initial entry.  We can maybe take a break if you
21   want to do that, and --
22            MS. MALKA:  Yeah, well let's do
23   that.  Maybe we'll take five minutes.  You think
24   that's enough time?
25            MR. WRIGHT:  Yeah, five or so
```

Aaron Acree
August 19, 2024

```
 1    minutes, and --

 2              MS. MALKA:  Okay.

 3              MR. WRIGHT:  -- we'll reconvene

 4    here.

 5              THE COURT REPORTER:  We will go

 6    off.

 7              MS. MALKA:  Sounds great.

 8

 9                   *    *    *

10              (Off the record.)

11                   *    *    *

12

13              THE COURT REPORTER:  We are back on

14    the record.

15              MR. WRIGHT:  And -- and I'll just

16    make the objection to form and foundation, to

17    the extent that he's not an artist, and it's not

18    to scale by any means.  But he can show you a

19    rough sketch of the site to the best of his

20    ability.

21              MS. MALKA:  That's great.  And

22    that's all that I'm really looking for, is just

23    a layout and what is where.

24              MR. WRIGHT:  Right.  You want to --

25              THE WITNESS:  Yeah.
```

Sharon Acree
August 19, 2024

52

```
 1              MR. WRIGHT:  -- show it to her?

 2

 3                   *    *    *

 4              CONTINUED EXAMINATION

 5   BY MS. MALKA:

 6        Q.    Yeah.  If you could just show me

 7   the sketch that you made and we'll see how close

 8   I am to what you described.  Can you lift it a

 9   little bit higher and maybe --

10        A.    Sure.

11              MR. WRIGHT:  Back.

12   BY MS. MALKA:

13        Q.    -- a little bit further?  Yeah,

14   it's a little -- see the whole thing.

15              MR. WRIGHT:  There you go.

16   BY MS. MALKA:

17        Q.    Okay.  Can you show -- point to on

18   that sketch where the side door is?

19        A.    Right here.

20        Q.    Okay.  Could you just label that

21   side door?  And you may have already.  I can't

22   really tell.  Could you just label that side

23   door, where you've just pointed?

24        A.    Give me a second to get a writing

25   utensil.
```

53

```
 1          Q.      Sure, no problem.

 2                  Okay.  And then you said -- it

 3     looks like there's a -- you walk in, to the left

 4     I see -- it looks like you've kind of drawn a

 5     door.  Could you point to where that door is to

 6     the left when you walk in the side door?

 7          A.      (Complying.)

 8          Q.      And could you -- and -- and what --

 9     it looks like a doorway, could you just label

10     that door?

11          A.      Here?

12          Q.      Yeah, that would be helpful.  Yes,

13     please.

14          A.      (Complying.)

15          Q.      And then I would ask that you also

16     go ahead and label the filing room where you --

17     you keep case files.

18          A.      (Complying.)

19          Q.      Okay.  Thank you so much.

20                  All right.  I see that you then

21     labeled the bench over on the right.  You wrote

22     the word bench, underlined.  And just so that

23     we're all on the same page, is that the bench

24     that you were referring to earlier with the

25     restraints on it?
```

Aaron Acree
August 19, 2024

54

```
 1         A.      Correct.
 2         Q.      Okay.  And then you said, there's
 3  your office, a squad room, and two supervisor
 4  offices.  Could you just label those for me as
 5  well?
 6              MR. WRIGHT:  Well, we didn't get in
 7  -- he can kind of label the areas.  We didn't
 8  really get into that.
 9              MS. MALKA:  That's fine.  This is
10  the one I made as he was describing.  I just
11  kind of put them off and -- and even something
12  -- I mean, whatever order that they're in would
13  be helpful.
14              MR. WRIGHT:  Just to speed things
15  along, and I -- obviously, it's Aaron's
16  testimony.  But for your purposes, the wall
17  behind the bench, that's Aaron's office and the
18  supervisors are on down.  And the squad room is
19  on the opposite side of that hallway.
20  BY MS. MALKA:
21         Q.      Perfect.  And again, I'm not
22  holding you to dimensions or anything like that,
23  but if you could just kind of jot generally,
24  squad room, office, supervisor offices, that
25  would be helpful and we'll get into the next
```

Aaron Acree
August 19, 2024

55

```
1    line of questioning.
2         A.      (Complying.)
3         Q.      Okay.  That is very helpful.  Thank
4    you so much for providing that.
5               So is -- am I looking at this
6    correctly, that your office also has a door to
7    the exterior of the building?
8         A.      Correct.
9               MS. MALKA:  Okay.  All right.  And
10   so if -- I would like to have this admitted as
11   Plaintiff's Exhibit A.
12               If you would just hold on to that.
13               And Derrick, if you don't mind to
14   just scan that and send it to the rest of us at
15   the conclusion of this deposition, I would
16   greatly appreciate it.
17               (Whereupon, the referred to
18               document was marked as Exhibit A,
19               and is attached hereto and made a
20               part hereof.)
21   BY MS. MALKA:
22        Q.      You said that when you have
23   arrested somebody and you're waiting for jail
24   transport and you take them back to the
25   Sheriff's Office, they would either go sit on
```

Aaron Acree
August 19, 2024

56

```
 1    that bench with the restraints or go in the
 2    squad room.
 3               Is that correct?
 4         A.    Correct.  And if they are a
 5    prisoner.
 6         Q.    Okay.  And if they're -- would
 7    there be such occasion where you would have an
 8    arrested person waiting for jail transport come
 9    to the Sheriff's Office that's not your
10    prisoner?
11         A.    It just depends if it's a
12    multi-agency arrest.  There could be occasions.
13         Q.    Okay.  How often does that happen?
14         A.    I mean, it's -- it's happened
15    before.  I don't -- I can't get into the
16    specifics of how often, but it's -- it's -- it
17    has happened.
18         Q.    When's the last time that happened,
19    when you guys had an arrested person waiting for
20    jail transport at your facility that wasn't your
21    -- that was arrested by a different agency?  Do
22    you recall the last time that happened?
23         A.     It's been prior to the jailer
24    putting his new -- I don't know you say it's
25    policies or makeshift policies.  I haven't seen
```

Aaron Acree
August 19, 2024

57

```
 1    a policy, but it's been prior -- it's been prior
 2    to the jailer changing his ways of
 3    transportation.
 4         Q.    And when was that?
 5         A.    I don't recall a specific time.
 6         Q.    More than a year ago?
 7         A.    Roughly.
 8         Q.    You think about a year, give or
 9    take?  I mean, I'm not holding you to an exact
10    amount, but you think roughly a year?
11         A.    Roughly a year.
12         Q.    Okay.  What jailer are you
13    referring to?
14         A.    The Trigg County jailer.
15         Q.    And so you said it was before that
16    -- the last time that you had -- the Sheriff's
17    Office was holding an arrested individual that a
18    different -- different agency had arrested, it
19    was before the Trigg County jailer had changed
20    the policy.  So would that have been two years,
21    three years, four years?  Do you recall?
22         A.    What are you asking me?  As far as
23    when he changed the policy?
24         Q.    The last time -- no, not when he
25    changed the policy.  I mean, I -- I think you --
```

Aaron Acree
August 19, 2024

58

```
 1    you stated that as a reference point.  You said
 2    that that hasn't happened where the sheriff's
 3    station has held, or you've had an arrested
 4    person in the sheriff's station that was not
 5    your-all's arrest since before Jailer Hughes
 6    changed that policy.
 7             So what I'm trying to nail down is,
 8    do you recall the last time that happened before
 9    the jailer changed the policy?
10    A.        No, it's been roughly a year.  I
11    don't recall anything.
12    Q.        Roughly a year since that hap- --
13    since you all held an arrested person that was
14    not the sheriff's arrest?
15    A.        Yes, that's what I just testified
16    to.  Because it was roughly a year when he
17    changed the policy.
18    Q.        Got it.  So that would have been
19    sometime in 2023?
20    A.        Possibly.  Maybe before -- it may
21    be before that.
22    Q.        Has the Sheriff's Office had an
23    arrested individual inside of it, that was not
24    the Sheriff's Office arrest, since the plaintiff
25    in this case, Crystal Smith, was brought to the
```

Aaron Acree
August 19, 2024

```
 1   Sheriff's Office?
 2         A.      Inside the Sheriff's Office?
 3         Q.      Yes.  Or held at the Sheriff's
 4   Office, or brought inside, yes.
 5         A.      During the times that I'm working,
 6   I can't -- I can't -- the guys on night shift
 7   work a lot better together or they're a lot
 8   closer on night shift, and there's times -- I
 9   don't -- I don't know or recall a specific
10   incident.
11         Q.      Since the plaintiff was brought to
12   the sheriff station, you don't recall another
13   incident where the sheriff station had an
14   arrested person that wasn't the sheriff's
15   arrest?
16         A.      I myself don't recall.  I have
17   other deputies that it's a possibility they
18   could -- Cadiz Police could have brought an
19   arrestee up there and waited for jail transport
20   or --
21         Q.      Sure.
22         A.      -- or whatever the case may be.  I
23   can't myself specifically recall.
24         Q.      Okay.
25         A.      I'm not saying it's not a
```

Aaron Acree
August 19, 2024

60

1   possibility.

2          Q.      I understand.  That's fair.  And --

3   and maybe I should have phrased that better.  I

4   was trying to say the last time that you -- you

5   specifically recall.

6          A.      Okay.

7          Q.      So that answers my question.

8                  What is this -- you referenced a

9   policy change that the Trigg County jailer

10  enacted roughly a year ago.  What was that

11  change?

12         A.      I don't know if it was a policy

13  change.  That's the only thing that I could

14  think.  I mean, I don't know if it's a policy

15  change or if it was just referenced specifically

16  my -- my office or my administration.

17         Q.      What is -- what's the change?

18         A.      To where all -- he's requested all

19  prisoners be brought down to the Justice Center

20  and not the arresting agency's offices.  When

21  they're ready for pickup.  I should be more

22  specific.

23         Q.      And is that jailer, would that be

24  Jailer Hughes?

25         A.      Yes.

Aaron Acree
August 19, 2024

61

```
1        Q.      Do you know why Jailer Hughes made

2    that change?

3        A.      No.

4        Q.      Do you know if that change -- we'll

5    call it procedure, or policy -- is that written

6    down anywhere or is that just a verbal

7    instruction that you were given?

8        A.      That's what -- the information was

9    relayed to me through our county judge.

10        Q.      And what county judge was that?

11        A.      Judge Stan Humphries.

12        Q.      And was that relayed to you

13    verbally or in writing?

14        A.      Verbally.

15        Q.      Prior to that, so going back to

16    say, like, 2022, was there any policies and

17    procedures relating to -- in writing, related to

18    the transport of an arrested person to jail,

19    where they're to be held, where -- where they're

20    to wait?

21        A.      Not to my knowledge, no.  The

22    jailer's policies are different than my

23    policies.

24        Q.      What are your policies?

25        A.      Which policy do you want to know?
```

1          Q.      Any policies relating to when a

2    person is arrested and where they're to be held,

3    or what's to happen with them until the

4    transport comes to get them.

5          A.      There isn't one.

6          Q.      So is it just a case-by-case

7    situation or --

8          A.      Depending on the circumstances,

9    yes.

10         Q.      And what circumstances might

11   dictate how a person's held?

12         A.      Depending on the arrest.

13         Q.      Like, whether it's violent, or

14   whether they're on drugs, or like, what -- what

15   would affect that?

16         A.      Whether something warranted -- or

17   whether something -- another -- whether the

18   investigation or the arrest is -- needs to

19   extend based on a -- on a -- an additional

20   interview or anything of that nature.

21         Q.      Okay.  So if the investigation

22   needs to extend, they may be brought back to the

23   Sheriff's Office -- and we're talking about 2022

24   -- they may be brought back to the Sheriff's

25   Office versus being taken directly to the

Aaron Acree
August 19, 2024

1    Justice Center.

2              Is that fair?

3        A.    That's fair.

4              Are -- are you -- are you under the

5    impression that all prisoners are transported

6    now to the Justice Center when they are

7    arrested?

8        Q.    Well, tell me, what's the process

9    now?

10       A.    Okay.  So you're asking

11   specifically what the process is after the

12   arrest is affected?  Is that what you're asking

13   me?  I just want to be sure that I answer your

14   question clearly.

15       Q.    Yes, that's correct.

16       A.    Okay.  It's the officers'

17   discretion.  Sometimes it may warrant an

18   extensive investigation.  The prisoner is not

19   turned over to the jail transport officer until

20   we've reached the Justice Center when we are

21   completed with that investigation.

22             So there are -- there are times and

23   -- numerous times to where, when someone is

24   arrested, they are brought back to our agency,

25   still to this day, for an extensive interview or

Aaron Acree
August 19, 2024

64

```
 1     -- or to talk about the arr- -- the nature of

 2     the arrest or any other type of further

 3     investigation.

 4          Q.     Would that investigation ever

 5     consist of a search of the person's body?

 6          A.     Correct.  Yes.

 7          Q.     And this --

 8          A.     I -- can --

 9          Q.     -- may have been --

10          A.     May I -- may I rephrase?  It just

11     depends on the -- it would depend on the nature

12     of the arrest.  I'm sorry.

13          Q.     And we may have -- this may have

14     been addressed earlier by the questions that I

15     -- we were talking about a little bit ago, but

16     just so that I'm clear, have -- does it ever

17     occur where another agency will arrest somebody

18     and instead of bringing them to their own

19     agency, bring them to the Sheriff's Office for

20     investigation?

21          A.     Yes.

22          Q.     How often does that occur?

23          A.     Depends on the nature of the

24     complaint.  It...

25          Q.     And what kind of complaint would
```

1    warrant them coming to the sheriff's station,

2    even if it's not the sheriff's arrest?

3          A.    For the sheriff's investigation, it

4    -- it depend -- it depends.  For instance,

5    Kentucky State Police, they do not have a

6    facility in Trigg County.  So if they need to

7    use our facility to hold their prisoners or

8    interview their prisoners, they have -- they

9    have access to our facility.

10         Q.    Okay.

11         A.    If that answers your question.

12         Q.    It does.  And I've got to follow

13   up.  Give me just a moment.

14         A.    Okay.

15         Q.    How often or -- how often does it

16   occur to where somebody that was arrested by the

17   Trigg County Police Department would be brought

18   to the sheriff's station for an investigation?

19               MR. WRIGHT:  Object to form.

20               Answer the best you can.

21   BY MS. MALKA:

22         Q.    To your knowledge.

23         A.    Trigg County Police Department?

24         Q.    Yes.  That's correct.

25         A.    We don't have a Trigg County Police

Aaron Acree
August 19, 2024

66

1    Department.  Cadiz Police Department?

2        Q.    Cadiz Police Department, I

3    apologize.  How often has a criminal defendant

4    in the custody, and arrested by the Cadiz Police

5    Department, get brought to the sheriff's station

6    where you work, for investigation?

7              MR. WRIGHT:  Object to form.

8    BY MS. MALKA:

9        Q.    To the best of your knowledge.

10       A.    I can't speak on how -- how often

11   has it -- if -- I can't speak on how often.

12       Q.    Has that happened since Crystal

13   Smith was brought to the Sheriff's Office after

14   she was taken to the Cadiz Police Department on

15   or around January 11, 2022?

16       A.    I'm not there for all of the

17   arrests.  I can't speak yes or no.  Remember, I

18   -- I don't work 24 hours a day, so it's -- as I

19   testified before, our officers do work very

20   closely with Cadiz Police Department and state

21   troopers at night, so I can't speak on anything

22   specific.

23             Is it uncommon?  No.

24       Q.    But for the shifts that you've been

25   working, while you've been there, have you seen

Aaron Acree
August 19, 2024

67

 1    an accused criminal defendant arrested by Cadiz

 2    Police, brought to the Sheriff's Office for any

 3    sort of questioning, since Crystal Smith was

 4    brought there on January 11, 2022?

 5         A.    Since Crystal Smith, I can't recall

 6    anything specific.

 7         Q.    Okay.  Can you recall any instances

 8    during your time as sheriff, where you've called

 9    the Cadiz Police Department and told them to

10    bring a charged criminal to the sheriff's

11    station on the way to jail?

12         A.    On their way to jail?

13         Q.    Or on their way to wait for jail

14    pickup.

15         A.    Not to --

16         Q.    Either situation.

17         A.    Well, that's -- that's two

18    different questions.  On their way to jail or on

19    their way to wait for jail pickup?

20         Q.    Okay.  Well, let's start the first

21    one.  Have you ever called the Cadiz Police

22    Department and told them to bring a charged

23    criminal to the sheriff's station on the way to

24    jail?

25         A.    If they're on their way to jail, I

Aaron Acree
August 19, 2024

68

```
 1   wouldn't call the Cadiz Police Department,
 2   because they would be with the jailer.
 3        Q.    Okay.  Have you ever called the
 4   local police department, Cadiz Police
 5   Department, and told them to bring a charged
 6   criminal to the sheriff's station on the way to
 7   jail pickup?
 8        A.    Not that I can specifically
 9   remember.
10        Q.    Okay.  Have you ever called the
11   jailer and told them to bring a charged criminal
12   to the sheriff's station on the way to jail?
13        A.    Me directly, I can't -- I can't say
14   that I remember anything specifically.
15        Q.    Do you remember doing that in
16   Crystal Smith's case?
17        A.    I'm sorry?
18        Q.    Do you remember doing that with
19   Crystal Smith?
20        A.    Yes.
21        Q.    Okay.  Other than Crystal Smith,
22   are you saying -- well, that's one instance, I
23   guess.
24              Fair?
25        A.    Yes, ma'am.
```

Aaron Acree
August 19, 2024

1      Q.      Other than Crystal Smith, can you

2   remember any other instances where you've called

3   the jailer and told them to bring a charged

4   criminal to the sheriff's station on the way to

5   jail?

6      A.      I can't remember a specific

7   incident.

8      Q.      Okay.  My next question is, under

9   what -- well, and you might have answered this

10  already when we were talking earlier about any

11  circumstance in which you would take a charged

12  criminal back to the victim of the crime.  And

13  you said that would be in a domestic violence

14  situation.

15          Can you think -- is that what your

16  testimony was?

17     A.      That was one incident.  Yes, ma'am.

18     Q.      Can you think of any other

19  circumstances in which you would take a criminal

20  back to the person that they harmed, or the

21  victim of the crime?

22     A.      Outside of the incidents involving

23  Crystal Smith?

24     Q.      Yes.

25     A.      I can't -- I can't think of any

Aaron Acree
August 19, 2024

```
1    other -- any other specific arrest.
2         Q.     Okay.  I think you already stated
3    that sheriffs don't have body cameras.
4              Correct?
5         A.     I can't speak for all sheriffs.
6         Q.     Well, the sheriff -- the specific
7    sheriff department that you work -- that you're
8    with, you all do not have body cameras?
9         A.     Yes, ma'am, we do.
10        Q.     You do.
11             Okay.  What's the procedure for
12   activating body camera?
13        A.     For the road deputies?
14        Q.     Yes.
15        A.     To have their body camera
16   activated.
17        Q.     At all time?
18        A.     No, not at all times.  When dealing
19   -- I mean, dealing with an -- a prisoner, I
20   encourage them to have their body camera on and
21   I reference policy.
22        Q.     And what was the last part?  I'm
23   sorry.  And what policy?
24        A.     I -- when I -- when I reference
25   policy to them.
```

Aaron Acree
August 19, 2024

71

```
 1        Q.      And what policy are you
 2   referencing?
 3        A.      The body -- the body --
 4   body-worn-issued-camera policy.
 5        Q.      Is that something that the
 6   Sheriff's Office created or is that a state-wide
 7   policy?  Where does that policy come from?
 8        A.      It's a model policy that we
 9   adopted.
10        Q.      Is that policy in writing anywhere?
11        A.      I'm sorry?
12        Q.      Is that a policy in writing within
13   your office?
14        A.      Yes, ma'am.  It is.
15        Q.      Per that policy, are sheriffs to
16   activate their body-worn camera when making an
17   arrest?
18        A.      Sheriffs or deputies?
19        Q.      Either.
20        A.      The deputies.
21        Q.      And does that -- is that not the
22   policy for the sheriff?
23        A.      I don't have a body camera.
24        Q.      Why don't you?
25        A.      I don't have a body camera.
```

Aaron Acree
August 19, 2024

1      Q.     Why?

2      A.      Typically, when I'm interacting

3   with people in a more -- an executive position,

4   sometimes the body camera can be triggered with

5   jingling of keys.  Or it's to help start the

6   body camera, if it simulates a shots fired, to

7   where sometimes the officer may be under dis- --

8   duress or stress, and he may not think to turn

9   on the body camera due to a human error.

10          And I don't -- I don't wear a body

11  camera due to my position, being in an executive

12  role sometimes.

13      Q.     Would it be problematic -- or let

14  me start here.  Would it be problematic if your

15  body camera was -- let's say you were wearing

16  one, and it was activated, say, by jingling of

17  keys?

18      A.      Can you rephrase your question?

19      Q.     Yeah.  I mean, you've given a few

20  reasons why you don't wear a body camera.  And

21  one of them was that it could be activated by

22  jingling of keys.

23          Is -- was that what you said or did

24  I misunderstand your testimony?

25      A.      Yes, ma'am, that's correct.  That's

Aaron Acree
August 19, 2024

```
 1   one example to where I saw some of my deputies'
 2   body cameras activated because they may drop
 3   something on the floor and it simulates a, you
 4   know, a pop.  It doesn't have to be anything
 5   loud of reference.
 6        Q.    Why would that be problematic, or
 7   would that be problematic?  Let's start there.
 8   Would that be problematic if your body camera
 9   was activated by dropping something or jingling
10   keys?
11        A.    Due to the role that I've taken,
12   more an executive position, typically when I'm
13   in meetings or when I'm in court, yes.
14        Q.    Okay.  And is that because some of
15   those interactions are supposed to be
16   confidential or out of public record?
17        A.    Due to some confidential
18   interactions, yes.
19        Q.    Okay.  Why is it -- well, why did
20   -- was this model policy for body-worn cameras
21   adopted while you've been sheriff, or was it
22   already adopted when you came into your role?
23        A.    I believe the agency -- I -- I
24   can't speak on that specifically.  I believe
25   they -- I don't know if they had a policy
```

Aaron Acree
August 19, 2024

```
 1   specifically, but in order to -- with KACo, they
 2   encourage certain model policies, to maintain
 3   the insurance.
 4              I believe from what I'm
 5   understanding, if that's correct, the statement
 6   I just made.  But I -- I adopted the policy and
 7   -- and established it when I took office.
 8        Q.     Okay.  And my next question was
 9   going to be, why.  And so are -- is your
10   testimony that it had to do with the insurance?
11        A.     I don't know if that's --
12        Q.     Or there --
13        A.     -- specifically is what it is.
14   It's -- it's for -- it's for legality purposes.
15   But I don't know if it pertains specifically to
16   body camera.  But there are some policies that
17   -- that are encouraged to -- to have, to
18   maintain, I believe, the standards of KACo.  But
19   don't -- please don't quote me on that
20   specifically.
21        Q.     Okay.  And what's KACo?
22        A.     I'm sorry?
23        Q.     What is KACo?
24        A.     Like, our agency insurance.
25        Q.     I see.  Okay.
```

Aaron Acree
August 19, 2024

75

```
 1              All right.  I want to talk about
 2   January 11, 2022, in particular.  And I know
 3   it's been over two years now, but I want you to
 4   tell me about as much of your day as you recall
 5   leading up to getting back home for lunch.
 6         A.     Prior to that or...
 7         Q.     Yeah.  Like, just start with when
 8   you woke up in the morning.  Walk me through
 9   everything that you did that day.
10         A.     I got dressed for office.  I got
11   dressed for office, and was -- was ready -- was
12   ready for duty that day.
13         Q.     Do you remember what time you
14   reported to duty?
15         A.     I don't have a standard time that I
16   report.
17         Q.     Do you recall, that day, what time
18   you reported, or you don't recall?
19         A.     No, ma'am.
20         Q.     Is there a -- well, you said
21   there's not a standard time.  Is there a general
22   time frame that you would typically report to
23   duty on an average day, or every day is
24   different?
25         A.     It varies.
```

Aaron Acree
August 19, 2024

```
 1          Q.    Okay.  I've got that January the
 2    11th, 2022, was a Tuesday.
 3                Is that your recollection?
 4          A.    I don't know specific.  If you have
 5    it in front of you...
 6          Q.    When you reported to duty, do you
 7    remember anything about your shift that morning
 8    leading up to lunch time?
 9          A.    No.  No, ma'am.
10          Q.    Okay.  How often do you go home for
11    lunch when you're working?
12          A.    It depends.  It varies.
13          Q.    Do you recall about what time you
14    went home -- well, is it true that you went home
15    for lunch on January 11th, 2022?
16          A.    Yes, ma'am.
17          Q.    Do you recall what time,
18    approximately, that would have been?
19          A.    Approximately, no.
20          Q.    All right.  Walk me through
21    everything that you recall happening after you
22    went home on your lunch break.
23          A.    I remember seeing a -- an unknown
24    vehicle in my -- in my driveway.  I didn't
25    recognize it.  I notified dispatch of the
```

Aaron Acree
August 19, 2024

77

```
 1   vehicle plate.  And in the process of that, I
 2   recognized a female exiting my home.  And that's
 3   when I notified dispatch to send additional
 4   units.
 5              And that particular female at the
 6   time was -- was detained until additional units
 7   arrived.
 8        Q.    Where did you detain -- was the
 9   person that -- what you saw walking out of your
10   house, did you later learn that person was
11   Crystal Smith?
12        A.    Yes.
13        Q.    Okay.  Where was she detained?  It
14   -- was it in the driveway, in the front yard, on
15   your front porch?
16        A.    To my recollection, the driveway.
17        Q.    Okay.  Tell me about any
18   conversation you had with her up until the point
19   that additional units arrived.
20        A.    Referencing what she was doing
21   there.
22        Q.    Is that what you asked her?
23        A.    Yes.  To some -- to --
24        Q.    And what --
25        A.    -- to some degree.  Basically,
```

Aaron Acree
August 19, 2024

```
 1   asked her what she was doing here.
 2         Q.      Did she respond?
 3         A.      To the best of my knowledge, it was
 4   she was looking for a friend of hers, I believe.
 5         Q.      Do you remember what she was
 6   wearing when you had her detained?
 7         A.      Specifically, I know she had a coat
 8   on.
 9         Q.      Did you put her in handcuffs?
10         A.      Yes.
11         Q.      Do you know how long you had her
12   detained before additional units arrived?
13         A.      No, ma'am.
14         Q.      Do you believe that it was more
15   than 15 minutes?
16               MR. WRIGHT:  Object to form.
17               Go ahead and answer if you can.
18         A.      I'm sorry.  I couldn't hear
19   clearly.  Do I believe what, ma'am?
20   BY MS. MALKA:
21         Q.      Do you believe that you had her
22   detained for more than 15 minutes?
23         A.      To the -- to the best of my
24   recollection, I wouldn't estimate it being more
25   than 15 minutes.
```

Sean Acree
August 19, 2024

79

```
 1        Q.      Okay.  Do you think it was more

 2   than five minutes?

