UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

CRYSTAL DAWN SMITH                                                    PLAINTIFF

v.                                                      No. 5:22-cv-174-BJB

AARON ACREE, JAMES HUGHES &                              DEFENDANTS
TRIGG COUNTY FISCAL COURT

\* \* \* \* \*

OPINION & ORDER GRANTING SUMMARY JUDGMENT IN PART

This lawsuit concerns a bizarre and troubling set of allegations by an arrestee, Crystal Smith, against Trigg County Sheriff Aaron Acree, Trigg County Jailer James Hughes, and the Trigg Fiscal Court. Acree returned home for lunch one afternoon in January 2022 to find Smith leaving his house, so he arrested her and called for backup. After her arrest, the Jailer drove her to the Sheriff's Office, where Sheriff Acree allegedly pushed and threatened her. Acree, for his part, says she fell. But both sides agree that this is a genuine factual dispute that a jury must resolve, so summary judgment is inappropriate on the assault, battery, and Fourth Amendment excessive-force claims against Acree.

Based on the record evidence developed in discovery, however, no jury could reasonably conclude that Trigg County was responsible for any physical force used by Sheriff Acree against Smith. So her claims against the municipality fail. As do her claims that Hughes falsely imprisoned her, failed to intervene, or discriminated against her based on her sex. In all, the Court grants summary judgment to the Fiscal Court and Jailer Hughes, grants Acree summary judgment in part (for the Equal Protection claim asserted against him), and denies summary judgment with respect to the remaining three claims against Acree.

SUMMARY-JUDGMENT RECORD

According to undisputed deposition testimony cited in the summary-judgment briefing, Sheriff Acree found Smith leaving his home with several of his family's belongings. He detained her and called for backup from the Cadiz Police Department. *See* Smith Deposition (DN 58-1) at 62–75. Cadiz Police Officer Duncan Wiggins took Smith to the Cadiz police station, where he booked her. Later that afternoon, Jailer Hughes arrived to drive her to the Christian County Detention Center. (Trigg County does not have its own detention facility. *See* Hughes Deposition (DN 58-3) at 18.) As Hughes loaded Smith into his cruiser, Acree (who had also come to the police station)

1

asked Hughes to bring Smith by the Trigg Sheriff's Office on the way to Christian County. *Id.* at 29–30.

Hughes agreed. When he arrived at the Sheriff's Office, he escorted Smith—who was shackled and cuffed—to the side entrance. Acree, who was waiting, told Hughes to wait outside and took Smith inside.

Smith and Acree dispute what happened next. She says that Acree grabbed her, threatened to kill her, and shoved her to the ground. Smith Deposition at 103–04. Acree says that Smith began crying and fell after he "grab[bed]" her "to get her to leave the office." Acree Deposition (DN 58-2) at 108–12. Acree eventually returned Smith to Hughes, who drove her to the Christian County jail.

Smith ultimately pled guilty to burglary and drug charges, and filed this civil suit against Acree, Hughes, and the County. She raises three claims under 42 U.S.C. § 1983. First, that both Hughes and Acree violated her Fourth Amendment rights to be free from unreasonable seizure and excessive force. Second, that both Hughes and Acree violated her Fourteenth Amendment right to equal protection. And third, that the Trigg County Fiscal Court is liable for Acree's constitutional violations under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

Smith also raises four state-law tort claims against the individual defendants: civil assault and civil battery (against Acree only), false imprisonment (against Hughes only), and intentional infliction of emotional distress (against both defendants). The Court has supplemental jurisdiction to consider these claims under 28 U.S.C. § 1367.

### ANALYSIS

All three Defendants moved for summary judgment, albeit Acree only in part. They are "entitled to [summary] judgment as a matter of law" if "there is no genuine dispute as to any material fact," such that no jury could reasonably find for Smith on a particular claim. FED. R. CIV. P. 56(a).

### A. Acree

Smith's claims against Acree turn almost entirely on disputed factual questions: what happened between the two of them inside the Trigg County Sheriff's Office?