 3        A.      Maybe that.

 4        Q.      Okay.  You think it -- it sounds

 5   like that you believe additional units got there

 6   pretty quickly then?

 7        A.      Relatively quick -- quick, due to

 8   the nature of the call.

 9        Q.      Okay.  So you think it may have

10   been somewhere around five minutes.

11               Is that fair?

12        A.      Roughly.  Yes, ma'am.

13        Q.      Okay.  Okay.  Did you do any sort

14   of pat down or search while you had Ms. Smith

15   detained?

16        A.      I don't -- I don't remember

17   conducting any search.  Maybe a -- maybe a pat

18   down for weapons, for officer safety.

19        Q.      Did you find any weapons?

20        A.      No, ma'am.

21        Q.      Okay.  You said that you asked her

22   something along the lines of, what are you doing

23   here.  She responded something to the effect of

24   looking for a friend of hers.  Was there any

25   additional conversation with her beyond that,
```

Aaron Acree
August 19, 2024

80

```
 1  until the other units arrived?

 2       A.     Not -- not that I could recall.

 3       Q.     Do you know if there was anybody

 4  inside -- other than Ms. Smith inside your home

 5  while -- during this time frame, while you saw

 6  Ms. Smith walking out of the house and you had

 7  her detained?  As in your family.  Was your wife

 8  or your daughter there?

 9       A.     No.

10       Q.     Okay.  What units ended up

11  responding to the scene?  What department?

12       A.     Cadiz Police.

13       Q.     Do you remember who it is, what

14  officer showed up?

15       A.     The best of my recollection,

16  Officer Tyler Thomas and Officer Duncan Wiggins.

17       Q.     Okay.  Once Cadiz Police Department

18  units showed up, what happened next?

19       A.     We entered my residence to clear

20  the home for officer safety and to make sure

21  that there was no other persons inside my

22  residence.

23       Q.     Who's we?

24       A.     The responding agency.  Cadiz

25  Police.
```

Jason Acree
August 19, 2024

81

1     Q.    Which officer specifically, do you
2   recall, that went in your house with you?
3     A.    To the best of my -- to the best of
4   my knowledge, I believe it was Officer Tyler
5   Thomas.
6     Q.    So you and Officer Thomas went
7   inside the residence to clear it.  Did Officer
8   Wiggins remain outside with Crystal Smith?
9     A.    I believe so.  Yes, ma'am.
10     Q.    Okay.  Was Crystal Smith -- well,
11   do you remember how long it took you to clear
12   the house?
13     A.    No, ma'am.
14     Q.    When you went back outside -- well,
15   let me ask this: I -- at some point after
16   clearing the house, did you and Officer Thomas
17   go back outside your residence?
18     A.    Yes.
19     Q.    Okay.  And when you all went back
20   outside, was Officer Wiggins and Crystal Smith
21   still outside?
22     A.    Yes.
23     Q.    Okay.  When -- and I just want to
24   back up really quickly.  When you had Crystal
25   Smith detained and you were waiting for backup

Aaron Acree
August 19, 2024

82

```
 1    units to arrive, where were you all?  Were you
 2    in the driveway outside?  Were you -- was she in
 3    your vehicle?  Where was she specifically being
 4    held?
 5         A.    I believe I testified to that to
 6    where we were in the driveway outside.
 7         Q.    So you were in the driveway the
 8    entire time?
 9         A.    Waiting for additional units to
10    respond?
11         Q.    Yes, while you were --
12               MR. WRIGHT:  Are you talking about
13    just -- I think you clarified it, sorry.
14    BY MS. MALKA:
15         Q.    Yeah.  From the point that you
16    detained her to the point that the other
17    officers arrived, were you outside in the
18    driveway that whole time?
19         A.    Yes.  Until they arrived, yes,
20    ma'am.
21         Q.    Okay.  Did she make any attempts to
22    flee or to get away from you, or would you say
23    she was compliant?
24         A.    She didn't make any attempts to
25    flee.
```

Aaron Acree
August 19, 2024

83

1          Q.      Did you do any sort of visual -- I
2     know you said you -- you maybe did a pat down.
3     Did you do any sort of visual search at that
4     time to look for objects that she might have
5     taken from the home?
6          A.      No, ma'am.  I wasn't sure the
7     nature or the reason why she was there.  I did
8     not conduct a visual search there.
9          Q.      Okay.  Beyond Officer Thomas and
10    Officer Wiggins, do you recall any other Cadiz
11    police officers responding to the scene?
12         A.      No, ma'am.  I don't.
13         Q.      Okay.  What happened next?  You
14    said you and Officer Thomas walked back outside.
15    Officer Wiggins and Crystal Smith were still out
16    there.  What happened from that point?
17         A.      She was transported to Cadiz Police
18    Department.
19         Q.      After Officer Thomas and Officer
20    Wiggins arrived at your home, until the point
21    that she departed to the Cadiz Police
22    Department, did you have any further
23    conversation with her?
24         A.      No, ma'am.
25         Q.      And did Officer Thomas and Officer

Aaron Acree
August 19, 2024

84

```
 1    Wiggins travel in the same car, or were they in
 2    two separate cars?
 3         A.    They were in two separate cars.
 4         Q.    Do you know which one of them
 5    transported Crystal Smith to the Cadiz Police
 6    Department?
 7         A.    No, ma'am.  I don't.
 8         Q.    Okay.  Did Officer Wiggins and
 9    Officer Thomas leave at the same time?
10         A.    I don't recall when they left or if
11    they left at the same time.  I don't recall
12    that.
13         Q.    Okay.  What did you do after
14    Crystal Smith left to be departed to the Cadiz
15    Police Department?
16         A.    I went back inside my residence.
17         Q.    Okay.  Then what happened?  What
18    did you do next?
19         A.    Took a -- an assessment of my -- of
20    my home.
21         Q.    Did you call anybody at that time?
22         A.    I believe I called my wife.
23         Q.    Did you tell her what had happened?
24         A.    Yes.
25         Q.    Do you know -- you said you did an
```

Aaron Acree
August 19, 2024

85

```
 1    assessment of your home.  What did you observe
 2    during that assessment of your home?
 3          A.     It was in complete disarray.
 4          Q.     And when you say disarray, I mean,
 5    did it look like things had been rummaged
 6    through and thrown around, or...
 7          A.     Absolutely.  It didn't look the way
 8    I left it.
 9          Q.     Were you able to determine at that
10    time if anything was missing?
11          A.     Outside of the property that was
12    already removed from her vehicle, that belonged
13    to us?
14          Q.     Okay.  Well, tell me about that
15    part.  When did that happen, that property was
16    removed from her vehicle?
17          A.     Before she left to go to Cadiz
18    Police.
19          Q.     Was that after you did the -- you
20    went inside to secure -- to clear your
21    residence, or before?
22          A.     Yes.  After.
23          Q.     Who went through her vehicle?
24          A.     I believe -- I don't know who
25    initiated the -- the observation of her vehicle.
```

Aaron Acree
August 19, 2024

86

1        Q.      Do you personally recall looking in

2    her vehicle?

3        A.      Yes.

4        Q.      And what did you find?

5        A.      A lot of my property.

6        Q.      Anything in particular that you can

7    remember?

8        A.      Suitcases, clothes, shoes.  She was

9    packing our own belongings in our own seat -- in

10   -- in our own suitcases.

11       Q.      Was that upsetting to you?

12       A.      Upsetting to me?

13       Q.      Yes.

14       A.      I mean, I was surprised.

15       Q.      Did you feel angry?

16       A.      No, not angry.

17       Q.      Before she was -- Crystal Smith was

18   taken to the Cadiz Police Department, I know

19   that you said you did not do a physical search

20   of her.  Do you know if Officer Thomas or

21   Officer Wiggins did a physical search of her?

22       A.      I know a search was done of her

23   person.  I don't know who conducted it.

24       Q.      Did that search of her person turn

25   up anything?

Susan Acree
August 19, 2024

87

```
 1        A.     I'm sorry?

 2        Q.     Did the search of her person turn

 3   up anything?  Do you know?

 4        A.     Can you be more specific when you

 5   say turn up anything?

 6        Q.     Yeah.  I mean, like, was there any

 7   additional stolen property located on -- on her,

 8   or any illegal items, or drugs, or anything

 9   located on her that shouldn't have been on her?

10        A.     Yes.  I know there was heroin, an

11   illegal substance that was removed from her

12   person.

13        Q.     Anything else?

14        A.     What -- without seeing the

15   investigation, I don't know anything else

16   specific.

17        Q.     Okay.  Okay.  So you said that

18   there was items recovered from her car that she

19   had stolen from your household.

20               Correct?

21        A.     Yes, ma'am.

22        Q.     She is then taken to the jail.  And

23   after you located those items in her car, was

24   there any sort of communication or anything that

25   you said to her -- any communication between her
```

Aaron Acree
August 19, 2024

88

```
1    and you at that time when you located those

2    items in her car?

3         A.    I couldn't help but notice you said

4    she was taken to the jail.  What -- were -- when

5    are you --

6         Q.    I'm sorry.  Yes, the Police

7    Department.  I apologize.  I misspoke.  From the

8    time she was taken to the Police Department --

9    let me scratch that and start over.

10             When you were finding the items in

11   her car that were taken out of your house, was

12   there any communication between she and you at

13   that time or immediately after that?

14        A.    No, ma'am.  Not that I recall.  No.

15        Q.    Okay.  So then she's taken to the

16   Police Department, and you said that you went

17   inside to, I guess, take an inventory.

18             Is that fair?

19        A.    Yes, ma'am.

20        Q.    Is there anything else at that time

21   that you identified as being missing from your

22   hou- -- from your home?

23        A.    There was -- the home was in

24   complete disarray.  I don't -- I don't know what

25   was missing and what -- what -- yeah.  I -- I
```

Kevin Acree
August 19, 2024

```
 1   wasn't able to -- to do a complete assessment at
 2   that time.
 3         Q.     Okay.  What did you do next?
 4         A.     After the assessment?
 5         Q.     Yes.  Yes, sir.
 6         A.     I went to the Cadiz Police
 7   Department.
 8         Q.     And what did you do there?
 9         A.     I believe I spoke with Officer
10   Tyler Thomas.
11         Q.     Okay.  What else did you do there?
12         A.     Specifically?  Are you --
13         Q.     Yeah, specifically.
14         A.     I spoke with Officer Tyler Thomas.
15         Q.     And tell me about that
16   conversation.
17         A.     It was generalized of what had just
18   took place.
19         Q.     As in -- when you said what had
20   just taken place, Ms. Smith being in your home
21   and taking items out of the home?
22         A.     Burglarizing my home, yes, ma'am.
23         Q.     Where was Ms. Smith at the time
24   that you were at the Cadiz Police Department?
25   Do you know?
```

Aaron Acree
August 19, 2024

90

```
 1          A.     I believe she was in an interview

 2     room.

 3          Q.     Did you see her in the interview

 4     room?

 5          A.     I don't remember seeing her.  I

 6     know that's -- I remember being told she was

 7     there.

 8          Q.     Okay.  So you didn't observe any of

 9     the interview?

10          A.     No.  No, I did not.

11          Q.     And was it Officer Thomas that told

12     you she was in an interview?

13          A.     Well, he was the only one I was

14     talking to, that I could remember, at the time.

15          Q.     Do you know if there had been any

16     additional search of Ms. Smith while she was at

17     the Cadiz Police Department?

18          A.     Other than locating the heroin, an

19     additional search, I -- I'm not aware.  I -- I

20     wasn't in the interview room.

21          Q.     Okay.  Do you remember how long,

22     approximately, you were at the Cadiz Police

23     Department?

24          A.     No, ma'am.  I don't.

25          Q.     Do you believe it was more than an
```

Aaron Acree
August 19, 2024

91

```
 1    hour?

 2         A.     No, ma'am.

 3         Q.     Do you believe it was more than 30

 4    minutes?

 5                MR. WRIGHT:  Object to form.

 6                Answer best you can.

 7         A.     Yeah.  I -- I can't give you even a

 8    reference.  I -- I don't remember.

 9    BY MS. MALKA:

10         Q.     So some period of time, but you

11    think it was less than an hour.

12                Is that fair?

13         A.     That's fair.  Yes, ma'am.

14         Q.     Okay.  And I know that you said

15    generally you had spoken to Officer Thomas about

16    what had just taken place.  Do you remember any

17    specifics of that conversation?

18         A.     No, ma'am.  I don't.

19         Q.     Okay.  At some point, I take it you

20    left the Cadiz Police Department.

21         A.     Yes.

22         Q.     And what did you do then?

23         A.     Called my wife.

24         Q.     Did you call her from outside of

25    the Cadiz Police Department?  Were you in your
```

Aaron Acree
August 19, 2024

92

```
 1   car heading somewhere else?  Where did you --
 2   where were you when you make that phone call?
 3          A.     I believe I was in my vehicle.
 4          Q.     And where were you heading?
 5          A.     Back to my office.
 6          Q.     And did you go back to your house?
 7                 MR. WRIGHT:  Object to form.
 8          A.     When?
 9   BY MS. MALKA:
10          Q.     Well, you said that you called your
11   wife, you were in your vehicle, and you were
12   heading back to your house.  So my question is:
13   Did you go back to your house?
14          A.     No, ma'am.  I didn't -- I did not
15   say that.
16          Q.     Oh, I'm sorry.  You said you called
17   your wife.  You were in your vehicle.  Where
18   were you heading?
19          A.     Back to my office.
20          Q.     Back to your office.
21          A.     Yes, ma'am.
22          Q.     Got it.  Sorry.  That's my fault.
23          A.     That's okay.
24          Q.     Did you go back to your office?
25          A.     Yes.
```

Aaron Acree
August 19, 2024

93

```
 1        Q.      And when you called your wife, was
 2   that the second time you had called her since
 3   you caught Crystal Smith in your home?
 4        A.      Second or third, maybe.  It wasn't
 5   the first --
 6        Q.      Okay.
 7        A.      -- I know.
 8        Q.      Okay.  When you talked to her this
 9   time, going back to your office, what was that
10   conversation?
11        A.      I explained to her the condition of
12   the home and some of the things that I had
13   recognized in the home -- in our -- in our home.
14        Q.      Some of the things you had
15   recognized?
16        A.      Yes.
17        Q.      What do you mean by that?
18        A.      Well, to where she was packing our
19   own belongings in -- in our own suitcases.  And
20   I know specifically, I told her I found an
21   expensive watch that she had possessed, was
22   located in a coat pocket that was -- looked like
23   it -- it was prepared to be packed.  But it did
24   not make it out of the home.
25        Q.      When you saw -- when you had gotten
```

Aaron Acree
August 19, 2024

```
 1    home on your lunch break and you said you saw
 2    Crystal Smith coming out of the house, was she
 3    carrying anything at that time?  If you
 4    remember.
 5         A.    I don't -- I don't remember her
 6    carrying anything.  I can't -- I can't recall.
 7         Q.    Okay.  That's fair.
 8               Any other -- anything else in the
 9    conversation, other than what you had found at
10    the home and what you had observed?
11         A.    Anything else in the conversation?
12         Q.    Yes.  With your wife, when you were
13    heading back to the -- your office.
14         A.    Yes.  Yes.  When I told her about
15    those things, my wife instructed me that I need
16    to double check Ms. Smith for any additional
17    belongings that she may have.
18         Q.    Okay.  So what did you do then?
19         A.    After my phone conversation with my
20    wife?
21         Q.    Yes.
22         A.    I quickly called the jailer and
23    asked if he would mind bringing Ms. Smith by my
24    office.
25         Q.    And was that Jailer Hughes?
```

Aaron Acree
August 19, 2024

95

```
 1              A.     Yes, ma'am.

 2              Q.     Okay.  Why did you want Jailer

 3     Hughes to bring Ms. Smith by your office?

 4              A.     To check her for additional

 5     property.  To inventory her, based on the

 6     conversation that I had with my wife.

 7              Q.     And why not -- why did you not go

 8     back to the Cadiz Police Department?

 9              A.     I was already at my office.

10              Q.     How far away is the Cadiz Police

11     Department from your office?

12              A.     Rea- -- it's a -- a few miles,

13     maybe.

14              Q.     When you called Jailer Hughes, was

15     he already in custody of Ms. Smith?

16              A.     Well, she -- she was already in

17     custody.

18              Q.     Right.  Was -- when you called

19     Jailer Hughes, was Ms. Smith already with him,

20     or was she still at the Cadiz Police Department?

21              A.     She was already with him on -- in

22     his custody.

23              Q.     And how did you know that Crystal

24     Smith was already with Jailer Hughes and not

25     still at the Cadiz Police Department?
```

96

```
 1        A.      Because he told me.

 2        Q.      So you called him and you asked

 3   him, did he have Crystal Smith yes -- yet?

 4        A.      No, ma'am.  That's not what I asked

 5   him.  I -- I asked him if he was already on the

 6   way, to the best of my knowledge.

 7        Q.      And what was his response?

 8        A.      His response was he was already on

 9   the way to the jail.

10        Q.      Already on the way to the jail with

11   Ms. Smith.

12                Is that your understanding?

13        A.      Correct.  I called him relatively

14   quick.

15        Q.      When you left the Cadiz Police

16   Department, was Jailer Hughes already there?  If

17   you recall.

18        A.      Yes.  Yes, I believe so.  He --

19   yes, he was there when I was there.

20                Is that what you're asking me, if

21   we were at the Cadiz Police --

22        Q.      Yes.

23        A.      -- Department at the same time?

24        Q.      Exactly.

25        A.      Yes, ma'am.  Yeah.
```

Aaron Acree
August 19, 2024

1    Q.    Okay.  And is it your understanding

2    that he was waiting for the investigation to be

3    completed before transporting her?

4                MS. BLANKENSHIP:  Objection to

5    form.

6                MR. WRIGHT:  Joined.

7    BY MS. MALKA:

8    Q.    Do you know -- when you and -- I'll

9    ask a different question.  When you and Off- --

10   Jailer Hughes were both at the Cadiz Police

11   Department, was Crystal Smith being -- in the

12   middle of giving a statement or being

13   interviewed?

14   A.    To the best of my memory, yes, she

15   was in the middle of being interviewed.

16   Q.    Okay.  To the best of your

17   knowledge, was the interview, or the

18   investigation into Crystal Smith by the Cadiz

19   Police Department, finished when Jailer Hughes

20   took Crystal Smith in his car and started -- in

21   order to go to the jail?

22               MR. WRIGHT:  Object to form.

23               MS. BLANKENSHIP:  Same.

24   A.    I -- I don't know.  It wasn't my

25   investigation.

Aaron Acree
August 19, 2024

1   BY MS. MALKA:

2        Q.    Okay.  So you said you called

3   Jailer Hughes, you asked him if he was already

4   on the way to the jail.  He said that he was.

5              Correct?

6        A.    Correct.

7        Q.    And then you asked him to bring

8   Ms. Smith by your office.

9              Is that correct?

10       A.    Correct.

11       Q.    Did -- what did Jailer Hughes say?

12       A.    I don't specifically know what he

13  said, but he did not object to that request.

14       Q.    Did he ask you why you wanted to --

15  him to bring Ms. Smith to the Sheriff's Office?

16       A.    Are you asking me, did he ask?

17       Q.    Yeah.  Did he ask you why?

18       A.    I don't remember him specifically

19  asking me why.

20       Q.    Do you remember telling him why you

21  wanted to bring Ms. Smith to your office?

22       A.    I don't remember what I

23  specifically said, other than, do you mind

24  bringing her by so I can check her for

25  additional property.

Kevin Acree
August 19, 2024

99

1       Q.      Okay.

2       A.      Yeah.

3       Q.      So Jailer Hughes brings Crystal

4    Smith to the office.

5               Correct?

6       A.      Correct.  As requested.

7       Q.      How long until -- from the time he

8    made the call until he arrived, approximately?

9    If you remember.

10      A.      I don't remember.  It wasn't very

11   long at all.  I know he had not passed my office

12   yet already.

13      Q.      Okay.  And did you see Jailer

14   Hughes arrive to the -- your office?

15      A.      I didn't see him arrive, as -- as I

16   was in the office already.  I was approaching

17   the side door, and he was -- he was approaching

18   the side door.  And we met there at the same

19   time.

20      Q.      All right.  What happened next?

21      A.      In which part?  We went from a

22   conversation to which -- which part?

23      Q.      You said that you were walking by

24   the side door and saw Jailer Hughes approaching

25   the side door.

Carson Acree
August 19, 2024

100

```
 1          A.      Uh-huh.  Yeah.

 2          Q.      What happened?

 3          A.      I -- I opened the door and allowed

 4   Ms. Crys- -- Ms. Smith to come inside, and I had

 5   her stand in a certain position where the camera

 6   was facing.  And I wanted to do a visual

 7   assessment.

 8                  And she began to get irate and made

 9   certain requests.  And -- I -- I could see -- I

10   could see it escalating.

11          Q.      Okay.  Where -- when she came

12   inside, did Jailer Hughes come inside too?

13          A.      No.  He went back to his car.

14          Q.      Do you know why he went back to his

15   car?

16          A.      No, ma'am.  I don't.

17                  MS. BLANKENSHIP:  Object to form.

18   BY MS. MALKA:

19          Q.      Was there any conversation between

20   you and Jailer Hughes when you met him at the

21   side door?

22          A.      No.  I -- I don't recall any

23   conversation.