The U.S. Constitution's Fourth Amendment guarantees the right to be free from unreasonable seizure, including the use of excessive force against an arrestee or pretrial detainee. *See Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015). And Kentucky tort law entitles plaintiffs to damages if they establish liability for battery or assault, claims which Smith likewise advances based on what she describes as excessive force (pushing) as well as (shouted) threats while in Acree's custody. Second

Amended Complaint (DN 29) ¶¶ 66–78; *Vitale v. Henchey*, 24 S.W.3d 651, 659 (Ky. 2000) (battery); *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001) (assault). As clarified during the hearing, the parties disagree about whether Acree shoved her or instead grabbed her while she fell. Because her excessive-force and battery claims against Acree turn on disputed evidence of physical contact, the parties agreed during the hearing that summary judgment is inappropriate at this stage on those two claims. The parties also dispute what if any threats Acree might have shouted—and whether those threats (along with Acree's other conduct in the office) put her in reasonable fear of further unwanted touching. So the Court denies Acree's motion for summary judgment on the assault claim as well.

Smith next argues that Acree (as well as Hughes, as discussed below) intentionally discriminated against her based on her sex. Response to Motion for Summary Judgment (DN 58) at 24–26. Her theory is that Acree "knew or should have known that requesting Defendant Hughes to violate policy and procedure and deliver under the cloak of darkness, Ms. Smith to him, fully restrained in order to physically batter her, and threaten her life was in whole or in parts as a result of her gender and or to violate her rights against self incrimination." Second Amended Complaint ¶ 63.[1]

The Fourteenth Amendment's Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." To prevail on an equal-protection claim, a plaintiff must demonstrate that a state action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Smith has pointed to no facts in the record (including when pressed during the hearing) that would allow a reasonable jury to conclude her sex motivated Acree's conduct, so he is entitled to summary judgment on this claim.

### B. Hughes

1. *Equal Protection.* Smith likewise advances an equal-protection claim against Hughes. Were she a man, her response insists, Hughes wouldn't have delivered her up to Acree at the Sheriff's Office. Response at 25. But once again, she has pointed to nothing in the record that would allow a jury to conclude that Hughes intentionally treated her worse because she was a woman. The most Smith can say is that Hughes's conduct was "anomalous," because he could not point to any male

---

[1] Smith's response sometimes assumes she also asserted a Fifth Amendment claim. *See* Response to MSJ at 44–45. But she did not. The passage quoted above, which appears (at ¶ 63) in her discussion of the Fourteenth Amendment count, is the only mention of self-incrimination in her Second Amended Complaint. And as discussed during the summary-judgment hearing, she has not alleged any incriminating statements elicited by Acree. So the claim would fail on summary judgment even assuming it were properly pled.

detainee who received similar treatment. *Id.* This, according to Smith, raises "an inference of differential treatment." *Id.* But a plaintiff bears the burden to show the disparate treatment underlying an equal-protection claim. *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). Recall that Hughes didn't arrive at the police station until well after the incident, apparently without much if any knowledge of the strange encounter at Acree's house. Hughes Dep. at 26–28. Absent any other facts suggesting that sex motivated Hughes, the fact that a one-off[2] occurrence happened to a woman instead of a man wouldn't allow a jury to reasonably find Hughes liable on this basis.

2. *Fourth Amendment.* As to the Fourth Amendment, Smith contends that when Hughes took her to Acree's office, he caused her to suffer excessive force at the hands of Acree in violation of the Fourth Amendment. Although Smith sometimes casts this claim as an unreasonable seizure, she doesn't challenge the lawfulness or appropriateness of her initial arrest. Rather, Smith contends that the detention became unconstitutional when Hughes made it likely that Acree would use excessive force. *See, e.g., Burchett v. Kiefer*, 310 F.3d 937, 944–45 (6th Cir. 2002) (analyzing allegations of inappropriate treatment after lawful arrest under rubric of excessive force); *Miller v. Sanilac County*, 606 F.3d 240, 251–54 (6th Cir. 2010) (same). But Section 1983 does not permit defendants to be held liable for the conduct of others; they may be liable only when their failure to intervene or prevent someone else's excessive force itself causes a constitutional violation. *See Chaney-Snell v. Young*, 98 F.4th 699, 721 (6th Cir. 2024).[3]

To demonstrate that Hughes caused the violation of her Fourth Amendment rights, Smith must show that Hughes "observed or had reason to know that excessive force would be or was being used" and that he "had both the opportunity and the means to prevent the harm from occurring." *Burley v. Gagacki*, 729 F.3d 610, 620 (6th Cir. 2013) (quotation omitted). She maintains that his liability "rests on his affirmative act of escorting Smith [to the Sheriff's Office] in deliberate indifference to

---

[2] Relying on Acree's deposition testimony, Smith characterizes her transport to the Sheriff's Office as novel departure from jail-transport policy. *See* Response at 25. But Hughes insists that he *had* transported detainees to sheriff's offices or police stations in the past—at least once or twice. Reply (DN 62) at 3 (citing Hughes Dep. at 31:6–7). Giving all benefits of the doubt to the non-movant, this opinion assumes this disputed factual question would be resolved in favor of Smith.