24          Q.      Okay.  You said you had her stand

25   inside.  So we made the chart earlier,
```

Aaron Acree
August 19, 2024

101

 1   Plaintiff's Exhibit A, or I guess the little

 2   sketch.  Could you hold that up to the camera

 3   and show me where you had her stand when you

 4   brought her inside the Sheriff's Off- -- your

 5   office?

 6        A.     Yes, ma'am.

 7               Can you see that okay?

 8        Q.     Yes, I can see that.  Thank you.

 9        A.     Okay.  This is the side -- this is

10   the side door.  She took -- she was guided here

11   a few steps more, right here in between this

12   little doorway.

13        Q.     Okay.  Is that where she was the

14   entire time when you were -- I think you said a

15   -- well, okay.  Scratch that.

16               You said she went in the side door

17   and you took her to the left in that doorway.

18               Is that correct?

19        A.     Correct.

20        Q.     Okay.  Did you enter that room, or

21   you stayed in the doorway?

22        A.     It's more like walking through the

23   doorway, just maybe a couple of steps there,

24   making sure it was the best angle there.

25        Q.     Okay.

Aaron Acree
August 19, 2024

102

```
 1        A.       You have to go forward a little bit
 2   before -- because there's -- there's the -- you
 3   got to remember, right here, if you can see
 4   that, this door right here, that -- that's a --
 5   that's a small wall to, you know, where a door
 6   is attached.
 7                 So you got to actually --
 8        Q.       Okay.
 9        A.       -- you actually have to walk
10   forward a little bit in order for the camera
11   here, that's placed in the corner, which is
12   actually behind this breezeway in reference, and
13   it's in the corner.  So you actually have to
14   walk up a little bit.
15                 If that better explains the -- the
16   positioning there for you.
17        Q.       It does.
18                 So that I understand correctly, you
19   walked Crystal Smith in the side door, you all
20   turned to the left, you walked into the doorway
21   and entered the filing room, where you said
22   earlier is where you keep case files.
23                 Is that correct?
24        A.       Yes.  That area right there.
25        Q.       All right.  And is there -- I guess
```

Aaron Acree
August 19, 2024

103

1    you said there's a camera in there?

2         A.    Uh-huh.  Yes, ma'am.

3         Q.    All right.  And you've labeled that

4    filing room, on the sketch.

5               Correct?

6         A.    Let me double check it.  Yes.

7         Q.    Okay.  Did the camera record that

8    interaction between you and Ms. Smith?

9         A.    I didn't go back to look at the

10   recording.

11        Q.    Why is there a camera in that room?

12        A.    Specifically?

13        Q.    Yeah.  Do you know?

14        A.    That camera was there before I -- I

15   took office.

16        Q.    Okay.  And how often does that

17   camera footage write over itself?

18        A.    I believe it's --

19        Q.    Or how long did -- sorry.  That was

20   a bad question.

21        A.    Okay.  Do you want to restate?

22        Q.    Yeah.  I think you know what I'm

23   trying to ask you, but how long until the

24   footage starts to rewrite over itself on that

25   camera?

1      A.      I believe -- I believe it's ten

2   days.  To the best -- to the best of my

3   knowledge, it's ten days, maybe.

4      Q.      To your knowledge, are there any

5   other cameras in the Sheriff's -- in your

6   office, that would pick up that filing room?

7      A.      Give me a moment to think.  I don't

8   -- no, we have -- I mean, we have the same

9   camera system for all of our cameras.

10             And are you asking if another angle

11  picked it up?

12     Q.      Yes.  Another angle, exactly.

13     A.      No, ma'am.  Not to my knowledge.

14     Q.      Is there a camera -- the bench that

15  you -- we talked about earlier, that has the

16  restraints on it, is there a camera that is

17  faced towards that bench?

18     A.      Yes, it would have been the same

19  camera.  So if you'd like, I could hold the

20  exhibit up and show you.

21     Q.      That would be helpful.  Thank you.

22     A.      The camera angle shoots, well,

23  right there.  The camera angle shoots from the

24  corner all the way through to where that bench

25  is set.

Aaron Acree
August 19, 2024

105

```
 1        Q.    Okay.  So that camera angle picks
 2   up the bench?
 3        A.    Yes.
 4        Q.    All right.  And what about the
 5   squad room?  Is there a camera that covers the
 6   squad room?
 7        A.    Not the inside, but --
 8        Q.    I think I -- I may have not called
 9   that room the proper name.  Is that the right
10   name, the squad room?
11        A.    That's what I have labeled here, if
12   that's the room you're referencing, yes --
13        Q.    Yeah.
14        A.    -- there we have a squad room.
15        Q.    Yes.  You said there is a camera
16   that picks up that one as well?
17        A.    No, ma'am.  Not the -- not the
18   interior of that room, no.
19        Q.    Right.  Okay.  And so you said you
20   had her stand inside that room where the camera
21   was facing.  Were you able to complete any sort
22   of search or inventory of her?
23        A.    No.
24        Q.    What was your intention?  I mean,
25   you said that she became irate.  Had she not
```

Aaron Acree
August 19, 2024

```
 1   become irate, what was your intention?

 2        A.     Had she not become irate?

 3        Q.     Had -- had she not.  Like, if she

 4   wouldn't have became irate, were you planning to

 5   undress her and do a search of her body, or what

 6   were you planning -- what was your plan?  What

 7   was your plan for your assessment of her person?

 8        A.     To do a visual assessment of her

 9   person.  To check for any additional stolen

10   items that could be returned back to me.

11        Q.     Okay.

12        A.     Based on the conversation I had

13   with my wife.

14        Q.     At that time, was -- what kind of

15   restraints was Ms. Smith wearing?

16        A.     What kind?

17        Q.     Yeah.  Yes, sir.  Was it handcuffs,

18   shackles?  What was she in?

19        A.     Handcuffs, shackles.

20        Q.     Were her legs shackled, or just her

21   hands?

22        A.     Her legs were shackled, yes.

23        Q.     Was she still wearing a coat?

24        A.     Still wearing a coat?

25        Q.     Well, I think you said that when
```

Aaron Acree
August 19, 2024

107

1   you saw her in your driveway --

2         A.      She had one on.

3         Q.      -- a coat.

4         A.      I -- I don't recall if she was

5   still wearing her coat.

6         Q.      Okay.  And you were saying that she

7   became out irate.  I'm going to have you pick

8   back up from there.  What was she saying, what

9   was she doing?

10        A.      She was obviously distraught for

11  what reasons -- obviously, maybe going to jail.

12  Usually, it's a reason to be distraught.  But

13  then she began to say, just -- I want to be with

14  my son, I want to be with my son.  Just kill me

15  now, just kill me now.

16        Q.      And when you say she was

17  distraught, was she yelling, was she crying?

18        A.      She seemed to be emotional.

19  Crying.

20        Q.      All right.  And then what happened

21  next?

22        A.      I tried to conduct a visual

23  assessment and she was resistive of that.

24        Q.      How so?

25        A.      Pulling away.  No wanting to show

Aaron Acree
August 19, 2024

108

```
 1   me her hands or her -- her person.
 2        Q.     Were you touching her during this
 3   time?
 4        A.     Yes.  Yes, I was.
 5        Q.     And I want you to describe exactly
 6   how you were touching her.  Where were your
 7   hands?
 8        A.     On the front of her -- on the front
 9   of her restraints.
10        Q.     All right.  So you said she began
11   pulling away.  Then what happened?
12        A.     Once I recognized that the
13   situation was escalating and it -- it was not
14   successful -- she kept pulling away the opposite
15   way toward more of the interior of the building.
16   And at this point in time, I knew we needed to
17   disengage from this act and -- and exit the
18   building.
19             And she just kept tugging and
20   pulling and pulling, and I was able to finally
21   bring her, and then she knocked over a trash
22   can.  And she had -- fell there after she
23   knocked over a trash can.
24             And at that point in time, Jailer
25   Hughes was walking into the -- into the
```

```
 1   building.  And then he assisted --
 2        Q.    How did she --
 3        A.    Sorry?
 4        Q.    How did she knock over a trash can?
 5        A.    It was right there in the -- in the
 6   doorway.  She was standing next to it.
 7        Q.    When she fell, were you all still
 8   in that filing room, or were you outside of the
 9   door into the hallway?  Or where -- where were
10   you all?
11        A.    Out -- outside.  Just outside of
12   that doorway there, once I was able to get her
13   mobile.  She was still pulling and resisting.
14        Q.    And were you having any
15   conversation with her during this time?
16        A.    Specific conversation, other than
17   --
18        Q.    Yes.
19        A.    -- you know, let's go.  Let -- you
20   know -- I could -- and at that -- at that point
21   in time?
22        Q.    Yes.  Correct.
23        A.    I -- I told her that I could have
24   killed her, in so many words.  And was telling
25   her, let's go, let's go.  And then that's when
```

Aaron Acree
August 19, 2024

110

```
1   she knocked over the trash can.  She fell, and
2   Jailer Hughes assisted me getting her up, back
3   on her feet, to exit the building.
4        Q.    When she first came in through that
5   side door, and you first went into that filing
6   room, was there any conversation between you and
7   Crystal -- Crystal Smith at that point?
8        A.    I don't recall anything specific.
9        Q.    Once Jailer Hughes assisted you
10  with getting her out of the building, what
11  happened next?
12       A.    We got her up on her feet, and I
13  walked her to the door, and he -- he took her
14  out of the building.
15       Q.    Are there any cameras in your
16  office that face into that parking area where
17  Jailer Hughes' car was parked that day?
18       A.    Yes.  Yes.
19       Q.    Is that of the same, it writes over
20  itself in about ten days?
21       A.    Yes, ma'am.  It's the same camera
22  system, just additional cameras.
23             Are you asking now or then?
24       Q.    Then.
25       A.    Yes, there was a camera facing that
```

Aaron Acree
August 19, 2024

1   parking lot there too.

2        Q.     Okay.  Did you walk with -- did you

3   assist Jailer Hughes in walking Crystal Smith to

4   his vehicle?

5        A.     No, ma'am.  I don't remember or

6   recall ass- -- walking her to the vehicle.

7        Q.     What's your recollection?  That you

8   stayed by the side door?

9        A.     Yeah, while he loaded her back up

10  in the vehicle.

11       Q.     Do you remember at that point

12  having any communication with Crystal Smith?

13       A.     While she's on the way to the

14  vehicle, or in the vehicle?

15       Q.     While she's on the way or getting

16  into the vehicle.

17       A.     No, ma'am.

18       Q.     What about once she was in the

19  vehicle?

20       A.     No.

21       Q.     When Crystal Smith was brought in

22  to you, I know you said she had on leg chains

23  and handcuffs.  Did she have on arm chains?

24       A.     Arm chains as far as to -- she had

25  on handcuffs, shackles around her feet, and a

Aaron Acree
August 19, 2024

112

```
 1   belly chain around her waist.
 2        Q.      Did you observe any injuries on her
 3   while she was in the Sheriff's Office -- in your
 4   office?  Any bruises, scrapes, anything like
 5   that?
 6        A.      No, that -- that happened so fast
 7   it -- it -- I -- I didn't get to do the visual
 8   assessment like I had planned to do.
 9        Q.      At any time, did you grab Ms. Smith
10   while she was at the Sheriff's Office?
11        A.      Grab.  Can you be more specific?
12        Q.      Did you grab her body at any time
13   while she was inside your office?
14        A.      Yes.  To get her to leave the
15   office.
16        Q.      Was she not trying to leave the
17   office or not going towards the exit?
18        A.      She just wasn't doing what I was
19   asking her to do.  I don't know if she was
20   specifically not trying to leave the office.
21        Q.      What was she doing?
22        A.      Resisting --
23        Q.      Go ahead, I'm sorry.
24        A.      Resisting is what she was doing.
25        Q.      Resisting the visual search?
```

1        A.        Resisting -- just non-compliant.

2    Resisting the search, resisting my movement to

3    get her out of the building after the search was

4    -- or there was no search due to her actions.

5    She was -- just resisted.

6        Q.        Did you push Crystal Smith at any

7    time while she was in your office?

8        A.        No.

9        Q.        Did you pull her at any time?

10       A.        Pull her, as in to extract her from

11   where she was standing to get her out of the

12   office.  She's tugging one way and I'm tugging

13   another.

14       Q.        And as she was doing so, was she

15   saying anything aside from what you've already

16   testified about?

17       A.        No.

18       Q.        Did you get in --

19       A.        Not to -- not to my knowledge.  I

20   don't recall anything else, other than what I've

21   already testified to.

22       Q.        Did you get in her face and yell at

23   her at any time while she --

24       A.        No.

25       Q.        -- was in your office?

Aaron Acree
August 19, 2024

1          Did you threaten her at any time

2    while she was in your office?

3          A.     Threaten her?

4          Q.     Yes.

5          A.     Can you be more specific?

6          Q.     Did you threaten her life at any

7    time while she was in your office?

8          A.     Other than I could have killed you?

9                 Ma'am?

10         Q.     That's all that -- your testimony

11   is that's the only thing you said?

12         A.     To my recollection.

13         Q.     Did you say anything to the effect

14   of, if I ever see you near my home or my family,

15   I will kill you?

16         A.     Specifically that?  I can't recall

17   anything specifically like that, no.

18         Q.     Okay.  So just so that I'm clear,

19   are you saying that you're not disputing that

20   you said that, or that you could have said that,

21   you just don't remember saying that?

22         A.     I don't -- I'm disputing saying

23   that specifically.  What -- your statement.

24         Q.     You did not say that.

25                Is what you're saying?

Aaron Acree
August 19, 2024

115

1      A.      I don't -- I'm disputing.  I don't
2   remember saying that.
3      Q.      Okay.  Got it.
4      A.      I just want to be clear with you.
5   I apologize.
6      Q.      That's okay.
7              Do you know if Jailer Hughes wears
8   a body cam?
9      A.      No, ma'am.  I -- I don't.
10     Q.      During the time that you had
11  Ms. Smith in your office at the -- and when I
12  say your office, I mean the sheriff's station as
13  a whole.  I think you understand what I'm
14  saying.
15             During the time that she was at
16  your office, was there anybody else besides
17  yourself, who witnessed your interaction with
18  Crystal Smith inside the Sheriff's Office?
19     A.      That witnessed it as in -- can you
20  be more specific when you say witness?
21     Q.      Yeah.  Anybody that saw any part of
22  your interaction with Crystal Smith.
23     A.      No, ma'am.
24     Q.      Do you recall if there was anybody
25  else at the sheriff's station that day?

Aaron Acree
August 19, 2024

116

1          A.      Yes.

2          Q.      Who else was there?

3          A.      Two of my administrative employees.

4          Q.      What are their names?

5          A.      Michelle Thomas, at the time she

6    was a -- she's a former employee now.   And Faye

7    Godair.

8          Q.      Does Faye still work there?

9          A.      Yes, ma'am.  She does.

10         Q.      And do you know where they were

11   inside your office during the time that you were

12   with Crystal Smith?

13         A.      Specifically, do I know where they

14   were, no.

15         Q.      Okay.  Do they have an office

16   within your office?

17         A.      Yes, ma'am.  They do.

18         Q.      Where would their offices be?

19         A.      In the front behind the glass and

20   behind the -- across from the lobby.

21         Q.      Okay.  So if your -- and I know

22   this isn't specifically marked on there, but

23   could you hold up that sketch again?

24         A.      Sure.

25         Q.      In relation to that side door and

Karen Acree
August 19, 2024

```
 1   everything you have on here, could you point to

 2   approximately where Ms. Michelle and Ms. Faye's

 3   office would be?

 4        A.    Approximately?

 5        Q.    Yeah.

 6        A.    In this general area up front.

 7        Q.    Okay.  Could you maybe create an

 8   asterisk or something right in that general

 9   area, and write, Faye and Michelle, to denote

10   where their offices are.  Or you can write, Faye

11   and Michelle office.

12        A.    What would you like me to do?

13        Q.    Is there like -- yeah, write Faye

14   and Michelle office just to be clear.  Because I

15   know you don't know specifically where they were

16   at that time.

17        A.    (Complying.)

18        Q.    And is there -- it looks like

19   there's a wall.  They wouldn't be able to see

20   that filing room from their office.

21              Is that correct?

22        A.    Correct.

23        Q.    Do you know if they would be able

24   to hear voices in the filing room from their

25   office?
```

Aaron Acree
August 19, 2024

118

```
 1              MR. WRIGHT:  Object to form.
 2        A.      Well, that depends.  I don't know
 3   -- I -- I don't know what you're asking me.
 4   BY MS. MALKA:
 5        Q.      Well, if you were standing in Faye
 6   and Michelle's office, would you be able to hear
 7   a commotion in that filing room, or you think
 8   it's too blocked off, or do you know?
 9        A.      Commotion, or conversation, or --
10        Q.      Whatever the noise level was of
11   Crystal Smith and you that day, would they have
12   been able to hear any of that?
13        A.      It's a possibility.
14        Q.      Did you ask them if they did hear
15   anything?
16        A.      No, ma'am.  I did not.
17        Q.      And I think -- correct me if I'm
18   wrong, but I believe your discovery responses
19   referenced that there was a man in the Sheriff's
20   Office at that -- at that time as well.
21              Is that correct?
22        A.      I don't know who.  I don't know if
23   -- I don't know who it would have been.
24        Q.      Do you recall that, or you don't
25   recall that?
```

```
 1        A.    Outside of looking at discovery or
 2   during the events that this took place?
 3        Q.    Yeah.  While this was taking place,
 4   do you recall anyone else being there?
 5        A.    No, ma'am.
 6        Q.    Okay.  How long had you been at the
 7   sher- -- well, never mind.  I think you -- we --
 8   you already testified about that.
 9             After Jailer Hughes put Crystal
10   Smith in his vehicle, what happened next?
11        A.    He transported her to Christian
12   County Jail.
13        Q.    Who is we?
14             MR. WRIGHT:  Object to form.
15        A.    I don't --
16   BY MS. MALKA:
17        Q.    Did you say we or he?  I'm sorry.
18   I may have misheard you.
19        A.    He.  He.
20        Q.    Okay.  And what did you do next?
21        A.    Specifically, left -- called my
22   wife, left the office, went back home.
23        Q.    And when you called your wife, what
24   was that conversation?
25        A.    Letting her know that that was
```

Mason Acree
August 19, 2024

120

```
 1    unsuccessful and that I was going back home to

 2    pretty much conduct a cleanup at that point in

 3    time, to best I could.

 4          Q.    Okay.  Then what happened?

 5          A.    While I was at home?

 6          Q.    Yes.

 7          A.    I was cleaning.  Taking inventory.

 8          Q.    All right.  And at some point, did

 9    you leave the home?

10          A.    During shift?

11          Q.    Well, I guess I'm just trying to

12    get -- I'm trying to nail down exactly what you

13    did for the entirety of the day.  So you said

14    you left the sheriff station, you went back

15    home, you cleaned up.

16          A.    Yeah.

17          Q.    What happened next?

18          A.    My wife got home after shift was

19    over with, and we continued to do inventory

20    there.  And we were able to recognize things

21    that were out of place that I missed from the

22    first time that I was in the home.

23          Q.    What things were those?

24          A.    Just put -- things that were just

25    in areas that they did not belong.  Such as
```

Jason Acree
August 19, 2024

121

clothing and suitcases, and -- and my daughter's
Christmas money was missing.  My wife recognized
that she'd had some jewelry missing.

    Q.    Okay.  What happened next?

    A.    At that point in time, once we were
sure that the ring was nowhere to be located in
the home, I called a Christian County sheriff's
deputy, explained to him what was going on.

        And then he put me in contact with
a deputy that was on duty at the time, to assist
me at the jail attempting to retrieve the
property, and do an inventory again there at the
jail.

    Q.    When you called the deputy that was
there at the jail, were they -- did they say
whether they had already done an inventory of
her or not?

    A.    Oh, I'm sorry.  He -- you might be
confused on what I said.  The -- the first
deputy informed me that he was not on shift, and
he guided me to a deputy that was on shift.  And
he does not work at the jail.  He -- he is a
Christian County road deputy.

    Q.    I see.  Okay.

        And he -- and -- and what was it

Aaron Acree
August 19, 2024

1  that this road deputy did -- I apologize -- when

2  you spoke to him?  The second person.

3       A.    He assisted me what I tried to

4  accomplish the first time, which was the

5  inventory.

6       Q.    What was his name?  Do you recall?

7       A.    Yes, ma'am.  I do.

8       Q.    What's his name?

9       A.    Scott Norsworthy.

10      Q.    Okay.  After you got off the phone

11 with him, what did you do?

12      A.    He met me and my wife there at the

13 Christian County detention center where

14 Ms. Smith was being processed -- or where she

15 was processed and lodged.

16      Q.    And then what did you all do?

17      A.    At that point in time we were able

18 to locate some property that she, in fact, did

19 enter into that facility with.

20      Q.    And what was that property?

21      A.    It was a diamond ring belonging to

22 my wife.

23      Q.    And so when somebody's booked into

24 the jail, if you know, what's the process of

25 doing an inventory on what they bring in?  What

Aaron Acree
August 19, 2024

123

```
 1   does that look like?  Do you know?
 2         A.     No, ma'am.  I don't.  I don't work
 3   at the jail.  I've never worked at the jail, and
 4   I -- I don't know their procedures.
 5         Q.     So when you got there, did you look
 6   through the property that had been taken off of
 7   her?  Did somebody else go and look through the
 8   property, or what exactly happened?
 9         A.     Yeah, I specifically did not look
10   at -- look at her.  Deputy Norsworthy was
11   assisting with bringing property out to me.  And
12   we were able to verify either, yes, this is ours
13   or no, this isn't ours.
14         Q.     Got it.
15                Do you recall seeing Crystal Smith
16   while you were there at the Christian County
17   detention center?
18         A.     No, ma'am.  I don't recall seeing
19   her there.
20         Q.     Were you in an area where you could
21   see inmates?
22         A.     When I entered into the jail?
23         Q.     Yes.
24         A.     I entered into the jail and turned
25   left to where the guards are, so the inmates
```

Aaron Acree
August 19, 2024

124

 1    aren't held there.
 2         Q.    Okay.  In the area where you were,
 3    somebody was bringing your property to identify,
 4    yes, it's yours or, yes, it's -- it's not.  Were
 5    you in any area where you could see inmates at
 6    that point?
 7         A.    No, ma'am.  I was in the sally port
 8    at that time.  There's no inmates there.
 9         Q.    All right.  You retrieved the ring
10    -- you were able to identify the ring.  You
11    retrieved it.
12              Is that correct?
13         A.    Correct.
14         Q.    And then what did you do at that
15    point?
16         A.    I showed a picture of the ring to
17    -- to the guard that was working before I even
18    saw the ring that she came in there with.  We
19    confirmed, yes, that was my wife's ring.  We got
20    the property, and then we returned home.
21         Q.    Okay.  From that point -- from that
22    day forward, have you had any other type of
23    communication with Crystal Smith?
24         A.    Communication?
25         Q.    Yes.

Aaron Acree
August 19, 2024

125

1          A.     Not communication.

2          Q.     Okay.  Can you think -- well, do

3    you know of any other time -- you personally --

4    of any other time where a criminal defendant

5    accused of robbing somebody, the victim was

6    allowed to personally search that alleged

7    defendant?

8          A.     Personally search?

9          Q.     Yes.  The victim searched the

10   robber while in custody of law enforcement.

11         A.     Not -- I can't think of a specific

12   scenario, but it wouldn't be uncommon.

13         Q.     Have you -- but you have not seen

14   that happen, or you just can't think of a time

15   when that's happened?

16         A.     I've never been the victim of

17   burglary before, so...

18         Q.     Well, have you ever arrested

19   somebody for burglary?

20         A.     I -- yes, absolutely.

21         Q.     Okay.  And have you ever taken

22   somebody accused of burglary, after leaving the

23   scene with that person, back to the victim and

24   allowing that victim to conduct a search of that

25   accused burglar?

Aaron Acree
August 19, 2024

1        A.      Not in this specific scenario.

2        Q.      Would that be proper procedure?

3        A.      It wouldn't be uncommon.

4        Q.      What would be -- what's the normal

5    procedure for if somebody commits a robbery and

6    a victim thinks that that defendant still might

7    have some of their property on them?

8        A.      Well, you want to preserve the

9    evidence if -- if you're able to, so you don't

10   take a chance on it being lost, or stolen, or

11   pawned, or anything of that nature.

12              So there is no specific procedure

13   to a burglary victim or a -- a suspect that I

14   can think of.  All scenarios can vary and be

15   different, depending on the nature of the

16   complaint.

17              If you have the burglar or the

18   victim there both on-site, or if you -- if

19   you're chasing a victim -- or chasing a burglar,

20   it just depends.  There -- there's very --

21   there's many different scenarios when it comes

22   to burglary.

23              MR. WRIGHT:  Hey, Annie --

24              MS. MALKA:  Okay.

25              MR. WRIGHT:  -- can I -- we went

Aaron Acree
August 19, 2024

127

```
 1    through the -- you shifted on me pretty fast
 2    after we got through the day's events.  We've
 3    been going a while.  Can we take a break?  I
 4    meant to --
 5                 MS. MALKA:  Of course.  Yeah.  You
 6    want to take ten or -- ten minutes, 15 minutes?
 7                 MR. WRIGHT:  Maybe ten or 15
 8    minutes would be great.
 9                 MS. MALKA:  That sounds good.
10    Let's come back in 15.
11                 THE COURT REPORTER:  We will go off
12    the record.
13
14                     *    *    *
15                 (Off the record.)
16                     *    *    *
17
18                 THE COURT REPORTER:  We are back on
19    the record.
20
21                     *    *    *
22               CONTINUED EXAMINATION
23    BY MS. MALKA:
24        Q.    Okay.  We just returned from a
25    quick break.  And I shouldn't have too much
```

Bryson Acree
August 19, 2024

128

1    more, hopefully.  We're over halfway done.

2                All right.  Sheriff Acree, would it

3    ever be appropriate for the victim of a crime

4    and the perpetrator of a crime to be left alone

5    together once the perpetrator is in custody?

6                MR. WRIGHT:  Object to form.

7    BY MS. MALKA:

8        Q.    I can ask again, if you need me to.

9                Once a perpetrator of a crime is in

10   custody, has been arrested, would it ever be

11   appropriate for that perpetrator and its victim

12   to be left alone together?

13               MS. BLANKENSHIP:  Object to form.

14       A.    It's depending on the

15   circumstances.

16   BY MS. MALKA:

17       Q.    Okay.  Tell me, under what

18   circumstances would that be appropriate?

19       A.    Maybe perhaps if the victim is a

20   law enforcement personnel who's entrusted to

21   uphold the law.

22       Q.    Is that the only circumstance you

23   can think of, or is there others?

24       A.    I don't know anything else

25   specifically.  It's a unique situation here.

Brian Acree
August 19, 2024

```
 1      Q.    And so is it your testimony that
 2  you believe it was appropriate for you and
 3  Crystal Smith to be left together after she was
 4  arrested?
 5      A.    Yes.
 6      Q.    Can you think of any other
 7  situation, other than this one with you and
 8  Crystal Smith, to your knowledge, where the --
 9  an alleged perpetrator of a crime and their
10  victim were left alone together?
11      A.    A specific situation, I can't think
12  of one off of -- I -- I can't think of one
13  specific situation off-hand.
14            And when you say left alone
15  together, do you want to clarify, what you mean,
16  left alone together, before I wrap up that --
17  that answer?
18      Q.    Alone together in a room.  Alone in
19  any sort of situation together.
20      A.    Are you stating an example such as
21  any perpetrator or victim, or this specific
22  situation to where me and Ms. Smith?
23      Q.    Any perpetrator and any victim.
24  Would it ever -- have you ever seen a situation
25  where the perpetrator of a crime and the victim
```

Aaron Acree
August 19, 2024

130

```
 1   --
 2          A.      Well, we weren't --
 3          Q.      -- of that crime --
 4          A.      Well, we weren't left alone.  The
 5   door was propped to where Deputy -- Jailer
 6   Hughes was able to gain entry into the door,
 7   because the door locks when it goes behind you.
 8   And the two staff members could have walked in
 9   the hallway -- in the filing room at any point
10   in time.
11          Q.      But they didn't.
12                  Did they?
13          A.      No, they did not.
14          Q.      And Jailer Hughes didn't come in
15   until you were already on your way out.
16                  Right?
17          A.      That's correct.  Yes, he had access
18   to the building.  I -- I had left it open.
19          Q.      So in fact, you and Crystal Smith
20   were alone together.
21                  Isn't that correct?
22          A.      Yes.  Yes, ma'am.  That is.
23          Q.      And my question is: Can you -- do
24   you know of any other situation, in all of your
25   years in law enforcement, where the victim of a
```

Mason Acree
August 19, 2024

131

```
 1    crime and the perpetrator of the crime, after

 2    the perpetrator has been arrested, have been

 3    left alone together?