[3] Sixth Circuit precedent recognizes this failure-to-intervene theory of Fourth Amendment liability. But recent cases have begun to question its consistency with the text of Section 1983, which "generally prohibits a plaintiff from holding one officer liable for another's actions." *Chaney-Snell*, 98 F.4th at 721 (citation omitted). "Whatever the claim's source, [the Sixth Circuit] has long followed a two-part test to hold officers liable for failing to stop excessive force." *Id.* at 722.

the risk posed by Acree." Response at 20. So for Hughes to have had opportunity and means to prevent harm from occurring, he must have had reason to know Acree would apply excessive force as of the moment he dropped Smith off at the Sheriff's Office.

Taking the facts in the light most favorable to Smith, Hughes could have known that Acree was the crime victim (from paperwork handed to Hughes at the police station), that it was peculiar to take a suspect to the crime victim's office (and to use a side door without cameras to do so), and that Acree had faced some allegations that he'd used excessive force in the past. Response at 18–19. Also undisputed, however, is that when Hughes arrived at the police station, he witnessed no commotion; saw Acree, Smith, and two police officers sitting at a table completing what looked like routine paperwork; and detected nothing out of the ordinary about Acree's or Smith's demeanor. Hughes Deposition at 26–31.[4]

On the merits, therefore, summary judgment may not be appropriate given disputed factual questions regarding whether Hughes "observed or had reason to know that excessive force would be … used" and whether he "had both the opportunity and the means to prevent the harm from occurring." *Burley*, 729 F.3d at 620. But Hughes has raised the defense of qualified immunity, so the question becomes whether those facts, viewed in the light most favorable to Hughes, would have given a reasonable officer "reason to know" that excessive force "would be used"? *Id.* Ordinarily, a plaintiff "must point to pre-existing Supreme Court or Sixth Circuit precedent that would have put a reasonable officer on notice that [his] specific conduct was unlawful." *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024).

Smith contends that any reasonable officer "would have recognized that diverting a detainee into the custody of her alleged victim for an unsupervised encounter" would violate the Fourth Amendment. Response at 24. In support, she cites *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997). There, officers threatened to arrest a woman for public intoxication unless she left the scene with a man they knew had already assaulted her earlier that evening. *See id.* at 868. In reversing the dismissal of claims against the officers, the Sixth Circuit pointed to "the clear and simple rule that state actors owe a duty of care to those individuals of whom they deprive their liberty." Given this obligation, the panel held, "a reasonable jury could conclude that the officers had deprived [the plaintiff] of her liberty by placing her in the truck or by threatening her with an arrest that would have been unwarranted under Kentucky law." *Id.*

---

[4] Smith concedes that once Hughes handed her off to Sheriff Acree at the side door, Hughes had no opportunity to stop whatever excessive force Acree might have applied. Response at 20. Her claim is limited to Hughes's decision to stop at the Sheriff's Office and hand her over to Acree.

5

The idiosyncratic fact pattern in *Stemler* would not—even indulging assumptions about officer awareness of legal precedent, *see Robinson v. Bibb*, 840 F.2d 349, 350 (6th Cir. 1988)—have put Hughes on notice that Smith was at risk of unconstitutionally excessive force unless he intervened.  That is, the law hadn't "clearly established" a constitutional prohibition against facilitating an officer's questioning of an arrestee at a sheriff's office between booking and overnight detention.  At least three important factual differences distinguish this case from *Stemler*.  First, as Smith concedes, her arrest here was lawful.  *Compare* Response at 14, *with Stemler*, 126 F.3d at 868 ("threatening her with an arrest that would have been unwarranted under Kentucky law").  Second, Hughes transported Smith, consistent with his lawful authority as jailer, to a law-enforcement office—not to a private assailant.  *Compare* Response at 15, *with Stemler*, 126 F.3d at 868–89 (detainee "was in the defendant officers' custody at the time she was forced into [the assailant's] truck").  Third, and most importantly, when Hughes brought Smith to Acree's office, Acree had not (even allegedly) assaulted or otherwise posed a threat to her, much less in a manner Hughes could've been expected to perceive.  *Contra id.* at 861 ("[I]t was immediately apparent that [the assailant] was very drunk," yet officers told plaintiff "she would be arrested for public intoxication 'if she didn't leave with the male.'").