 4         A.    Not without them being law

 5    enforcement, no.

 6         Q.    Can you think of other situations

 7    -- do you know of other situations, in all of

 8    your experience in law enforcement, where the

 9    perpetrator of a crime and the victim of a

10    crime, who is in law enforcement, has been left

11    alone with the perpetrator once the perpetrator

12    is arrested?

13         A.    No, ma'am.  It's -- like I said,

14    like I stated, this is a unique situation.

15         Q.    All right.  You said that you did

16    find the missing ring at booking.

17               Correct?  When you went to the

18    Grayson County detention center.

19               Is that correct?

20         A.    That's incorrect.  I'd said

21    Christian County detention center.

22         Q.    Christian.  I apologize.

23               You found the missing ring once you

24    went to the Christian County correction center.

25               Correct?  Detention center.
```

Aaron Acree
August 19, 2024

```
 1        A.      Correct.

 2        Q.      The ring was located once an

 3   inventory was taken of Crystal Smith.

 4                Is that correct?

 5        A.      Correct.

 6        Q.      All right.  So in reality, you did

 7   not need Jailer Hughes to bring Crystal Smith to

 8   your office.

 9                Did you?

10                MR. WRIGHT:  Object to form.

11                MS. BLANKENSHIP:  Object to form.

12        A.      What do -- can you -- what do you

13   mean, I did not need him to do it?

14   BY MS. MALKA:

15        Q.      You did not need Jailer Hughes to

16   bring Crystal Smith to the Sheriff's Office in

17   order to recover your property.

18        A.      Yes, ma'am, I did.

19        Q.      But you didn't recover your

20   property at the Sheriff's Office.

21                Did you?

22        A.      That's -- no, ma'am.  I did not.

23        Q.      In fact, you recovered it at the

24   detention center.

25                Correct?
```

Aaron Acree
August 19, 2024

133

```
 1        A.      Correct.
 2        Q.      So there was no purpose served, in
 3   reality, in Jailer Hughes bringing Crystal Smith
 4   to your office?
 5            MS. BLANKENSHIP:  Object to form.
 6            MR. WRIGHT:  Join.
 7        A.      Yes, there was a purpose.
 8   BY MS. MALKA:
 9        Q.      But no purpose was it -- the
10   purpose was to recover -- look -- do an
11   inventory.  You weren't able to do an inventory.
12            Were you?
13        A.      Due to her actions, that's correct.
14        Q.      And in fact, the jail did the
15   inventory.
16            Didn't they?
17        A.      The jail did the inventory?
18        Q.      The detention center.
19        A.      They took her -- they took her
20   property.  They didn't know it wasn't hers or
21   not hers at the time.  It was the Christian
22   County sheriff's deputy who assisted me at the
23   jail.
24        Q.      And had Crystal Smith never been
25   brought to the Sheriff's Office, you still would
```

Aaron Acree
August 19, 2024

134

1   have gotten your ring from the detention center.

2              Wouldn't you?

3              MR. WRIGHT:  Object to form.

4              MS. BLANKENSHIP:  Object to form.

5      A.      I was going to get my property

6   either way.  Due to the fact that there's a

7   possibility that it could be lost and trying to

8   preserve that property is -- is what the -- what

9   the goal was at the time.

10             Had she had bonded out, or had --

11  she was picked up or whatever the case may be,

12  there's a chance that that property could have

13  been lost and never recovered.

14  BY MS. MALKA:

15     Q.      And the property wasn't lost,

16  though.

17             Was it?

18     A.      No.  I went there right away after

19  I left my home.

20     Q.      And it was -- and it was recovered.

21             Correct?

22     A.      Because I didn't take the chance on

23  delaying, yes, ma'am.  That's correct.

24     Q.      Because you went home and you

25  immediately did a more thorough inventory with

```
 1    your wife.

 2              Correct?

 3        A.      That's correct.

 4        Q.      Not because she was brought to your

 5    office.

 6              Correct?

 7        A.      What do you mean?

 8        Q.      Bringing Crystal Smith to your

 9    office did nothing to advance you getting your

10    ring back.

11              Did it?

12        A.      I didn't have the opportunity to

13    inventory her, due to her actions.

14        Q.      So -- so I'm going to ask -- that's

15    not my question.  My question isn't whether you

16    got the opportunity or not.

17              My question is: Crystal Smith

18    coming to your office did nothing to get your

19    ring back.

20              Did it?

21        A.      No, ma'am.  It was not successful.

22        Q.      Okay.  What got your ring back was

23    you going home and doing an inventory.

24              Correct?

25        A.      I did not know that the ring at the
```

Aaron Acree
August 19, 2024

136

```
 1    time -- it was to inventory her.  I didn't say

 2    anything about specifically looking for that

 3    ring.  It was to inventory her at the time, to

 4    retrieve property if I was able to recognize

 5    property.  If that better helps your

 6    questioning.

 7         Q.    And once you got home, you were

 8    able to do an inventory and realized there was a

 9    missing ring.

10              Correct?

11         A.    Correct.

12         Q.    And then you -- what got you the

13    ring back, was going to the detention center.

14              Correct?  Once other officers had

15    -- or other jailers had retrieved property from

16    her.

17              Correct?

18         A.    Because she was brought to the

19    jail, yes.

20         Q.    Okay.  Have you ever discharged

21    your weapon in the line of duty?

22         A.    Yes.

23         Q.    Did it result in a death?

24         A.    Yes.

25         Q.    So you killed somebody.
```

1              Is that correct?

2              MR. WRIGHT:  Object to form.

3       A.     I have fatally wounded someone in

4   the line of duty.

5   BY MS. MALKA:

6       Q.     Is that -- is fatally wounding

7   somebody and killing somebody, different?

8              MR. WRIGHT:  Object to form.

9       A.     I fatally wounded someone in the

10  line of duty.

11  BY MS. MALKA:

12      Q.     Is that different than killing

13  somebody?

14             MR. WRIGHT:  Object.  This -- he's

15  indicated someone has been killed in the line of

16  duty.  We don't have to belabor the point.  This

17  is getting argumentative.

18             MS. MALKA:  I -- I just don't know

19  if there's -- to me, it's the same thing.  I

20  don't know if there's a difference.  That's why

21  I'm trying to ask him if there's a difference.

22      A.     Well, if it's the same thing to

23  you, ma'am, with all due respect, I've fatally

24  wounded someone in the line of duty.

25

Aaron Acree
August 19, 2024

```
 1   BY MS. MALKA:
 2        Q.    Did that make the news?
 3        A.    Yes.
 4        Q.    What was the person's name that was
 5   fatally wounded in the line of duty?
 6        A.    Mr. Biby.  I don't even remember
 7   his first name.
 8        Q.    Anybody else?
 9        A.    Anybody else?  Can you restate?
10        Q.    Yeah.  Have you ever fatally
11   wounded anybody, other than Mr. Biby, in the
12   line of duty?
13        A.    No.
14        Q.    Were you identified in the news as
15   the person who fatally wounded Mr. Biby?
16        A.    Yes, to my knowledge.  I don't know
17   how I was identified, whether it was the Trigg
18   County Sheriff or Trigg County Sheriff Aaron
19   Acree, but there was some sort of
20   identification.
21        Q.    Other than your attorney, can you
22   tell me everybody that you've discussed this
23   lawsuit and the events underlying this lawsuit
24   with?
25        A.    No, ma'am.
```

Aaron Acree
August 19, 2024

```
 1          Q.     Do you know who you've spoken to

 2    your interaction with Crystal Smith with?

 3          A.     Other than my attorney, my wife,

 4    obviously.

 5          Q.     Yeah.

 6          A.     Obviously, Officer Tyler Thomas,

 7    Duncan Wiggins.

 8          Q.     Anybody else?

 9          A.     Specifically, no, ma'am.

10          Q.     What was your conversation with

11    Officer Duncan?

12          A.     I don't remember what -- at what

13    point in time?  Are you referencing a specific

14    conversation or a specific time?

15          Q.     I'm just trying to figure out every

16    conversation you've had with anybody, other than

17    your attorneys, about your interaction with

18    Crystal Smith on January 11, 2022.

19          A.     I can't say specifically who else,

20    outside of the obvious ones that were there

21    helping with the investigation.

22          Q.     What about this lawsuit?  Who all

23    have you spoken to about this lawsuit, other

24    than your attorneys?

25          A.     My wife.
```

Aaron Acree
August 19, 2024

140

1      Q.      Have you spoken with anybody at
2  your office, any of your employees about it?
3      A.      Details, or the fact that there is
4  a lawsuit?
5      Q.      Either one.
6      A.      Yes.
7      Q.      Okay.  Who all have you spoken to?
8      A.      My assistant, Faye Godair.
9      Q.      And can you tell me the nature of
10  the communications?
11      A.      She does my scheduling for me, so
12  she knows that depositions are taking place and
13  that we're getting close to some type of
14  disposition somewhere, and -- hopefully.
15      Q.      In your discovery responses, there
16  was a question -- and I can pull them up if you
17  need me to, just let me know -- about every
18  witness or participant to any of the events that
19  are outlined in Crystal Smith's complaint.
20          One of the people that you identify
21  is Faye Godair.  You say, Faye Godair is
22  expected to have knowledge of the interaction
23  between Sheriff Aaron Acree and Crystal Smith at
24  the Trigg County Sheriff's Department on January
25  11th, 2022.

Aaron Acree
August 19, 2024

```
 1              Do you recall giving that as your
 2     answer?
 3          A.     In -- in what?
 4          Q.     In your discovery responses.
 5          A.     Yes.
 6          Q.     What information about the
 7     interaction between Sher- -- you and Crystal
 8     Smith would she have?
 9          A.     The general information, other than
10     she's the plaintiff in this -- in this lawsuit.
11          Q.     Well, it specifically says she has
12     knowledge of the interaction.  I mean, did --
13     what does she know about that interaction?
14          A.     What she's able to testify to her
15     being a witness.
16          Q.     What did she witness?
17          A.     Well, as we stated before, she was
18     there at the Sheriff's Office.
19          Q.     And you said you never asked her if
20     she heard anything.
21              Correct?
22          A.     No --
23          Q.     While Crystal Smith was there?
24          A.     Correct.
25          Q.     Did you ever ask if she saw
```

Aaron Acree
August 19, 2024

142

```
 1    anything?

 2         A.     No, ma'am.

 3         Q.     Okay.

 4         A.     The day --

 5         Q.     So --

 6         A.     The day -- are you speaking -- I

 7    need you to be a little bit more specific with

 8    me here so I know how to properly answer your

 9    question.

10              Are you talking the day that the

11    interaction took place?

12         Q.     Yes, that's correct.  It says, Faye

13    Godair is expected to have knowledge of the

14    interaction between Sheriff Aaron Acree and

15    Crystal Smith at the Trigg County Sheriff's

16    Department on January 11th, 2022.

17              That was what your answer says, but

18    it sounds like she didn't -- you don't know if

19    she saw anything and you don't know if she heard

20    anything.

21              Is that correct?

22         A.     Other than what she -- if she heard

23    anything, but she didn't see anything because

24    she wasn't in there.

25         Q.     Okay.  What about Michelle Thomas?
```

Gabon Acree
August 19, 2024

143

1   Same answer for Michelle Thomas.  I can read it

2   back to you again if you want, but basically

3   says that she's got knowledge of the interaction

4   between you and Crystal Smith at the Sheriff's

5   Department on January 11, '22.

6         A.    Okay.  So she had knowledge of

7   what?

8         Q.    Well, I'm trying to figure out what

9   knowledge of the interaction does Michelle

10  Thomas have?

11        A.    Whatever answer she give you if she

12  -- I mean, I -- I don't know.  I did not talk to

13  Michelle Thomas that day.

14        Q.    Okay.  Have you talked to her about

15  it since then?

16        A.    Not that I can specifically recall,

17  no.

18        Q.    Other than Faye Godair doing your

19  schedule, have you talked to her about the

20  incident, since that day, January 11, '22?

21        A.    I can't recall anything specific

22  that we referenced or talked about.  It's a lot

23  of time between now and then.  I'm sorry.

24        Q.    That's all right.

25              Okay.  Tell me about -- do you know

Aaron Acree
August 19, 2024

144

1    Andrea Baron?

2        A.    I'm sorry.  Andrea who?

3        Q.    Do you know anyone named Andrea

4    Baron?

5        A.    It doesn't ring -- I -- no, not to

6    my knowledge.  I don't -- I don't recall anybody

7    name of Andrea Baron.

8        Q.    What about Crystal Howard?

9        A.    Same answer as before, ma'am.  No,

10   I -- I can't recall anybody by those two names.

11       Q.    Tanna Dunlap?

12       A.    No, ma'am.  I'm sorry.

13       Q.    Carmen Filbach?

14       A.    No, ma'am.

15       Q.    Lexie McRoy?

16       A.    No.

17       Q.    Have you ever been a party to any

18   lawsuits other than this one?

19       A.    Yes.

20       Q.    Tell me about those.

21       A.    Those are the ones that I believe

22   Ms. Shrewsbury is representing.  The Jared

23   Kennedy case, and the Mike and Michelle

24   Sandbrink [sic].  I don't know if she's

25   specifically representing those or not, but I

145

```
 1   know she's got a few of the different cases.
 2        Q.    Could it be Michelle Kent?  Could
 3   that be one of the parties?
 4        A.    As I just stated, yes, ma'am.
 5   Michelle Kent and Mike Sandbrink.
 6        Q.    I see.  Okay.
 7              What -- what's the nature of that
 8   lawsuit?  I mean, what's being alleged in that
 9   lawsuit, the Mike Sandbrink and Michelle Kent?
10        A.    Maybe unlawful termination.
11        Q.    Okay.
12        A.    I don't -- I don't have any other
13   details about that or what -- what the
14   disposition of that is.
15        Q.    Okay.  Have you -- I take it you've
16   not given a deposition then in that case?
17        A.    No, ma'am.  As stated previously,
18   this is my first deposition.
19        Q.    Have you ever been involved in a
20   lawsuit entitled, Estate of Dylan Akers versus
21   Deputy Gary Hicks and Aaron Acree, et al.?
22        A.    That's me.  Yes, ma'am.
23        Q.    Okay.  Do you know who Dylan Akers
24   is?
25        A.    No, ma'am.  I don't.
```

Aaron Acree
August 19, 2024

```
 1        Q.      And I apologize, your name is not

 2   on that one.  I guess this one's answering to

 3   the Trigg County Sheriff's Department.  You

 4   don't have any knowledge of that lawsuit then?

 5        A.      No.

 6        Q.      You produced some text messages in

 7   your discovery responses that I want to pull up

 8   and ask you about.

 9        A.      Okay.

10        Q.      I'm going to share my screen here.

11   And I'm going to scroll through the whole thing.

12   I'll let you read through everything, and then

13   we'll come back and I'll ask you questions about

14   it.

15        A.      Okay.

16        Q.      Okay.

17        A.      Okay.

18        Q.      Have you seen this text thread

19   before?

20        A.      Yes.

21        Q.      Okay.  And I guess Michelle Thomas

22   is one of your employees at the Sheriff's

23   Department?

24        A.      Yes.  Form -- she's not -- no

25   longer employed.
```

Kevin Acree
August 19, 2024

```
 1        Q.      Okay.  That's right.  I'm sorry.
 2                Whose number, if you know, is (XXX)
 3     XXX-XXXX?
 4        A.      That's my number.
 5        Q.      And who -- do you know -- there's a
 6     name at the top that says, My BFF.  Do you know
 7     who that is?
 8        A.      No, ma'am.  I don't.
 9        Q.      Okay.  Do you recall this
10     particular conversation in or around July 7th of
11     2022?
12        A.      Yes.
13        Q.      Do you know -- who were you talking
14     to?
15        A.      It would have been my
16     administrative clerks up front.
17        Q.      Okay.  And this was produced --
18     give me just a quick second.
19        A.      Okay.
20        Q.      Okay.  This was produced in
21     response to a request for any documents, emails,
22     text messages, video recordings, audio
23     recordings, which discussed Crystal Smith in any
24     form or fashion, from the last three years.
25                Other than this -- well, does this
```

Mason Acree
August 19, 2024

148

1    text message conversation reference Crystal

2    Smith in any form or fashion?

3           A.      Reference her specifically?

4           Q.      In any way.  Does it reference her

5    directly or indirectly?

6           A.      No, ma'am.  No.  It does not.

7           Q.      Do you know who produced this

8    conversation?

9           A.      Well, at the top, it says, Me.

10   Anybody want breakfast?

11          Q.      I -- to me, it looks like the

12   person that made these screenshots was the

13   person with the green texts.  Do you know who

14   that would have been?  It looks like everyone

15   else is on the left, person with the green texts

16   on the right is how I read that.

17          A.      Are you saying I produced these

18   documents or someone else produced --

19          Q.      These were produced in your

20   discovery responses.

21          A.      Okay.  What is your question?

22          Q.      And your response -- well, I'm

23   asking if this ref- -- how this references

24   Crystal Smith.  Because the -- it was produced

25   in response to a request for any email, text

Brian Acree
August 19, 2024

149

```
 1   message, et cetera, that references Crystal

 2   Smith in any form or fashion in the last three

 3   years.  And this was what was produced.

 4        A.    I don't know.  I don't know how --

 5   can you scroll back down so I can double check

 6   the --

 7        Q.    Yes.

 8        A.    -- the last part of the thread?

 9              Okay.  So -- so did I give this to

10   you or did you obtain this through attorneys, or

11   how did you obtain this?

12        Q.    Your attorney produced it in

13   response to our discovery request to you.

14        A.    Okay.

15        Q.    Let me ask you this: Were you

16   expecting some outside agency to show up

17   investigating your interaction with Crystal

18   Smith?

19        A.    When was this?

20        Q.    This was July 7th, 2022.

21        A.    No, ma'am.  I mean, this was me

22   trying to gain control of my office so things

23   weren't continued to be done behind my back.

24        Q.    Did any outside agency show up in

25   or around July of 2022?
```

Mason Acree
August 19, 2024

150

```
 1        A.      I can't recall specifically.  I
 2   don't know.
 3        Q.      Did any -- did any outside agency
 4   show up in any part of 2022?
 5        A.      Yes.
 6        Q.      Who was that?
 7        A.      Kentucky State Police and the FBI.
 8        Q.      And why do -- do you know why they
 9   showed up?
10        A.      To conduct an investigation.
11        Q.      Into what?
12                MR. WRIGHT:  Object to form.
13        A.      I don't know why.  At this point in
14   time, I had already been interviewed, so if they
15   were back, I don't know why.
16   BY MS. MALKA:
17        Q.      Who were you interviewed by?
18        A.      As I had stated, the Kentucky State
19   Police and the FBI.
20        Q.      Were you interviewed in relation to
21   your interaction with Crystal Smith on January
22   11th, 2022?
23        A.      No, ma'am.  I was not.
24        Q.      What were you interviewed about?
25        A.      Not in relation to Crystal Smith.
```

Aaron Acree
August 19, 2024

```
 1                MS. MALKA:  Stop my share.
 2                THE COURT REPORTER:  Did you want
 3     to introduce those as an exhibit, Annie?
 4                MS. MALKA:  Well, yeah, we can go
 5     ahead and introduce them as Plaintiff's Exhibit
 6     B, or 2, I guess we might be on actually.
 7                     (Whereupon, the referred to
 8                     document was marked as Exhibit B,
 9                     and is attached hereto and made a
10                     part hereof.)
11                THE COURT REPORTER:  We started
12     with A, so if we want to keep it consistent, B,
13     would be --
14                MS. MALKA:  There we go.  Perfect.
15     BY MS. MALKA:
16         Q.    Okay.  Were you investigated by
17     Kentucky State Police and FBI related to
18     allegations of official misconduct?
19         A.    Yes.
20         Q.    And were you charged with official
21     misconduct?
22         A.    Yes.
23         Q.    Did you plead guilty to official
24     misconduct?
25         A.    Yes, ma'am.
```

Aaron Acree
August 19, 2024

152

```
 1          Q.     Two counts?

 2          A.     Yes.

 3          Q.     Is it -- okay.  Were you charged

 4   with a crime arising out of your interaction

 5   with Crystal Smith on January 11th, 2022?

 6          A.     Yes.

 7          Q.     Did you plead guilty to two counts

 8   of menacing, involving the incident with Crystal

 9   Smith at the Trigg County Sheriff's Office?

10          A.     Yes.

11          Q.     And do you recall signing a plea

12   agreement when you entered those two guilty

13   pleas of menacing?

14          A.     Yes.  The plea agreement was

15   offered to me.

16          Q.     Okay.  Do you -- did you read the

17   plea agreement?

18          A.     Yes, ma'am.  Yes, ma'am, I did.

19          Q.     Okay, I'm sorry.  I got quiet for a

20   minute because I'm pulling something up.  I'm

21   about to share my screen.  Sorry for not --

22   okay.  I'm sharing my screen again.

23                 This is a three-page document.  The

24   top says, Commonwealth of Kentucky, Trigg

25   District Court, Case 22-M-246, Commonwealth of
```

```
 1   Kentucky versus Aaron Acree.

 2              And I'm going to scroll through it.

 3   Take as much time as you need to read through

 4   it.  I just want to ask you about something on

 5   the second page.

 6        A.    So do you want me to read it to its

 7   entirety, or something on the second page?

 8        Q.    Well, I'm going to ask you if you

 9   recognize this as the plea agreement that you

10   signed, but I don't want you to think I'm, like,

11   trying to trick you or anything like that.

12   That's why I'm -- I'm giving you an opportunity

13   to read the whole thing.

14        A.    Well --

15        Q.    So just let me know --

16        A.    -- my signature is not there on the

17   bottom.

18        Q.    We don't have the signed one.  We

19   have to get that directly -- we've got to, I

20   think send a subpoena for that.