So *Stemler* cannot carry Smith's burden here.  And she has cited no other precedent—nor has the Court found any—that would have given Hughes reason to foresee that the Sheriff might threaten Smith and knock her to the ground.  In general, the cases involving sufficient knowledge of risk involved express warnings that excessive force could be applied.  *Compare Kent v. Oakland County*, 810 F.3d 384, 397 (6th Cir. 2016) (officer who "was in the bedroom for the majority of the incident, communicated with Lopez as the events unfolded, and was facing Kent when she heard Lopez warn Kent that he would use the taser" could have had sufficient knowledge), *with Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) ("No evidence indicates that Officers Scott and Daly communicated with one another prior to or between the blows.").  To require an officer to infer a risk of excessive force based at least in significant part on background knowledge about past excessive-force complaints would extend far beyond what existing precedent has clearly established.  So Hughes (at a minimum) is entitled to qualified immunity.

3. *False Imprisonment.*  Smith next argues that Hughes falsely imprisoned her when he diverted his trip to the Christian County Detention Center and brought her instead to the Trigg County Sheriff's Office.  Second Amended Complaint ¶¶ 84–86.[5]  Under Kentucky law, "[f]alse imprisonment is the intentional confinement or instigation of confinement of a plaintiff of which confinement the plaintiff is aware at

---

[5] Smith's second amended complaint asserts this claim against Hughes only.

the time." *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007). "A law enforcement officer is liable for false imprisonment unless he or she enjoys a privilege or immunity to detain an individual." *Id.* That "privilege" applies when detention lawfully occurred "pursuant to legal process" (such as a valid warrant). *Id.*

As noted above, Smith doesn't challenge the lawfulness of her arrest. Response at 29. Yet she contends that this initially lawful detention became unlawful false imprisonment when Hughes "intentionally directed Smith into a high-risk situation … beyond the ordinary bounds of lawful custody." *Id.* at 29–30. But this theory—that lawful detention can become unlawful based on the conditions of confinement—finds no support in the Kentucky case law, which is clear that if an officer has a lawful basis for detention, the tort of false imprisonment cannot lie. *See Dunn*, 226 S.W.3d at 71. Any challenge to force or restraints imposed on a detainee must sound instead in battery, excessive force, or the like.

Kentucky law would entitle Hughes to immunity regardless. Municipal actors are immune under state law from tort liability when exercising discretionary functions unless they act in "bad faith"—by violating a clearly established right or by acting "with the malicious intention to cause a deprivation of constitutional rights or other injury." *See Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001) (quotation omitted); *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012). Supervision of inmates is a discretionary function under Kentucky law. *See Rowan County v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006). And as discussed above, no record evidence suggests that Hughes violated the federal constitution—let alone maliciously or in bad faith.

## C. Municipal Liability

Smith also sues the Trigg County Fiscal Court for its purported failure to supervise Acree.[6]

"[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat

---

[6] On top of this, Smith brings claims against Acree in his *official* capacity. And at least some authority suggests that amounts to a claim against the County itself based on the sheriff's policymaking role. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Mills v. Owsley County*, 483 F. Supp. 3d 435, 474 (E.D. Ky. 2020) (Kentucky sheriff "was the County, for liability purposes"); *Wheeler v. Ward*, No. 3:19-cv-59, 2020 WL 1442904, at *3 (W.D. Ky. Mar. 24, 2020) (treating sheriff as policymaker at least in some contexts). The parties' briefing, however, addresses only Smith's *Monell* claim against the Trigg County Fiscal Court, which turns on the Fiscal Court's purported role as Acree's supervisor. This ruling addresses only the *Monell* claim (Count 7 of the Second Amended Complaint). As to the official-capacity claim against Acree, his counsel and Smith's (and the Fiscal Court's, as appropriate) should address in subsequent briefing filed the status of this separate municipal-liability claim.

superior theory." *Monell*, 436 U.S. at 691. Instead, a plaintiff must establish that "execution of a government's policy or custom … inflicts the injury." *Id.* at 694.

To that end, Smith alleges that the Trigg County Fiscal Court failed to properly train or supervise Acree. First, it knew of his violent tendencies, yet failed to discipline him. Second, it continued to permit detainees to be placed under his supervision. Third, it ratified his illegal behavior by failing to seek his removal after this incident. *See* Second Amended Complaint ¶¶ 88–97; Response to MSJ at 32, 35–38.