21        A.    Okay.

22        Q.    But this is the one that was

23   provided to Ms. Shrewsbury, as the attorney for

24   Crystal Smith, while that was going on.

25              And my question, in particular,
```

Aaron Acree
August 19, 2024

154

1   Page 2 of this says, The Commonwealth further

2   explains the reasons for the two amended charges

3   as follows.  First is to the original charge of

4   Terroristic Threatening Third Degree, two

5   witnesses describe the Defendant's statement to

6   Crystal Smith as being, paraphrasing, if I ever

7   catch you in my house again, I'll kill you.

8           Had you read that line before, or

9   do you remember reading that line?

10       A.     Well, this is not the one that I

11  signed.  So unless something was amended or

12  changed -- and I don't have the one that I

13  signed in front of me, I can't say that this is

14  the one that I specifically signed.

15       Q.     The one that you signed, did you

16  read?

17       A.     Yes, ma'am.

18       Q.     Do you recall seeing a line in

19  there that said, Two witnesses described the

20  defendant's statement to Crystal Smith as being,

21  paraphrasing, if I ever catch you in my house,

22  again, I'll kill you?

23       A.     I don't recall the specifics or

24  detail being that it was so long ago.  But if

25  I'd had the signed one there, I would be able to

Aaron Acree
August 19, 2024

155

1    confirm with my signature.

2           Q.    And my question for you is: Do you

3    recall hearing that there were two witnesses?

4    Hearing, reading at any time during the pendency

5    of this criminal case, that there were two

6    witnesses that say they heard you say, If I ever

7    catch you in my house again, I'll kill you.

8           A.    I recall two people being there

9    during the interaction with Ms. Smith.

10          Q.    Who was that?

11          A.    Michelle Thomas and Faye Godair.

12   They would have been the only ones there, to my

13   knowledge.

14          Q.    Do you know if they were ever

15   identified as the -- as witnesses who heard your

16   statement to Crystal Smith as being, If I ever

17   catch you in my house again, I'll kill you?

18               MR. WRIGHT:  Object.

19          A.    I don't -- I don't know --

20               MR. WRIGHT:  Go ahead.

21          A.    I don't know who said what or -- or

22   -- I can't -- I can't answer that thoroughly

23   without knowing who said what.

24   BY MS. MALKA:

25          Q.    Okay.  And that -- that was my

```
 1    question.  If you know who those people were.
 2    That's all I was trying to figure out.
 3              Okay.  All right.  I think I'm
 4    nearly through if maybe we could take five for
 5    me just to kind of go through my notes really
 6    quick and get us wrapped up.
 7              THE COURT REPORTER:  Before we go
 8    on a break, did you want to make that plea
 9    agreement an exhibit or not?
10              MS. MALKA:  No.  I don't.
11              THE COURT REPORTER:  Okay.  We will
12    go off the record.
13
14                    *    *    *
15              (Off the record.)
16                    *    *    *
17
18              THE COURT REPORTER:  We are back on
19    the record.
20
21                    *    *    *
22              CONTINUED EXAMINATION
23    BY MS. MALKA:
24       Q.    Sheriff Acree, I just have a couple
25    of quick follow-up questions for you.
```

Sharon Acree
August 19, 2024

157

1          A.     Sure.

2          Q.     One of the questions that we asked

3    you in discovery, was to list each individual

4    present at the Sheriff's Department on January

5    11th, 2022, at the time Crystal Smith was

6    transported there.

7                 You identify yourself, Faye Godair

8    and Michelle Thomas.  And then it also says

9    there was a male civilian.  To date, the male

10   civilian has not been identified to Defendant's

11   best knowledge and belief.

12                Just so that I'm clear, do you

13   recall there being a male civilian there, or you

14   do not have a recollection of that?

15         A.     No, ma'am.  I don't have any

16   recollection of any male civilian there.

17         Q.     Okay.  Did Kentucky State Police or

18   the FBI ever make any request for the camera

19   footage showing the interaction of you and

20   Crystal Smith on January the 11th, 2022?

21         A.     Respectfully, I would not know the

22   answer to that because I was never interviewed

23   on this interaction.

24         Q.     Sheriff Acree, have you understood

25   all my questions today?

Aaron Acree
August 19, 2024

158

```
 1        A.    Yes, ma'am.  I have.

 2        Q.    Is there any of your answers that

 3   you wish to change?

 4        A.    No, ma'am.  Not at this time.

 5              MS. MALKA:  Okay.  That's all I

 6   have.  The other lawyers may have some questions

 7   for you.  Thank you for your time.

 8

 9                  *    *    *

10                  EXAMINATION

11   BY MS. BLANKENSHIP:

12        Q.    Sheriff Acree, I just have one

13   question.

14        A.    Yes, ma'am.

15        Q.    You know I'm Stacey Blankenship.  I

16   represent the county and Mr. Hughes.

17              Do you know whether Jailer Hughes

18   knew if the investigation of Crystal Smith was a

19   joint investigation between the Sheriff's

20   Department and Cadiz Police Department or not?

21        A.    Do I officially know that, or...

22        Q.    Yes.  Do you know whether he knew

23   it at the time?  Do you know officially whether

24   he knew that at the time?

25        A.    No, ma'am.
```

Aaron Acree
August 19, 2024

159

```
 1              MS. BLANKENSHIP:  Okay.  Thank you.
 2      That's all I have.

 3

 4                      *      *      *

 5                      EXAMINATION

 6      BY MR. WRIGHT:

 7          Q.     I just have one question.

 8                 On the body camera discussion, you

 9      were talking about policies.  When were you

10      appointed to fill the vacancy, what month and

11      year?

12          A.     September of 2020, sir.

13          Q.     Okay.  Was the body cameras, were

14      they in use in this January of, I guess it was

15      2022, when this happened?

16          A.     No, sir.  They were not.

17          Q.     So the body camera and the

18      policies, to your memory, was after the fact?

19          A.     Correct.  Yes, sir.

20                 MR. WRIGHT:  Okay.  That's all I

21      have.

22                 MS. MALKA:  No follow up for me.

23                 THE COURT REPORTER:  If those are

24      all the questions, we will close the record.

25
```

Aaron Acree
August 19, 2024

160

```
 1
 2                    *        *        *
 3            (Witness excused.)
 4                    *        *        *
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Aaron Acree
August 19, 2024

161

```
1   STATE OF KENTUCKY       )
                            )  SS.
2   COUNTY OF JEFFERSON     )

3            I, STEVEN TAYLOR, a Notary Public

4   within and for the State at Large, do hereby

5   certify that the foregoing deposition was taken

6   before me, via communications technology, at the

7   time and place and for the purpose in the

8   caption stated; that the witness was first duly

9   sworn to tell the truth, the whole truth and

10  nothing but the truth; that the deposition was

11  reduced to shorthand and recorded by me in the

12  presence of the witness; that the foregoing is a

13  full, true, and correct transcript of my notes

14  and recording; that there was no request that

15  the witness read and sign this deposition; that

16  the appearances were as stated in the caption.

17

18           WITNESS MY SIGNATURE this 4th day of

19  September, 2024.

20           My commission expires January 5, 2026.

21               /s/ Steven Taylor___   _____
                 STEVEN TAYLOR
22               Court Reporter
                 Notary Public, State At Large
23               KY Notary No. 42425

24

25  V/st
```

**A**

**Aaron** 1:11,15 2:15
4:4 7:4 9:1 10:4
10:18 23:10
138:18 140:23
142:14 145:21
153:1
**Aaron's** 54:15,17
**ability** 27:14 51:20
**able** 11:16 49:17
50:6 85:9 89:1
105:21 108:20
109:12 117:19,23
118:6,12 120:20
122:17 123:12
124:10 126:9
130:6 133:11
136:4,8 141:14
154:25
**absolutely** 44:8 85:7
125:20
**academies** 18:10
19:11
**academy** 17:3,8,13
17:18,22 18:8 22:7
24:13 25:4,6,22
27:23 32:14 35:18
**accepted** 24:5,8
**access** 65:9 130:17
**accomplish** 122:4
**accurate** 49:25
**accused** 19:13 31:17
31:24 40:1,13
41:10,24 42:14,18
42:25 67:1 125:5
125:22,25
**Acree** 1:11,15 2:15
4:4 7:4 8:17,23
9:1,11 10:4,12,18
14:3 15:17 28:23
128:2 138:19
140:23 142:14
145:21 153:1
156:24 157:24
158:12
**act** 108:17
**action** 22:14 26:14
34:1

**actions** 113:4
133:13 135:13
**activate** 71:16
**activated** 70:16
72:16,21 73:2,9
**activating** 70:12
**additional** 17:7,17
18:8 38:17,22 39:4
48:22 62:19 77:3,6
77:19 78:12 79:5
79:25 82:9 87:7
90:16,19 94:16
95:4 98:25 106:9
110:22
**address** 12:22 13:15
13:16,17 14:23
15:1,7
**addressed** 64:14
**addresses** 12:25
**administration**
60:16
**administrative**
39:16 43:16,19
116:3 147:16
**admitted** 55:10
**adopted** 71:9 73:21
73:22 74:6
**advance** 135:9
**affect** 62:15
**affirm** 9:15
**agencies** 18:22
**agency** 56:21 57:18
63:24 64:17,19
73:23 74:24 80:24
149:16,24 150:3
**agency's** 60:20
**ago** 36:10 57:6
60:10 64:15
154:24
**agree** 20:12
**agreement** 152:12
152:14,17 153:9
156:9
**ahead** 44:25 53:16
78:17 112:23
151:5 155:20
**Akers** 145:20,23
**al** 1:11 145:21

**Alexander** 22:24
26:7
**allegations** 151:18
**alleged** 41:11,12
125:6 129:9 145:8
**allowed** 100:3 125:6
**allowing** 125:24
**amended** 154:2,11
**amount** 57:10
**Andrea** 144:1,2,3,7
**Angela** 14:2,3
**angle** 101:24 104:10
104:12,22,23
105:1
**angry** 86:15,16
**Annie** 3:6 8:13
10:13 126:23
151:3
**annie@malkalaw...**
3:12
**anoth-** 39:4
**answer** 11:12,14,20
23:17 31:8 43:25
45:1 63:13 65:20
78:17 91:6 129:17
141:2 142:8,17
143:1,11 144:9
155:22 157:22
**answered** 20:22
69:9
**answering** 146:2
**answers** 11:25 12:5
60:7 65:11 158:2
**anybody** 41:21
44:16 80:3 84:21
115:16,21,24
138:8,9,11 139:8
139:16 140:1
144:6,10 148:10
**apologize** 22:19
23:15 38:16 39:19
66:3 88:7 115:5
122:1 131:22
146:1
**appearances** 3:2 4:2
5:7 161:16
**Appeared** 3:7,18
4:7

**applied** 29:7,8
**appointed** 38:2,7
159:10
**appointment** 32:24
**appreciate** 55:16
**approaching** 99:16
99:17,24
**appropriate** 40:25
41:5 46:20 128:3
128:11,18 129:2
**approximate** 20:4
**approximately**
45:10 76:18,19
90:22 99:8 117:2,4
**area** 16:3 29:25
32:11,18 102:24
110:16 117:6,9
123:20 124:2,5
**areas** 54:7 120:25
**argumentative**
137:17
**arising** 152:4
**arm** 111:23,24
**arr-** 64:1
**arrest** 30:8 31:14
39:23 43:11,12
44:4 46:7,18,20
47:3 56:12 58:5,14
58:24 59:15 62:12
62:18 63:12 64:2
64:12,17 65:2 70:1
71:17
**arrested** 30:17
31:18,25 41:6 42:6
46:13 55:23 56:8
56:19,21 57:17,18
58:3,13,23 59:14
61:18 62:2 63:7,24
65:16 66:4 67:1
125:18 128:10
129:4 131:2,12
**arrestee** 59:19
**arresting** 60:20
**arrests** 66:17
**arrive** 82:1 99:14,15
**arrived** 77:7,19
78:12 80:1 82:17
82:19 83:20 99:8

Aaron Acree
August 19, 2024

163

**artist** 50:18 51:17
**aside** 16:14 113:15
**asked** 14:23 23:19
  77:22 78:1 79:21
  94:23 96:2,4,5
  98:3,7 141:19
  157:2
**asking** 12:4,7 32:2
  36:23 37:5,9,10,23
  41:18 45:14 57:22
  63:10,12 96:20
  98:16,19 104:10
  110:23 112:19
  118:3 148:23
**ass-** 111:6
**assessment** 84:19
  85:1,2 89:1,4
  100:7 106:7,8
  107:23 112:8
**assigned** 30:1 32:12
  36:2 40:10,12
**assist** 111:3 121:10
**assistant** 140:8
**assisted** 109:1 110:2
  110:9 122:3
  133:22
**assisting** 123:11
**Association** 18:25
  20:24
**associations** 19:18
  19:23
**assume** 20:6
**asterisk** 117:8
**attached** 55:19
  102:6 151:9
**attempting** 121:11
**attempts** 82:21,24
**attended** 19:11
**attending** 8:12,14
  8:17,20 9:2 17:22
  24:13
**attorney** 20:12
  138:21 139:3
  149:12 153:23
**attorneys** 139:17,24
  149:10
**audio** 147:22
**August** 1:16 2:16

7:6
**average** 75:23
**aware** 90:19

---

## B

**B** 6:7 151:6,8,12
**back** 13:8 14:16
  27:19 28:17 29:15
  31:18,25 41:11,21
  42:3,8,19 43:5,24
  51:13 52:11 55:24
  61:15 62:22,24
  63:24 69:12,20
  75:5 81:14,17,19
  81:24 83:14 84:16
  92:5,6,12,13,19,20
  92:24 93:9 94:13
  95:8 100:13,14
  103:9 106:10
  107:8 110:2 111:9
  119:22 120:1,14
  125:23 127:10,18
  135:10,19,22
  136:13 143:2
  146:13 149:5,23
  150:15 156:18
**background** 12:16
**backup** 81:25
**bad** 12:4 103:20
**Baptist** 19:22 20:2
**BARKER** 4:8
**Barkley** 21:7,12
  22:13
**Barnes** 38:12
**Barnett** 33:21
**Baron** 144:1,4,7
**based** 19:7 62:19
  95:5 106:12
**basic** 17:2,6,8 25:4
  25:6
**basically** 29:21
  77:25 143:2
**bay** 50:14
**began** 100:8 107:13
  108:10
**beginning** 46:15
**belabor** 137:16
**belief** 46:5 157:11

**believe** 15:6 17:19
  35:2 38:21 45:18
  73:23,24 74:4,18
  78:4,14,19,21 79:5
  81:4,9 82:5 84:22
  85:24 89:9 90:1,25
  91:3 92:3 96:18
  103:18 104:1,1
  118:18 129:2
  144:21
**belly** 112:1
**belong** 120:25
**belonged** 85:12
**belonging** 122:21
**belongings** 86:9
  93:19 94:17
**bench** 47:18 48:24
  53:21,22,23 54:17
  56:1 104:14,17,24
  105:2
**best** 26:5 27:15 45:1
  49:16 51:19 65:20
  66:9 78:3,23 80:15
  81:3,3 91:6 96:6
  97:14,16 101:24
  104:2,2 120:3
  157:11
**better** 36:22 59:7
  60:3 102:15 136:5
**beyond** 16:10 17:8
  18:7 79:25 83:9
**BFF** 147:6
**Biby** 138:6,11,15
**birth** 13:15
**bit** 49:7 52:9,13
  64:15 102:1,10,14
  142:7
**Blankenship** 3:17
  3:19 5:13 8:19,20
  97:4,23 100:17
  128:13 132:11
  133:5 134:4
  158:11,15 159:1
**blocked** 118:8
**blood** 20:7,14
**Bob** 33:9,15
**body** 45:19 64:5
  70:3,8,12,15,20

71:3,3,23,25 72:4
  72:6,9,10,15,20
  73:2,8 74:16 106:5
  112:12 115:8
  159:8,13,17
**body-worn** 71:16
  73:20
**body-worn-issue...**
  71:4
**bonded** 134:10
**booked** 122:23
**booking** 131:16
**bottom** 153:17
**break** 10:25 11:3,5
  28:6,24 50:9,20
  76:22 94:1 127:3
  127:25 156:8
**breakfast** 148:10
**breezeway** 102:12
**bring** 64:19 67:10
  67:22 68:5,11 69:3
  95:3 98:7,15,21
  108:21 122:25
  132:7,16
**bringing** 64:18
  94:23 98:24
  123:11 124:3
  133:3 135:8
**brings** 27:3 99:3
**brought** 41:21,25
  42:2,3 58:25 59:4
  59:11,18 60:19
  62:22,24 63:24
  65:17 66:5,13 67:2
  67:4 101:4 111:21
  133:25 135:4
  136:18
**bruises** 112:4
**building** 47:15
  50:12 55:7 108:15
  108:18 109:1
  110:3,10,14 113:3
  130:18
**burglar** 125:25
  126:17,19
**Burglarizing** 89:22
**burglary** 125:17,19
  125:22 126:13,22

Aaron Acree
August 19, 2024

**C**

**Cadiz** 15:13 22:24
23:2,22 24:2,4,19
24:20 25:14 26:1,8
26:9,13 27:11,21
28:25 29:18 30:4,6
30:16 31:11,16
39:3 44:7 46:1
59:18 66:1,2,4,14
66:20 67:1,9,21
68:1,4 80:12,17,24
83:10,17,21 84:5
84:14 85:17 86:18
89:6,24 90:17,22
91:20,25 95:8,10
95:20,25 96:15,21
97:10,18 158:20
**call** 27:5 40:20 61:5
68:1 79:8 84:21
91:24 92:2 99:8
**called** 10:4 67:8,21
68:3,10 69:2 84:22
91:23 92:10,16
93:1,2 94:22 95:14
95:18 96:2,13 98:2
105:8 119:21,23
121:7,14
**calls** 43:25
**cam** 45:19 115:8
**camera** 49:23 70:12
70:15,20 71:16,23
71:25 72:4,6,9,11
72:15,20 73:8
74:16 100:5 101:2
102:10 103:1,7,11
103:14,17,25
104:9,14,16,19,22
104:23 105:1,5,15
105:20 110:21,25
157:18 159:8,17
**cameras** 70:3,8 73:2
73:20 104:5,9
110:15,22 159:13
**capacity** 8:11
**captain** 33:17,20
**caption** 161:8,16
**car** 42:19 84:1
87:18,23 88:2,11

92:1 97:20 100:13
100:15 110:17
**career** 35:24
**Carmen** 144:13
**carrying** 94:3,6
**cars** 84:2,3
**case** 1:3 10:15 42:5
42:8 48:6 53:17
58:25 59:22 68:16
102:22 134:11
144:23 145:16
152:25 155:5
**case-by-case** 62:6
**cases** 145:1
**catch** 154:7,21
155:7,17
**caught** 93:3
**cell** 30:21 47:9,16
**center** 30:22 47:10
60:19 63:1,6,20
122:13 123:17
131:18,21,24,25
132:24 133:18
134:1 136:13
**certain** 36:25 74:2
100:5,9
**certainly** 11:1 12:3
**certificate** 5:16 16:8
**certification** 18:12
**certifications** 16:12
**certify** 161:5
**cetera** 149:1
**chain** 112:1
**chains** 111:22,23,24
**chance** 126:10
134:12,22
**change** 60:9,11,13
60:15,17 61:2,4
158:3
**changed** 57:19,23
57:25 58:6,9,17
154:12
**changing** 57:2
**channels** 27:3
**charge** 154:3
**charged** 46:20
67:10,22 68:5,11
69:3,11 151:20

152:3
**charges** 154:2
**Charles** 22:2,2
**chart** 100:25
**chasing** 126:19,19
**Chasity** 15:13
**check** 94:16 95:4
98:24 103:6 106:9
149:5
**chief** 22:25 23:2
24:4 26:6
**child** 20:3
**choose** 19:1
**Christian** 31:9
119:11 121:7,23
122:13 123:16
131:21,22,24
133:21
**Christmas** 121:2
**Chuck** 21:21 22:2
**church** 19:21,22
20:2
**churches** 19:17
**circumstance** 69:11
128:22
**circumstances**
42:22,23 62:8,10
69:19 128:15,18
**cities** 32:18
**city** 30:5
**Civil** 7:8
**civilian** 157:9,10,13
157:16
**clarified** 82:13
**clarify** 129:15
**classify** 29:23
**clean** 11:18
**cleaned** 120:15
**cleaning** 120:7
**cleanup** 120:2
**clear** 11:23 64:16
80:19 81:7,11
85:20 114:18
115:4 117:14
157:12
**clearing** 81:16
**clearly** 63:14 78:19
**clerks** 147:16

**close** 52:7 140:13
159:24
**closely** 66:20
**closer** 59:8
**clothes** 86:8
**clothing** 121:1
**clubs** 19:18,23
**coat** 78:7 93:22
106:23,24 107:3,5
**collection** 39:18
**college** 16:1,2,9,11
23:8,21,24,24
**Color** 5:6
**come** 23:5 35:10
46:4 47:5 48:2
49:1 56:8 71:7
100:4,12 127:10
130:14 146:13
**comes** 27:2 62:4
126:21
**coming** 65:1 94:2
135:18
**Commander** 33:20
**commanders** 33:12
**commission** 161:20
**commits** 46:17
126:5
**committed** 46:6,12
**Commonwealth**
40:9 152:24,25
154:1
**commotion** 118:7,9
**communication**
87:24,25 88:12
111:12 124:23,24
125:1
**communications**
140:10 161:6
**community** 16:2,11
19:18
**complaint** 26:22,24
26:25 27:2,5,8
34:18 64:24,25
126:16 140:19
**complaints** 26:17
27:9 34:5,12,12
39:17
**complete** 16:22 17:1

17:12 18:4,21 27:7
85:3 88:24 89:1
105:21
**completed** 18:9
25:12 29:9 38:19
63:21 97:3
**completely** 11:11,14
12:6
**completing** 32:13
35:18
**compliant** 82:23
**Complying** 9:13
53:7,14,18 55:2
117:17
**conclusion** 55:15
**condition** 93:11
**conditions** 12:11
**conduct** 34:23
36:19 83:8 107:22
120:2 125:24
150:10
**conducted** 86:23
**conducting** 35:9
79:17
**conference** 18:25
19:6,7
**confidential** 73:16
73:17
**confirm** 155:1
**confirmed** 124:19
**confused** 121:19
**consist** 32:9,18 64:5
**consistent** 151:12
**contact** 46:4 121:9
**continued** 13:12
14:20 28:21 52:4
120:19 127:22
149:23 156:22
**continuing** 15:21
**control** 149:22
**conversation** 11:22
77:18 79:25 83:23
89:16 91:17 93:10
94:9,11,19 95:6
99:22 100:19,23
106:12 109:15,16
110:6 118:9
119:24 139:10,14

139:16 147:10
148:1,8
**corner** 102:11,13
104:24
**correct** 15:14,15
19:9 25:10,11
27:12,16,17 38:4
43:8,9 45:8,16,17
49:5 54:1 55:8
56:3,4 63:15 64:6
65:24 70:4 72:25
74:5 87:20 96:13
98:5,6,9,10 99:5,6
101:18,19 102:23
103:5 109:22
117:21,22 118:17
118:21 124:12,13
130:17,21 131:17
131:19,25 132:1,4
132:5,25 133:1,13
134:21,23 135:2,3
135:6,24 136:10
136:11,14,17
137:1 141:21,24
142:12,21 159:19
161:13
**correction** 131:24
**corrective** 22:14
26:14 34:1
**correctly** 39:10 55:6
102:18
**counsel** 3:4,15 4:4
8:8 9:20 10:6
**Count-** 40:4
**counties** 32:17,20
40:9
**counts** 152:1,7
**county** 3:15,15 9:2
12:17,20 15:18
20:6,15 31:1,3,9
31:13 32:21 40:4
40:10,12,21 41:6
44:2 46:22,23
57:14,19 60:9 61:9
61:10 65:6,17,23
65:25 119:12
121:7,23 122:13
123:16 131:18,21

131:24 133:22
138:18,18 140:24
142:15 146:3
152:9 158:16
161:2
**couple** 10:23 22:5
25:3 101:23
156:24
**course** 23:8 26:6
127:5
**courses** 23:21,25
**court** 1:1,24 3:15
5:16 8:4,5,22 9:4
9:11,14,19 11:8
13:8 14:16 23:16
28:10,17 51:5,13
73:13 127:11,18
151:2,11 152:25
156:7,11,18
159:23 161:22
**cover** 12:24
**covers** 105:5
**create** 117:7
**created** 71:6
**credit** 16:9 18:11,16
**credits** 16:1
**crim-** 42:25
**crime** 31:20 32:1,4
41:22,24,25 46:6
46:12,17 47:6
69:12,21 128:3,4,9
129:9,25 130:3
131:1,1,9,10 152:4
**crimes** 46:20
**criminal** 16:4,23
18:23 19:13 24:7
31:17,24 39:16
40:2,13,13,23
41:10 42:25 66:3
67:1,10,23 68:6,11
69:4,12,19 125:4
155:5
**criticism** 37:4,6,7
**crying** 107:17,19
**Crys-** 100:4
**Crystal** 1:5 8:14
10:5,14 58:25
66:12 67:3,5 68:16

68:19,21 69:1,23
77:11 81:8,10,20
81:24 83:15 84:5
84:14 86:17 93:3
94:2 95:23 96:3
97:11,18,20 99:3
102:19 110:7,7
111:3,12,21 113:6
115:18,22 116:12
118:11 119:9
123:15 124:23
129:3,8 130:19
132:3,7,16 133:3
133:24 135:8,17
139:2,18 140:19
140:23 141:7,23
142:15 143:4
144:8 147:23
148:1,24 149:1,17
150:21,25 152:5,8
153:24 154:6,20
155:16 157:5,20
158:18
**current** 12:22 24:22
**custody** 66:4 95:15
95:17,22 125:10
128:5,10
**cut** 23:9