For any alleged inaction by the Fiscal Court to give rise to liability, that body must have been deliberately indifferent "to the fact that its inadequate training or supervision would lead its agents to violate constitutional rights." *Gambrel v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022). To determine whether such indifference exists on the part of a municipality, Sixth Circuit precedent requires: "(1) the existence of a clear and persistent pattern of unconstitutional conduct; (2) notice or constructive notice on the part of the municipality; (3) the municipality's tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction." *Franklin v. Franklin County*, 115 F.4th 461, 472 (6th Cir. 2024) (quotation omitted). Separately, a plaintiff must also show "the [municipality's] custom was the moving force or direct causal link in the constitutional deprivation." *Id.* (quotation marks omitted); *see also Gambrel*, 25 F.4th at 408 ("[A] municipality's improper training or supervision must have actually caused the plaintiff's injury," which requires establishing both but-for and proximate causation) (quotation marks omitted).

Here, the undisputed record would not permit a reasonable jury to find deliberate indifference, let alone causation. For one thing, Smith's claim is based not on a pattern, but on a single purported constitutional violation—the rarest species of successful *Monell* claims. *See Gambrel*, 25 F.4th at 410. To succeed on this theory, she must show that it is so obvious that a failure to train or supervise would lead to a constitutional violation that a municipality's inaction would amount to intentional deprivation of constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 63 (2011). That she has not done. The Sixth Circuit has already held that it is not "obvious" that a county would need to instruct a law-enforcement officer to refrain from "gratuitous violence" of the sort that Smith has alleged here. *Gambrel*, 25 F.4th at 410. Nor has Smith demonstrated that the County was even on notice of past constitutional violations that it could have tacitly approved.[7] And absent such notice,

---

[7] Smith's summary-judgment response mentions (seemingly for the first time) three previous traffic stops in which Acree allegedly used excessive force. Response to MSJ at 11–12. The filing says nothing about what if any notice the County may have had regarding these incidents, or what (if anything) it did or didn't do as a result. And Smith's lawyer

it is hard to see how it could have been obvious to the County that it should have trained Jailer Hughes not to work with a partner law-enforcement officer while performing his official duties. Indeed, Smith's third argument—which rests on how Fiscal Court officials responded *after* this incident, *see e.g.*, Response to MSJ at 35–36 (suggesting that the county's Judge-Executive should have gone to the governor to seek Sheriff Acree's dismissal)—underscore her failure to identify anything they should have done *beforehand* that might've prevented it. So Smith's *Monell* claim fails to establish either deliberate indifference or causation.

## D. Intentional Infliction of Emotional Distress

Finally, Smith's complaint asserted that Hughes and Acree had committed the common-law tort of intentional infliction of emotional distress. Second Amended Complaint ¶¶ 79–82. But at the hearing, Smith's attorney conceded that the claim could be dismissed based on its overlap with her assault and battery claims, given IIED's status as a "gap filler tort." *See Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012) (quotation marks omitted); *see also Banks*, 39 S.W.3d at 481 (dismissing claim rooted in emotional distress when alleged false imprisonment was not "intended only to cause extreme emotional distress"). So the Court grants summary judgment on this claim, without opposition, for both individual defendants.

### ORDER

The Court grants Hughes's and the Fiscal Court's motion for summary judgment (DN 50) and grants in part and denies in part Acree's partial summary-judgment motion (DN 55). The Court orders Smith and Acree to confer in good faith and file joint or separate status reports within 45 days addressing the appropriate next steps in this litigation, including the status of the official-capacity claim against Acree, as discussed above in n.6.

---

clarified during the hearing that this claim rests solely on the single January 11 incident. As a supplemental filing notes, moreover, another judge on this court recently ruled that at least one of those incidents did not violate the Constitution. *See* Supplemental Reply (DN 65) at 1–2 (citing *Kennedy v. Acree*, No. 5:21-cv-134, 2025 WL 3527529 (W.D. Ky. Dec. 9, 2025) (granting Acree summary judgment on excessive-force claim)). In any event, even assuming that Acree twice engaged in excessive force during traffic stops, conduct during traffic stops— "fraught with danger to police officers," *see Michigan v. Long*, 463 U.S. 1032, 1047 (1983)— does not obviously correspond to post-booking interrogation inside a sheriff's office.