─────────────

**D**

**date** 1:16 13:15
43:7 157:9
**daughter** 13:22,23
13:24 15:5 80:8
**daughter's** 121:1
**Dawn** 1:5 10:5
**day** 29:20,23 43:21
44:1 50:5 63:25
66:18 75:4,9,12,17
75:23,23 110:17
115:25 118:11
120:13 124:22
142:4,6,10 143:13
143:20 161:18
**day's** 127:2
**days** 104:2,3 110:20
**deal** 25:7
**dealing** 70:18,19

**death** 136:23
**dedicating** 23:7,21
  23:25
**defendant** 4:4 8:17
  31:18,24 40:2,14
  40:23 41:10 42:14
  43:1 66:3 67:1
  125:4,7 126:6
**defendant's** 154:5
  154:20 157:10
**defendants** 1:11
  3:15 46:24
**degree** 16:8 77:25
  154:4
**delaying** 134:23
**denote** 117:9
**departed** 83:21
  84:14
**department** 16:23
  18:23 23:22 24:7
  25:8,14 26:1,10,13
  27:11,22 28:25
  29:18 30:17,21
  31:12,17 39:3,9
  44:7 46:1 65:17,23
  66:1,1,2,5,14,20
  67:9,22 68:1,4,5
  70:7 80:11,17
  83:18,22 84:6,15
  86:18 87:8,16
  89:7,24 90:17,23
  91:20,25 95:8,11
  95:20,25 96:16,23
  97:11,19 140:24
  142:16 143:5
  146:3,23 157:4
  158:20,20
**depend** 64:11 65:4
**depending** 40:10
  62:8,12 126:15
  128:14
**depends** 19:4 40:8
  42:21 56:11 64:11
  64:23 65:4 76:12
  118:2 126:20
**deponent** 1:15 5:6
  8:23
**deposed** 10:7

**deposition** 7:4,6
  8:11 10:20 55:15
  145:16,18 161:5
  161:10,15
**depositions** 140:12
**deputies** 59:17
  70:13 71:18,20
**deputies'** 73:1
**deputy** 121:8,10,14
  121:20,21,23
  122:1 123:10
  130:5 133:22
  145:21
**Derek** 33:18 35:21
**Derrick** 4:6 8:16
  55:13
**describe** 108:5
  154:5
**described** 50:13
  52:8 154:19
**describing** 49:24
  54:10
**detail** 154:24
**detailed** 49:10
**details** 140:3 145:13
**detain** 77:8
**detained** 77:6,13
  78:6,12,22 79:15
  80:7 81:25 82:16
**detention** 41:14
  42:10 46:22
  122:13 123:17
  131:18,21,25
  132:24 133:18
  134:1 136:13
**determine** 85:9
**diamond** 122:21
**dictate** 62:11
**difference** 26:24
  36:19 137:20,21
**different** 17:15,20
  37:20,21,21 56:21
  57:18,18 61:22
  67:18 75:24 97:9
  126:15,21 137:7
  137:12 145:1
**difficult** 49:7
**dimensions** 54:22

**direct** 34:18
**directly** 36:6,7
  62:25 68:13 148:5
  153:19
**dis-** 72:7
**disarray** 85:3,4
  88:24
**discharged** 136:20
**disciplinary** 22:14
  26:14
**discipline** 34:1
**discovery** 7:7
  118:18 119:1
  140:15 141:4
  146:7 148:20
  149:13 157:3
**discretion** 31:7
  46:19 63:17
**discussed** 138:22
  147:23
**discussing** 36:25
**discussion** 159:8
**disengage** 108:17
**dispatch** 76:25 77:3
**disposition** 140:14
  145:14
**disputing** 114:19,22
  115:1
**distraught** 107:10
  107:12,17
**District** 1:1,1
  152:25
**DIVISION** 1:2
**docum-** 37:23
**document** 15:8
  55:18 151:8
  152:23
**documentation**
  37:24
**documented** 46:21
**documents** 36:24,24
  37:6,9,11 147:21
  148:18
**doing** 23:22 25:6
  27:18 34:24,25
  36:20,21 37:3,15
  37:22 50:10 68:15
  68:18 77:20 78:1

  79:22 107:9
  112:18,21,24
  113:14 122:25
  135:23 143:18
**domestic** 42:5,12
  69:13
**door** 33:13 47:23,24
  48:3,5,10,11 49:1
  49:3,12 52:18,21
  52:23 53:5,5,6,10
  55:6 99:17,18,24
  99:25 100:3,21
  101:10,16 102:4,5
  102:19 109:9
  110:5,13 111:8
  116:25 130:5,6,7
**doorway** 53:9
  101:12,17,21,23
  102:20 109:6,12
**double** 94:16 103:6
  149:5
**drawing** 6:6 49:23
**drawn** 53:4
**dressed** 75:10,11
**Drive** 15:13
**driveway** 76:24
  77:14,16 82:2,6,7
  82:18 107:1
**drop** 73:2
**dropping** 73:9
**drugs** 62:14 87:8
**due** 72:9,11 73:11
  73:17 79:7 113:4
  133:13 134:6
  135:13 137:23
**duly** 10:6 161:8
**Duncan** 24:17,18
  25:2 26:6 80:16
  139:7,11
**Dunlap** 144:11
**duress** 72:8
**duties** 29:19,24
  39:14
**duty** 75:12,14,23
  76:6 121:10
  136:21 137:4,10
  137:16,24 138:5
  138:12

**dwright@sturgill...** 4:13
**Dylan** 145:20,23

**E**

**E-T-H-E-R-I-N-...** 21:24
**earlier** 21:1 53:24 64:14 69:10 100:25 102:22 104:15
**easiest** 49:18
**education** 15:22
**effect** 79:23 114:13
**effective** 37:3,13
**effectively** 34:23 36:19 39:17
**Eighteen** 17:2
**either** 18:23 30:20 47:8 55:25 67:16 71:19 123:12 134:6 140:5
**either/or** 42:6
**elected** 38:8
**Eleven** 32:20
**email** 3:12,24 4:13 50:1 148:25
**emails** 147:21
**emotional** 107:18
**emotions** 42:22
**employed** 24:19 146:25
**employee** 116:6
**employees** 45:5,11 45:15 116:3 140:2 146:22
**employment** 21:4 24:1
**enacted** 60:10
**encourage** 70:20 74:2
**encouraged** 74:17
**ended** 22:8 80:10
**enforcement** 12:25 18:20 22:11,23 24:5 29:22 125:10 128:20 130:25 131:5,8,10

**enter** 47:15 50:2 101:20 122:19
**entered** 80:19 102:21 123:22,24 152:12
**entire** 35:23 82:8 101:14
**entirety** 120:13 153:7
**entitled** 145:20
**entrusted** 128:20
**entry** 50:20 130:6
**error** 72:9
**escalating** 100:10 108:13
**especially** 50:4
**Esq** 3:6,17 4:6
**established** 74:7
**Estate** 145:20
**estimate** 78:24
**et** 1:11 145:21 149:1
**Etherington** 21:21 22:3
**events** 119:2 127:2 138:23 140:18
**everybody** 138:22
**evidence** 126:9
**exact** 57:9
**exactly** 96:24 104:12 108:5 120:12 123:8
**Examination** 5:12 5:13,14 10:10 13:12 14:20 28:21 52:4 127:22 156:22 158:10 159:5
**examined** 10:7
**example** 73:1 129:20
**excused** 160:3
**executive** 72:3,11 73:12
**exercise** 50:15
**exhibit** 6:6,7 50:2 55:11,18 101:1 104:20 151:3,5,8 156:9

**Exhibits** 5:9 6:2
**exit** 108:17 110:3 112:17
**exiting** 77:2
**expect** 11:2
**expected** 140:22 142:13
**expecting** 149:16
**expensive** 93:21
**experience** 131:8
**expires** 161:20
**explained** 93:11 121:8
**explaining** 37:24
**explains** 102:15 154:2
**extend** 62:19,22
**extensive** 63:18,25
**extent** 51:17
**exterior** 55:7
**extract** 113:10

**F**

**face** 110:16 113:22
**faced** 104:17
**facility** 40:25 41:5 41:15 42:10 46:22 56:20 65:6,7,9 122:19
**facing** 100:6 105:21 110:25
**fact** 122:18 130:19 132:23 133:14 134:6 140:3 159:18
**fair** 12:8 22:21 30:9 31:10,23 43:15,17 60:2 63:2,3 68:24 79:11 88:18 91:12 91:13 94:7
**family** 13:20,20 80:7 114:14
**far** 18:10 36:25 57:22 95:10 111:24
**fashion** 147:24 148:2 149:2
**fast** 112:6 127:1

**fatally** 137:3,6,9,23 138:5,10,15
**fault** 92:22
**Faye** 116:6,8 117:9 117:10,13 118:5 140:8,21,21 142:12 143:18 155:11 157:7
**Faye's** 117:2
**FBI** 150:7,19 151:17 157:18
**February** 24:14
**Federal** 7:8
**feel** 43:18 86:15
**feet** 110:3,12 111:25
**fell** 108:22 109:7 110:1
**female** 77:2,5
**field** 24:11 25:2 35:13,14,16,19 36:5,8
**field-training** 24:12 24:15
**figure** 139:15 143:8 156:2
**Filbach** 144:13
**files** 48:6 53:17 102:22
**filing** 48:5 53:16 102:21 103:4 104:6 109:8 110:5 117:20,24 118:7 130:9
**fill** 159:10
**filling** 38:6,9
**finally** 108:20
**find** 79:19 86:4 131:16
**finding** 88:10
**fine** 20:18 54:9
**finish** 11:4,11,13
**finished** 97:19
**fired** 72:6
**first** 10:6 18:13 21:5 21:25 67:20 93:5 110:4,5 120:22 121:19 122:4 138:7 145:18

154:3 161:8
**FISCAL** 3:15
**five** 15:2 50:23,25
  79:2,10 156:4
**flee** 82:22,25
**floor** 73:3
**flow** 10:23
**follow** 65:12 159:22
**follow-up** 156:25
**following** 15:22
**follows** 10:7 154:3
**footage** 103:17,24
  157:19
**foregoing** 161:5,12
**forgets** 42:7
**form** 51:16 65:19
  66:7 78:16 91:5
  92:7 97:5,22
  100:17 118:1
  119:14 128:6,13
  132:10,11 133:5
  134:3,4 137:2,8
  146:24 147:24
  148:2 149:2
  150:12
**formal** 26:22,24
  27:1,8,10 29:11
  34:7,8,12
**Formally** 26:19,20
**former** 15:1 22:24
  23:2 116:6
**forward** 21:4 102:1
  102:10 124:22
**found** 93:20 94:9
  131:23
**foundation** 51:16
**four** 57:21
**Fourth** 3:9,20
**frame** 20:4 75:22
  80:5
**Frankfort** 17:14
**frequency** 44:4
**friend** 78:4 79:24
**front** 76:5 77:14,15
  108:8,8 116:19
  117:6 147:16
  154:13
**full** 8:24 10:16

161:13
**full-time** 25:7
**Fulton** 32:20
**funny** 27:19
**further** 52:13 64:2
  83:22 154:1

**G**

**gain** 130:6 149:22
**Gary** 145:21
**general** 49:10 75:21
  117:6,8 141:9
**generalized** 48:4
  89:17
**generally** 54:23
  91:15
**getting** 12:16 17:16
  34:16 75:5 110:2
  110:10 111:15
  135:9 137:17
  140:13
**give** 9:16 11:12,24
  26:3 52:24 57:8
  65:13 91:7 104:7
  143:11 147:18
  149:9
**given** 10:19 13:14
  61:7 72:19 145:16
**giving** 12:13 35:5,6
  97:12 141:1
  153:12
**glass** 116:19
**go** 10:22 13:1 14:9
  15:16 16:18 28:10
  29:15 42:7,16
  43:24 44:25 46:8
  48:5,7,13 51:5
  52:15 53:16 55:25
  56:1 76:10 78:17
  81:17 85:17 92:6
  92:13,24 95:7
  97:21 102:1 103:9
  109:19,25,25
  112:23 123:7
  127:11 151:4,14
  155:20 156:5,7,12
**goal** 134:9
**Godair** 116:7 140:8

140:21,21 142:13
  143:18 155:11
  157:7
**goes** 130:7
**going** 11:17 12:15
  25:9 46:7 50:15
  61:15 74:9 93:9
  107:7,11 112:17
  120:1 121:8 127:3
  134:5 135:14,23
  136:13 146:10,11
  153:2,8,24
**good** 10:12 50:18
  127:9
**gotten** 93:25 134:1
**grab** 112:9,11,12
**graduate** 15:19
**graduation** 15:22
**Grayson** 131:18
**great** 51:7,21 127:8
**greatly** 55:16
**green** 148:13,15
**groups** 19:18,24
  20:22
**guard** 124:17
**guards** 123:25
**guess** 27:20 37:9
  43:7 45:6 68:23
  88:17 101:1
  102:25 120:11
  146:2,21 151:6
  159:14
**guidance** 34:19,20
  35:1,5,6,11 36:15
  36:21
**guided** 101:10
  121:21
**guidelines** 10:23
**guilty** 12:3 151:23
  152:7,12
**guys** 56:19 59:6

**H**

**halfway** 128:1
**hallway** 48:1,2,4,13
  48:17 54:19 109:9
  130:9
**hand** 9:12 43:3

**handcuffs** 78:9
  106:17,19 111:23
  111:25
**hands** 106:21 108:1
  108:7
**hap-** 58:12
**happen** 56:13 62:3
  85:15 125:14
**happened** 50:5
  56:14,17,18,22
  58:2,8 66:12 80:18
  83:13,16 84:17,23
  99:20 100:2
  107:20 108:11
  110:11 112:6
  119:10 120:4,17
  121:4 123:8
  125:15 159:15
**happening** 76:21
**happens** 46:4 50:14
**harmed** 69:20
**head** 33:23
**heading** 92:1,4,12
  92:18 94:13
**hear** 23:11,14 28:2
  28:4 78:18 117:24
  118:6,12,14
**heard** 23:20 141:20
  142:19,22 155:6
  155:15
**hearing** 155:3,4
**held** 12:4 21:5 47:7
  47:13 58:3,13 59:3
  61:19 62:2,11 82:4
  124:1
**help** 10:23 72:5 88:3
**helpful** 49:21 53:12
  54:13,25 55:3
  104:21
**helping** 139:21
**helps** 136:5
**hereof** 55:20 151:10
**hereto** 55:19 151:9
**heroin** 87:10 90:18
**hey** 37:13 126:23
**Hicks** 145:21
**high** 15:16,18,23
  21:4,5

higher 52:9
history 21:4
hold 40:22 49:22
  55:12 65:7 101:2
  104:19 116:23
holding 30:21 47:9
  47:16 54:22 57:9
  57:17
Hollis 22:24 26:6
home 75:5 76:10,14
  76:14,22 77:2 80:4
  80:20 83:5,20
  84:20 85:1,2 88:22
  88:23 89:20,21,22
  93:3,12,13,13,24
  94:1,10 114:14
  119:22 120:1,5,9
  120:15,18,22
  121:7 124:20
  134:19,24 135:23
  136:7
hopefully 128:1
  140:14
Hopkinsville 16:1
  16:10 19:22 20:2
hou- 88:22
hour 91:1,11
hours 18:11,17,19
  66:18
house 77:10 80:6
  81:2,12,16 88:11
  92:6,12,13 94:2
  154:7,21 155:7,17
household 87:19
Howard 144:8
Hughes 58:5 60:24
  61:1 94:25 95:3,14
  95:19,24 96:16
  97:10,19 98:3,11
  99:3,14,24 100:12
  100:20 108:25
  110:2,9 111:3
  115:7 119:9 130:6
  130:14 132:7,15
  133:3 158:16,17
Hughes' 110:17
huh-uh 11:21,21
human 72:9

Humphries 61:11
husband 42:6,13
HUTCHINS 3:19

_____

I

identification
  138:20
identified 9:5 88:21
  138:14,17 155:15
  157:10
identify 8:24 124:3
  124:10 140:20
  157:7
illegal 87:8,11
immediate 13:20
immediately 50:14
  88:13 134:25
impression 63:5
in-person 49:6
incidences 42:4
incident 32:6 59:10
  59:13 69:7,17
  143:20 152:8
incidents 41:14
  69:22
incorrect 131:20
Index 5:2,8
indicate 20:21,22
indicated 137:15
indirectly 148:5
individual 31:25
  57:17 58:23 157:3
industrial 50:11
informal 26:25 27:4
  27:10 34:7,10,12
  34:15
informally 26:20
information 61:8
  141:6,9
informed 121:20
initial 50:20
initiated 85:25
injuries 112:2
inmates 123:21,25
  124:5,8
inside 47:25 58:23
  59:2,4 80:4,4,21
  81:7 84:16 85:20

88:17 100:4,12,12
  100:25 101:4
  105:7,20 112:13
  115:18 116:11
instance 65:4 68:22
instances 67:7 69:2
instructed 94:15
instruction 61:7
insurance 74:3,10
  74:24
intention 105:24
  106:1
interact 31:19 32:3
  41:11 42:14 43:2
interacting 72:2
interaction 103:8
  115:17,22 139:2
  139:17 140:22
  141:7,12,13
  142:11,14 143:3,9
  149:17 150:21
  152:4 155:9
  157:19,23
interactions 73:15
  73:18
interior 105:18
  108:15
interview 47:20
  62:20 63:25 65:8
  90:1,3,9,12,20
  97:17
interviewed 97:13
  97:15 150:14,17
  150:20,24 157:22
introduce 151:3,5
Introduction 5:11
  8:2
inventory 88:17
  95:5 105:22 120:7
  120:19 121:12,16
  122:5,25 132:3
  133:11,11,15,17
  134:25 135:13,23
  136:1,3,8
investigated 151:16
investigating
  149:17
investigation 62:18

62:21 63:18,21
  64:3,4,20 65:3,18
  66:6 87:15 97:2,18
  97:25 139:21
  150:10 158:18,19
involved 145:19
involving 42:13
  69:22 152:8
irate 100:8 105:25
  106:1,2,4 107:7
issue 28:1
issued 45:24
items 87:8,18,23
  88:2,10 89:21
  106:10

_____

J

jail 19:13 30:12,13
  30:18,19,23,25
  31:1,2,5,9,13 40:2
  40:4,7,11,14,15
  41:2 46:8,8 55:23
  56:8,20 59:19
  61:18 63:19 67:11
  67:12,13,18,19,24
  67:25 68:7,12 69:5
  87:22 88:4 96:9,10
  97:21 98:4 107:11
  119:12 121:11,13
  121:15,22 122:24
  123:3,3,22,24
  133:14,17,23
  136:19
jailer 3:15 31:8
  40:21 56:23 57:2
  57:12,14,19 58:5,9
  60:9,23,24 61:1
  68:2,11 69:3 94:22
  94:25 95:2,14,19
  95:24 96:16 97:10
  97:19 98:3,11 99:3
  99:13,24 100:12
  100:20 108:24
  110:2,9,17 111:3
  115:7 119:9 130:5
  130:14 132:7,15
  133:3 158:17
jailer's 61:22

Aaron Acree
August 19, 2024

**jailers** 136:15
**Janet** 33:21
**January** 66:15 67:4
  75:2 76:1,15
  139:18 140:24
  142:16 143:5,20
  150:21 152:5
  157:4,20 159:14
  161:20
**Jared** 144:22
**Jason** 38:12
**JEFFERSON** 161:2
**jewelry** 121:3
**jingling** 72:5,16,22
  73:9
**job** 21:5,9 22:6
  25:16 29:11,11,19
  29:24 32:8 39:10
  39:13
**Joe** 22:1
**Join** 133:6
**joined** 39:8 97:6
**joint** 158:19
**jot** 54:23
**judge** 61:9,10,11
**July** 147:10 149:20
  149:25
**jump** 11:14 43:5
**jumping** 39:19
**jury** 20:10
**justice** 16:4,23
  18:23 24:7 30:22
  47:10 60:19 63:1,6
  63:20

**K**

**KACo** 74:1,18,21
  74:23
**keep** 27:20 48:6
  50:15 53:17
  102:22 151:12
**KELLY** 3:19
**Kennedy** 144:23
**Kent** 145:2,5,9
**Kentucky** 1:1,24,25
  3:10,22 4:11 8:7
  8:15,18,21 9:3
  15:13 16:24 17:13

17:14,17,22,24
18:7,23,24 19:5,22
25:21 27:23 29:1,6
29:10 32:8,13,22
33:4,8,9 34:2,6
35:21,24 36:16
38:20 39:5,21,24
40:3,6 41:1,8 42:1
44:6 65:5 150:7,18
151:17 152:24
153:1 157:17
161:1
**kept** 108:14,19
**KEULER** 3:19
**keys** 72:5,17,22
  73:10
**kill** 107:14,15
  114:15 154:7,22
  155:7,17
**killed** 109:24 114:8
  136:25 137:15
**killing** 137:7,12
**kind** 11:17 29:19
  34:2 47:24 50:9,11
  50:19 53:4 54:7,11
  54:23 64:25
  106:14,16 156:5
**KLEFPF** 18:19
**knew** 23:4 108:16
  158:18,22,24
**knock** 109:4
**knocked** 108:21,23
  110:1
**know** 11:1,4 12:2
  20:4,24 21:23 23:2
  23:20 24:23 34:4
  34:14 38:13 39:1
  42:4 43:13 44:23
  46:12 49:6,24,25
  50:18 56:24 59:9
  60:12,14 61:1,4,25
  73:4,25 74:11,15
  75:2 76:4 78:7,11
  80:3 83:2 84:4,25
  85:24 86:18,20,22
  86:23 87:3,10,15
  88:24 89:25 90:6
  90:15 91:14 93:7

93:20 95:23 97:8
97:24 98:12 99:11
100:14 102:5
103:13,22 109:19
109:20 111:22
112:19 115:7
116:10,13,21
117:15,15,23
118:2,3,8,22,22,23
119:25 122:24
123:1,4 125:3
128:24 130:24
131:7 133:20
135:25 137:18,20
138:16 139:1
140:17 141:13
142:8,18,19
143:12,25 144:3
144:24 145:1,23
147:2,5,6,13 148:7
148:13 149:4,4
150:2,8,13,15
153:15 155:14,19
155:21 156:1
157:21 158:15,17
158:21,22,23
**knowing** 155:23
**knowledge** 22:17
  26:21 27:10 61:21
  65:22 66:9 78:3
  81:4 96:6 97:17
  104:3,4,13 113:19
  129:8 138:16
  140:22 141:12
  142:13 143:3,6,9
  144:6 146:4
  155:13 157:11
**knows** 140:12
**KRS** 9:7
**KY** 161:23

**L**

**L** 3:6
**label** 52:20,22 53:9
  53:16 54:4,7
**labeled** 53:21 103:3
  105:11
**Lake** 21:7,11 22:12

22:13
**LANE** 1:24
**large** 50:11 161:4
  161:22
**law** 3:8 12:25 18:20
  22:10,22 24:4
  29:22 125:10
  128:20,21 130:25
  131:4,8,10
**law-enforcement**
  16:14,19,20
**lawsuit** 138:23,23
  139:22,23 140:4
  141:10 145:8,9,20
  146:4
**lawsuits** 144:18
**lawyers** 158:6
**lay** 47:24
**layout** 47:22 49:10
  51:23
**leading** 75:5 76:8
**leads** 48:8
**learn** 19:2 77:10
**leave** 20:25 22:9
  26:9 84:9 112:14
  112:16,20 120:9
**leaving** 125:22
**led** 35:6
**left** 27:21 42:18
  48:1,3 50:17 53:3
  53:6 84:10,11,14
  85:8,17 91:20
  96:15 101:17
  102:20 119:21,22
  120:14 123:25
  128:4,12 129:3,10
  129:14,16 130:4
  130:18 131:3,10
  134:19 148:15
**leg** 111:22
**legality** 74:14
**legs** 106:20,22
**lessons** 19:12
**let's** 16:18 18:13
  21:3 34:8 43:5
  46:15 50:22 67:20
  72:15 73:7 109:19
  109:25,25 127:10

**Letting** 119:25
**level** 118:10
**Lexie** 144:15
**Lexington** 4:11 8:18
  9:3
**licenses** 16:12
**life** 12:20 114:6
**lift** 52:8
**limits** 30:5
**line** 55:1 136:21
  137:4,10,15,24
  138:5,12 154:8,9
  154:18
**lines** 79:22
**list** 19:20 20:13 33:6
  157:3
**little** 49:7 52:9,13
  52:14 64:15 101:1
  101:12 102:1,10
  102:14 142:7
**live** 15:3
**lived** 12:19 14:24
**lives** 13:19 15:9
**living** 20:14
**loaded** 111:9
**lobby** 116:20
**local** 41:2,4 68:4
**locate** 122:18
**located** 87:7,9,23
  88:1 93:22 121:6
  132:2
**locating** 90:18
**locks** 130:7
**lodged** 122:15
**long** 11:2 13:16
  14:25 16:25 17:25
  20:1 21:13 25:1,19
  27:20 32:22 78:11
  81:11 90:21 99:7
  99:11 103:19,23
  119:6 154:24
**longer** 15:9 146:25
**look** 46:9 83:4 85:5
  85:7 103:9 123:1,5
  123:7,9,10 133:10
**looked** 93:22
**looking** 50:11 51:22
  55:5 78:4 79:24

86:1 119:1 136:2
**looks** 27:19,25
  47:25 53:3,4,9
  117:18 148:11,14
**lost** 126:10 134:7,13
  134:15
**lot** 11:16 59:7,7
  86:5 111:1 143:22
**loud** 73:5
**Louisville** 1:25 3:10
  8:7,15
**lunch** 75:5 76:8,11
  76:15,22 94:1

---

## M

**ma'am** 12:9 29:3
  30:3,5,13 31:4
  33:2 34:3,9 35:7
  35:25 36:17 38:5
  38:15 39:7,25
  40:17 43:9,17
  45:21,24 48:12,15
  49:5 68:25 69:17
  70:9 71:14 72:25
  75:19 76:9,16
  78:13,19 79:12,20
  81:9,13 82:20 83:6
  83:12,24 84:7
  87:21 88:14,19
  89:22 90:24 91:2
  91:13,18 92:14,21
  95:1 96:4,25
  100:16 101:6
  103:2 104:13
  105:17 110:21
  111:5,17 114:9
  115:9,23 116:9,17
  118:16 119:5
  122:7 123:2,18
  124:7 130:22
  131:13 132:18,22
  134:23 135:21
  137:23 138:25
  139:9 142:2 144:9
  144:12,14 145:4
  145:17,22,25
  147:8 148:6
  149:21 150:23

151:25 152:18,18
  154:17 157:15
  158:1,4,14,25
**Madisonville** 33:10
  33:18 36:2
**maintain** 18:11,18
  18:19 74:2,18
**maintenance** 21:7
  21:12
**makeshift** 56:25
**making** 71:16
  101:24
**male** 157:9,9,13,16
**Malka** 3:6,8 5:12
  8:13,13 9:21 10:11
  10:13 13:1,13 14:9
  14:21 15:11 20:19
  21:2 23:14,18 28:4
  28:8,22 44:20 45:4
  49:13,20 50:22
  51:2,7,21 52:5,12
  52:16 54:9,20 55:9
  55:21 65:21 66:8
  78:20 82:14 91:9
  92:9 97:7 98:1
  100:18 118:4
  119:16 126:24
  127:5,9,23 128:7
  128:16 132:14
  133:8 134:14
  137:5,11,18 138:1
  150:16 151:1,4,14
  151:15 155:24
  156:10,23 158:5
  159:22
**MALONEY** 4:8
**man** 118:19
**mandatory** 18:11
  18:16,18,20
**marathon** 11:2
**marked** 55:18
  116:22 151:8
**marriage** 20:7,14
**married** 14:5,7
**Martin** 26:6
**matter** 20:11
**Mayfield** 32:12
**McRoy** 144:15

**mean** 26:23 35:15
  37:4 39:1 41:17,20
  42:18 43:13 50:7
  54:12 56:14 57:9
  57:25 60:14 70:19
  72:19 85:4 86:14
  87:6 93:17 104:8
  105:24 115:12
  129:15 132:13
  135:7 141:12
  143:12 145:8
  149:21
**means** 51:18
**meant** 39:20 127:4
**medication** 42:7
**medications** 12:10
**meetings** 73:13
**member** 19:17,24
  20:1,23
**members** 130:8
**memory** 26:5,16
  97:14 159:18
**menacing** 152:8,13
**mentioned** 20:25
  47:22 48:25
**message** 148:1
  149:1
**messages** 146:6
  147:22
**met** 99:18 100:20
  122:12
**Michael** 33:8,14
  35:2
**Michelle** 116:5
  117:2,9,11,14
  142:25 143:1,9,13
  144:23 145:2,5,9
  146:21 155:11
  157:8
**Michelle's** 118:6
**middle** 97:12,15
**Mike** 144:23 145:5
  145:9
**MILE** 1:24
**miles** 95:12
**mind** 55:13 94:23
  98:23 119:7
**mine** 48:23

Aaron Acree

August 19, 2024

172

**minor** 13:24
**minute** 152:20
**minutes** 36:10
  50:23 51:1 78:15
  78:22,25 79:2,10
  91:4 127:6,6,8
**misconduct** 151:18
  151:21,24
**misheard** 119:18
**missed** 120:21
**missing** 85:10 88:21
  88:25 121:2,3
  131:16,23 136:9
**misspoke** 88:7
**misunderstand**
  72:24
**mobile** 109:13
**model** 71:8 73:20
  74:2
**moment** 65:13
  104:7
**Monday** 7:5
**money** 121:2
**month** 159:10
**months** 24:13 25:3
**morning** 10:12 75:8
  76:7
**move** 36:1
**movement** 113:2
**multi-agency** 56:12

**N**
**nail** 58:7 120:12
**name** 8:5,8,24 10:13
  10:17 14:1 21:22
  21:25 30:23 105:9
  105:10 122:6,8
  138:4,7 144:7
  146:1 147:6
**named** 144:3
**names** 8:10 33:15
  36:9 116:4 144:10
**natural** 11:22
**nature** 43:16 62:20
  64:1,11,23 79:8
  83:7 126:11,15
  140:9 145:7
**near** 114:14

**nearly** 156:4
**necessitated** 35:5
**need** 10:25 11:3
  46:8 65:6 94:15
  128:8 132:7,13,15
  140:17 142:7
  153:3
**needed** 30:18 42:17
  108:16
**needs** 62:18,22
**never** 49:16 119:7
  123:3 125:16
  133:24 134:13
  141:19 157:22
**new** 56:24
**news** 138:2,14
**night** 59:6,8 66:21
**noise** 118:10
**non-compliant**
  113:1
**normal** 126:4
**normally** 38:7
**Norsworthy** 122:9
  123:10
**nos** 11:20
**Notary** 161:3,22,23
**notes** 156:5 161:13
**notice** 7:5 88:3
**notified** 76:25 77:3
**number** 147:2,4
**numerous** 33:5,12
  63:23

**O**
**object** 44:17,24
  65:19 66:7 78:16
  91:5 92:7 97:22
  98:13 100:17
  118:1 119:14
  128:6,13 132:10
  132:11 133:5
  134:3,4 137:2,8,14
  150:12 155:18
**objection** 50:10
  51:16 97:4
**objects** 83:4
**observation** 85:25
**observe** 35:9 85:1

  90:8 112:2
**observed** 94:10
**obtain** 16:7 17:16
  149:10,11
**obtained** 16:11
**obvious** 139:20
**obviously** 11:8
  54:15 107:10,11
  139:4,6
**occasion** 56:7
**occasions** 56:12
**occur** 64:17,22
  65:16
**Off-** 97:9 101:4
**off-hand** 129:13
**offer** 23:5
**offered** 19:3 22:10
  22:18,22 23:3 24:4
  29:5 152:15
**office** 3:8 39:16
  43:24 44:10,14
  45:7 47:9,12,17,22
  48:8,8,14 49:11
  50:10,16 54:3,17
  54:24 55:6,25 56:9
  57:17 58:22,24
  59:1,2,4 60:16
  62:23,25 64:19
  66:13 67:2 71:6,13
  74:7 75:10,11 92:5
  92:19,20,24 93:9
  94:13,24 95:3,9,11
  98:8,15,21 99:4,11
  99:14,16 101:5
  103:15 104:6
  110:16 112:3,4,10
  112:13,15,17,20
  113:7,12,25 114:2
  114:7 115:11,12
  115:16,18 116:11
  116:15,16 117:3
  117:11,14,20,25
  118:6,20 119:22
  132:8,16,20 133:4
  133:25 135:5,9,18
  140:2 141:18
  149:22 152:9
**officer** 17:5,6 24:12

  24:16,20 29:11
  39:2 42:15 63:19
  72:7 79:18 80:14
  80:16,16,20 81:1,4
  81:6,7,16,20 83:9
  83:10,14,15,19,19
  83:25,25 84:8,9
  86:20,21 89:9,14
  90:11 91:15 139:6
  139:11
**officer's** 46:19
**officers** 66:19 82:17
  83:11 136:14
**officers'** 63:16
**offices** 48:19,20,22
  54:4,24 60:20
  116:18 117:10
**official** 39:10
  151:18,20,23
**officially** 158:21,23
**Oh** 92:16 121:18
**okay** 10:22 11:7
  12:10,22,23 13:21
  14:9 15:3,12,16
  16:10,18 17:25
  18:4 20:5,9,19
  21:3,15 22:4,18
  24:3,18 25:1,5
  26:3,12 27:18
  28:23 29:5,9,14
  33:6,14,22 36:14
  38:1,24 39:8,22
  40:22 41:7,16 43:4
  43:18 44:3,9 45:2
  45:9 46:3 47:4,21
  49:20 50:7 51:2
  52:17,20 53:2,19
  54:2 55:3,9 56:6
  56:13 57:12 59:24
  60:6 62:21 63:10
  63:16 65:10,14
  67:7,20 68:3,10,21
  69:8 70:2,11 73:14
  73:19 74:8,21,25
  76:1,10 77:13,17
  79:1,4,9,13,13,21
  80:10,17 81:10,19
  81:23 82:21 83:9

83:13 84:8,13,17
85:14 87:17,17
88:15 89:3,11 90:8
90:21 91:14,19
92:23 93:6,8 94:7
94:18 95:2 97:1,16
98:2 99:1,13
100:11,24 101:7,9
101:13,15,20,25
102:8 103:7,16,21
105:1,19 106:11
107:6 111:2
114:18 115:3,6
116:15,21 117:7
119:6,20 120:4
121:4,24 122:10
124:2,21 125:2,21
126:24 127:24
128:17 135:22
136:20 140:7
142:3,25 143:6,14
143:25 145:6,11
145:15,23 146:9
146:15,16,17,21
147:1,9,17,19,20
148:21 149:9,14
151:16 152:3,16
152:19,22 153:21
155:25 156:3,11
157:17 158:5
159:1,13,20
**on-site** 126:18
**once** 14:10 25:5,12
47:2 48:2 80:17
108:12 109:12
110:9 111:18
121:5 128:5,9
131:11,23 132:2
136:7,14
**one's** 146:2
**ones** 26:3 33:6
139:20 144:21
155:12
**open** 8:4 130:18
**opened** 100:3
**opportunity** 135:12
135:16 153:12
**opposed** 34:24

37:24
**opposite** 54:19
108:14
**order** 54:12 74:1
97:21 102:10
132:17
**original** 154:3
**originally** 12:16
**outlined** 140:19
**outside** 43:22 69:22
81:8,14,17,20,21
82:2,6,17 83:14
85:11 91:24 109:8
109:11,11 119:1
139:20 149:16,24
150:3
**overseeing** 45:13

_____

**P**

**packed** 93:23
**packing** 86:9 93:18
**Paducah** 1:2 3:22
8:20
**page** 5:4 6:4 53:23
153:5,7 154:1
**paper** 27:3 49:9
**paraphrasing** 154:6
154:21
**Park** 21:8,12 22:12
22:13
**parked** 110:17
**parking** 110:16
111:1
**part** 46:11 55:20
70:22 85:15 99:21
99:22 115:21
149:8 150:4
151:10
**participant** 140:18
**particular** 29:25
42:25 47:12 75:2
77:5 86:6 147:10
153:25
**parties** 145:3
**party** 144:17
**passed** 99:11
**pat** 79:14,17 83:2
**patrol** 24:25 29:21

29:23 30:1 32:10
35:17 36:7 43:25
**patrolling** 43:16,19
43:23
**patrolman** 25:18
29:18 30:16 31:11
31:16 46:1
**pawned** 126:11
**pendency** 155:4
**people** 30:8,11 31:5
39:23 40:7 43:11
45:6,9,12 72:3
140:20 155:8
156:1
**Perfect** 54:21
151:14
**period** 34:17 91:10
**perpetrator** 41:24
41:25 128:4,5,9,11
129:9,21,23,25
131:1,2,9,11,11
**person** 56:8,19 58:4
58:13 59:14 61:18
62:2 69:20 77:9,10
86:23,24 87:2,12
106:7,9 108:1
122:2 125:23
138:15 148:12,13
148:15
**person's** 62:11 64:5
138:4
**personal** 23:25
**personally** 86:1
125:3,6,8
**personnel** 128:20
**persons** 8:10 80:21
**pertains** 74:15
**phone** 92:2 94:19
122:10
**phrased** 60:3
**physical** 12:11
86:19,21
**pick** 104:6 107:7
**picked** 104:11
134:11
**picks** 105:1,16
**pickup** 60:21 67:14
67:19 68:7

**picture** 5:6 50:1
124:16
**pictures** 49:18
**piece** 49:8
**place** 46:6 89:18,20
91:16 119:2,3
120:21 140:12
142:11 161:7
**placed** 46:19 47:2
102:11
**plaintiff** 1:5 3:4
8:14 10:5,14 58:24
59:11 141:10
**Plaintiff's** 55:11
101:1 151:5
**plan** 106:6,7
**planned** 112:8
**planning** 106:4,6
**plate** 77:1
**plea** 152:11,14,17
153:9 156:8
**plead** 151:23 152:7
**pleas** 152:13
**please** 8:8,9,23 9:12
10:16 12:2 15:25
53:13 74:19
**PLLC** 4:8
**pocket** 93:22
**point** 11:6 29:12
52:17 53:5 58:1
77:18 81:15 82:15
82:16 83:16,20
91:19 108:16,24
109:20 110:7
111:11 117:1
120:2,8 121:5
122:17 124:6,15
124:21 130:9
137:16 139:13
150:13
**pointed** 52:23
**police** 17:2,5,6,8,13
17:17,22 18:7,24
22:7,25 23:2,22
24:2,4,19,20 25:8
25:14,22 26:1,9,13
27:11,22,23 28:25
29:1,6,10,18 30:17

30:20 31:12,17
32:13 33:9,10
35:22,24 39:2,3
41:2,4 42:1 44:7
46:1 59:18 65:5,17
65:23,25 66:1,2,4
66:14,20 67:2,9,21
68:1,4,4 80:12,17
80:25 83:11,17,21
84:5,15 85:18
86:18 88:6,8,16
89:6,24 90:17,22
91:20,25 95:8,10
95:20,25 96:15,21
97:10,19 150:7,19
151:17 157:17
158:20
**policies** 56:25,25
61:16,22,23,24
62:1 74:2,16 159:9
159:18
**policy** 57:1,20,23,25
58:6,9,17 60:9,12
60:14 61:5,25
70:21,23,25 71:1,4
71:7,7,8,10,12,15
71:22 73:20,25
74:6
**pop** 73:4
**porch** 77:15
**port** 124:7
**position** 21:11
22:10,22 24:4,6,8
25:20 29:5,7,8
31:11 32:25 38:8,9
38:10 72:3,11
73:12 100:5
**positioning** 102:16
**possessed** 93:21
**possibility** 21:17
59:17 60:1 118:13
134:7
**possible** 37:18 49:13
**Possibly** 58:20
**post** 32:13,15,18
33:9,10,12,17,20
33:20 35:22,23
36:3,3,4,11,11,12

36:13,13 41:2
**prepared** 93:23
**presence** 161:12
**present** 8:10,25 9:5
43:7 157:4
**preserve** 126:8
134:8
**pretty** 79:6 120:2
127:1
**prevent** 12:11
**previous** 38:10
**previously** 145:17
**prior** 14:24 24:1,13
25:3,4 56:23 57:1
57:1 61:15 75:6
**Priority** 39:17
**prisoner** 56:5,10
63:18 70:19
**prisoners** 60:19
63:5 65:7,8
**probably** 15:7
**problem** 53:1
**problematic** 72:13
72:14 73:6,7,8
**procedure** 7:9 19:12
61:5 70:11 126:2,5
126:12
**procedures** 61:17
123:4
**proceed** 9:20
**PROCEEDINGS**
10:2
**proceeds** 20:11
**process** 30:16 46:4
46:9,11,13 63:8,11
77:1 122:24
**processed** 122:14,15
**produced** 146:6
147:17,20 148:7
148:17,18,19,24
149:3,12
**production** 15:8
**professional** 16:13
**professionally** 20:23
**program** 23:24 24:1
**proper** 105:9 126:2
**properly** 142:8
**property** 85:11,15

86:5 87:7 95:5
98:25 121:12
122:18,20 123:6,8
123:11 124:3,20
126:7 132:17,20
133:20 134:5,8,12
134:15 136:4,5,15
**propped** 130:5
**provide** 10:16 20:12
**provided** 153:23
**providing** 55:4
**public** 73:16 161:3
161:22
**pull** 113:9,10
140:16 146:7
**pulled** 37:1
**pulling** 107:25
108:11,14,20,20
109:13 152:20
**purpose** 17:21
133:2,7,9,10 161:7
**purposes** 7:7 20:11
31:14 54:16 74:14
**pursuant** 7:5 9:7
**push** 113:6
**pushing** 27:20
**put** 12:24 15:9
54:11 78:9 119:9
120:24 121:9
**puts** 27:2
**putting** 19:8,8
56:24

## Q

**question** 11:5,11,15
11:24 12:4 17:20
20:21 31:8 38:22
50:5 60:7 63:14
65:11 69:8 72:18
74:8 92:12 97:9
103:20 130:23
135:15,15,17
140:16 142:9
148:21 153:25
155:2 156:1
158:13 159:7
**questioning** 55:1
67:3 136:6

**questions** 12:2,12
64:14 67:18
146:13 156:25
157:2,25 158:6
159:24
**quick** 28:24 79:7,7
96:14 127:25
147:18 156:6,25
**quickly** 29:16 79:6
81:24 94:22
**quiet** 152:19
**quite** 20:6
**quote** 74:19

## R

**raise** 9:12
**Rea-** 95:12
**reached** 63:20
**read** 143:1 146:12
148:16 152:16
153:3,6,13 154:8
154:16 161:15
**reading** 154:9 155:4
**ready** 60:21 75:11
75:12
**reality** 132:6 133:3
**realized** 136:8
**really** 29:15,22
34:18 47:16 51:22
52:22 54:8 81:24
156:5
**reason** 11:3,10 12:2
37:25 83:7 107:12
**reasonable** 46:5
**reasons** 72:20
107:11 154:2
**recall** 19:15 31:21
31:23 33:15,19
34:16 36:18 41:7
41:13,18 42:24
44:12 56:22 57:5
57:21 58:8,11 59:9
59:12,16,23 60:5
67:5,7 75:4,17,18
76:13,17,21 80:2
81:2 83:10 84:10
84:11 86:1 88:14
94:6 96:17 100:22

Aaron Acree
August 19, 2024

107:4 110:8 111:6
113:20 114:16
115:24 118:24,25
119:4 122:6
123:15,18 141:1
143:16,21 144:6
144:10 147:9
150:1 152:11
154:18,23 155:3,8
157:13
**receive** 33:25 39:18
**received** 34:14
36:15
**recognize** 76:25
120:20 136:4
153:9
**recognized** 77:2
93:13,15 108:12
121:2
**recollection** 27:15
29:4 76:3 77:16
78:24 80:15 111:7
114:12 157:14,16
**reconvene** 51:3
**record** 8:5,24 9:6
10:17 11:18 13:2,5
13:9,15 14:10,13
14:17,23 15:7,10
28:11,14,18 51:10
51:14 73:16 103:7
127:12,15,19
156:12,15,19
159:24
**recorded** 161:11
**recording** 103:10
161:14
**recordings** 147:22
147:23
**recover** 132:17,19
133:10
**recovered** 87:18
132:23 134:13,20
**reduced** 161:11
**ref-** 148:23
**reference** 50:6 58:1
70:21,24 73:5 91:8
102:12 148:1,3,4
**referenced** 60:8,15

118:19 143:22
**references** 148:23
149:1
**referencing** 71:2
77:20 105:12
139:13
**referred** 55:17
151:7
**referring** 53:24
57:13
**regularly** 31:12
**related** 61:17
151:17
**relating** 61:17 62:1
**relation** 116:25
150:20,25
**relatively** 79:7
96:13
**relatives** 20:7,8,13
**relayed** 61:9,12
**released** 35:17
**remain** 30:20 81:8
**remember** 22:20
26:4 27:14 32:5
33:7,11 34:11,15
36:14 41:23 66:17
68:9,14,15,18 69:2
69:6 75:13 76:7,23
78:5 79:16 80:13
81:11 86:7 90:5,6
90:14,21 91:8,16
94:4,5 98:18,20,22
99:9,10 102:3
111:5,11 114:21
115:2 138:6
139:12 154:9
**remotely** 8:6,14,17
8:20 9:2 49:17
**removed** 85:12,16
87:11
**Repeat** 23:16
**rephrase** 12:3 27:13
64:10 72:18
**report** 44:15,18
75:16,22
**reported** 75:14,18
76:6
**reporter** 1:18 8:4,6

8:22 9:4,11,14,19
11:9 13:8 14:16
23:16 28:10,17
51:5,13 127:11,18
151:2,11 156:7,11
156:18 159:23
161:22
**Reporter's** 5:16
**reporting** 1:24 8:6
**represent** 8:9 10:14
158:16
**representing** 144:22
144:25
**request** 98:13
147:21 148:25
149:13 157:18
161:14
**requested** 60:18
99:6
**requests** 100:9
**required** 17:5
**requirement** 17:23
**residence** 80:19,22
81:7,17 84:16
85:21
**resigned** 38:13,14
**resigning** 38:10
**resisted** 113:5
**resisting** 109:13
112:22,24,25
113:1,2,2
**resistive** 107:23
**Resort** 21:8,12
22:13
**respect** 137:23
**Respectfully** 157:21
**respective** 46:22
**respond** 39:16 78:2
82:10
**responded** 79:23
**responding** 80:11
80:24 83:11
**response** 96:7,8
147:21 148:22,25
149:13
**responses** 118:18
140:15 141:4
146:7 148:20

**rest** 55:14
**restate** 103:21 138:9
**restraints** 47:18
48:25 53:25 56:1
104:16 106:15
108:9
**result** 136:23
**retrieve** 42:16
121:11 136:4
**retrieved** 124:9,11
136:15
**return** 25:13
**returned** 106:10
124:20 127:24
**revolving** 33:13
**rewrite** 103:24
**Richmond** 16:24
**Rick** 26:5
**ride** 35:8
**ride-along** 24:1
**right** 9:12 12:15
21:18 25:7,12 27:9
32:7 33:23 37:2,12
38:1 39:13 43:4,10
48:2,7,11,12,17
49:2,3,4 50:16
51:24 52:19 53:20
53:21 55:9 75:1
76:20 95:18 99:20
101:11 102:3,4,24
102:25 103:3
104:23 105:4,9,19
107:20 108:10
109:5 117:8 120:8
124:9 128:2
130:16 131:15
132:6 134:18
143:24 147:1
148:16 156:3
**ring** 121:6 122:21
124:9,10,16,18,19
131:16,23 132:2
134:1 135:10,19
135:22,25 136:3,9
136:13 144:5
**road** 70:13 121:23
122:1
**robber** 125:10

Aaron Acree
August 19, 2024

**robbery** 126:5
**robbing** 125:5
**rode** 24:12
**role** 17:15,20 21:13
  22:9 23:3,6 24:22
  29:1,15 30:16
  31:16 32:7 33:4
  34:2,6 36:6,15
  38:2 39:21,24 40:2
  40:6 43:5,6,11,15
  44:2 45:20,22,25
  46:25 72:12 73:11
  73:22
**room** 47:19 48:6,9
  48:16 50:15 53:16
  54:3,18,24 56:2
  90:2,4,20 101:20
  102:21 103:4,11
  104:6 105:5,6,9,10
  105:12,14,18,20
  109:8 110:6
  117:20,24 118:7
  129:18 130:9
**rough** 51:19
**roughly** 13:18 15:2
  57:7,10,11 58:10
  58:12,16 60:10
  79:12
**Rules** 7:8
**rummaged** 85:5
**running** 39:15

---

**S**

**s/** 161:21
**safety** 79:18 80:20
**sally** 124:7
**Sandbrink** 144:24
  145:5,9
**saw** 73:1 77:9 80:5
  93:25 94:1 99:24
  107:1 115:21
  124:18 141:25
  142:19
**saying** 37:17 39:9
  59:25 68:22 107:6
  107:8 113:15
  114:19,21,22,25
  115:2,14 148:17

**says** 141:11 142:12
  142:17 143:3
  147:6 148:9
  152:24 154:1
  157:8
**sblankenship@k...**
  3:24
**scale** 51:18
**scan** 55:14
**scenario** 125:12
  126:1
**scenarios** 126:14,21
**scene** 47:6 80:11
  83:11 125:23
**schedule** 43:21
  143:19
**scheduled** 43:22
**scheduling** 140:11
**school** 15:17,18,23
  21:4,6
**Scott** 10:18 35:21
  122:9
**scrapes** 112:4
**scratch** 88:9 101:15
**screen** 27:18 146:10
  152:21,22
**screenshots** 148:12
**scroll** 146:11 149:5
  153:2
**search** 64:5 79:14
  79:17 83:3,8 86:19
  86:21,22,24 87:2
  90:16,19 105:22
  106:5 112:25
  113:2,3,4 125:6,8
  125:24
**searched** 125:9
**seasonal** 21:11
**seat** 86:9
**second** 52:24 93:2,4
  122:2 147:18
  153:5,7
**secure** 85:20
**see** 28:6 31:15,19,25
  32:2,3 41:11 42:1
  42:19 52:7,14 53:4
  53:20 74:25 90:3
  99:13,15 100:9,10

  101:7,8 102:3
  114:14 117:19
  121:24 123:21
  124:5 142:23
  145:6
**seeing** 20:5 76:23
  87:14 90:5 123:15
  123:18 154:18
**seen** 56:25 66:25
  125:13 129:24
  146:18
**selection** 20:11
**send** 55:14 77:3
  153:20
**separate** 12:24 84:2
  84:3
**September** 159:12
  161:19
**Sergeant** 35:2
**served** 133:2
**service** 30:19,24
  40:21,24 43:25
  46:24 47:5
**set** 43:20,21,21 44:1
  104:25
**shackled** 106:20,22
**shackles** 106:18,19
  111:25
**share** 146:10 151:1
  152:21
**sharing** 152:22
**she'd** 121:3
**sher-** 119:7 141:7
**sheriff** 8:23 9:2,11
  10:12 13:14 14:22
  15:17 19:5 28:23
  32:25 38:2,10,11
  38:18 39:6,12,14
  43:5,6,11,15 44:2
  44:14 45:20 46:25
  59:12,13 67:8 70:6
  70:7 71:22 73:21
  120:14 128:2
  138:18,18 140:23
  142:14 156:24
  157:24 158:12
**sheriff's** 18:25 19:5
  20:23 39:9 44:10

  44:14 45:6 47:9,12
  47:17,22 49:11
  50:10 55:25 56:9
  57:16 58:2,4,14,22
  58:24 59:1,2,3,14
  62:23,24 64:19
  65:1,2,3,18 66:5
  66:13 67:2,10,23
  68:6,12 69:4 71:6
  98:15 101:4 104:5
  112:3,10 115:12
  115:18,25 118:19
  121:7 132:16,20
  133:22,25 140:24
  141:18 142:15
  143:4 146:3,22
  152:9 157:4
  158:19
**sheriffs** 70:3,5 71:15
  71:18
**shift** 59:6,8 76:7
  120:10,18 121:20
  121:21
**shifted** 127:1
**shifts** 66:24
**shoes** 86:8
**shoots** 104:22,23
**short** 28:6
**shorthand** 161:11
**shots** 72:6
**show** 51:18 52:1,6
  52:17 101:3
  104:20 107:25
  149:16,24 150:4
**showed** 80:14,18
  124:16 150:9
**showing** 157:19
**Shrewsbury** 144:22
  153:23
**sic** 144:24
**side** 47:15,23,24
  48:3 49:12 52:18
  52:21,22 53:6
  54:19 99:17,18,24
  99:25 100:21
  101:9,10,16
  102:19 110:5
  111:8 116:25

**SIGLER** 3:19
**sign** 161:15
**signature** 153:16
  155:1 161:18
**signed** 153:10,18
  154:11,13,14,15
  154:25
**signing** 152:11
**simulates** 72:6 73:3
**sir** 9:18 45:17 89:5
  106:17 159:12,16
  159:19
**sit** 55:25
**site** 51:19
**situation** 31:15,22
  35:4 41:23 42:13
  42:24 43:1 62:7
  67:16 69:14
  108:13 128:25
  129:7,11,13,19,22
  129:24 130:24
  131:14
**situations** 42:11
  131:6,7
**SIX** 1:24
**size** 44:2
**sketch** 49:8,17,22
  50:19 51:19 52:7
  52:18 101:2 103:4
  116:23
**small** 102:5
**Smith** 1:5 8:14 10:5
  10:14 33:18 58:25
  66:13 67:3,5 68:19
  68:21 69:1,23
  77:11 79:14 80:4,6
  81:8,10,20,25
  83:15 84:5,14
  86:17 89:20,23
  90:16 93:3 94:2,16
  94:23 95:3,15,19
  95:24 96:3,11
  97:11,18,20 98:8
  98:15,21 99:4
  100:4 102:19
  103:8 106:15
  110:7 111:3,12,21
  112:9 113:6

115:11,18,22
116:12 118:11
119:10 122:14
123:15 124:23
129:3,8,22 130:19
132:3,7,16 133:3
133:24 135:8,17
139:2,18 140:23
141:8,23 142:15
143:4 147:23
148:2,24 149:2,18
150:21,25 152:5,9
153:24 154:6,20
155:9,16 157:5,20
158:18
**Smith's** 68:16
  140:19
**smoothly** 10:24
**social** 20:21
**socially** 20:22
**solemnly** 9:15
**somebody** 30:17
  42:7 44:5 46:5
  55:23 64:17 65:16
  123:7 124:3 125:5
  125:19,22 126:5
  136:25 137:7,7,13
**somebody's** 122:23
**son** 107:14,14
**sorry** 14:10 21:9
  24:19 28:9 38:22
  40:5 41:4 43:4
  44:19,22 48:11
  64:12 68:17 70:23
  71:11 74:22 78:18
  82:13 87:1 88:6
  92:16,22 103:19
  109:3 112:23
  119:17 121:18
  143:23 144:2,12
  147:1 152:19,21
**sort** 16:7,12 22:14
  33:25 50:3 67:3
  79:13 83:1,3 87:24
  105:21 129:19
  138:19
**sounds** 21:17 51:7
  79:4 127:9 142:18

**South** 3:9,20
**space** 50:16
**speak** 66:10,11,17
  66:21 70:5 73:24
**speaking** 142:6
**specific** 19:14,15
  31:21 32:1,5 34:11
  37:18 38:14 41:13
  41:19 57:5 59:9
  60:22 66:22 67:6
  69:6 70:1,6 76:4
  87:4,16 109:16
  110:8 112:11
  114:5 115:20
  125:11 126:1,12
  129:11,13,21
  139:13,14 142:7
  143:21
**specifically** 24:24
  34:13 43:3 59:23
  60:5,15 63:11 68:8
  68:14 73:24 74:1
  74:13,15,20 78:7
  81:1 82:3 89:12,13
  93:20 98:12,18,23
  103:12 112:20
  114:16,17,23
  116:13,22 117:15
  119:21 123:9
  128:25 136:2
  139:9,19 141:11
  143:16 144:25
  148:3 150:1
  154:14
**specifics** 56:16
  91:17 154:23
**speed** 54:14
**spell** 21:22
**spoke** 89:9,14 122:2
**spoken** 91:15 139:1
  139:23 140:1,7
**squad** 47:19 48:9,16
  54:3,18,24 56:2
  105:5,6,10,14
**SS** 161:1
**Stacey** 3:17 8:19
  158:15
**staff** 130:8

**Stan** 61:11
**stand** 100:5,24
  101:3 105:20
**standard** 75:15,21
**standards** 74:18
**standing** 109:6
  113:11 118:5
**start** 11:12 12:15
  16:19 21:15 34:8
  37:10 40:5 46:15
  67:20 72:5,14 73:7
  75:7 88:9
**started** 22:7 24:10
  97:20 151:11
**starts** 103:24
**state** 8:8,9,23 17:13
  17:17,22,24 18:7
  18:24 21:7,12
  22:13 25:22 27:23
  29:1,6,10 32:8,13
  32:23 33:4,9,10
  34:2,6 35:21,24
  36:16 38:20 39:5
  39:21,24 40:3,6
  41:1,8 42:1 44:6
  45:22 65:5 66:20
  150:7,18 151:17
  157:17 161:1,4,22
**state-wide** 71:6
**stated** 10:13 24:3
  58:1 70:2 131:14
  141:17 145:4,17
  150:18 161:8,16
**statement** 74:5
  97:12 114:23
  154:5,20 155:16
**STATES** 1:1
**stating** 129:20
**station** 41:4 58:3,4
  59:12,13 65:1,18
  66:5 67:11,23 68:6
  68:12 69:4 115:12
  115:25 120:14
**stayed** 101:21 111:8
**steps** 101:11,23
**Steve** 8:5
**Steven** 1:18 161:3
  161:21,21

Aaron Acree
August 19, 2024

178

**Stipulations** 5:10 7:2
**stolen** 87:7,19 106:9 126:10
**stop** 34:24 35:9 36:20 151:1
**stopped** 37:25
**Street** 3:9,20 4:9 19:21 20:2
**stress** 72:8
**study** 16:3
**stuff** 27:19
**STURGILL** 4:8
**subpoena** 153:20
**substance** 87:11
**successful** 108:14 135:21
**suitcases** 86:8,10 93:19 121:1
**Suite** 3:21 4:10
**superior** 36:16
**supervise** 45:7
**supervision** 33:13
**supervisor** 21:19 25:25 33:3 45:3 48:18,20 54:3,24
**supervisor's** 48:8
**supervisors** 26:2 33:5,16 36:9,11 44:11 45:11 54:18
**supposed** 73:15
**sure** 12:5 28:8 35:13 52:10 53:1 59:21 63:13 80:20 83:6 101:24 116:24 121:6 157:1
**surprised** 86:14
**suspect** 126:13
**swear** 9:6,15
**sworn** 10:6 161:9
**system** 104:9 110:22

**T**

**T** 4:6
**take** 16:25 20:9 23:1 24:5 28:5 30:7 47:7,8,11 49:18 50:1,9,20,23 55:24

57:9 69:11,19 88:17 91:19 126:10 127:3,6 134:22 145:15 153:3 156:4
**taken** 7:5,6 22:15 26:15 30:18 31:18 31:25 42:2,14,19 43:1 46:7 62:25 66:14 73:11 83:5 86:18 87:22 88:4,8 88:11,15 89:20 91:16 123:6 125:21 132:3 161:5
**takes** 48:14
**talk** 11:19 18:13 21:3 44:23 46:3 64:1 75:1 143:12
**talked** 42:12 93:8 104:15 143:14,19 143:22
**talking** 28:24 39:20 62:23 64:15 69:10 82:12 90:14 142:10 147:13 159:9
**Tanna** 144:11
**tax** 39:18
**Taylor** 1:18,24 8:5 161:3,21,21
**technology** 161:6
**telephone** 3:11,23 4:12 27:5
**tell** 11:17 15:25 18:16 34:22 37:10 44:10 52:22 63:8 75:4 77:17 84:23 85:14 89:15 128:17 138:22 140:9 143:25 144:20 161:9
**telling** 98:20 109:24
**ten** 104:1,3 110:20 127:6,6,7
**termination** 145:10
**Terroristic** 154:4
**testified** 58:15

66:19 82:5 113:16 113:21 119:8
**testify** 141:14
**testimony** 9:15 12:13 54:16 69:16 72:24 74:10 114:10 129:1
**text** 146:6,18 147:22 148:1,25
**texts** 6:8 148:13,15
**Thank** 9:4,19,21 20:19 53:19 55:3 101:8 104:21 158:7 159:1
**thing** 11:13 46:16 52:14 60:13 114:11 137:19,22 146:11 153:13
**things** 10:23 54:14 85:5 93:12,14 94:15 120:20,23 120:24 149:22
**think** 20:21 22:4 49:15 50:23 57:8 57:10,25 60:14 69:15,18,25 70:2 72:8 79:1,4,9 82:13 91:11 101:14 103:22 104:7 105:8 106:25 115:13 118:7,17 119:7 125:2,11,14 126:14 128:23 129:6,11,12 131:6 153:10,20 156:3
**thinks** 126:6
**third** 93:4 154:4
**Thomas** 80:16 81:5 81:6,16 83:9,14,19 83:25 84:9 86:20 89:10,14 90:11 91:15 116:5 139:6 142:25 143:1,10 143:13 146:21 155:11 157:8
**thorough** 134:25
**thoroughly** 155:22

**thought** 44:22
**thread** 146:18 149:8
**threaten** 114:1,3,6
**Threatening** 154:4
**three** 57:21 147:24 149:2
**three-page** 152:23
**thrown** 85:6
**time** 10:25 15:22 20:4,10 22:12 23:7 23:21,25 25:17 26:1,8,13 31:24 41:7 44:9 50:24 56:18,22 57:5,16 57:24 58:8 60:4 67:8 70:17 75:13 75:15,17,21,22 76:8,13,17 77:6 80:5 82:8,18 83:4 84:9,11,21 85:10 88:1,8,13,20 89:2 89:23 90:14 91:10 93:2,9 94:3 96:23 99:7,19 101:14 106:14 108:3,16 108:24 109:15,21 112:9,12 113:7,9 113:23 114:1,7 115:10,15 116:5 116:11 117:16 118:20 120:3,22 121:5,10 122:4,17 124:8 125:3,4,14 130:10 133:21 134:9 136:1,3 139:13,14 143:23 150:14 153:3 155:4 157:5 158:4 158:7,23,24 161:7
**times** 11:16 59:5,8 63:22,23 70:18
**title** 21:10 25:16 29:11 39:11
**today** 8:6,11 10:24 11:3 12:5,12 20:10 157:25
**told** 15:12 67:9,22 68:5,11 69:3 90:6

90:11 93:20 94:14
96:1 109:23
**top** 33:23 147:6
148:9 152:24
**topics** 19:1
**Total** 45:12
**touching** 108:2,6
**town** 30:4
**traffic** 34:24 35:9
36:20
**training** 16:13,15
16:19,20,24 17:4,7
17:17,25 18:5,8,10
18:14,20 19:8,12
19:16 22:7 24:7,10
24:11 25:2,4,6,9
25:13 29:10 35:13
35:14,16,19 36:5,8
38:17,23 39:2,4,6
**trainings** 19:10,14
**trans-** 30:25
**transcript** 161:13
**transition** 28:25
**transport** 30:11,19
30:24 31:1,13 40:1
40:7,13,20,24
46:24 47:5 55:24
56:8,20 59:19
61:18 62:4 63:19
**transportation**
19:14,15 57:3
**transported** 31:6
46:14,21 63:5
83:17 84:5 119:11
157:6
**transporting** 19:13
97:3
**transports** 46:24
**trash** 108:21,23
109:4 110:1
**travel** 84:1
**trial** 20:12
**trick** 153:11
**tried** 107:22 122:3
**Trigg** 3:15,15 9:1
12:17,20 15:18
20:5,14 30:25 31:2
31:13 32:21 40:4,4

46:23 57:14,19
60:9 65:6,17,23,25
138:17,18 140:24
142:15 146:3
152:9,24
**triggered** 72:4
**trooper** 17:24 29:13
32:8,23 33:4 34:2
34:6 35:13,15,16
35:20,21 36:5,16
38:20 39:5,21,24
40:3,7 41:9 44:6
45:23
**troopers** 66:21
**true** 76:14 161:13
**truth** 9:16,17,17
161:9,9,10
**truthful** 12:13
**try** 11:11,13,19
37:13,14,17
**trying** 17:16 37:17
49:15 58:7 60:4
103:23 112:16,20
120:11,12 134:7
137:21 139:15
143:8 149:22
153:11 156:2
**Tuesday** 76:2
**tugging** 108:19
113:12,12
**turn** 72:8 86:24
87:2,5
**turned** 63:19
102:20 123:24
**TURNER** 4:8
**Twenty-two** 18:1,3
**two** 48:22 54:3
57:20 67:17 75:3
84:2,3 116:3 130:8
144:10 152:1,7,12
154:2,4,19 155:3,5
155:8
**Tyler** 80:16 81:4
89:10,14 139:6
**type** 64:2 124:22
140:13
**typical** 29:20,22
**typically** 27:1 31:5

31:8 72:2 73:12
75:22

―――――
**U**

**uh-huh** 11:21 48:15
100:1 103:2
**uncommon** 42:9
66:23 125:12
126:3
**underlined** 53:22
**underlying** 138:23
**underneath** 30:21
**understand** 12:1,6
17:19 37:19,20
38:21 60:2 102:18
115:13
**understanding**
12:12 74:5 96:12
97:1
**understood** 157:24
**undertaken** 18:9
**undress** 106:5
**unique** 128:25
131:14
**UNITED** 1:1
**units** 77:4,6,19
78:12 79:5 80:1,10
80:18 82:1,9
**unknown** 76:23
**unlawful** 145:10
**unsuccessful** 120:1
**uphold** 128:21
**upsetting** 86:11,12
**use** 40:3 65:7
159:14
**usually** 12:24 46:17
47:6 107:12
**utensil** 52:25

―――――
**V**

**V** 1:8
**V/st** 161:25
**vacancy** 38:6
159:10
**varied** 40:9
**varies** 18:22 19:6,7
75:25 76:12
**various** 26:2
**vary** 126:14

**vehicle** 76:24 77:1
82:3 85:12,16,23
85:25 86:2 92:3,11
92:17 111:4,6,10
111:14,14,16,19
119:10
**verbal** 11:25 27:4
61:6
**verbally** 11:20
61:13,14
**verify** 123:12
**versus** 62:25 145:20
153:1
**victim** 31:19 32:1,4
41:11,12,14,22
42:1,2,3,9,15,20
43:2 69:12,21
125:5,9,16,23,24
126:6,13,18,19
128:3,11,19
129:10,21,23,25
130:25 131:9
**video** 28:6 147:22
**videoconference** 3:7
3:18 4:7 8:7
**Vine** 4:9
**violence** 42:5,12
69:13
**violent** 62:13
**Virginia** 19:21 20:2
**visual** 83:1,3,8
100:6 106:8
107:22 112:7,25
**voices** 117:24

―――――
**W**

**waist** 112:1
**wait** 61:20 67:13,19
**waited** 59:19
**waiting** 40:23 47:4
55:23 56:8,19
81:25 82:9 97:2
**walk** 29:19 46:9,16
47:21 49:3,11 53:3
53:6 75:8 76:20
102:9,14 111:2
**walked** 83:14
102:19,20 110:13

130:8
**walking** 47:23 77:9
   80:6 99:23 101:22
   108:25 111:3,6
**wall** 54:16 102:5
   117:19
**want** 12:5 20:9,20
   20:24 28:5 29:14
   29:15 36:24 44:23
   47:19 49:21 50:1,9
   50:21 51:24 61:25
   63:13 75:1,3 81:23
   95:2 103:21
   107:13,14 108:5
   115:4 126:8 127:6
   129:15 143:2
   146:7 148:10
   151:2,12 153:4,6
   153:10 156:8
**wanted** 37:19 98:14
   98:21 100:6
**wanting** 107:25
**wants** 49:22
**warrant** 63:17 65:1
**warranted** 30:10
   39:25 46:18 62:16
**warrants** 43:12
**wasn't** 56:20 59:14
   83:6 89:1 90:20
   93:4 97:24 99:10
   112:18 133:20
   134:15 142:24
**watch** 93:21
**way** 31:19 32:3
   34:24,25 36:19,23
   36:25 37:2,3,5,8
   37:12,14,14,20,21
   41:12 49:16,18
   67:11,12,13,18,19
   67:23,25 68:6,12
   69:4 85:7 96:6,9
   96:10 98:4 104:24
   108:15 111:13,15
   113:12 130:15
   134:6 148:4
**ways** 37:16 57:2
**we'll** 10:22 11:5
   27:20 28:10 50:23

51:3 52:7 54:25
   61:4 146:13
**we're** 11:5 49:6
   53:23 62:23 128:1
   140:13
**we've** 11:8 14:22
   63:20 127:2
   153:19
**weapon** 136:21
**weapons** 79:18,19
**wear** 45:19 72:10,20
**wearing** 72:15 78:6
   106:15,23,24
   107:5
**wears** 115:7
**weeks** 17:2 18:1
   25:13 27:24
**went** 24:6 25:21
   27:22 36:4,6,7
   76:14,14,22 81:2,6
   81:14,19 84:16
   85:20,23 88:16
   89:6 99:21 100:13
   100:14 101:16
   110:5 119:22
   120:14 126:25
   131:17,24 134:18
   134:24
**weren't** 25:7 45:24
   130:2,4 133:11
   149:23
**West** 4:9
**WESTERN** 1:1
**When's** 56:18
**wife** 13:21,23 15:5
   42:6,13 80:7 84:22
   91:23 92:11,17
   93:1 94:12,15,20
   95:6 106:13
   119:22,23 120:18
   121:2 122:12,22
   135:1 139:3,25
**wife's** 14:1 124:19
**Wiggins** 24:17,18
   25:2 26:6 80:16
   81:8,20 83:10,15
   83:20 84:1,8 86:21
   139:7

**Williams** 33:8,14
   35:3
**Winters** 33:9,15
**wish** 158:3
**witness** 9:1,6,13,18
   23:11,15 28:2
   44:18 51:25
   115:20 140:18
   141:15,16 160:3
   161:8,12,15,18
**witnessed** 115:17,19
**witnesses** 50:8
   154:5,19 155:3,6
   155:15
**woke** 75:8
**wondering** 49:8
**word** 53:22
**words** 109:24
**work** 25:19 32:22
   36:5 45:6 59:7
   66:6,18,19 70:7
   116:8 121:22
   123:2
**worked** 31:12 44:13
   123:3
**working** 25:8 27:11
   28:6 29:17 41:8,10
   44:7 59:5 66:25
   76:11 124:17
**wouldn't** 68:1 78:24
   106:4 117:19
   125:12 126:3
   134:2
**wounded** 137:3,9
   137:24 138:5,11
   138:15
**wounding** 137:6
**wrap** 129:16
**wrapped** 156:6
**Wright** 4:6 5:14
   8:16,16 12:23 15:6
   20:17,20 23:9,13
   27:25 28:5,9 44:17
   44:25 49:14,15
   50:7,25 51:3,15,24
   52:1,11,15 54:6,14
   65:19 66:7 78:16
   82:12 91:5 92:7

97:6,22 118:1
   119:14 126:23,25
   127:7 128:6
   132:10 133:6
   134:3 137:2,8,14
   150:12 155:18,20
   159:6,20
**write** 103:17 117:9
   117:10,13
**write-ups** 22:15
   34:1
**writes** 110:19
**writing** 11:9 52:24
   61:13,17 71:10,12
**written** 61:5
**wrong** 37:8,12,15
   118:18
**wrote** 53:21

## X

**XXX** 147:2
**XXX-XXXX** 147:3

## Y

**yard** 77:14
**yeah** 13:1 23:19
   27:17 28:4 30:14
   39:1 41:5,17,20
   44:21 48:18 50:7
   50:22,25 51:25
   52:6,13 53:12
   72:19 75:7 82:15
   87:6 88:25 89:13
   91:7 96:25 98:17
   99:2 100:1 103:13
   103:22 105:13
   106:17 111:9
   115:21 117:5,13
   119:3 120:16
   123:9 127:5
   138:10 139:5
   151:4
**year** 13:18 14:5,25
   15:19 17:10 18:20
   19:3 57:6,8,10,11
   58:10,12,16 60:10
   159:11
**years** 15:2 16:5
   21:14 22:5 57:20

57:21,21 75:3
130:25 147:24
149:3
**yell** 113:22
**yelling** 107:17
**yeses** 11:20
**young** 20:3
**your-all's** 58:5

## Z

**Zoom** 3:7,18 4:7 7:5
8:7

## 0

## 1

**1** 32:13,15,18 33:9
33:20 35:22,23
36:11,12,13
**10** 5:12
**100** 3:20
**11** 66:15 67:4 75:2
139:18 143:5,20
**11th** 76:2,15 140:25
142:16 150:22
152:5 157:5,20
**1387** 3:9
**15** 78:15,22,25
127:6,7,10
**1500** 4:10
**151** 6:7
**158** 5:13
**159** 5:14
**161** 5:16
**17** 45:18
**18** 25:13
**18-week** 17:4,8
**19** 1:16 2:16 7:6

## 2

**2** 5:6 33:10 36:3,4
36:12,13 151:6
154:1
**20** 45:18
**2008** 15:20 21:16,17
**2009** 16:6
**2010** 16:6 22:6,8
24:8,9
**2011** 16:21 22:6

24:6,10,14 27:22
**2015** 14:6 17:11
18:5 25:23 26:9
33:1,16
**2020** 32:24 33:1,16
38:3 39:10 43:7
159:12
**2022** 61:16 62:23
66:15 67:4 75:2
76:2,15 139:18
140:25 142:16
147:11 149:20,25
150:4,22 152:5
157:5,20 159:15
**2023** 58:19
**2024** 1:16 2:16 7:6
161:19
**2026** 161:20
**212-5888** 3:11
**22** 18:2 27:23 143:5
143:20
**22-M-246** 152:25
**23** 18:3 27:23
**235** 15:12
**24** 66:18
**255-8581** 4:12
**270** 3:23
**2901** 1:24

## 3

**3** 5:7
**30** 91:3
**333** 4:9

## 4

**40** 18:19,19
**400** 3:21
**40208** 3:10
**40220** 1:25
**40507** 4:11
**42001** 3:22
**423.455(6)** 9:7
**42425** 161:23
**488-8888** 3:23
**4th** 161:18

## 5

**5** 5:8 161:20
**5:22-cv-00174-BJB**

1:3
**502** 3:11
**55** 6:6

## 6

**6** 5:9

## 7

**7** 5:10
**7th** 147:10 149:20

## 8

**8** 5:11
**859** 4:12